# U.S. District Court
## Northern District of Georgia (Rome)
## CIVIL DOCKET FOR CASE #: 4:14−cv−00139−HLM
### *Internal Use Only*

| | |
|---|---|
| GeorgiaCarry.Org, Inc. et al v. The U.S. Army Corps of Engineers et al | Date Filed: 06/12/2014 |
| | Jury Demand: None |
| Assigned to: Judge Harold L. Murphy | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**GeorgiaCarry.Org, Inc.**　　　represented by　**John R. Monroe**
9640 Coleman Road
Roswell, GA 30075
678−362−7650
Email: jrm@johnmonroelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David James**　　　represented by　**John R. Monroe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The U.S. Army Corps of Engineers**　　　represented by　**Daniel M. Riess**
U.S. Department of Justice, Civil Division
20 Massachusetts Ave. NW
Washington, DC 20530
(202)353−3098
Email: Daniel.Riess@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Lori M. Beranek**
Office of United States Attorney
Northern District of Georgia
75 Spring Street, S.W.
600 United States Courthouse
Atlanta, GA 30303
404−581−6050
Email: lori.beranek@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jon J. Chytka**
*in his official Capacity as Commander, Mobile District of the US Army Corps of Engineers*

represented by **Daniel M. Riess**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 06/12/2014 | 1 | | COMPLAINT ( Filing fee $ 400 receipt number 113E−5236217.), filed by GeorgiaCarry.Org, Inc., David James. (Attachments: # 1 Civil Cover Sheet)(dob) Please visit our website at http://www.gand.uscourts.gov/forms to obtain Pretrial Instructions which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 06/13/2014) |
| 06/13/2014 | 2 | | Electronic Summons Issued as to The U.S. Army Corps of Engineers. (dob) (Entered: 06/13/2014) |
| 06/13/2014 | 3 | | Electronic Summons Issued as to Jon J. Chytka. (dob) (Entered: 06/13/2014) |
| 06/13/2014 | 4 | | ORDER, to the extent that Plaintiffs seek atemporary restraining order, a preliminary injunction, orother emergency injunctive relief, directing Plaintiffs to file a separate motion requestingsuch relief, along with a supporting brief. Signed by Judge Harold L. Murphy on 6/13/2014. (dob) (Entered: 06/13/2014) |
| 06/13/2014 | 5 | 4 | Emergency MOTION for Preliminary Injunction with Brief In Support by GeorgiaCarry.Org, Inc., David James. (Attachments: # 1 Brief, # 2 Exhibit Memorandum and Opinion from District Court of Idaho)(Monroe, John) (Entered: 06/13/2014) |
| 06/13/2014 | 6 | | Return of Service Executed by GeorgiaCarry.Org, Inc., David James. The U.S. Army Corps of Engineers served on 6/13/2014, answer due 8/12/2014. (Monroe, John) (Entered: 06/13/2014) |
| 06/13/2014 | 7 | | Return of Service Executed by GeorgiaCarry.Org, Inc., David James. Jon J. Chytka served on 6/13/2014, answer due 8/12/2014. (Monroe, John) (Entered: 06/13/2014) |
| 07/02/2014 | | | Submission of 5 Emergency MOTION for Preliminary Injunction, to District Judge Harold L. Murphy. (bjh) (Entered: 07/02/2014) |
| 07/02/2014 | 8 | | Unopposed MOTION for Extension of Time to file opposition to Plaintiff's motion re: 5 Emergency MOTION for Preliminary Injunction with Brief In Support by The U.S. Army Corps of Engineers, Jon J. Chytkka. (Attachments: # 1 Brief Memorandum in Support of Motion for Extension of Time, # 2 Text of Proposed Order)(Beranek, Lori) Modified on 8/14/2014 to edit filers (bjh). (Entered: 07/02/2014) |
| 07/02/2014 | 9 | | ORDER Granting Defendants' 8 Unopposed Motion for Extension of Time to file their Response, through and including July 14, 2014, to Plaintiffs' 5 Motion for Preliminary Injunction. Signed by Judge Harold L. Murphy on 7/2/14. (bjh) (Entered: 07/02/2014) |
| 07/14/2014 | 10 | | NOTICE of Appearance by Daniel M. Riess on behalf of Jon J. Chytka, The U.S. Army Corps of Engineers (Riess, Daniel) (Entered: 07/14/2014) |
| 07/14/2014 | 11 | 32 | RESPONSE in Opposition re 5 Emergency MOTION for Preliminary |

| | | | |
|---|---|---|---|
| | | | Injunction filed by Jon J. Chytka, The U.S. Army Corps of Engineers. (Attachments: # 1 Exhibit 1)(Riess, Daniel) (Entered: 07/14/2014) |
| 07/15/2014 | 12 | | CERTIFICATE OF SERVICE re 11 Response in Opposition to Motion by Jon J. Chytka, The U.S. Army Corps of Engineers.(Riess, Daniel) (Entered: 07/15/2014) |
| 07/15/2014 | 13 | | Unopposed MOTION for Extension of Time File Reply in Support of Motion for Preliminary Injunction re: 5 Emergency MOTION for Preliminary Injunction , 11 Response in Opposition to Motion with Brief In Support by GeorgiaCarry.Org, Inc., David James. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(Monroe, John) (Entered: 07/15/2014) |
| 07/15/2014 | 14 | | ORDER Granting Plaintiffs' 13 Motion for Extension of Time through and including August 14, 2014 to file a Reply in support of their 5 Motion for a Preliminary Injunction. Signed by Judge Harold L. Murphy on 7/15/14. (bjh) (Entered: 07/15/2014) |
| 08/14/2014 | 15 | | REPLY to Response to Motion re 5 Emergency MOTION for Preliminary Injunction filed by GeorgiaCarry.Org, Inc., David James. (Monroe, John) (Entered: 08/14/2014) |
| 08/14/2014 | 16 | | MOTION for Clerks Entry of Default with Brief In Support by GeorgiaCarry.Org, Inc., David James. (Attachments: # 1 Brief)(Monroe, John) (Entered: 08/14/2014) |
| 08/14/2014 | | | Submission of 5 Emergency MOTION for Preliminary Injunction, to District Judge Harold L. Murphy. (bjh) (Entered: 08/14/2014) |
| 08/14/2014 | | | Submission of 16 MOTION for Clerks Entry of Default, to District Judge Harold L. Murphy. (bjh) (Entered: 08/14/2014) |
| 08/14/2014 | 17 | | MOTION for Extension of Time Respond to Complaint with Brief In Support by Jon J. Chytka, The U.S. Army Corps of Engineers. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(Riess, Daniel) Modified on 8/15/2014 (dob). (Entered: 08/14/2014) |
| 08/15/2014 | 18 | | ORDER denying 16 Motion for Clerks Entry of Default; granting 17 Motion for Extension of Time to Answer re 1 Complaint,, Jon J. Chytka Answer due 8/22/2014; The U.S. Army Corps of Engineers Answer due 8/22/2014. Signed by Judge Harold L. Murphy on 8/15/2014. (dob) (Entered: 08/15/2014) |
| 08/18/2014 | 19 | 68 | ORDER Denying Plaintiffs' 5 Motion for Preliminary Injunction. Signed by Judge Harold L. Murphy on 8/18/14. (bjh) (Entered: 08/18/2014) |
| 08/20/2014 | 20 | 126 | NOTICE OF APPEAL as to 19 Order on Motion for Preliminary Injunction by GeorgiaCarry.Org, Inc., David James. Filing fee $ 505, receipt number 113E−5352727. Transcript Order Form due on 9/3/2014 (Monroe, John) (Entered: 08/20/2014) |
| 08/20/2014 | 21 | 129 | NOTICE Of Filing Interlocutory Appeal Transmission re 20 Notice of Appeal. (bjh) (Entered: 08/20/2014) |
| 08/20/2014 | 22 | | TRANSCRIPT ORDER FORM re 20 Notice of Appeal. (Monroe, John) (Entered: 08/20/2014) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| GEORGIACARRY.ORG, INC.<br>And DAVID JAMES, | ) | |
| | ) | |
| Plaintiffs | ) | CIVIL ACTION FILE NO. |
| | ) | |
| v. | ) | 4:14-CV-139-HLM |
| | ) | |
| | ) | |
| THE U.S. ARMY CORPS OF<br>ENGINEERS, | ) | |
| And | ) | |
| JON J. CHYTKA, in his official | ) | **EMERGENCY MOTION 7.2B** |
| Capacity as Commander, Mobile | ) | |
| District of the US Army Corps of | ) | |
| Engineers, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs move for a preliminary injunction to stay enforcement of 36 C.F.R.

§ 327.13 during the pendency of this case.  As grounds for this Motion, Plaintiffs

rely on the record and the accompanying Memorandum of Law.

JOHN R. MONROE,

____/s/ John R. Monroe_____

–1–

John R. Monroe
Attorney at Law
9640 Coleman Road
Roswell, GA 30075
Telephone: (678) 362-7650
Facsimile: (770) 552-9318
jrm@johnmonroelaw.com
Georgia Bar No. 516193

ATTORNEY FOR PLAINTIFFS

−2−

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 13, 2014, I served a copy of the foregoing via fax and U.S. Mail upon:

Sally Yates
U.S. Attorney for the Northern District of Georgia
75 Spring Street, NW, Suite 600
Atlanta, GA  30303
Fax 404-581-6181

_____/s/ John R. Monroe_
John R. Monroe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| GEORGIACARRY.ORG, INC. | ) | |
| And DAVID JAMES, | ) | |
| | ) | |
| Plaintiffs | ) | CIVIL ACTION FILE NO. |
| | ) | |
| v. | ) | 4:14-CV-139-HLM |
| | ) | |
| | ) | |
| THE U.S. ARMY CORPS OF | ) | |
| ENGINEERS, | ) | |
| And | ) | |
| JON J. CHYTKA, in his official | ) | **EMERGENCY MOTION 7.2B** |
| Capacity as Commander, Mobile | ) | |
| District of the US Army Corps of | ) | |
| Engineers, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**A PRELIMINARY INJUNCTION**

**Introduction**

Plaintiffs commenced this action to enjoin Defendants' enforcement of 36

C.F.R. § 327.13.  Because the operation of that regulation violates Plaintiffs' rights

–1–

to keep and bear arms, and the violation is ongoing, Plaintiffs file this emergency motion for a preliminary injunction during the pendency of this case.

**Factual Background**

Plaintiff James is a natural person who regularly uses the U.S. Army Corps of Engineers' facilities at Lake Allatoona, particularly during the summer months. Doc. 1, ¶¶ 5-7, 14-17. James is a member of Plaintiff GeorgiaCarry.Org, Inc. ("GCO"), a non-profit Georgia corporation whose mission is to foster the rights of its members to keep and bear arms. *Id.,* ¶ 7. James asked for, and was denied, permission from Defendant Chytka to carry a loaded firearm for self-protection while using Corps facilities, including while James camped at Allatoona. *Id.,* ¶¶ 30-32. James therefore is subject to the prohibition of 36 C.F.R. § 327.13.

**Argument**

36 C.F.R. § 327.13 provides:

(a) The possession of loaded firearms, ammunition, loaded projectile firing devices, bows and arrows, crossbows, or other weapons is prohibited unless:
(1) In the possession of a Federal, state or local law enforcement officer;
(2) Being used for hunting or fishing as permitted under § 327.8, with devices being unloaded when transported to, from or between hunting and fishing sites;
(3) Being used at authorized shooting ranges; or

–2–

(4) Written permission has been received from the District Commander.
(b) Possession of explosives or explosive devices of any kind, including fireworks or other pyrotechnics, is prohibited unless written permission has been received from the District Commander.

A violation of § 327.13 carries a penalty of a $5,000 fine or 6 months' imprisonment or both.  36 C.F.R. § 327.25(a).

Plaintiff James is a frequent user of the camping and boating facilities at Lake Allatoona, and he desires to keep and carry a firearm in case of confrontation while recreating at Lake Allatoona.  James does not claim to qualify for any of the exceptions to § 327.13, so on May 21, 2014, he requested the written permission described in § 327.13(a)(4).  On June 9, 2014, Defendant Chytka, the District Commander for the Corps' Mobile District (which includes Lake Allatoona) denied James' request.

## I.  The Corps is Estopped From Re-Litigating This Case

As an initial matter, Plaintiffs note that the very issues brought in this case, and indeed the very issues brought in this Motion, already have been litigated unsuccessfully by the Corps.   In *Morris v. U.S. Army Corps of Engineers,* No. 3:13-CV-336-BLW, "Memorandum Decision and Order" (D.Id. January 10, 2014)

−3−

("Idaho Order")1, the plaintiffs brought an essentially identical case against the Corps.  In granting a preliminary injunction to stay enforcement of § 327.13 during the pendency of the case the Court said, "This ban [contained in § 327.13] poses a substantial burden on a core Second Amendment right and is therefore subject to strict scrutiny."  Idaho Order, p. 5.  The Court "[Granted] the injunction requested by plaintiffs enjoining the Corps from enforcing 36 C.F.R. § 327.13 as to law-abiding individuals possessing functional firearms on Corps-administered public lands for the purpose of self-defense."  *Id.,* p. 10.

As a result of *Morris,* the Corps should be collaterally estopped from re-litigating the same issues here.  *See, e.g., Parklane Hosiery Company, Inc. v. Shore,* 439 U.S. 322 (1979).  In *Parklane,* the Court approved the use of "offensive" collateral estoppel when the plaintiff seeking to use it did not have an opportunity to participate in the earlier case.  Obviously, neither James nor GCO were involved in similar litigation in Idaho, nor do they assert that they would have had standing to do so.

---

1 For the Court's Convenience, a copy of the Idaho Order is being filed as an

## II.  Plaintiffs Are Entitled to a Preliminary Injunction

A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998).  Plaintiffs shall address each factor in turn.

### A.  Likelihood of Success on the Merits.

This factor perhaps merits the bulk of the discussion in this case, and the remaining factors fall out easily in Plaintiffs' favor.  Plaintiffs will subdivide it into a claim for carrying a handgun while camping and a claim for carrying a handgun while engaging in non-camping activities on Corps property.

Plaintiffs claim that the Ban (contained in 36 C.F.R. § 327.13) violates their Second Amendment rights.  The Second Amendment states, "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."  The Second Amendment went largely

---

electronic attachment to this Motion.

−5−

undiscussed for over 200 years.  The 21st Century, however, has seen a spate of

Second Amendment litigation.

The discussion can begin in this case with *District of Columbia v. Heller,* 554

U.S. 570 (2008), in which the Supreme Court announced for the first time that the

Second Amendment guarantees a fundamental, individual right to keep and carry

arms "in case of confrontation.  The 11th Circuit recognized the Supreme Court's

decision that "the need for defense of self, family, and property is most acute in the

home and … the special role of handguns as the most preferred firearm in the

nation to keep and use for protection of one's home and family…."

*GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d 1244, 1259 (11th Cir. 2012).

In both *Heller* and then two years later in *McDonald v. City of Chicago,* 130

S.Ct. 3020 (2010), the Supreme Court struck down total bans on keeping functional

firearms in one's home.  If any one lesson can be learned from *Heller* and

*McDonald,* it is that bans on guns in one's home are unconstitutional.

The Court in *Morris* applied a 9th Circuit holding that a tent was much like a

home (*U.S. v. Gooch,* 6 F.3d 673 (9th Cir. 1993)).  As such, the *Morris* Court ruled,

the Corps is prohibited, by *Heller* and *McDonald,* from banning possessing a gun in

a tent, even when that tent is pitched (legally) on Corps property.

*Heller, McDonald,* and *Morris* should end the inquiry.  The Corps is absolutely prohibited from enforcing § 327.13 against law-abiding campers. Plaintiffs will therefore transition to a discussion of non-campers on Corps property (but the Court should keep in mind that the non-camper discussion also would apply to campers).

The Supreme Court declined to articulate the contours of the Second Amendment right, nor of the standard of review for Second Amendment cases, leaving such matters for another day (or for the Circuit Courts of Appeals). The 11th Circuit has not had occasion to announce a standard of review for Second Amendment cases, so we must look to other circuits.  Perhaps the most thorough discussion of this topic comes from the 7th Circuit, in *Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) and *Moore v. Madigan,* 702 F.3d 933 (7th Cir. 2012).

In *Ezell,* the Court struck down a ban on gun ranges in the City of Chicago, and in *Moore,* the Court ruled unconstitutional Illinois' then-ban on carrying guns in public.  Both rulings were based on an analysis of the Second Amendment.

*Ezell* developed a rather thorough process for evaluating Second Amendment challenges to regulatory provisions:

> [I]f the government can establish that a challenged firearms law
> regulates activity falling outside the scope of the Second Amendment
> right as it was understood at the relevant historical moment – 1791 or
> 1868 – then the analysis can stop there; the regulated activity is
> categorically unprotected, and the law is not subject to further Second
> Amendment review.
> If the government cannot establish this – if the historical evidence is
> inconclusive or suggest that the regulated activity is *not* categorically
> unprotected – then there must be a second inquiry into the strength of
> the government's justification for restricting or regulating the exercise
> of Second Amendment rights.

651 F.3d at 702-703.  *Ezell* based this approach on *United States v. Marzzarella,*

614 F.3d 85 (3d Cir. 2010) and *United States v. Chester,* 628 F.3d 673 (4th Cir.

2010).

Thus, the burden is on the Corps to establish that the right to carry a firearm

on Corps property is ***categorically*** outside the Second Amendment.  This burden

the government cannot bear.

In *Moore,* the 7th Circuit, in an opinion written by Judge Posner, rejected the

Illinois carry ban because it "flat[ly] ban[ned] … carrying ready-to-use guns outside

the home" with no self-defense exception.  702 F.3d at 940-41.  The *Morris* Court

found the *Moore* decision persuasive, because the Corps' Ban "contains a flat ban

on carrying a firearm for self-defense purposes."  Idaho Opinion, p. 7.  The *Morris*

Court further said the Corps Ban probably should be subject to strict scrutiny, but

–8–

that the Ban could not even pass muster under intermediate scrutiny.  *Id.*  The Court went on to say that the Ban, "drafter long before *Heller,* … violates the Supreme Court's description of Second Amendment rights in that case.  This regulation needs to be brought up to date."  *Id.*

In summary, Plaintiffs are highly likely to succeed on the merits, both for their claim associated with camping on Corps property and associated with other recreational activities on Corps property.

### B.  Irreparable Injury

As promised, the remaining factors for issuing a preliminary injunction fall out rather easily in Plaintiffs' favor.  "Generally, an alleged deprivation of a constitutional right is sufficient to constitute an irreparable injury."  *Cate v. Oldham,* 707 F.2d 1176, 1188 (11th Cir. 1983).  Plaintiffs have not only alleged a deprivation of a constitutional right, but they have shown that they are likely to succeed on the merits in their alleged deprivation.

Aside from the *per se* irreparable injury, however, Plaintiffs also show that they cannot be financially compensated for their harm, and they are suffering the harm now, and on a continual basis, at the height of the outdoor recreational season in Georgia.

−9−

### C.  Balance of Harms

Again, this factor easily resolves in favor of Plaintiffs.  The harm to them is deprivation of a fundamental constitutional right.  The harm to the Corps if the injunction issues is nonexistent.  In fact, arguably the Corps would benefit by no longer having to spend resources enforcing the illegal Ban.  Moreover, the Corps already has been enjoined by the District Court of Idaho from enforcing the Ban.  It is difficult to imagine any incremental harm to the Corps by extending the injunction to the Northern District of Georgia.

### D.  Public Interest

There can be little argument that the public has an interest in seeing a deprivation of fundamental constitutional rights being imposed.  The public policy in Georgia has shifted more and more in the past six years toward liberalized carrying of firearms in public.  In 2008, the State decriminalized carrying guns in restaurants that serve alcohol and in *state parks,* and imposed sanctions on license issuers who fail to issue a timely license to carry pistols.  2008 Act 802 (House Bill 89).  In 2010, the State repealed the 140-year old "public gathering law," a Jim Crow law that banned carrying guns in many public places, and replaced it instead with a list of 8 locations where a gun may not be carried in public.  2010 Act 643

−10−

(Senate Bill 308); *GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d at 1248.  Just this year, the State further decriminalized carrying guns in bars and schools, and lessened the penalty for carrying guns in churches.  2014 Act 575 (House Bill 826); 2014 Act 604 (House Bill 60).  Finally, state law preempts local bans on carrying guns in parks.  *GeorgiaCarry.Org, Inc. v. Coweta County,* 288 Ga.App. 748 (2007); *GeorgiaCarry.Org, Inc. v. City of Roswell,* 298 Ga.App. 686 (2009).

Given that the public policy in Georgia strongly favors carrying firearms in state and local parks for people with licenses to carry weapons, it is all but impossible to assert that the public would be harmed by allowing carrying firearms in federally-controlled recreational facilities in Georgia.  This is especially true now that Congress preempted bans on national parks in 2010 via the so-called "Coburn Amendment."  The Forest Service already did not ban guns in national forests, so now the vast majority of non-Corps federally-controlled recreation areas do not ban guns for self defense.

## Conclusion

Plaintiffs have shown that they are likely to succeed on the merits, that they are being irreparably harmed, that the balance of harms favors granting a preliminary injunction, and that a preliminary injunction would be in the public

interest.  They therefore have satisfied all four factors for obtaining a preliminary

injunction and ask the Court to do so.

JOHN R. MONROE,


___/s/ John R. Monroe_____
John R. Monroe
Attorney at Law
9640 Coleman Road
Roswell, GA 30075
Telephone: (678) 362-7650
Facsimile: (770) 552-9318
jrm@johnmonroelaw.com
Georgia Bar No. 516193
ATTORNEY FOR PLAINTIFFS

−12−

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 13, 2014, I served a copy of the foregoing via fax and U.S. Mail upon:

Sally Yates
U.S. Attorney for the Northern District of Georgia
75 Spring Street, NW, Suite 600
Atlanta, GA  30303
Fax 404-581-6181

_____/s/ John R. Monroe_
John R. Monroe

−13−

## **RULE 7.1D CERTIFICATION**

I certify that this brief was prepared in accordance with the page, font, size, margin and other requirements of Rules 7.1D and 5.1C.


_____/s/ John R. Monroe_____
John R. Monroe

−14−

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ELIZABETH E. MORRIS; and ALAN C. BAKER, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ARMY CORPS OF ENGINEERS, *et al*., <br><br> Defendants. | Case No. 3:13-CV-00336-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

The Court has before it a motion for preliminary injunction filed by plaintiffs and a motion to dismiss filed by the defendants. The Court heard oral argument on January 7, 2014, and took the motions under advisement. After further review, the Court has decided, for reasons set forth below, to deny the motion to dismiss and grant the motion for preliminary injunction.

**LITIGATION BACKGROUND**

Plaintiffs challenge regulations promulgated by the Army Corp of Engineers. The regulations govern the possession of firearms on property administered by the Corps. Plaintiffs argue that the regulations violate their Second Amendment right to keep and bear arms.

The regulations govern over 700 dams – holding back more than 100 trillion gallons of water – built by the Corps, and the surrounding recreation areas that serve over

**Memorandum Decision & Order -- 1**

300 million visitors annually.  Adopted in 1973, the regulations were intended to provide

for more effective management of the lake and reservoir projects.  The regulation at issue

here reads as follows:

> (a) The possession of loaded firearms, ammunition, loaded projectile firing
> devices, bows and arrows, crossbows, or other weapons is prohibited
> unless:
>   (1) In the possession of a Federal, state or local law enforcement officer;
>   (2) Being used for hunting or fishing as permitted under § 327.8, with
> devices being unloaded when transported to, from or between hunting and
> fishing sites;
>   (3) Being used at authorized shooting ranges; or
>   (4) Written permission has been received from the District Commander.
> (b) Possession of explosives or explosive devices of any kind, including
> fireworks or other pyrotechnics, is prohibited unless written permission has
> been received from the District Commander.

36 C.F.R. § 327.13.  The plaintiffs' complaint alleges that this regulation violates the

Second Amendment by (1) banning the possession of firearms in a tent, and (2) banning

the carrying of firearms on Corps' recreation sites.  The plaintiffs live in western Idaho,

recreate on Corps-administered public lands where this regulation applies, and would

possess a functional firearm at those recreation sites but for the Corps' active

enforcement of this regulation.[1]

>       The Court will take up first the Corps' motion to dismiss, and specifically the

Corps' argument that the plaintiffs have no Second Amendment rights as a matter of law.

## ANALYSIS

## <u>Corps' Motion to Dismiss</u>

---

[1] These allegations establish that the plaintiffs have standing and that the case is not moot.  The
Court therefore refuses to dismiss the case at this time on standing or mootness grounds.

**Memorandum Decision & Order -- 2**

The Corps argues that its recreation sites are public venues where large numbers of people congregate, making it imperative that firearms be tightly regulated.  The Corps also points out that the sites contain dams and power generation facilities that require heightened protection, especially given homeland security threats.  The Corps distinguishes its sites from those of other agencies like the Forest Service that are required by law to manage for multiple use, including the use by the public for recreation.  In contrast, there is no law requiring the Corps to operate recreation sites, and that gives the Corps more leeway to restrict the public under the Second Amendment, the agency argues.  For these reasons, the Corps seeks to dismiss the case on the ground that its regulation does not violate the Second Amendment as a matter of law.

To evaluate this argument, the Court will employ the two-step analysis set out in *U.S. v. Chovan,* 735 F.3d 1127 (9th Cir. 2013).  The Court must determine first "whether the challenged law burdens conduct protected by the Second Amendment."  *Id.* at 1136.  The second step is to "apply an appropriate level of scrutiny."  *Id.*

The "appropriate level" depends on (1) "how close the law comes to the core of the Second Amendment right," and (2) "the severity of the law's burden on the right."  *Id.* at 1138 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 705 (7th Cir.2011)).  A regulation that threatens a core Second Amendment right is subject to strict scrutiny, while a less severe regulation that does not encroach on a core Second Amendment right is subject to intermediate scrutiny.  *Silvester v Harris,* 2013 WL 6415670 (E.D.Cal. Dec. 9, 2013).

The Court must ask first whether the Corps' regulation burdens conduct protected by the Second Amendment. It does. The Second Amendment protects the right to carry a firearm for self-defense purposes. *Heller*, 554 U.S. at 628 (stating that "the inherent right of self-defense has been central to the Second Amendment right"). The regulation bans carrying a loaded firearm for the purpose of self-defense. It also bans carrying an unloaded firearm along with its ammunition. At most, it would allow a person to carry an unloaded firearm so long as he was not also carrying its ammunition. An unloaded firearm is useless for self-defense purposes without its ammunition. While those who use firearms for hunting are allowed greater latitude, the regulation grants no such exemption to those carrying firearms solely for purposes of self-defense. Consequently, the regulation does impose a burden on plaintiffs' Second Amendment rights.

The second step is to apply the appropriate level of scrutiny. That inquiry turns on how close the regulation cuts to the core of the Second Amendment and how severe the burden is on that right.

No court has identified those core rights comprehensively. But one core right was described by the Supreme Court: The right of a law-abiding individual to possess a handgun in his home for self-defense. *District of Columbia v. Heller*, 554 U.S. 570 (2008). In addressing the need for self-defense in the home, the Supreme Court held that the home is "where the need for defense of self, family, and property is most acute." *Id.* at 628.

The same analysis applies to a tent. While often temporary, a tent is more importantly a place – just like a home – where a person withdraws from public view, and

**Memorandum Decision & Order -- 4**

seeks privacy and security for himself and perhaps also for his family and/or his property. Indeed, a typical home at the time the Second Amendment was passed was cramped and drafty with a dirt floor – more akin to a large tent than a modern home.  Americans in 1791 – the year the Second Amendment was ratified – were probably more apt to see a tent as a home than we are today.  *Heller,* 554 U.S. at 605 (holding that "public understanding" at time of ratification is "critical tool of constitutional interpretation").  Moreover, under Fourth Amendment analysis, "tents are protected  . . . like a more permanent structure," and are deemed to be "more like a house than a car."  *U.S. v. Gooch,* 6 F.3d 673 (9th Cir. 1993).  The privacy concerns of the Fourth Amendment carry over well into the Second Amendment's security concerns.

The regulation at issue would ban firearms and ammunition in a tent on the Corps' sites.  This ban poses a substantial burden on a core Second Amendment right and is therefore subject to strict scrutiny.

The plaintiffs also challenge the ban on their right to carry firearms outside their tents for self-defense purposes.  As the Court discussed above, the regulation prohibits carrying firearms for self-defense purposes despite *Heller's* recognition that "the inherent right of self-defense has been central to the Second Amendment right."  *Heller,* 554 U.S. at 628.  In interpreting the phrase "bear arms" in the Second Amendment, the *Heller* majority held that "[w]hen used with 'arms,' . . . the term ["bear"] has a meaning that refers to carrying for a particular purpose – confrontation."  *Heller,* 554 U.S. at 584. "Heller does not simply reaffirm the traditional right to act in self-defense when threatened.  Rather, it recognizes a right to have and carry guns in case the need for such

**Memorandum Decision & Order -- 5**

an action should arise." Blocher, *The Right Not To Keep or Bear Arms,* 64 Stanford L. Rev. 1, 16 (2012).

The right of self-defense is not, however, unlimited. *Heller* stated that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." *Heller*, 554 U.S. at 626-27. "[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *U.S. v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).

Still, a solid line of cases decided after *Heller* examines a regulation's impact on self-defense even when the conduct governed is a public venue outside the home. For example, *Masciandaro* upheld a regulation that banned loaded firearms in a National Park because the regulation contained an exception that struck a balance between public safety and self-defense. *Id.* at 474 (holding that the regulation "leaves largely intact the right to possess and carry weapons in case of confrontation").

The opposite result was reached in *Moore v. Madigan,* 702 F.3d 933, 936 (7th Cir. 2012) (Posner, J.). The Seventh Circuit examined an Illinois regulation with a reach similar to the regulation at issue here – it banned carrying even unloaded firearms if ammunition was accessible. *Id.* at 934. Judge Posner, writing the majority opinion, described the Illinois law as "the most restrictive gun law of any of the 50 states," and held that it violated the Second Amendment because it "flat[ly] ban[ned] . . . carrying ready-to-use guns outside the home" with no self-defense exception. *Id.* at 940–41.

**Memorandum Decision & Order -- 6**

The ban imposed by the Corps places this case closer to *Moore* than *Masciandaro.* The Corps' regulation contains a flat ban on carrying a firearm for self-defense purposes. By completely ignoring the right of self-defense, the regulation cannot be saved by the line of cases, like *Masciandaro,* that upheld gun restrictions accommodating the right of self-defense. *See also, U.S. v Parker*, 919 F.Supp.2d 1072 (E.D.Cal. Jan 22 2013) (upholding concealed weapon regulation in Yosemite Park that allowed for self-defense); *Nichols v Brown,* 2013 WL 3368922 (C.D.Cal. July 3 2013) (upholding California gun control laws that allowed for self-defense).

While the ban on carrying firearms for self-defense may impose a burden on this core right of the Second Amendment severe enough to call for strict scrutiny, it is unnecessary for the Court to decide that issue because the regulation fails to pass muster even if intermediate scrutiny is applied. The intermediate scrutiny standard requires: (1) that the government's stated objective must be significant, substantial, or important, and (2) that there is a reasonable fit between the challenged regulation and the government's asserted objective. *Chovan,* 735 F.3d at 1138. For there to be a "reasonable fit," the regulation must not be substantially broader than necessary to achieve the government's interest. *Id.*

Here, the regulation is designed to protect both critical infrastructure and the public. If the regulation ended there, it would satisfy the "reasonable fit" test. But it extends to ban firearms entirely from being carried for self-defense. It is simply too broad. Drafted long before *Heller,* it violates the Supreme Court's description of Second Amendment rights in that case. This regulation needs to be brought up to date.

Memorandum Decision & Order -- 7

The Corps argues that the impact of its regulation is felt only on federal land that it administers, and that it is entitled to have the regulation evaluated under a rational basis test.  The Corps cites *Nordyke v King*, 681 F.3d 1041 (9th Cir. 2012) where the Circuit upheld a county law regulating firearms at commercial gun sales on county property.  In making that ruling, the Circuit cited *U.S. v. Kokinda,* 497 U.S. 720, 725 (1990) for the proposition that there is a distinction between governmental exercise of the "power to regulate or license, as law-maker" and governmental actions taken in its role "as proprietor, to manage its internal operations."

But *Nordyke* never discussed the right of self-defense, and cannot be used to justify the use of a rational basis test here.  The cases cited above where self-defense was discussed – *Masciandaro*, *Moore, Parker,* and *Nichols* – all applied more than a rational basis test to evaluate the laws under scrutiny.  The Court finds that line of authority persuasive.

The Corps argues that it should be treated differently than other agencies because unlike them, the Corps is not statutorily required to open its sites to the public.  But the Corps cites no case exempting the Government from constitutional requirements whenever it acts voluntarily. The Court can find no reason to adopt such a rule.

For all these reasons, the Court will deny the Corps' motion to dismiss.

**Plaintiffs' Motion for Preliminary Injunction**

Plaintiffs seek to enjoin the Corps from enforcing its ban on law-abiding citizens possessing functional firearms on Corps-administered public lands for the purpose of self-defense.  The Corps responds that plaintiffs are seeking a mandatory injunction that

**Memorandum Decision & Order -- 8**

is more difficult to obtain than a standard injunction.  "A mandatory injunction orders a responsible party to take action," and therefore "goes well beyond simply maintaining the status quo."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir.2009).  Accordingly, mandatory injunctions are "particularly disfavored." *Id*.

Plaintiffs are not, however, seeking a mandatory injunction – they are not asking the Corps to take affirmative action but are asking instead that a regulatory ban not be enforced.  While this would require the Corps to change its practices, that type of change does not convert the injunction into a mandatory injunction.  In the leading case of *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), the injunction required the Navy to stop using sonar in its training exercises – in other words, it caused the Navy to change its practices – but the Supreme Court evaluated the injunction under the standard test.  This case presents the same type of prohibitory injunction, and the Court will therefore not apply the stricter test applicable to mandatory injunctions.

To be entitled to injunctive relief under that standard test, plaintiffs must show each of the following:  (1) a likelihood of success on the merits; (2) that irreparable harm is likely, not just possible, if the injunction is not granted; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir. 2011).  If requirements (2) and (4) are satisfied, and the balance of hardships "tips sharply in the plaintiffs' favor," the plaintiff need only raise "serious questions going to the merits" to be entitled to injunctive relief.

*Id.* at 1134-35 (holding that this aspect of the Ninth Circuit's sliding scale test survived *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008)).

From the discussion above concerning the motion to dismiss, it is apparent that plaintiffs have shown a very strong likelihood of success on the merits. Moreover, irreparable harm is likely because the plaintiffs have made out a colorable claim that their Second Amendment rights have been threatened. *See Sanders County Republican Cent. Committee v. Bullock,* 698 F.3d 741, 744 (9th Cir. 2012) (holding that colorable claim of constitutional violation satisfies irreparable harm element). This threat tips the balance of equities in favor of plaintiffs because the harms complained of by the Corps could be "addressed by a more closely tailored regulatory measure[]." *Ezell,* 651 F.3d at 710. For the same reasons, an injunction would be in the public interest.

Accordingly, the Court will grant the injunction requested by plaintiffs enjoining the Corps from enforcing 36 C.F.R. § 327.13 as to law-abiding individuals possessing functional firearms on Corps-administered public lands for the purpose of self-defense.[2]

**Conclusion**

This is a preliminary injunction, and hence the Court's decision here is preliminary in nature. The Corps remains entitled to an evidentiary hearing or trial to establish a factual record before the Court reaches any final resolution. To move toward

---

[2] The Court waives the bond requirement under Rule 65(c). *Barahona-Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir. 1999).

**Memorandum Decision & Order -- 10**

that point, counsel are directed to contact the Court's Clerk to set up a status conference

to determine how the case should proceed from here.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to dismiss

(docket no. 30) is DENIED.

IT IS FURTHER ORDERED, that the motion for preliminary injunction (docket

no. 4) is GRANTED.  The Corps is enjoined from enforcing 36 C.F.R. § 327.13 as to

law-abiding individuals possessing functional firearms on Corps-administered public

lands for the purpose of self-defense.  This preliminary injunction shall remain in force

until further notice of the Court.

IT IS FURTHER ORDERED, that counsel shall contact the Court's Clerk

(jamie_gearhart@id.uscourts.gov) to set up a telephone status conference to determine

how this case should proceed.


DATED: January 10, 2014

B. Lynn Winmill
Chief Judge
United States District Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

GEORGIACARRY.ORG, INC., )
and DAVID JAMES, )
 )
  Plaintiffs, )  CIVIL ACTION FILE NO.
 )
  v. )  4:14-CV-139-HLM
 )
U.S. ARMY CORPS OF )
ENGINEERS and JOHN J. )
CHYTKA, in his official capacity )
as Commander, Mobile District, )
U.S. Army Corps of Engineers, )
 )
  Defendants. )

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................1

BACKGROUND .................................................................................................1

ARGUMENT .......................................................................................................3

I.     Plaintiffs Are Not Entitled to the Extraordinary and Drastic
       Remedy of a Preliminary Injunction ...........................................................3

       A.     Plaintiffs Have Failed to Demonstrate a Substantial
              Likelihood of Success on the Merits.....................................................4

              1.     The Corps Regulation Is Constitutional.....................................4

              2.     Plaintiffs Misplace Their Reliance on Case Law That
                     Does Not Materially Advance Their Claims..............................14

       B.     Plaintiffs Have Failed to Demonstrate That They Will
              Suffer Irreparable Injury Absent a Preliminary Injunction................19

              1.     Plaintiff James' Frequent Use of Corps-Managed
                     Facilities Without an Injunction in Place
                     Undercuts Any Claim That Plaintiffs Will Suffer
                     Irreparable Injury if Preliminary Injunctive Relief
                     Is Not Granted ..........................................................................19

              2.     Plaintiffs Otherwise Fail to Demonstrate That They
                     Will Suffer Irreparable Harm Absent Injunctive Relief...........21

       C.     Granting the Requested Preliminary Relief Would Harm
              Defendants and the Public Interest......................................................23

II.    Non-Mutual Offensive Collateral Estoppel May Not Be Asserted
       Against the Federal Government..................................................................24

CONCLUSION ..................................................................................................25

**INTRODUCTION**

Defendants U.S. Army Corps of Engineers ("Corps") and John J. Chytka, Commander of the Corps' Mobile District (collectively, "Defendants") respectfully submit this opposition to Plaintiffs' motion for preliminary injunction.  Plaintiffs' motion asks this Court to enjoin the Corps from enforcing its long-standing restriction on the presence of firearms on Corps-managed recreation areas.  As set forth in more detail below, the Corps regulation at issue ensures the public safety of visitors and Corps personnel in these busy, crowded recreation areas.  Entering the injunction Plaintiffs seek will upset that balance, when there is no evidence of irreparable harm; when Plaintiff James has been using these Corps-managed lands for years with this regulation in place; and where there is no binding legal authority compelling such an injunction.  The balance of preliminary injunctive relief factors favors the government, and Plaintiffs' motion should therefore be denied.

**BACKGROUND**

The Corps receives millions of visitors per year to Corps-managed recreation areas located on water resource development projects administered by

1

the Corps.  The area located near Lake Allatoona, in northwest Georgia, receives over 6 million visitors per year.  Compl. ¶¶ 18, 20.[1]

Federal regulations govern the public use of Corps-managed water resource development projects.  See 36 C.F.R. Pt. 327.  To provide for "more effective recreation-resource management of lake and reservoir projects," the Corps issued regulations in 1973.  38 Fed. Reg. 7,552, 7,552 (March 23, 1973).  As amended, the regulation entitled "Explosives, firearms, other weapons and fireworks" provides:

> (a)  The possession of loaded firearms, ammunition, loaded projectile firing devices, bows and arrows, crossbows, or other weapons is prohibited unless:
>   (1)  In the possession of a Federal, state or local law enforcement officer;
>   (2)  Being used for hunting or fishing as permitted under § 327.8, with devices being unloaded when transported to, from or between hunting and fishing sites;
>   (3)  Being used at authorized shooting ranges; or
>   (4)  Written permission has been received from the District Commander.
>
> (b)  Possession of explosives or explosive devices of any kind, including fireworks or other pyrotechnics, is prohibited unless written permission has been received from the District Commander.

36 C.F.R. § 327.13.

---

[1] Any cited statements from Plaintiffs' complaint are presumed to be correct solely for purposes of this Opposition.

Plaintiff David James, a Georgia resident, "frequently camps and recreates on Corps property and facilities at Lake [Allatoona]," a Corps project and water facility located in Northwest Georgia.  Compl. ¶¶ 17-18.  Plaintiff James is a member of GeorgiaCarry.Org, Inc., a non-profit corporation, which is also a named plaintiff.  Id. ¶ 4.  On June 12, 2014, Plaintiffs filed this case, contending that the application of the Corps firearms regulation to Plaintiff James while visiting the Lake Allatoona project violates the Second Amendment.  See id. ¶ 35.

## ARGUMENT

### I.  Plaintiffs Are Not Entitled to the Extraordinary and Drastic Remedy of a Preliminary Injunction.

A preliminary injunction is an "extraordinary and drastic remedy," Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc), that is "never awarded as of right."  Winter v. Natural Res. Def. Council, 555 U.S. 7, 24 (2008) (citation omitted).  A party seeking preliminary injunctive relief must produce evidence demonstrating: (1) a substantial likelihood of success on the merits of its claims; (2) that the plaintiff will suffer irreparable injury unless an injunction is issued; (3) that the threatened injury to plaintiff outweighs any harm the proposed injunction might cause the non-moving party; and (4) that the requested injunction would not be adverse to the public interest.  Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1273-74 (11th Cir. 2013).  Because a preliminary

3

injunction is such an "extraordinary and drastic remedy," it is "not to be granted unless the movant [has] clearly established the burden of persuasion as to each of the four prerequisites."  Siegel, 234 F.3d at 1176 (citation and internal punctuation omitted).  A plaintiff's failure to show any of the four factors is "fatal."  ACLU of Fla. v. Miami-Dade Cty. Sch. Bd., 557 F.3d 1177, 1198 (11th Cir. 2009).

### A. Plaintiffs Have Failed to Demonstrate a Substantial Likelihood of Success on the Merits.

A moving party's failure to demonstrate a "substantial likelihood of success on the merits" may defeat the party's claim, regardless of the party's ability to establish any of the other elements.  See Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994).  Plaintiffs have failed to demonstrate that they are substantially likely to succeed on the merits of their claim that the firearms restriction at issue here – which governs only property owned and managed by the Corps, rather than a private home owned by Plaintiff James – violates the Second Amendment.

### 1. The Corps Regulation Is Constitutional.

The Eleventh Circuit has explained that in analyzing Second Amendment claims, "[l]ike our sister circuits, we believe a two-step inquiry is appropriate: first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny."

4

GeorgiaCarry.Org v. State of Georgia, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012),

cert. denied, 133 S. Ct. 856 (2013).  Initially, because the Corps regulation is a

"law[] forbidding the carrying of firearms in [a] sensitive place[]," District of

Columbia v. Heller, 554 U.S. 570, 626 (2008), it addresses conduct that falls

outside the scope of the Second Amendment's protection.  See United States v.

Marzzarella, 614 F.3d 85, 91-92 (3d Cir. 2010) (concluding, after extensive

analysis, that the presumptively lawful regulatory measures identified in Heller

concern "exceptions to the right to bear arms" to which "the Second Amendment

affords no protection"), cert. denied, 131 S. Ct. 958 (2011); see Declaration of

Stephen Austin ¶ 9 (attached as Ex. 1) (explaining why the Corps lands at issue

here are sensitive places).

   In any event, even if the Corps regulation did implicate Plaintiff James'

Second Amendment right, the regulation is constitutional.  As a preliminary

matter, even if the Court were to find that the Corps regulation implicates Second

Amendment protections, it need not engage in heightened constitutional scrutiny.

"[N]ot every limitation or incidental burden on the exercise of" a constitutionally-

protected right "is subject to a stringent standard of review."  Bullock v. Carter,

405 U.S. 134, 143 (1972) (citation omitted).  As the Second Circuit has explained,

"heightened scrutiny is triggered only by those restrictions that (like the complete

prohibition struck down in <u>Heller</u>) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)."  <u>United States v. DeCastro</u>, 682 F.3d 160, 166 (2d Cir. 2012), <u>cert.</u> <u>denied</u>, 133 S. Ct. 838 (2013).  Here, as applied to Plaintiff James, the Corps regulation only pertains to his carrying of firearms on designated federal property; in addition, these firearms restrictions apply only to his occasional recreational visits to Corps-managed public land, and thus do not represent a substantial burden.  Because the Corps regulation does not come close to the complete prohibition at issue in <u>Heller</u>, the Court need not employ heightened scrutiny to uphold the regulation.

Even assuming that heightened scrutiny were to apply, however, the Corps regulation passes constitutional muster.  "It is a long-settled principle that governmental actions are subject to a lower level of [constitutional] scrutiny when the governmental function operating is not the power to regulate or license, as lawmaker, but, rather, as proprietor, to manage its internal operations."  <u>United States v. Kokinda</u>, 497 U.S. 720, 725 (1990) (plurality opinion) (citation omitted); <u>see</u> <u>also</u> <u>Nordyke v. King</u>, 681 F.3d 1041, 1044-45 (9th Cir. 2013) (en banc) (upholding county ordinance regulating sale of firearms "only on County property" against Second Amendment challenge, and citing <u>Kokinda</u>); <u>United States v.</u>

6

Dorosan, 350 F. App'x 874, 875 (5th Cir. 2009) (U.S. Postal Service's "restrictions on guns stemmed from its constitutional authority as the property owner" of the land to which the restriction applied), cert. denied, 559 U.S. 983 (2010).[2] Where, as here, the government is "acting in its proprietary capacity," its action is valid "unless it is unreasonable, . . . arbitrary, capricious, or invidious." Kokinda, 497 U.S. at 725-26 (citation and internal punctuation omitted).

The policy of the Secretary of the Army, acting through the Corps, is "to manage the natural, cultural and developed resources of each [Corps-managed] project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources." 36

---

[2] See also United States v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011) (upholding, as constitutional, regulation prohibiting carrying or possession of loaded handguns in motor vehicles in national parks, and noting government's "substantial interest in providing for the safety of individuals who visit and make use of the national parks," explaining: "The government, after all, is invested with 'plenary power' to protect the public from danger on federal lands under the Property Clause. See U.S. Const. art. IV, § 3, cl. 2 (giving Congress the power to 'make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States')."), cert. denied, 132 S. Ct. 756 (2011); Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense, 56 UCLA L. Rev. 1443, 1475 (2009) ("Nevertheless, there is both precedent and reason for allowing the government acting as proprietor extra power to restrict the exercise of many constitutional rights on its property. This suggests that separate government-as-proprietor standards may likewise be proper for the right to keep and bear arms, whether in government buildings, by government employees, in government-owned parks, in government-owned housing, and so on.") (footnote omitted).

7

C.F.R. § 327.1.  The Corps must consider a number of factors when deciding whether the public interest is furthered by opening Corps-managed lands for recreation, and when developing rules for their recreational use.  Austin Decl. ¶ 3. These rules require a delicate balancing of several of these factors, including the safety of visitors and of Corps employees; protection of natural, cultural, and developed resources; and promotion of recreational opportunities.  Id.  As part of this balancing of factors, the Corps has considered how to structure its firearms rules to ensure the safety of visitors to the lands it manages and Corps assets located on those lands.  Id.; see also id. ¶ 9.

Large numbers of visitors frequently congregate in the recreational facilities of Corps-administered lands, including Lake Allatoona.  Austin Decl. ¶ 4.  The Corps has considered potential sources of conflict among visitors and has enacted rules aimed at minimizing any such conflict.  Id.  Some sources of conflict include alcohol consumption, visitors' preference for different types of music played at different sound levels, and the relative loudness of visitors' conversations.  Id. Such problems are often more acute at Corps-managed recreational areas, as contrasted with U.S. National Park Service recreational areas, because of the higher concentration of visitors on Corps lands.  Id.

8

Corps regulations are aimed at ensuring that inevitable conflicts that arise as a result of disagreements about how different visitors make use of Corps recreational areas are resolved as quickly and peacefully as possible.  Austin Decl. ¶ 4.  The Corps has reasonably concluded that the presence of a loaded firearm could far more quickly escalate tensions resulting from such disagreements, and present a significant threat to public safety, involving the potential use of deadly force against a visitor or a Corps Park Ranger.  Id.

This balancing of factors has also included consideration of available law enforcement options.  Austin Decl. ¶ 5.  Corps Park Rangers are neither equipped nor trained to function as law enforcement officers because Congress has not authorized Corps employees to carry firearms, to execute search warrants, or to enforce any federal laws except for issuing citations for violations of regulations governing Corps-managed land.  Id. ¶¶ 5-6.  Corps Park Rangers are thus not authorized to enforce the restriction on firearms in Corps facilities such as Corps-operated power-generation plants.  Id. ¶ 6; see 18 U.S.C. § 930.  The Corps has also reasonably determined that allowing armed visitors on Corps-managed lands could create a chilling effect on the enforcement of Corps regulations, because Congress has not authorized Corps Park Rangers to be armed.  Austin Decl. ¶ 6.

9

The Corps firearms regulation represents a balancing of these factors, and is premised on the Corps' determination that the public interest is furthered by restricting the possession of loaded firearms on lands the Corps manages, unless the firearms are being used in areas specifically designated for hunting or target shooting, or being carried by a law enforcement officer or a visitor who has received permission from the District Commander.  Austin Decl. ¶ 8.  Plaintiffs have not shown – and cannot show – that this regulation is "unreasonable, . . . arbitrary, capricious, or invidious."  Kokinda, 497 U.S. at 726.  Consequently, the Court should uphold the Corps regulation as a permissible regulation of the government's use of its own property.

Finally, even if this Court were to apply a more rigorous level of review, the Corps regulation would still pass constitutional muster.  Courts addressing restrictions on the possession of firearms outside the home, such as the Corps regulation, have almost uniformly declined to apply a standard above intermediate scrutiny.[3]  This includes courts in this Circuit.  See GeorgiaCarry.Org, Inc. v.

---

[3] See Drake v. Filko, 724 F.3d 426, 435-36 (3d Cir. 2013) (applying intermediate scrutiny to law requiring showing of justifiable need to carry handguns in public), cert. denied, 134 S. Ct. 2134 (2014); Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 93-94 (2d Cir. 2012) (applying intermediate scrutiny to law requiring showing of proper cause to carry concealed handgun in public), cert. denied, 133 S. Ct. 1806 (2013); Woollard v. Gallagher, 712 F.3d 865, 874-83 (4th Cir. 2013) (applying intermediate scrutiny to state requirement that permit to carry, wear, or

10

Georgia, 764 F. Supp. 2d 1306, 1317-20 (M.D. Ga. 2011), aff'd on other grounds,

687 F.3d 1244 (11th Cir. 2012); United States v. Nowka, No. 11-474, 2012 WL

2862061, at *6-8 (N.D. Ala. May 10, 2012).

     "Under an intermediate scrutiny standard, a regulation 'may be upheld so

long as it is substantially related to an important governmental objective.'"

GeorgiaCarry.Org, 764 F. Supp. 2d at 1318 (quoting Nat'l Parks Conservation

Ass'n v. Norton, 324 F.3d 1229, 1244 (11th Cir. 2003)).   "The fit between the

government's objective and regulation need not be 'necessarily perfect, but

reasonable'; the government need 'not necessarily employ the least restrictive

means.'"   Id. (quoting Bd. of Trustees of State Univ. v. Fox, 492 U.S. 469, 480

(1989)) (internal punctuation omitted).

     Under intermediate scrutiny analysis, in order to advance its compelling

interests in combating crime and protecting public safety, policymakers may need

to make "predictive judgments" about the risk of dangerous behavior.   Turner

Broad. Sys., Inc. v. FCC, 512 U.S. 622, 665 (1994).   Such judgments are entitled to

"substantial deference" by the courts.   Id.   In addition, "[s]ound policymaking

---

transport a handgun in public must be conditioned on showing of "good and
substantial reason"), cert. denied, 134 S. Ct. 422 (2013); Masciandaro, 638 F.3d at
470-71 (applying intermediate scrutiny to federal regulation prohibiting the
possession of a loaded handgun in a motor vehicle on national park land).

often requires [policymakers] to forecast future events and to anticipate the likely

impact of these events based on deductions and inferences for which complete

empirical support may be unavailable." Id.  Moreover, "[t]he Constitution does not

mandate a specific method by which the government must satisfy its burden under

heightened judicial scrutiny." United States v. Carter, 669 F.3d 411, 418 (4th Cir.

2012).  As the Supreme Court has explained, the "quantum of empirical evidence

needed to satisfy heightened judicial scrutiny of legislative judgments will vary up

or down with the novelty and plausibility of the justification raised." Nixon v.

Shrink Missouri Gov't PAC, 528 U.S. 377, 391 (2000).  The Court has upheld

restrictions on speech, even under a strict scrutiny standard of review, in some

cases relying "solely on history, consensus, and 'simple common sense.'" Florida

Bar v. Went For It, Inc., 515 U.S. 618, 628 (1995) (citations omitted); see also

Milavetz, Gallop & Milavetz v. United States, 130 S. Ct. 1324, 1340 (2010)

(rejecting notion that government must adduce evidence to justify restriction on

speech and noting "[w]hen the possibility of deception is as self-evident as it is in

this case, we need not require the State to conduct a survey of the public before it

may determine that the advertisement had a tendency to mislead") (internal

alterations and citations omitted).  The Corps regulation must only satisfy this

intermediate level of scrutiny and, as set forth below, it does so.

Here, the Corps undoubtedly has an important – indeed, compelling – interest in promoting order and public safety on the land it manages, and in protecting visitors from the risk of firearm violence.  The Supreme Court has stated repeatedly that "the government's interest in preventing crime . . . is both legitimate and compelling."  United States v. Salerno, 481 U.S. 739, 749 (1987) (citation omitted); see also Masciandaro, 638 F.3d at 473 (government has a substantial, even compelling, interest in "providing for the safety of individuals who visit and make use of the national parks," which include "area[s] where large numbers of people, including children, congregate for recreation").

The Corps' justification for this important regulation is neither novel nor implausible.  As explained above, the Corps has developed rules governing visitors' access to Corps-managed lands that are designed to resolve potential sources of conflict among the large numbers of visitors who recreate on these lands.  The Corps has reasonably determined that the presence of a loaded firearm on lands it manages has the potential to escalate tensions and pose a substantial threat to public safety.  In addition, because Congress has not authorized Corps Park Rangers to carry firearms, the Corps has reasonably concluded that allowing visitors to carry arms on Corps-managed lands could create a chilling effect on Rangers' enforcement of Corps regulations.  Thus, in order to fulfill its mission of

13

"manag[ing] the natural, cultural, and developed resources of each project in the public interest, [and] providing the public with safe and healthful recreational opportunities," 36 C.F.R. § 327.1, the Corps regulation restricts the possession of loaded firearms on Corps-administered lands (including Lake Allatoona) unless the firearms are being carried by a law enforcement officer, by a visitor with permission from the District Commander, or by a visitor using them in areas specifically designated for hunting or target shooting.

For the reasons stated above, the Corps regulation substantially relates to the indisputably important government interest of protecting the public and reducing violent crime.  It therefore satisfies the requirements of intermediate scrutiny analysis.  Plaintiffs thus cannot show that they would be likely to succeed on the merits of their claim that the regulation is unconstitutional.

## 2.    Plaintiffs Misplace Their Reliance on Case Law That Does Not Materially Advance Their Claims.

The case law relied on by Plaintiffs does not show they are substantially likely to succeed on their claim that restricting firearms possession by an individual who camps temporarily on *government* property is unconstitutional. Mem. Supp. Pl. Mot. for Prelim. Inj. ("Pl. Mot.") at 5-7 [ECF No. 5-1].  Heller did not so hold.  Indeed, Heller's first sentence makes clear the limited scope of that case's holding: "We consider whether a District of Columbia prohibition on the

14

possession of usable handguns *in the home* violates the Second Amendment to the Constitution." Id. at 573 (emphasis added). The respondent in Heller did not purport to be seeking the right to possess a firearm in a tent located on land owned by a third party, but simply "the right to render a firearm operable and carry it about his home in that condition only when necessary for self-defense." Id. at 576. Indeed, as the Eleventh Circuit has emphasized, "[t]he Court went to great lengths to emphasize the special place that the home – an *individual's private property* – occupies in our society." GeorgiaCarry.Org, 687 F.3d at 1259 (emphasis added). But the Corps-managed recreational area near Lake Allatoona is not Plaintiff James's private property. Given this important distinction from the factual circumstances in Heller, that case does not demonstrate that Plaintiffs are substantially likely to succeed on the merits.[4]

Moreover, the preliminary conclusion by the District of Idaho in Morris v. U.S. Army Corps of Engineers, _ F. Supp. 2d _, 2014 WL 117527 (D. Idaho Jan. 10, 2014) – that for Second Amendment purposes, a tent pitched on land not belonging to an individual should receive the same constitutional protection as a

---

[4] Additionally, Plaintiffs are simply incorrect that McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), "struck down [a] total ban[] on keeping functional firearms in one's home." Pl. Mot. at 6. In fact, McDonald struck down no law; rather, the plurality opinion in that case held that the Fourteenth Amendment's Due Process Clause incorporated the right recognized in Heller. See id. at 3050.

private home – is in error.  As Plaintiffs note, <u>Morris</u>'s conclusion relied heavily on

<u>United States v. Gooch</u>, 6 F.3d 673 (9th Cir. 1993), in which the Ninth Circuit

concluded that an individual possessed a reasonable expectation of privacy in a

tent pitched on a state campground, and thus a warrantless search of the tent

violated the Fourth Amendment.  <u>Id.</u> at 677.  But <u>Morris</u> cited no authority

supporting the proposition that the concerns at the heart of the Fourth Amendment

(a citizen's legitimate expectation of privacy in his or her person, papers, and

effects) relate in any significant way to the concerns at the core of the Second

Amendment (self-defense).  Nor did <u>Morris</u> cite any authority justifying the

wholesale importation of substantive Fourth Amendment doctrine into Second

Amendment jurisprudence.  Different constitutional provisions do not necessarily

have the same scope or substantive protections.  Grafting substantive Fourth

Amendment doctrines onto Second Amendment cases is problematic because "as

we move outside the home, firearm rights have always been more limited, because

public safety interests often outweigh individual interests in self-defense."

<u>Masciandaro</u>, 638 F.3d at 470.

        In any event, a finding that Fourth Amendment privacy interests apply to a

particular place does not end the inquiry as to whether the search or seizure at issue

was unconstitutional.  <u>See</u>, <u>e.g.</u>, <u>United States v. Rigsby</u>, 943 F.2d 631, 637 (6th

16

Cir. 1991) (cursory search of defendant's tent and seizure of shotgun found therein were "valid based on the government's legitimate interests as weighed against any privacy expectation which defendant may have had in the tent").  In other words, the conclusion that an individual might have a reasonable expectation of privacy in a tent on government property does not resolve the issue of whether a search or seizure of that land would violate the Fourth Amendment.  And by analogy, even if substantive Fourth Amendment doctrine were relevant here, starting from the bare premise that the Second Amendment might apply to a tent located on government property, it would not follow that a regulation related to firearms possession in that tent would violate the Second Amendment.

Thus, neither <u>Heller</u> nor <u>Morris</u> show that Plaintiffs are likely to succeed on the merits of their claim that the Corps' firearms regulation is unconstitutional as applied to Plaintiff James' possession of a firearm in a tent located on government-owned property.

Nor have Plaintiffs shown that they are likely to prevail on their claim that the Second Amendment prohibits the Corps from restricting the carrying of firearms on public lands that it owns and administers.  Plaintiffs are simply incorrect that the only relevant issue is whether carrying a firearm on Corps-owned property lies outside the scope of the Second Amendment's protection.  Pl. Mot. at

17

8.  As explained above, the Eleventh Circuit employs a two-step inquiry in evaluating Second Amendment claims, and Plaintiffs have not shown they are likely to succeed under this inquiry.

Additionally, Plaintiffs' reliance on cases such as <u>Ezell v. City of Chicago</u>, 651 F.3d 684 (7th Cir. 2011), and <u>Moore v. Madigan</u>, 702 F.3d 933 (7th Cir. 2012), is misplaced because those cases concerned firearms laws enacted by municipal and state legislatures in their respective capacities as lawmaking bodies, not (as here) as a proprietor of land.  In any event, the laws at issue in those cases are readily distinguishable from the Corps regulation.  In <u>Ezell</u>, the City of Chicago had mandated range training as a prerequisite to any firearms possession in the City, while simultaneously prohibiting all firing ranges within the City.  651 F.3d at 689-91.  And the state law at issue in <u>Moore</u> prohibited every Illinois resident (with limited exceptions) from carrying a loaded and immediately-accessible firearm anywhere in the State of Illinois except for their permanent residences, fixed places of business, or on the property of someone who consented to the carrying of firearms.  702 F.3d at 934.  The Seventh Circuit expressly noted that in contrast to Illinois' law – the only one of its kind in all fifty States – "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a

18

lesser burden, the state doesn't need to prove so strong a need." Id. at 940.  The

Corps' restriction on firearms possession on property it owns and manages is thus

not comparable to a law prohibiting such possession in an entire State.

In short, Plaintiffs have failed to show that they are likely to succeed on the

merits of their claims.

### B.     Plaintiffs Have Failed to Demonstrate That They Will Suffer Irreparable Injury Absent a Preliminary Injunction.

#### 1.     Plaintiff James' Frequent Use of Corps-Managed Facilities Without an Injunction in Place Undercuts Any Claim That Plaintiffs Will Suffer Irreparable Injury if Preliminary Injunctive Relief Is Not Granted.

"A showing of irreparable injury is the sine qua non of injunctive relief."

Siegel, 234 F.3d at 1176 (citation and internal punctuation omitted).

"Significantly, even if Plaintiffs establish a likelihood of success on the merits, the

absence of a substantial likelihood of irreparable injury would, standing alone,

make preliminary injunctive relief improper." Id. (citations omitted).

Furthermore, a plaintiff's unexplained delay in seeking relief may, "standing alone,

. . . preclude the granting of preliminary injunctive relief . . . because the failure to

act sooner undercuts the sense of urgency that ordinarily accompanies a motion for

preliminary relief and suggests that there is, in fact, no irreparable injury." Mobile

Cty. Water, Sewer & Fire Prot. Auth. v. Mobile Area Water & Sewer Sys., No. 07-

0357, 2007 WL 3208587, at *6 (S.D. Ala. Oct. 29, 2007) (quoting <u>Tough Traveler,</u>

<u>Ltd. v. Outbound Products,</u> 60 F.3d 964, 968 (2d Cir. 1995)).  Any delay by a

plaintiff in seeking preliminary relief is a relevant factor when considering whether

the plaintiff has met its burden to show irreparable harm.

Here, Plaintiffs' claim of imminent irreparable injury is undermined by the

fact that Plaintiff James has frequently visited the Lake Altoona property, with the

firearms regulation in place.  Plaintiff James states that he "frequently camps and

recreates on Corps property and facilities at Lake [Allatoona]," and "camps in a

tent at the McKaskey Creek campsites, a Corps camping facility, several weeks per

year."  Compl. ¶¶ 17, 22.  Plaintiff James does not represent that he ever sought

preliminary injunctive relief before any of his visits to the Corps facilities.  Indeed,

despite this repeated and frequent use of Corps facilities with the Corps' firearms

regulation in place, it was not until June 13, 2014, that Plaintiffs filed for a

preliminary injunction.  "Plaintiffs' delay . . . undermines plaintiffs' assertion of

immediate, irreparable harm because plaintiffs are seeking a *change* in the status

quo. . ."  <u>ACLU v. City of Las Vegas</u>, 13 F. Supp. 2d 1064, 1083 (D. Nev. 1998)

(emphasis in original).

The critical importance of irreparable injury derives from the fact that

"[p]reliminary injunctions are issued to forestall imminent and irreversible injury

20

to the plaintiff's rights." Comic Strip, Inc. v. Fox Television Stations, Inc., 710 F. Supp. 976, 980 (S.D.N.Y. 1989).  Consequently, "[d]elay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) (ten-week delay from notice); Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("Courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.").  Where the delay is significant, it "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Citibank, 756 F.2d at 277 (citation omitted).  "If the plaintiff has failed to prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its delay, [a] district court should be reluctant to award relief." Natural Res. Def. Council v. Pena, 147 F.3d 1012, 1026 (D.C. Cir. 1998)). The fact that Plaintiff James has frequented Corps-managed lands for years without seeking preliminary injunctive relief beforehand shows that Plaintiffs will not suffer imminent irreparable harm if an injunction is not granted.

> **2.    Plaintiffs Otherwise Fail to Demonstrate That They Will Suffer Irreparable Harm Absent Injunctive Relief.**

Additionally, contrary to Plaintiffs' contention, merely alleging constitutional injury is not enough to demonstrate the likelihood of irreparable

harm.  Though Plaintiffs quote a sentence from <u>Cate v. Oldham</u>, 707 F.2d 1176

(11th Cir. 1983), suggesting that such an allegation is sufficient, they fail to

acknowledge that this sentence represents only a quotation from the district court

decision that the Eleventh Circuit was reversing, not a statement of the relevant

legal standard.  <u>See</u> <u>id.</u> at 1188.  Moreover, the Eleventh Circuit has specifically

rejected the "conten[tion] that a violation of constitutional rights always constitutes

irreparable harm," noting that "[o]ur case law has not gone that far."  <u>Siegel</u>, 234

F.3d at 1177 (citing cases).  Rather, "[t]he only areas of constitutional

jurisprudence where we have said that an on-going violation may be presumed to

cause irreparable injury involve the right of privacy and certain First Amendment

claims establishing an imminent likelihood that pure speech will be chilled or

prevented altogether.  <u>Id.</u> at 1178.  Here, as in <u>Siegel</u>, "[t]his is plainly not such a

case."

       Nor, finally, does Plaintiffs' bare assertion that financial compensation will

not adequately remedy any alleged harm, Pl. Mot. at 9, suffice to demonstrate that

they will suffer irreparable harm absent an injunction.  Plaintiffs have thus failed to

satisfy their burden on the second requirement of preliminary relief.

**C.    Granting the Requested Preliminary Relief Would Harm Defendants and the Public Interest.**

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (citation and internal punctuation omitted). The harms to the public and the Corps if it is unable to enforce its firearms regulation include safety concerns for the unarmed Park Rangers and visitors, security problems for dams, levees, and hydropower facilities co-located within recreation areas, the inability to perform full safety and security evaluations to account for the presence of firearms, and the necessity to engage in the extensive rulemaking process required to promulgate new regulations.  Austin Decl. ¶¶ 9-12.

Moreover, as noted above, Plaintiffs' extensive delay in seeking relief casts serious doubt upon their assertions that they will suffer imminent irreparable injury if they are not granted a preliminary injunction.  And Plaintiffs' contention that they will be deprived of a constitutional right absent injunctive relief, Pl. Mot. at 10, fails because Plaintiffs have not shown that they are substantially likely to succeed on the merits of their constitutional claim.  See Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005) (public interest did not support issuance of a preliminary injunction where plaintiffs failed to demonstrate a likelihood of success on the merits of their constitutional claim).  And while Plaintiffs suggest

23

that recent Georgia legislation permitting greater latitude for the carrying of firearms in public bolsters their public-interest argument, Pl. Mot. at 10-11, that argument ignores the essential difference between the government acting in its role as legislator and acting as a proprietor of land that it owns and manages.  Plaintiffs have thus failed to show that the balance of the equities favors them.

## II.    Non-Mutual Offensive Collateral Estoppel May Not Be Asserted Against the Federal Government.

Relying on Parklane Hosiery Company, Inc. v. Shore, 439 U.S. 322 (1979), Plaintiffs mistakenly contend that Defendants are collaterally estopped from raising legal issues similar to those at issue in a case in the District of Idaho.  Pl. Mot. at 3-4.  In thus contending, Plaintiffs fail to recognize that "Parklane Hosiery's approval of nonmutual offensive collateral estoppel is not to be extended to the United States."  United States v. Mendoza, 464 U.S. 154, 158 (1984); see also Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp., 768 F.2d 1558, 1578 (11th Cir. 1985) (recognizing that in Mendoza, "the Supreme Court held that nonmutual collateral estoppel may not be invoked against the government.").  Mendoza discussed numerous reasons why collateral estoppel does not and should not lie against the government.  These reasons include, inter alia, the government's status as a far more frequent litigator than any other litigant; the frequency with which the government is involved in litigation over matters of great

24

public importance; the legitimate reasons successive administrations may decide to take different positions on issues from those taken by predecessor administrations; and the fact that a contrary rule would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.  Mendoza, 464 U.S. at 158-64.  Because of Mendoza's clear holding, Plaintiffs' attempt to invoke collateral estoppel principles here fails.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated:  July 14, 2014                              Respectfully submitted,

Of Counsel                                               STUART F. DELERY
                                                               Assistant Attorney General

SALLY QUILLIAN YATES
United States Attorney
LORI BERANEK                                        /s/ Daniel Riess
Assistant United States Attorney          DIANE KELLEHER
600 Richard B. Russell Federal Building   Assistant Branch Director
75 Spring Street, S.W.                         DANIEL RIESS
Atlanta, Georgia 30303                        Trial Attorney
Lori.Beranek@usdoj.gov                       U.S. Department of Justice
                                                               Civil Division, Rm. 6122
                                                               20 Massachusetts Avenue, NW
                                                               Washington, D.C. 20530
                                                               Telephone: (202) 353-3098
                                                               Fax: (202) 616-8460
                                                               Email: Daniel.Riess@usdoj.gov
                                                               *Attorneys for Defendants*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| GEORGIACARRY.ORG, INC., and DAVID JAMES, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO. |
| v. | ) ) | 4:14-CV-139-HLM |
| U.S. ARMY CORPS OF ENGINEERS and JOHN J. CHYTKA, in his official capacity as Commander, Mobile District, U.S. Army Corps of Engineers, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF STEPHEN B. AUSTIN

I, Stephen B. Austin, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     I have been employed as a Park Ranger/Outdoor Recreation Planner/Natural Resources Manager by the U.S. Army Corps of Engineers (Corps) for 37 years.  This declaration is based on my personal knowledge, as well as knowledge made available to me in the course of my duties with the Corps.  I make this declaration in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction.

1

2.     The Corps manages the operation and maintenance of Water

Resources Development Projects throughout the United States, including Lake

Allatoona in northwest Georgia.

3.     36 C.F.R. § 327.1 outlines the policy of the Secretary of the Army,

acting through the Chief of Engineers, to manage the natural, cultural, and

developed resources of each project in the public interest, providing the public with

safe and healthful recreational opportunities while protecting and enhancing these

resources.  The Corps must consider many factors when deciding whether it is in

the public interest to open Water Resources Development Project areas for

recreation, and when developing the rules and regulations for the recreational use

of the projects.  These factors generally include the safety of the visiting public; the

safety of Corps employees and other government officials; the protection of the

natural, cultural and developed resources; and the promotion of recreational

opportunities.  The rules regarding the use and possession of firearms at Corps-

administered areas, as set forth in 36 C.F.R. § 327.13, reflects the result of the

Corps' balancing of these competing factors with the ultimate goal of providing a

safe recreational experience for the visiting public.

4.     Corps-managed recreational areas bring together a diverse mixture of

visitors with their own lifestyles that influence how they enjoy their stay.  In

2

general, Corps recreational facilities have a high density of use because many projects are located close to major population centers.  For example, Lake Allatoona is located approximately 30 miles from Atlanta, Georgia.  The Corps must consider potential sources of conflict between visitors and craft regulations to mitigate the sources of conflict.  For example, visitors staying at campgrounds sleep, cook meals, socialize with their companions, and enjoy nature all within a limited space.  Sources of conflict include preferences for varying tastes of music at different audible levels, loud socializing at times inconvenient to other visitors, consumption of alcohol, and general infringements on other users' space.  These problems are more acute at Corps recreational areas because of the high density of usage, as compared with U.S. national parks.  Corps regulations must be crafted to minimize these conflicts.  Corps regulations, for example, address these issues by setting rules on the operation of vessels (36 C.F.R. § 327.3), swimming (id. § 327.5), sanitation (id. § 327.9), fires (id. § 327.10), pet control (id. § 327.11), and establishing quiet hours (id. § 327.12).  The Corps must ensure that inevitable conflicts resulting from how people use its recreational facilities are resolved as quickly and peacefully as possible.  The presence of a loaded firearm could far more quickly escalate such tension between visitors from a minor disagreement to

3

a significant threat to public safety involving the potential use of deadly force by a visitor against another visitor or an unarmed Corps Park Ranger.

5.     Another factor the Corps must consider when developing regulations for the recreational use of its projects is the nature of law enforcement options available to the agency.  The primary duty of Corps Park Rangers is visitor assistance, not serving as a law enforcement officer.  Accordingly, Corps Park Rangers do not carry weapons.  Congress has not authorized the Corps to let its employees exercise full law enforcement powers at Water Resources Development Project recreational areas.  Instead, Congress has only authorized Corps Park Rangers to issue citations for violations of pertinent regulations.  See 16 U.S.C. § 460d; 36 C.F.R. § 327.25.  Congress has not provided authority for Corps employees to carry firearms, execute search warrants, or enforce other federal laws on Corps projects.  By contrast, Congress has authorized the National Park Service to permit designed Department of Interior employees to carry firearms, execute warrants, and enforce federal laws within the U.S. National Park system.  See 16 U.S.C. § 1a-6(b)(1) – (b)(3).

6.     Consequently, Corps Park Rangers are not trained or equipped to serve as law enforcement officers.  Corps Park Rangers cannot enforce federal firearms laws that could control firearms possession in some Corps facilities, such

4

as Corps-operated power-generation plants, because of Rangers' limited law enforcement authority.  Additionally, the potential of permitting armed visitors could create a chilling effect on the overall enforcement of Corps regulations, given that Corps Park Rangers are not armed.

7.     Congress has authorized the Corps to supplemental law enforcement presence at projects during peak visitation periods through cooperative agreements that compensate local law enforcement agencies to provide increased patrols on Corps lands and waters.  However, local law enforcement officers can only enforce state and local law, not federal law, and may be limited by other state and local law enforcement demands.

8.     Taking all relevant factors into consideration, the Corps has determined that it is in the best overall public interest to restrict the possession of loaded firearms unless the firearm is being used in an area specifically designated for hunting or target shooting, or is being carried by a law enforcement officer. Structuring the regulation in this manner has accommodated the sporting use and possession of firearms, while appropriately accounting for visitor and Corps Park Ranger safety, protection of infrastructure on Corps facilities, and the limits of the Corps' law enforcement authority.

9.     The Corps would need to address a number of issues before changing the current regulation on the use and possession of firearms.  In particular, the Corps would need to perform a full safety and security assessment of Corps-managed infrastructure to determine how best to secure its facilities in light of the heightened potential for the presence of firearms.  Both the Corps and the U.S. Department of Homeland Security have identified certain Corps-managed infrastructure as critical to homeland security and the economy, but a full evaluation is ongoing.  This is due to the fact that the majority of Corps facilities have multiple congressionally-authorized purposes, including navigation, flood control or damage reduction, and water supply.  Recreation is never the sole purpose of a Corps-managed Water Resources Development Project.  Early detection of threats to Corps-managed infrastructure is aided by current Corps policy, and could be compromised by an overly permissive firearms policy.  With an overly permissive policy, Corps officials or other law enforcement officers could face situations in which they would not be able to intervene or ascertain bad intent on the part of an individual with a firearm until he or she actually uses it.  If the threat of such situations could not be mitigated, the Corps could consider further restrictions on public access to its facilities, which could stop popular tours and even close recreational areas completely.

6

10.    The Corps would also need to evaluate whether additional alcohol or other public-use restrictions on Corps projects would be necessary to maintain visitor and Corps Park Ranger security.  The Corps would need to consider current budgetary constraints that could limit available measures to mitigate safety issues associated with the increased presence of firearms, such as providing body armor for Park Rangers.

11.    Additionally, the Corps would need to evaluate whether the current congressionally-set funding limit on cooperative law enforcement agreements for increased law enforcement services would be adequate to support any additional armed law enforcement visitors at Corps projects.  The Corps would also need to expend funds to publicize the new rule to visitors, and would need to update its signage at thousands of affected recreational areas, which would significantly affect its budget.

12.    Finally, in order to change the Corps' firearms regulation, the Corps would need to engage in rulemaking in accordance with the Administrative

7

Procedure Act's rulemaking requirements and comply with the National Environmental Policy Act.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____11 July 2014_____

Stephen B. Austin

8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

GEORGIACARRY.ORG, INC.,
and DAVID JAMES,

     Plaintiffs,

v.

THE U.S. ARMY CORPS OF
ENGINEERS, and JOHN J.
CHYTKA, in his official capacity
as Commander, Mobile District of
the U.S. Army Corps of Engineers

     Defendant.

CIVIL ACTION FILE
NO. 4:14-CV-00139-HLM

## ORDER

This case is before the Court on Plaintiffs' Motion for

Preliminary Injunction [5].

# I.    Background

## A.    Procedural Background

On June 12, 2014, Plaintiffs filed the instant Complaint seeking the Court's declaration that 36 C.F.R. § 327.13 (the "Firearms Regulation"), a regulation restricting gun use on Defendant Army Corps of Engineers' ("Defendant Army Corps") property, violates the Second Amendment of the United States Constitution. (Docket Entry No. 1.) In the Complaint, Plaintiffs requested a preliminary injunction prohibiting   enforcement of the Firearms Regulation. (Compl. (Docket Entry No. 1) ¶ 37.) The Court instructed Plaintiffs to file a separate brief requesting injunctive relief (Docket Entry No. 4), and Plaintiffs filed  such a brief on June 13, 2014 (Docket Entry No. 5). After receiving an

2

extension (Docket Entry No. 9), Defendants filed their response on July 14, 2014 (Docket Entry No. 11). Plaintiffs have now replied (Docket Entry No. 15), and the Court consequently finds the instant Motion ripe for resolution.

### B.  Plaintiffs' Allegations

Plaintiff GeorgiaCarry.Org ("Plaintiff GCO") is a non-profit corporation organized under Georgia law. (Compl. ¶ 4.) Its mission is to support its member's rights to keep and bear arms. (Id. ¶ 5.) Plaintiff David James ("Plaintiff James") is a resident of Paulding County, Georgia, and a member of Plaintiff GCO. (Id. ¶¶ 6-7.) Defendant Army Corps is a subset of the United States Army. (Id. ¶ 8.) Defendant Army Corps operates public parks and recreational facilities at water resource development projects under control of the

3

Department of the Army. (Id. ¶ 9.) Plaintiffs allege that Defendant Army Corps "is the largest provider of water-based outdoor recreation in the United States." (Id. ¶ 10.) Defendant Chytka is the Commander of the Mobile District of Defendant Army Corps, and is sued in his official capacity only. (Id. ¶¶ 11-12.) The Mobile District of Defendant Army Corps operates projects and facilities on the Apalachicola, Chattahoochee, and Flint rivers. (Id. ¶ 13.)

Plaintiff James possesses a Georgia weapons carry license issued pursuant to O.C.G.A. § 16-11-129. (Compl. ¶ 14.) In Georiga, such licenses are generally required to carry a gun outside of one's home, automobile or place of business. (Id. ¶ 15.) Plaintiff James regularly carries a handgun in case of confrontation, except in locations where

4

AO 72A
(Rev.8/8
2)

doing so is prohibited by law. (<u>Id.</u> ¶ 16.) Plaintiff James,
along with other members of Plaintiff GCO, regularly camps
and recreates on property owned by Defendant Army Corps
at Lake Allatoona (the "Allatoona Property"), a Defendant
Army Corps water facility located in northwest Georgia. (<u>Id.</u>
¶¶ 17-18, 33.) The Allatoona Property lies in Defendant
Army Corps' Mobile District, and is therefore subject to
Defendant Chytka's command. (<u>Id.</u> ¶ 19.) The Allatoona
Property is one of Defendant Army Corps' most visited
properties, receiving over six million visitors per year. (<u>Id.</u> ¶¶
20-21.) There are nearly six hundred campsites and two
hundred picnic sites on the Allatoona Property, and Plaintiff
James camps in a tent on one of those sites several weeks
per year. (<u>Id.</u> ¶ 22.)

AO 72A
(Rev.8/8
2)

Defendant Army Corps' Firearms Regulation prohibits the possession of firearms on Corps property, absent certain exceptions. (Compl. ¶ 23.) It states, in full:

(a)   The   possession   of   loaded   firearms, ammunition, loaded projectile firing devices, bows and   arrows,   crossbows,   or   other   weapons   is prohibited unless:

(1) In the possession of a Federal, state or local law enforcement officer;

(2) Being used for hunting or fishing as permitted under § 327.8, with devices being unloaded when transported to, from or between hunting and fishing sites;

(3) Being used at authorized shooting ranges; or

(4) Written permission has been received from the District Commander.

(b) Possession of explosives or explosive devices of   any   kind,   including   fireworks   or   other pyrotechnics,   is   prohibited   unless   written permission has been received from the District Commander.

6

AO 72A
(Rev.8/8
2)

36 C.F.R. § 327.13. Violation of the Firearms Regulation is punishable by a fine of up to $5,000.00, six months imprisonment, or both. (Compl. ¶ 27; 36 C.F.R. § 327.25.)

Plaintiffs state that "[b]ut for the application and enforcement of [the Firearms Regulation], [Plaintiff] James would keep and carry a handgun in case of confrontation when he recreates and camps at Allatoona." (Compl. ¶ 26.) Further, Plaintiff James "is in fear of arrest, prosectuion and punishment for violating [the Firearms Regulation] and therefore refrains from keeping and carrying a handgun when he recreates and camps at Allatoona." (Id. ¶ 29.) Plaintiff James requested that he be granted written permission to carry a handgun pursuant to section (a)(4) of the firearms regulation. (Id. ¶¶ 30-31.) However, on June 9,

7

2014, Defendant Chytka informed Plaintiff James that he had "discerned not to exercise [his] discretion under [the Firearms Regulation] to grant [Plaintiff James] permission to possess a loaded firearm while visiting Lake Allatoona." (Id. ¶ 32.) Based on this denial, Plaintiffs assert that Defendants are violating the Second Amendment rights of Plaintiff James. (Id. ¶¶ 34-35.) Plaintiffs request a declaration that the Firearms Regulation is unconstitutional on its face and as applied (id. ¶ 36), a preliminary and permanent injunction prohibiting enforcement of the Firearms Regulation (id. ¶ 37), costs for bringing and maintaining this case (id. ¶ 38), and any other relief the Court deems proper (id. ¶ 39).

8

AO 72A
(Rev.8/8
2)

## II.    Preliminary Injunction Standard

To obtain a temporary restraining order or preliminary injunction, a movant must show: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction is issued; (3) that the threatened injury outweighs the harm the temporary restraining order would inflict on the non-movant; and (4) that the temporary restraining order would not be adverse to the public interest. LSSI Data Corp. v. Comcast Phone, LLC, 696 F.3d 1114, 1119 (11th Cir. 2012).  "[A] [temporary restraining order or preliminary injunction] is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." SunTrust Bank v. Houghton Mifflin Co., 252

9

AO 72A
(Rev.8/8
2)

F.3d 1165, 1166 (11th Cir. 2001) (per curiam) (citation omitted).

## III.  Discussion

### A.   Likelihood of Success on the Merits[1]

#### 1.   Collateral Estoppel

Plaintiffs argue that Defendant Army Corps is collaterally estopped from re-litigating the issues in this cased based on an Idaho District Court's January 10, 2014, order granting an injunction against Defendant Army Corps' enforcement of the Firearms Regulation. (See Br. Supp.

---

[1]Though not raised by the Parties, as a threshold issue, the Court notes that Plaintiffs have standing to challenge the Firearms Regulation because "Plaintiffs are seriously interested in engaging in conduct that is arguably prohibited by the [Firearms Regulation] and that could give rise to prosecution by [federal] authorities." See GeorgiaCarry.Org v. Georgia, 687 F.3d 1244,1252-53 (11th Cir. 2012).

10

AO 72A
(Rev.8/8
2)

Prelim. Inj. (Docket Entry No. 5-1) at 3-4 <u>citing</u> <u>Morris v.</u> <u>U.S. Army Corps of Eng'rs</u>, 990 F. Supp. 2d 1082 (D. Idaho Jan. 10, 2014).) This argument fails for two reasons.

First, the order Plaintiffs rely upon is an order granting a preliminary injunction, not a final order on the merits. <u>See</u> <u>Morris</u>, 990 F. Supp. 2d at 1089. However, "[f]inality is an essential element of both res judicata and collateral estoppel." <u>In re Bayshore Ford Trucks Sales, Inc.</u>, 471 F.3d 1233, 1253 (11th Cir. 2006); <u>see also</u> <u>Medtronic, Inc. v.</u> <u>Gibbons</u>, 684 F.2d 565, 569 (8th Cir. 1982) ("[T]he doctrine of collateral estoppel requires a prior final judgment; the granting or denial of a preliminary injunction is generally not based on a final decision on the merits and is not a final judgment for the purposes of collateral estoppel."). This lack

11

AO 72A
(Rev.8/8
2)

of finality alone precludes any application of collateral estoppel in this case.

Second, whether the <u>Morris</u> order was final or not, it is a well founded legal principle that the government cannot be subjected to offensive collateral estoppel. <u>See United States v. Mendoza</u>, 464 U.S. 154, 155 (1984) ("We hold that the United States may not be collaterally estopped on an issue . . . adjudicated against it in an earlier lawsuit brought by a different party."). Indeed, the policy reasons espoused by the United States Supreme Court in its decision banning the use of nonmutual offensive collateral estoppel against the government applies directly to this case. That court wrote that "[a] rule allowing nonmutual collateral estoppel against the government . . . would substantially thwart the

12

development of important questions of law by freezing the first final decision rendered on a particular legal issue. Allowing only one final adjudication would deprive [the Supreme Court] of the benefit it receives from permitting several courts of appeals to explore a difficult question before [the Supreme Court] grants certiorari." Id. at 160. For both these reasons, Plaintiffs' collateral estoppel argument fails and cannot be the basis for a preliminary injunction against enforcement of the Firearms Regulation.

## 2. Violation of Plaintiffs' Second Amendment Rights

The Supreme Court's 2008 decision in District of Columbia v. Heller made clear that the Second Amendment encompasses an individual right to keep and bear arms.[2]

---

[2] The case of McDonald v. City of Chicago, Ill. ruled that the

13

See District of Columbia v. Heller, 554 U.S. 570, 635 (2008) ("[The Second Amendment] elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."). Further, Heller left little doubt that laws banning "handgun possession in the home" are in violation of the Second Amendment. (Id.) However, the extent to which the Second Amendment protects individuals seeking to carry firearms outside the home, and the framework in which courts are to evaluate laws regulating firearm possession, remains unclear. See id. at 718 (Breyer, J., dissenting) ("The [majority] decision will

---

Fourteenth Amendment made the Second Amendment applicable to the states; however, no state laws are at issue in the instant case. See McDonald v. City of Chicago, Ill., 130 S.Ct. 3020, 3050 (2010) ("[T]he Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller.").

14

encourage legal challenges to gun regulation throughout the Nation. Because it says little about standards used to evaluate regulatory decisions, it will leave the Nation without clear standards for resolving those challenges.").

Despite this lack of guidance from the Supreme Court, the Eleventh Circuit, along with most other circuits to address the issue, has adopted a two step approach to evaluating Second Amendment challenges. See GeorgiaCarry.Org, 687 F.3d at 1261 n.34 ("Like our sister circuits, we believe a two-step inquiry is appropriate: first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny."); see also Ezell v. City of Chicago, 651 F.3d 684, 700-704 (7th Cir.

15

2011) (applying two step framework); <u>Jackson v. City & Cnty. of San Francisco</u>, 746 F.3d 953, 960 (9th Cir. 2014) ("Like the majority of our sister circuits, we have discerned from <u>Heller</u>'s approach a two-step Second Amendment inquiry."). "First, the threshold inquiry in some Second Amendment cases will be a 'scope' question: Is the restricted activity protected by the Second Amendment in the first place?" <u>Ezell</u> 651 F.3d at 701. Second, if the regulated activity is not categorically unprotected, "there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." <u>Id.</u> at 703. The scrutiny applied "will depend on how close the law comes to the core of the Second Amendment right and the severity of

16

AO 72A
(Rev.8/8
2)

the law's burden on the right." Id. The Court applies this framework below.[3]

### a.   The Firearms Regulation Does Not Burden a Pre-existing Right

To determine whether the Firearms Regulation burdens a pre-existing right, courts are instructed to make "a textual and historical inquiry into original meaning." Ezell 651 F.3d at 701. In other words, the framework adopted by the

---

[3]Though the Complaint requests a declaration that the Firearms Regulation is "unconstitutional on its face and as applied" (Compl. ¶ 36), Plaintiffs' Brief Supporting their Motion for Preliminary Injunction makes no distinction between the two requests, (see generally Br. Supp. Prelim. Inj.). However, the Court addresses the challenges as being of the "as-applied" variety. Plaintiffs do not address what constitutional problems would have arisen had Defendant Chytka granted Plaintiff James permission to carry pursuant to section (a)(4) of the Firearms Regulation, instead focusing only on the individualized set of facts at hand. Consequently, Plaintiffs do not attempt to "establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987).

17

AO 72A

(Rev.8/8
2)

country's appellate courts requires this Court to determine

whether, in 1791, there was a widely accepted right to carry

firearms on Defendant Army Corps' property.[4] See Heller,

554 U.S. at 592 ("[I]t has always been widely understood

that the Second Amendment, like the First and Fourth

––––––––––––––––––––

[4]Admittedly, given the paucity of appellate court opinions on the issue at this time, it is difficult, if not impossible, for a district court faced with an emergency motion for preliminary injunction to evaluate the contours of Second Amendment rights in colonial America. Indeed, the Court in Morris, a case heavily relied upon by Plaintiffs, appears to skip this step and instead holds that the Second Amendment encompasses a right to carry firearms everywhere, so long as the bearer is carrying the weapons for "self-defense purposes." See Morris, 990 F. Sup. 2d at 1085-86, at *2 (finding that "[Defendant Army] Corps' regulation burdens conduct protected by the Second Amendment [because] [t]he Second Amendment protects the right to carry a firearm for self-defense purposes"). Respectfully, this Court finds that the pre-existing right encompassed by the Second Amendment was not free from locational restrictions. See Heller, 554 U.S. at 626 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). The Court addresses such limitations in the context of Defendant Army Corps' property below.

18

AO 72A
(Rev.8/8
2)

Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" (emphasis omitted).) For the following reasons, the Court finds it highly unlikely that any such right existed.

"When Congress organized the Continental Army on June 16, 1775, it provided for a Chief Engineer and two assistants with the Grand Army and a Chief Engineer and two assistants in a separate department, should one be established." U.S. ARMY CORPS OF ENGINEERS OFFICE OF HISTORY, THE U.S. ARMY CORPS OF ENGIGNEERS: A HISTORY 1 (2008) (hereinafter, "Army Corps History"). During the revolutionary war, "Engineer officers reconnoitered enemy

19

AO 72A
(Rev.8/8
2)

positions and probable battlefields, wrote useful reports based on their observations, oversaw the construction of fortifications, and drew detailed maps for commanders." Id. at 2. In the years following the Revolutionary War, there was much debate in the country about the necessity of a large standing army, and the use of engineering corps was limited to temporary assignments to upgrade old coastal fortifications and occasionally to build new ones. Id. at 7. However, "[o]n March 16, 1802, Congress permanently established a separate U.S. Army Corps of Engineers and the U.S. Military Academy at West Point as the Nation's first engineering school." Id. at 8.

During the War of 1812, "the engineers performed many of the same tasks they had in the Revolution,

20

AO 72A

(Rev.8/8

2)

including constructing fortifications, reconnoitering and mapping, and assisting the movement of armies." Army Corps History at 12. However, "fortifications were the primary concern of the engineers during the War of 1812, as they had been earlier." Id.

Though primarily concerned with defense related projects, Defendant Army Corps' role began to encompass civil works at an early stage in its history. For example, in 1800, "Secretary of War James McHenry . . . suggested that engineer officers possess talents that serve the country not only in war, but also in peacetime 'works of a civil nature.'" Army Corps History at 241. However, it was still clear that Defendant Army Corps was, first and foremost, a branch of the United States military. For example, "[m]ail intended for

21

AO 72A
(Rev.8/8
2)

the Chief Engineer was sent under cover to the Secretary

of War with the words 'Engineer Department' written on the

lower left-hand corner of the envelope." Id. Oversight of

Defendant Army Corps was also entrusted to the cabinet

official overseeing the United States Army. Id. Finally, many

congressional acts mandating that Defendant Army Corps

carry out civil works activities "explicitly mandated that the

Secretary of War supervise the expenditure of appropriated

funds." Id. at 243.

Much like the firearms that were initially protected by

the second amendment have evolved over the years, the

role of Defendant Army Corps has changed to suit the

country's needs. For example, it may have been hard for

the framers to comprehend a wilderness "recreational

22

AO 72A
(Rev.8/8
2)

facility" at all, much less one owned and operated by the federal government. Nonetheless, the Flood Control Act of 1944 authorized Defendant Army Corps to "construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army." 16 U.S.C. § 460d.

However, despite this evolution, Defendant Army Corps is still an integral part of the United States Armed Forces. See 10 U.S.C. § 3063(a)(4) ("The Secretary of the Army may assign members of the Army to its basic branches. The basic branches [include] . . . [the] Corps of Engineers."). Though much of Defendant Army Corps' modern day work is on civil projects, those projects, including the flood control project that led to the creation of Lake Allatoona, are

23

regularly overseen by the Secretary of the Army. <u>See</u> 33 U.S.C. § 701b ("Federal investigations and improvements of rivers and other waterways for flood control and allied purposes shall be under the jurisdiction of and shall be prosecuted by the Department of the Army under the direction of the Secretary of the Army and supervision of the Chief of Engineers.").

Finally, it cannot be overlooked that the existence of Defendant Army Corps' "recreational facilities" is merely a byproduct of the sensitive dam construction projects nearby. (<u>See</u> Decl. of Stephen B. Austin (Docket Entry No. 11-1) ¶ 9 ("[T]he majority of [Defendnant Army] Corps facilities have multiple congressionally-authorized purposes, including navigation, flood control or damage reduction, and water

24

AO 72A
(Rev.8/8
2)

supply. Recreation is never the sole purpose of a [Defendant Army] Corps-managed Water Resources Development Project.").) These dams and other infrastructure works, just like the fortifications built by Defendant Army Corps during the founding era of our country, are vitally important to our national security and well being. (See id. ("Both [Defendant Army] Corps and the U.S. Department of Homeland Security have identified certain [Defendant Army] Corps-managed infrastructure as critical to homeland security and the economy.").) Simply put, the Court cannot fathom that the framers of the Constitution would have recognized a civilian's right to carry firearms on property owned and operated by the United States Military, especially when such property contained

25

AO 72A
(Rev.8/8
2)

infrastructure products central to our national security and well being.

Turning to the relatively small amount of Second Amendment case law that has wound its way through the country's courts following <u>Heller</u>, this Court can find no decisions suggestive of a right to carry firearms on Defendant Army Corps' property. As discussed above, the <u>Heller</u> court declined to address what degree of constitutional protection firearm possession outside the home is afforded. However, the <u>Heller</u> court acknowledged that the restriction of firearm possession in certain locations did not burden any pre-existing rights. The court wrote that "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment

26

. . . nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." <u>Heller</u>, 554 U.S. at 626. Though Defendant Army Corps' property is more expansive than just a "building," there is no reason to doubt that the Firearms Regulation, which restricts the use of firearms on military property nearby sensitive infrastructure projects, does not fall squarely into the existing "laws forbidding the carrying of firearms in sensitive places" referenced in <u>Heller</u>. <u>Id.</u>

Further, though the Eleventh Circuit has issued only one post-<u>Heller</u> opinion addressing the right of law abiding citizens to carry firearms outside their homes, it is not contrary to, and in certain respects supports, the Court's

27

AO 72A

(Rev.8/8

2)

finding today. In GeorgiaCarry.Org v. Georgia, Plaintiff GCO sued the State of Georgia and several Georgia state government officials challenging a law that prevented licensed gun holders from carrying firearms in "places of worship" unless they received permission from security or management personnel of the church. GeorgiaCarry.Org, 687 F.3d at 1248-49. The court found that no pre-existing right to carry firearms on the property of others existed, so the law did not infringe upon Second Amendment rights and no constitutional scrutiny need be applied. Id. at 1266.

The GeorgiaCarry.Org holding is of course not a perfect comparison to the instant situation. It concerned the rights of private property owners, namely places of worship, to keep firearms off of their privately owned property. See

28

<u>GeorgiaCarry.Org</u> 687 F.3d at 1264 ("Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed."). However, while Defendant Army Corps is not a private property owner, in contrast to many examples of publicly held lands, there is little doubt that Defendant Army Corps could exclude civilians from its property altogether. <u>See</u> <u>United States v. Jelinski</u>, 411 F.2d 476, 478 (5th Cir. 1969)[5] ("We do not doubt the Commander's historically recognized authority to summarily bar civilians from a military establishment in the exercise of his discretion in managing

---

[5]Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

29

AO 72A
(Rev.8/8
2)

the internal operations of the military facility."); see also 16 U.S.C. § 460d (stating that Defendant Army Corps is "authorized" to maintain recreational facilities, but including no requirement that it do so). Under those circumstances, the Eleventh Circuit's proclamation that private property owners may exclude guns from their property is relevant to the case at hand. It would be an awkward holding to find that, though Defendant Army Corps may exclude civilians from its property altogether, if it chooses to allow them access, it must also allow them to carry firearms.[6] Indeed,

_____

[6]The same can be said of the Morris court's position that placing a tent on Defendant Army Corps property makes such property more like a "home" and brings the regulation within the scope of Heller. See Morris, 990 F. Supp. 2d at 1085-86. Unlike private property or national park property, Plaintiffs have no constitutional or statutory right to pitch a tent in the first place. To hold that Defendant Army Corps' decision to allow civilians to erect tents on their property means that Defendant Army Corps must also

30

AO 72A
(Rev.8/8
2)

it is not hard to see how the end result of an order from this Court requiring Defendant Army Corps to allow the use of firearms for self defense on its property could result in the limitation of access to Defendant Army Corps property for all citizens, whether they are attempting to carry firearms or not.

The Court is aware that the right to carry firearms for self defense purposes is central to the Second Amendment. See McDonald, 130 S.Ct. at 3036 ("[S]elf-defense is 'the central component' of the Second Amendment right." (emphasis omitted)). However, the Court cannot find that the Firearms Regulation infringes on Plaintiffs' constitutionally enshrined right to defend themselves. The

---

allow firearms in those tents would be irrational.

31

AO 72A
(Rev.8/8
2)

only contours that the Supreme Court gave to this right to self defense is that citizens have a right to bear arms for self defense within the home. <u>See</u> <u>id.</u> at 3044 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."). The Firearms Regulation does not infringe on that right.

Further, while some lower courts have expanded on that limited right, such cases are inapplicable here. For example, Plaintiffs cite to two Seventh Circuit cases striking down laws as violative of the Second Amendment: <u>Ezell v. City of Chicago</u> and <u>Moore v. Madigan</u>. (<u>See</u> Br. Supp. Mot. Compel at 7.) In <u>Ezell</u>, a Chicago law banned residents from possessing firearms, even in the home, without first

32

AO 72A
(Rev.8/8
2)

completing at least "one hour of [firing] range training."

Ezell, 651 F.3d at 691. However, that same law "banned

[firing ranges] throughout the city." Id. Consequently, though

the Ezell Plaintiffs were technically challenging Chicago's

ban on firing ranges, that ban also burdened Chicago

residents' ability to possess firearms in their homes. No

such burden is at issue with the instant Firearms

Regulation. See, e.g., Young v. Hawaii, 911 F. Supp. 2d

972, 990 (D. Haw. Nov. 29, 2012) ("Unlike the law held

unconstitutional in McDonald, which operated as a complete

ban, or Ezell, which burdened gun ownership for

self-defense in the home, Hawaii's Firearm Carrying Laws

allow firearms to be carried in public between specified

locations or with a showing of special need. Plaintiff does

not allege a constitutional violation because the right to bear arms does not include the right to carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (internal quotation marks and citations omitted)).

In <u>Moore</u>, the Seventh Circuit evaluated an Illinois law that essentially banned the possession of loaded firearms outside the home altogether. <u>See Moore</u>, 702 F.3d at 936. The Court found that right to self defense espoused in <u>Heller</u> and <u>McDonald</u> necessarily included some right to bear arms outside ones home. <u>See id.</u> at 937 ("To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in <u>Heller</u> and <u>McDonald</u>."). In the words of Judge Posner, limiting the right to bear arms to ones home would do little

34

AO 72A
(Rev.8/8
2)

to protect the right to self defense, as "a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower." Id.

Certainly, Judge Posner's statement is true, and the Court does not address whether carrying firearms outside the home is protected under certain circumstances. Nonetheless, Judge Posner's proclamation bears little bearing on the instant facts. Unlike city streets, or even public schools, post offices, and other government properties, Defendant Army Corps has the right to exclude Plaintiffs from its property altogether, and Plaintiffs can ensure no harm befalls them on Defendant Army Corps

35

AO 72A
(Rev.8/8
2)

property by simply choosing to recreate elsewhere.[7] Indeed, courts have found carry restrictions on properties far more integral to citizens' everyday lives to fall outside the scope of the Second Amendment. See, e.g., Young, 911 F. Supp. 2d at 989-90 (finding that Hawaii laws banning firearm possession outside the home without application for a permit based on an exceptional showing of fear or injury "to the applicant's person or property"); Kachalsky v. Cacace, 817 F. Supp. 2d 235, 240, 264 (S.D.N.Y. Sept. 2, 2011)

---

[7]In the Fourth Amendment context, the Supreme Court has held that what may ordinarily be a constitutional incursion falls outside an individual's constitutional rights when such incursion is the result of an individual's voluntary actions. See, e.g., Wyman v. James, 400 U.S. 309, 317-18 (1971) (finding that requiring welfare recipients to allow social workers into their homes in order to receive aid did not violate fourth amendment rights because "the visitation in itself is not forced or compelled, and [] the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be . . .").)

36

AO 72A
(Rev.8/8
2)

(finding that a New York law banning handgun possession outside of the home without a showing of "a special need for self-protection distinguishable from that of the general community" fell outside the scope of the Second Amendment), aff'd 701 F.3d 81 (2d Cir. 2012); Digiacinto v. Rector & Visitors of George Mason Univ., 704 S.E.2d 365, 370, 281 Va. 127, 137 (Va. 2011) (finding that almost total ban of firearm possession on university campus did not violate second amendment); United States v. Dorsan, 350 Fed. App'x 874, 875-76 (5th Cir. 2009) (per curiam) (finding that a firearms ban in post office parking lots fell outside the scope of the Second Amendment). Consequently, the Firearms Regulation does not burden Plaintiffs' right to carry a firearm in self defense.

37

AO 72A
(Rev.8/8
2)

For all the above reasons, the Court finds that the conduct regulated by the Firearms Regulation falls outside the scope of the Second Amendment. Consequently, no further evaluation of the Firearms Regulation need occur. Nonetheless, out of an abundance of caution, the Court proceeds to consider the regulation's ability withstand constitutional scrutiny.

### b.  The Firearms Regulation Withstands Appropriate Constitutional Scrutiny

As discussed above, the Court finds that the Firearms Regulation does not burden rights protected by Second Amendment, and therefore falls outside its scope. Nonetheless, the Court is mindful that, though the Second Amendment was drafted almost two and a quarter centuries ago, litigation over its meaning, and the resulting case law,

38

AO 72A
(Rev.8/8
2)

is still in its infancy. Indeed, as pointed out by Defendants,

another district court faced with the same question found

that the Firearms Regulation burdened Second Amendment

rights. See Morris, 990 F. Supp. 2d at 1085 ("The Court

must ask first whether [Defendant Army] Corps' regulation

burdens conduct protected by the Second Amendment. It

does."). Consequently the Court proceeds to determine the

appropriate level scrutiny and apply it to this case under the

assumption that the Firearms Regulation treads upon

Second Amendment protections.

### i.   Intermediate   Scrutiny   Would Apply

Though the Heller court declined to determine the

appropriate level of scrutiny to apply to Second Amendment

based challenges, it did take rational-basis scrutiny off the

39

AO 72A
(Rev.8/8
2)

table. See Heller, 554 U.S. at 629 n.27 ("[Rational-basis scrutiny] could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms."). This leaves the Court to choose between strict scrutiny, which requires that a law be narrowly tailored to serve a compelling government interest, see Abrams v. Johnson, 521 U.S. 74, 91 (1997), and intermediate scrutiny, which requires a law to be substantially related to an important governmental interest, see Clark v. Jeter, 486

40

U.S. 456, 461 (1988).[8] For the following reasons, the Court finds that the intermediate scrutiny standard applies here.

First, the Court finds that the lowest possible level of scrutiny applies because Defendant Army Corps' issuance of the Firearms Regulation was not an act of governance--it was a managerial action affecting only government owned lands. The Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as a lawmaker,' and the government

---

[8]The Supreme Court has also used an "undue burden" test in the context of laws limiting access to abortions. See, e.g., Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 877 (1992). However, the Court finds such a standard, which provides that a law is permissible as long as it does not have the "purpose or effect of placing a substantial obstacle in the path" of the individual seeking to engage in constitutionally protected conduct, best left to the abortion cases from which it stemmed. Id.

41

AO 72A
(Rev.8/8
2)

acting 'as proprietor, to manage [its] internal operation.'"
Engquist v. Oregon Dept. of Agr., 553 U.S. 591, 598 (2008)
(quoting Cafeteria & Restaurant Workers v. McElroy, 367
U.S. 886, 896 (1961)) (alterations in original). Indeed, the
Ninth Circuit used this government property rationale to
uphold a law stating that "[e]very person who brings onto or
possesses on County property a firearm, loaded or
unloaded, or ammunition for a firearm is guilty of a
misdemeanor." Nordyke v. King, 681 F.3d 1041, 1044 (9th
Cir. 2012); see also United States v. Masciandaro, 638 F.3d
458, 473 (4th Cir. 2011) (upholding restrictions on firearms
in national parks based, in part, the rule that "[t]he
government . . . is invested with 'plenary power' to protect
the public from danger on federal lands under the Property

42

AO 72A
(Rev.8/8
2)

Clause"). The respect courts must pay to government decisions concerning the management of its own lands only increases when the land in question is military property. <u>See</u> <u>Jelinski</u>, 411 F.2d at 478 (finding that military base commander "was not required to afford notice and a hearing to appellant prior to barring him from the base").

Second, the voluntary nature of Plaintiffs' presence on Defendant Army Corps property limits the extent to which Plaintiffs' Second Amendment rights are burdened by the Firearms Regulation. As the <u>Moore</u> Court wrote: "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a

43

AO 72A
(Rev.8/8
2)

need." <u>Moore</u>, 702 F.3d at 940; <u>see also</u> <u>Jackson v. City &</u>

<u>Cnty. of San Francisco</u>, 746 F.3d 953, 961 (9th Cir. 2014)

(applying to Second Amendment case the First Amendment

principle that "laws that place reasonable restrictions on the

time, place, or manner of protected speech and that leave

open alternative channels for communication of information,

pose less of a [constitutional] burden" (internal quotation

marks and citation omitted)). In other words, unlike most

laws that have been struck down on Second Amendment

grounds, the Firearms Regulation only burdens Plaintiffs'

right to defend themselves on a finite amount of property.

Further, the property in question is not a road, a school, or

a post office that Plaintiffs arguably <u>need</u> to use on a regular

basis. Defendant Army Corps property is merely a collection

AO 72A
(Rev.8/8
2)

of recreational campsites. The Court cannot find that any limitation of Plaintiffs' ability to bear arms on those campsites constitutes a serious burden on Plaintiffs' Second Amendment rights.

Consequently, for both of the above reasons, the Court applies intermediate scrutiny to the Firearms Regulation.

### b.   The   Regulation   Withstands Intermediate Scrutiny

In the Second Amendment context, "under intermediate scrutiny the government must assert a significant, substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary." Drake v. Filko, 724 F.3d 426, 436 (3d Cir. 2013); see also Nat'l Parks

AO 72A
(Rev.8/8
2)

Conservation Ass'n v. Norton, 324 F.3d 1229, 1244 (11th Cir. 2003) ("Under [intermediate scrutiny], a preference may be upheld so long as it is substantially related to an important governmental objective." (internal quotation marks and citation omitted)). "When reviewing the constitutionality of statutes, courts 'accord substantial deference to the [legislature's] predictive judgments.'" Drake, 724 F.3d at 436-37 (quoting Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997)) (alteration in original)).

Here, Defendant Army Corps undoubtedly has a substantial interest in "providing the public with safe and healthful recreational opportunities while protecting and enhancing [its] resources." 36 C.F.R. § 327.1. The only question is whether there is a reasonable fit between that

AO 72A
(Rev.8/8
2)

interest and the Firearms Regulation. The Court finds that there is.

First, the Firearms Regulation contributes to ensuring that visitors to Defendant Army Corps' property are safe. There is evidence in the record that Defendant Army Corps' facilities "have a high density of use" from a "diverse mixture of visitors with their own lifestyles." (Austin Decl. ¶ 4.) These visitors regularly play loud music, socialize at inconvenient hours, and consume alcohol. (Id.) Such circumstances inevitably lead to conflicts, and the Court cannot find unreasonable Defendant Army Corps conclusion that "[t]he presence of a loaded firearm could far more quickly escalate such tension between visitors from a minor disagreement to a significant threat to public safety." (Id.)

47

AO 72A
(Rev.8/8
2)

Second, the Firearms Regulation is reasonably suited to protecting the infrastructure projects that lie at the heart of Defendant Army Corps' properties. As stated above, "[b]oth [Defendant Army Corps] and the U.S. Department of Homeland Security have identified certain [Defendant Army Corps]-managed infrastructure as critical to homeland security and the economy." (Austin Decl. ¶ 9.) Further, [e]arly detection of threats to [Defendant Army Corps]-managed infrastructure is aided by current [Defendant Army Corps] policy, and could be compromised by an overly permissive firearms policy." (Id.) The Court finds it reasonable for Defendant Army Corps to limit the carrying of loaded firearms around such sensitive areas.

48

AO 72A
(Rev.8/8

Finally, and perhaps most importantly, the limitations on Defendant Army Corps' ability to police its own property make the Firearms Regulations key to achieving its goal of maintaining safe premises for all visitors. Defendant Army Corps' Park Rangers ("Park Rangers") do not carry weapons. (Austin Decl. ¶ 5.) Indeed, Park Rangers could not carry firearms even if they chose to, as Congress has not given them any authorization to carry firearms, execute search warrants, or enforce other federal laws on Defendant Army Corps' property. (Id.) Instead, Park Rangers must call in local law enforcement to handle any serious issues. (Id. ¶ 7.) And, even when local law enforcement is called in, they can only enforce state and local laws, and they are still

49

AO 72A
(Rev.8/8
2)

subject to their other state and local law enforcement demands. (Id.)

The Court is aware that this case is only at the preliminary injunction stage, and as discovery takes place and more evidence comes before the Court, the situation may change. However, at this point, the Court finds it likely that the Firearms Regulations is reasonably suited to advance a substantial government interest.

## B.   Irreparable Injury

Plaintiff asserts that irreparable injury exists in this case because an "alleged deprivation of a constitutional right is sufficient to constitute irreparable injury," and "Plaintiffs have not only alleged a deprivation of a constitutional right, but they have shown that they are likely to succeed on the

50

merits in their alleged deprivation." (Br. Supp. Prelim. Inj. at 9 (internal quotation marks and citation omitted).) Further, Plaintiffs contend "that they cannot be financially compensated for their harm, and they are suffering the harm now, and on a continual basis, at the height of the outdoor recreational season in Georgia." (<u>Id.</u>) The Court disagrees with Plaintiffs' position, and finds that there is no evidence of irreparable harm in this case.

The Court does not question that a demonstrated violation of certain constitutional rights satisfies the irreparable harm requirement without any further showing. <u>See, e.g., Cate v. Oldham</u>, 707 F.2d 1176, 1188 (11th Cir. 1983) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes

51

AO 72A
(Rev.8/8
2)

irreparable injury justifying the grant of a preliminary injunction." (internal quotation marks and citation omitted)). But see, e.g., N.E. Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl., 896 F.2d 1283, 1285 (11th Cir. 1990) ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation."). However, the Court need not decide whether the Second Amendment's protections are of the sort that, when violated, trigger a presumption of irreparable harm, as there is no indication here that such a violation has occurred. See supra Part III.A. It is the showing of a likelihood of constitutional deprivation, not merely the

52

allegation of such a depravation, that amounts to irreparable harm. See Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) ("[T]he absence of a substantial likelihood of irreparable injury . . . standing alone, make[s] preliminary injunctive relief improper."). Consequently, because Plaintiffs do not demonstrate a likelihood of constitutional harm in the first place, Plaintiffs fail to demonstrate that irreparable harm will flow from a denial of the instant Motion for Preliminary injunction.

## C.   Balance of Harms and The Public Interest

Plaintiffs also fail to demonstrate that the balance of harms falls in their favor. Even assuming that Plaintiffs eventually do prevail on the merits, the most harm that will befall them from denial of the instant Motion is a temporary

53

AO 72A
(Rev.8/8
2)

inability to carry firearms for self protection while camping on Defendant Army Corps' property.[9] While the Court in no way means to downplay the importance of protecting individual rights, given the relatively uncertain nature of Second Amendment rights and the fact that the status quo is, and has been for some time, the continued enforcement of the Firearms Regulation, such a temporary setback to Plaintiffs' firearms use is relatively minor.

Contrastingly, should the Court grant Plaintiffs' Motion, the consequences to Defendant Army Corps and the public that enjoys recreating on Defendant Army Corps property

_____

[9]The Complaint makes clear that the Firearms Regulation has not dissuaded Plaintiff James from camping on Defendant Army Corps' property altogether.  (See Compl. ¶ 17 ("'[Plaintiff] James regularly camps on [Defendant Army Corps'] property and facilities at Lake Atoona [sic].").)

54

AO 72A

(Rev.8/8

would be severe. Defendant Army Corps would not just have to change its rule on firearms, it would have to remold the entire regulatory framework governing recreation at recreational facilities. (See Austin Decl. ¶ 9 ("[Defendant Army] Corps would need to address a number of issues before changing the current regulation on the use and possession of firearms.").) This would likely include limitations on alcohol consumption, increased spending on protection for Park Rangers and outside police forces, and limitation of public services as a result of budgetary concerns. (Id. ¶ 10.) Indeed, should the Court order Defendant Army Corps to allow increased firearm use on its property, it is highly possible that Defendant Army Corps would have to, at least temporarily, close off its public

55

AO 72A
(Rev.8/8
2)

facilities altogether while it altered its operation to better deal with a more firearm saturated environment. Consequently, granting Plaintiffs' Motion, especially given the possibility, if not likelihood, that Defendants will eventually prevail on the merits of their claim would cause severe, possibly unnecessary, harm to Defendants and the public interest. The Court therefore finds that the balance of harms and public interest factors tip in favor denying Plaintiffs' Motion.

### E.   Summary

For all the above reasons, the Court finds that Defendants are likely to prevail on the merits, that Plaintiffs will not be irreparably harmed should the Court deny their Motion, that the balance of harms tips in favor of

56

AO 72A

(Rev.8/8
2)

Defendants, and that the public interest would be harmed if the Court were to grant Plaintiffs' Motion. Further, the above discussion aside, all Parties surely agree that the law governing Second Amendment rights is in its infancy and that the allegations in this case are relatively untested. Given these circumstances, the Court finds it appropriate to maintain the status quo until the Parties' rights can be fully and fairly adjudicated. See Suntrust Bank, 268 F.3d at 1265 ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.") (internal quotation marks and citation omitted). Consequently, the Court denies Plaintiffs' Motion for Preliminary Injunction.

57

AO 72A
(Rev.8/8
2)

## IV.  Conclusion

ACCORDINGLY, the Court **DENIES** Plaintiffs' Motion

for Preliminary Injunction [5].

IT IS SO ORDERED, this the 18 day of August, 2014.

_____

UNITED STATES DISTRICT JUDGE

58

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

GEORGIACARRY.ORG, INC.  )
And DAVID JAMES,    )
            )
  Plaintiffs      )  CIVIL ACTION FILE NO.
            )
v.           )  4:14-CV-139-HLM
            )
            )
THE U.S. ARMY CORPS OF  )
ENGINEERS,      )
And          )
JON J. CHYTKA, in his official  )
Capacity as Commander, Mobile  )
District of the US Army Corps of  )
Engineers,       )
            )
  Defendants.     )

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that all Plaintiffs in this action hereby appeal to the United States Court of Appeals for the Eleventh Circuit from the Order denying Plaintiffs' Emergency Motion for a Preliminary Injunction, entered on August 18, 2014 [Doc. 19].

JOHN R. MONROE,

−1−

126

_____/s/ John R. Monroe_____
John R. Monroe
Attorney at Law
9640 Coleman Road
Roswell, GA 30075
Telephone: (678) 362-7650
Facsimile: (770) 552-9318
jrm@johnmonroelaw.com
Georgia Bar No. 516193

ATTORNEY FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 20, 2014, I served a copy of the foregoing via ECF upon:

Daniel Riess
Daniel.riess@usdoj.gov

<u>      /s/ John R. Monroe </u>
John R. Monroe

# UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF GEORGIA
#### 600 E. FIRST STREET
##### ROME, GA 30161

**JAMES N. HATTEN**
DCE/CLERK OF COURT

706-378-4060

Thomas K. Kahn, Clerk
U.S. Court of Appeals, Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia   30303

**U.S.D.C. No.  4:14-cv-139-HLM**
**U. S.C.A. No.**
**In re:  GeorgiaCarry.Org, Inc., et al Vs The U.S. Army Corps of Engineers, et al**

Enclosed are documents regarding an appeal in this matter.

| | |
|---|---|
| X | Certified copies of the **Interlocutory** notice of appeal, docket sheet, order appealed enclosed. |
| _____ | This is not the first notice of appeal.  Other notices were filed on: . |
| _____ | There is a transcript(s)  but Financial Arrangements . |
| _____ | The court reporter is . |
| _____ | There is sealed material as described below: . |
| _____ | Other: |
| x | Fee paid on 8/20/14 |
| _____ | Appellant has been granted leave to file *in forma pauperis.* |
| _____ | This is a bankruptcy appeal.  The Bankruptcy Judge is . |
| _____ | The Magistrate Judge is . |
| _____ | The District Judge is Harold L Murphy |
| _____ | This is a **DEATH PENALTY** appeal. |

Sincerely,

James N. Hatten,
DCE/Clerk of Court
By   s/Brenda Hambert
Deputy Clerk

Enclosures

129