**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| GEORGIACARRY.ORG, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO. |
| v. | ) ) | 4:14-CV-139-HLM (consolidated with 4:15-CV-0009-HLM) |
| U.S. ARMY CORPS OF ENGINEERS et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ...................................................................................2

STATUTORY AND REGULATORY BACKGROUND.........................................3

PROCEDURAL HISTORY.......................................................................................5

ARGUMENT ............................................................................................................5

    I.   The Army Corps' Firearms Regulation Does Not Burden Conduct
Protected by the Second Amendment ............................................................6

   II.   In Any Event, the Army Corps Regulation Readily Withstands
Intermediate Scrutiny..................................................................................16

          A. At Most, Intermediate Scrutiny Applies to the Challenged
Regulation...........................................................................................14

          B. The Regulation Here Satisfies the Appropriate Level of
Review ................................................................................................17

CONCLUSION.......................................................................................................27

i

## INTRODUCTION

The Army Corps receives millions of visitors each year to Corps-managed recreation areas in Georgia located on water resource development projects that the agency administers.  Like many other federal agencies, the Army Corps has long restricted the possession of loaded firearms on its property under its constitutional and statutory authority as property owner.  As the largest provider of federal outdoor recreation based on annual visitation, the Army Corps has a firm and longstanding commitment to providing violence-free recreational areas, and the Army Corps' firearms regulation forms an important part of that commitment.

Plaintiffs argue that the Army Corps' restriction on firearms possession on its property violates the Second Amendment because the individual plaintiffs wish to arm themselves when they visit Corps-managed lands in Georgia, but this argument has no merit.  The Army Corps regulation does not burden conduct falling within the scope of the Second Amendment's guarantee.  In any event, however, the regulation easily survives constitutional means-end scrutiny because the regulation substantially relates to the Army Corps' compelling interest in protecting both the safety of visitors to its property and of its employees, and preventing violent crime on that property.  Accordingly, the Court should enter summary judgment for Defendants.

1

# FACTUAL BACKGROUND

Plaintiff David James alleges that he is a Georgia resident, and that several weeks every year, he camps in a tent on the McKaskey Creek Campground, a camping facility located on recreational facilities managed by the Army Corps surrounding Lake Allatoona in northwest Georgia.  Compl., ECF No. 1, ¶¶ 6, 18, 22.  On or about May 21, 2014, Plaintiff James emailed an Army Corps official seeking permission to carry a loaded firearm while visiting the Army Corps' Lake Allatoona property.  SAM AR at 3.[1]  Defendant John J. Chytka, Commander of the Army Corps' Mobile District, responded on June 9, 2014, explaining that in consideration of the Army Corps' policy to manage its project resources in the public interest and to provide the public with safe and healthful recreational opportunities, he had determined not to exercise his discretion to grant Plaintiff James permission to possess a loaded firearm while visiting the Lake Allatoona property.  SAM AR at 2.

Plaintiff Brian Barrs alleges that he is a Georgia resident, and that during the summer months, he uses the facilities at Mistletoe State Park "weekly and

---

[1] Defendants have filed three administrative records in this case: (1) the record for 36 C.F.R. Part 327, Final Rule, "Public Use of Water Resources Development Projects Administered by the Chief of Engineers" ("HQ AR"); (2) the record related to Plaintiff David James' request to carry a firearm on Lake Allatoona property ("SAM AR"); and (3) the record related to Plaintiff Brian Barrs' request to carry a firearm on J. Strom Thurmond Dam and Lake ("SAS AR").

sometimes daily;" Mistletoe is a park operated by the State of Georgia on Army Corps recreational facilities located at J. Strom Thurmond Lake.  Compl., No. 4:15-CV-0009-HLM, ECF No. 1, ¶¶ 6, 24-25.  The Thurmond Lake property is located near the state border of Georgia and South Carolina.  On or about June 16, 2014, Plaintiff Barrs emailed an Army Corps official seeking permission to carry a loaded firearm while visiting the Army Corps' Lake Thurmond property.  SAS AR at 3.  Thomas J. Tickner, then-Commander of the Army Corps' Savannah District, responded to Plaintiff Barrs on July 8, 2014, and explained that he had determined not to exercise his discretion to permit Plaintiff Barrs to possess a loaded firearm while visiting the Lake Thurmond property.  SAS AR at 1.[2]

## STATUTORY AND REGULATORY BACKGROUND

In Section 4 of the Flood Control Act of 1944, Congress authorized the Army Corps to "construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army."  16 U.S.C. § 460d.  The Act provides that "all such projects shall be open to public use generally" for various "recreational purposes, . . . when such use is determined by the Secretary of the Army not to be contrary to

---

[2] Plaintiffs James and Barrs further allege that they are members of GeorgiaCarry.Org, Inc., a non-profit corporation ("GeorgiaCarry"), which is also a named plaintiff.  Compl. ¶ 7; Compl., No. 4:15-CV-0009-HLM, ¶ 7.

the public interest, all under such rules and regulations as the Secretary of the

Army may deem necessary." *Id*.

Utilizing this rulemaking authority, the Army Corps has issued federal

regulations governing the public use of Army Corps-managed water-resource

development projects. *See* 36 C.F.R. pt. 327. To provide for "more effective

recreation-resource management of the lake and reservoir projects," the Army

Corps issued regulations in 1973. 38 Fed. Reg. 7,552, 7,552 (Mar. 23, 1973).[3] As

amended, the regulation entitled "Explosives, firearms, other weapons and

fireworks" provides:

> (a) The possession of loaded firearms, ammunition, loaded projectile
> firing devices, bows and arrows, crossbows, or other weapons is
> prohibited unless:
>> (1) In the possession of a Federal, state or local law
>> enforcement officer;
>> (2) Being used for hunting or fishing as permitted under §
>> 327.8, with devices being unloaded when transported to, from
>> or between hunting and fishing sites;
>> (3) Being used at authorized shooting ranges; or
>> (4) Written permission has been received from the District
>> Commander.
>
> (b) Possession of explosives or explosive devices of any kind,
> including fireworks or other pyrotechnics, is prohibited unless written
> permission has been received from the District Commander.

36 C.F.R. § 327.13 (the "Firearms Regulation").

---

[3] Restrictions on the use of firearms in Army Corps reservoir areas date to at least
1946. SAM AR 1149.

4

## PROCEDURAL HISTORY

Plaintiffs James and GeorgiaCarry filed the lead action on June 12, 2014, and moved for a preliminary injunction shortly thereafter.  The Court denied preliminary injunctive relief in a written order.  *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 38 F. Supp. 3d 1365 (N.D. Ga. 2014) ("*GeorgiaCarry II*").  The Eleventh Circuit affirmed.  *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318 (11th Cir. 2015) ("*GeorgiaCarry III*").  On February 18, 2015, the Court consolidated the lead action with case no. 4:15-CV-0009-HLM, an action brought by Plaintiffs GeorgiaCarry and Barrs.  Order, ECF No. 27, Feb. 18, 2015, No. 4:15-CV-0009-HLM.

## ARGUMENT

The Eleventh Circuit has established a two-step analysis for deciding Second Amendment challenges.  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012) ("*GeorgiaCarry I*").  Under this approach, the Court "ask[s] if the restricted activity is protected by the Second Amendment in the first place;" if so, the Court "appl[ies] the appropriate level of scrutiny."  *Id*.  Here, Plaintiffs' challenge fails both steps of this inquiry.  The Firearms Regulation does not burden conduct protected by the Second Amendment.  In any event, even if the Second Amendment were implicated here, the regulation readily withstands the

appropriate level of scrutiny.  The Court should therefore enter summary judgment for Defendants.

## I.      The Army Corps' Firearms Regulation Does Not Burden Conduct Protected by the Second Amendment.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual's right to possess arms for the purpose of self-defense in the home.  The Court thus invalidated a District of Columbia statute that the Court characterized as an "absolute prohibition of handguns held and used for self-defense in the home."  *Id.* at 636.

As the Eleventh Circuit explained on appeal in this case, "the right secured by the Second Amendment is not unlimited."  *GeorgiaCarry III*, 788 F.3d at 1323 (quoting *Heller*, 554 U.S. at 626).  The Court recognized that nothing in *Heller* "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* (quoting *Heller*, 554 U.S. at 626-27).  As the Eleventh Circuit explained, these examples represented "a non-

exhaustive list of presumptively lawful regulatory measures."  *Id.* (quoting *Heller*, 554 U.S. at 627 n.26).[4]

Because the Firearms Regulation is a "law[] forbidding the carrying of firearms in [a] sensitive place[]," *Heller*, 554 U.S. at 626, it addresses conduct that falls outside the scope of the Second Amendment's protection.  *See GeorgiaCarry II*, 38 F. Supp. 3d at 1371-76; *see also United States v. Marzzarella*, 614 F.3d 85, 91-92 (3d Cir. 2010) (concluding, after extensive analysis, that the presumptively lawful regulatory measures identified in *Heller* concern "exceptions to the right to bear arms" to which "the Second Amendment affords no protection").

As this Court has recognized, it is extremely improbable that "the framers of the Constitution would have recognized a civilian's right to carry firearms on property owned and operated by the United States Military, especially when such

---

[4] In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), a plurality of the Court reaffirmed its statements in *Heller* regarding the limited nature of the Second Amendment right.  The plurality reiterated the point from *Heller* "that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'"  *Id.* at 786 (quoting *Heller*, 554 U.S. at 626) (Alito, J., joined by Roberts, C.J., and Scalia and Kennedy, JJ.).  And the plurality further noted that the Court "made it clear in *Heller* that [its] holding did not cast doubt on . . . longstanding regulatory measures" including, as most relevant here, "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'"  *Id.* (quoting *Heller*, 554 U.S. at 626).  The plurality continued: "[w]e repeat those assurances here.  Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms."  *Id.*

7

property contained infrastructure products central to our national security and well being." *GeorgiaCarry II*, 38 F. Supp. 3d at 1373. "[T]he pre-existing right encompassed by the Second Amendment was not free from locational restrictions." *Id*. at 1371 n.4. Rather, such restrictions are among the "traditional restrictions" that tend "to show the scope of the right." *McDonald*, 561 U.S. at 802 (Scalia, J., concurring). "[W]hen the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee." *Nat'l Rifle Ass'n ("NRA") v. ATF*, 700 F.3d 185, 200 (5th Cir. 2012), *cert. denied*, 134 S. Ct. 1364 (2014). "Since even before the Revolution, gun use and gun control have been inextricably intertwined" and "[t]he historical record shows that gun safety regulation was commonplace in the colonies," including "laws prohibiting the use of firearms on certain occasions and in *certain places*." *Id*. (emphasis added).

Forbidding the carrying of firearms in sensitive places is consistent with nineteenth-century State cases analyzing the Second Amendment and State analogues. As these decisions explain, the government retains authority to impose firearms restrictions "as is necessary for the preservation of the peace, the protection of the person and property of the citizens, and the fulfillment of [its] other constitutional duties." *Hill v. State*, 53 Ga. 472, 482-83 (Ga. 1874).

Accordingly, "the right to keep and bear arms is not infringed if the exercise of it be by law prohibited at places and times when a proper respect for the majesty of the law, a sense of decency and propriety, or the danger of a breach of the peace, forbid it." *Id*. at 479.

State courts have thus readily upheld prohibitions on firearms in a wide variety of sensitive places.  For example, the Texas Supreme Court upheld an 1871 statute that prohibited carrying firearms in specified places including churches, religious assemblies, school rooms, or other places where persons were assembled for amusement or for educational or scientific purposes.  *See English v. State*, 35 Tex. 473, 479 (1871) (upholding Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws 25-26).  The Texas Supreme Court considered it "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly." *Id*. at 478. Similar provisions applicable to various sensitive places in other States were likewise not thought to offend the right to bear arms.  *See id*. at 479 ("It is safe to say that almost [all], if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration."); *Hill*, 53 Ga. at 474 (upholding Act of Oct. 18, 1870, No. 285, 1870 Ga. Laws 421, which prohibited

9

firearms at courts, election grounds, and "any other public gathering"); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (noting that Missouri Supreme Court had upheld law that prohibited firearms at a number of places including "any school-room or place where people are assembled for educational, literary, or social purposes.").

The Army Corps Firearms Regulation represents another such permissible firearms restriction. The Army Corps remains "an integral part of the United States Armed Forces," and "the existence of [its] 'recreational facilities' is merely a byproduct of the sensitive dam construction projects nearby." *GeorgiaCarry II*, 38 F. Supp. 3d at 1372, 1372-73.[5] And history provides no warrant for concluding that a person may assert the Second Amendment's "core" guarantee, *Heller*, 554 U.S. at 634, on publicly-owned and -managed property that he or she is merely visiting. *See United States v. Adame-Najera*, No. 2:10-CR-10-01-RWS, 2010 WL 6529643, at *3 (N.D. Ga. Nov. 24, 2010) ("The Court made clear in *Heller* that the Second Amendment right it recognized was 'the right of law-abiding, responsible

---

[5] Several other courts have upheld restrictions on firearms in sensitive places, including public areas used for recreational purposes. *See Warden v. Nickels*, 697 F. Supp. 2d 1221, 1224 (W.D. Wash. 2010) (park facilities); *Embody v. Ward*, No. 10-126, 2011 WL 2971055, at *10-11 (M.D. Tenn. July 20, 2011) (public park), *aff'd on other grounds*, 695 F.3d 577 (6th Cir. 2012); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009) (motor vehicles on national park land), *aff'd on other grounds*, 638 F.3d 458 (4th Cir. 2011).

citizens to use arms in defense of hearth and home.'") (quoting *Heller*, 554 U.S. at

634-35), *report and recommendation adopted*, No. 2:10-CR-00010-01-RWS, 2011

WL 1497889 (N.D. Ga. Apr. 19, 2011).

Furthermore, *GeorgiaCarry.Org I*, which upheld a state law barring the

unrestricted carrying of weapons by "people who assemble in eight specific

locations," is instructive here.  687 F.3d at 1248.  In that case, the Eleventh Circuit

"found that no pre-existing right to carry firearms on the property of others existed,

so the law did not infringe upon Second Amendment rights and no constitutional

scrutiny need be applied."  *GeorgiaCarry II*, 38 F. Supp. 3d at 1373 (citing

*GeorgiaCarry I*, 687 F.3d at 1266).  The Eleventh Circuit explained that "any

Second Amendment right 'must be limited by the equally fundamental right of a

private property owner to exercise exclusive dominion and control over its land.'"

*GeorgiaCarry III*, 788 F.3d at 1324 (quoting *GeorgiaCarry II*, 687 F.3d at 1265).

And it is not necessary to equate public lands with private property to recognize an

analogy between a person visiting land owned by a private third party and a visitor

on land owned by a public third party.  Indeed, the Supreme Court has "stated on

several occasions, the State, no less than a private owner of property, has power to

preserve the property under its control for the use to which it is lawfully

dedicated."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46

(1983) (internal punctuation omitted).  And the fact that the Army Corps "could exclude civilians from its property altogether" makes the Eleventh Circuit's "proclamation that private property owners may exclude guns from their property . . . relevant to the case at hand." *GeorgiaCarry II*, 38 F. Supp. 3d at 1374. Notably, in Georgia, private property owners or persons in legal control of private property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such private property have the right to exclude or eject a person who possesses firearms on their private property.  Ga. Code Ann. § 16-11-127(c).

By analogy, it would be counterintuitive to conclude that though the Army Corps "may exclude civilians from its property altogether, if it chooses to allow them access, it must also allow them to carry firearms." *GeorgiaCarry II*, 38 F. Supp. 3d at 1374.  Moreover, that the existence of conditions on a visitor's access to its lands may affect the visitor's constitutional rights does not change the analysis. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799-800 (1985) ("Even protected speech is not equally permissible in all places and at all times.  Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the

12

disruption that might be caused by the speaker's activities.").[6]  As an owner of the land in question, the Army Corps has more leeway in setting conditions for the use of that land than a governmental body acting in its regulatory capacity.

Indeed, the Army Corps regulation is particularly well-grounded in light of the fact that "the Property Clause gives Congress the power over the public lands to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them.'"  *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976) (citation and internal punctuation omitted); *see also id.* at 539 ("[T]he Clause, in broad terms, gives Congress the power to determine what are needful rules respecting the public lands.") (internal punctuation omitted).  And Congress delegated broad authority to the Army Corps to regulate the use of its property in furtherance of the public interest, by providing that Army Corps projects "shall be open to public use generally" for various "recreational purposes, . . . when such use is determined by the Secretary of the Army not to be contrary to the public interest, all under such rules and regulations as the Secretary of the Army may deem necessary."  16 U.S.C. § 460d.  This authority includes the ability to "prohibit[] any 'use' of the lands . . . which is

---

[6] *See also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1475 (2009) ("[T]here is both precedent and reason for allowing the government acting as proprietor extra power to restrict the exercise of many constitutional rights on its property.").

determined by the Secretary of the Army to be 'contrary to the public interest.'" *South Dakota v. Bourland*, 508 U.S. 679, 690 (1993) (quoting 16 U.S.C. § 460d); *see also Light v. United States*, 220 U.S. 523, 536 (1911) ("The United States can prohibit absolutely or fix the terms on which its property may be used . . . . These are rights incident to proprietorship . . . . ").

The Army Corps issued the Firearms Regulation under this expansive authority to administer the public use of park and recreational facilities at water resource development projects under its control.  "Beyond doubt, the Property Clause authorizes the enactment and enforcement of regulations which, like those at issue in this case, are designed to maintain safety and order on government property."  *United States v. Gliatta*, 580 F.2d 156, 160 (5th Cir. 1978).[7]  The Firearms Regulation was enacted to protect the safety of individuals who recreate on the public land that the Army Corps owns and administers.  Indeed, the fact that the Firearms Regulation is consistent with the Army Corps' proprietary interests is further evidenced by the fact that, as noted above, owners of private property in Georgia maintain the right to exclude or eject persons who possess firearms on their property.  *See* Ga. Code Ann. § 16-11-127(c).

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1, 1981.

Furthermore, the Fifth Circuit has "state[d] that a longstanding, presumptively lawful regulatory measure – whether or not it is specified on *Heller*'s illustrative list – would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." *NRA*, 700 F.3d at 196 (citing *Heller v. Dist. of Columbia* ("*Heller II*"), 670 F.3d 1244, 1253 (D.C. Cir. 2011). Thus, a "regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment." *Id.*

Restrictions on the use of firearms in Army Corps reservoir areas date back to at least 1946. SAM AR 1149. Such restrictions are thus "firmly historically rooted." *NRA*, 700 F.3d at 204. "After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage." *Id.* at 196; *see also United States v. Booker*, 644 F.3d 12, 23- 24 (1st Cir. 2011) (explaining that the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), "bears little resemblance to laws in effect at the time the Second Amendment was ratified," as it was not enacted until 1938, was not expanded to cover non-violent  felonies until 1961, and was not re-

focused from receipt to possession until 1968); *United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010 (en banc) (explaining that 18 U.S.C. § 922(g)(4), which forbids firearm possession by a person who has been adjudicated to be mentally ill, was enacted in 1968).

In sum, "there is no reason to doubt that the Firearms Regulation, which restricts the use of firearms on military property nearby sensitive infrastructure projects, does not fall squarely into the existing 'laws forbidding the carrying of firearms in sensitive places' referenced in *Heller*." *GeorgiaCarry II*, 38 F. Supp. 3d at 1373.  The Court should thus uphold the Firearms Regulation because it is "presumptively lawful," *Heller*, 554 U.S. at 626-27, and does not burden conduct protected by the Second Amendment.

## II.     In Any Event, the Army Corps Regulation Readily Withstands Intermediate Scrutiny.

Alternatively, if the Court were to determine that the Firearms Regulation burdens protected conduct, it must "apply the appropriate level of scrutiny." *GeorgiaCarry I*, 687 F.3d at 1260 n.34.  In the event that a "standard of scrutiny" analysis is necessary here, the Court should evaluate the Firearms Regulation under no more stringent level of review than intermediate scrutiny.  As explained below, the Regulation readily passes constitutional muster.

**A.    At Most, Intermediate Scrutiny Applies to the Challenged Regulation.**

"As laws burdening protected conduct under the First Amendment are susceptible to different levels of scrutiny, similarly the Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue." *Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013) (internal punctuation omitted).  The Eleventh Circuit correctly rejected Plaintiffs' argument that the Firearms Regulation "destroys" Plaintiffs' Second Amendment rights, explaining that the law at issue in *Heller* "involved [a] vastly broader firearms regulation[]" than the restriction at issue here." *GeorgiaCarry.Org*, 788 F.3d at 1325.

This Court should similarly reject any argument that strict scrutiny should apply here.  As the Eleventh Circuit correctly recognized, the Firearms Regulation "is narrowly cabined to a specific area, and in this case that area is specifically designated for recreation." *Id.* at 1326.  Moreover, the individual plaintiffs "can freely exercise their right to bear arms for self-defense elsewhere, whether in the home or on the streets, without running afoul of this regulation." *Id.*

In its preliminary injunction decision, this Court correctly held that even if the Firearms Regulation affects conduct protected by the Second Amendment, any constitutional means-end analysis of the regulation should apply no more than

17

intermediate scrutiny for two key reasons.  *GeorgiaCarry II*, 38 F. Supp. 3d at 1376-77.

 First, because the Army Corps was acting in its proprietary capacity when it enacted the challenged regulation, its action is subject to "the lowest possible level of scrutiny."  *GeorgiaCarry II*, 38 F. Supp. 3d at 1376.  Second, even assuming that the Army Corps regulation affected rights protected by the Second Amendment, the voluntary nature of Plaintiffs' presence on Corps property limits the extent to which those rights are affected.  *Id*. at 1377; *see also Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need."); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("Intermediate scrutiny makes sense in the Second Amendment context.  The right to carry weapons in public for self-defense poses inherent risks to others.  Firearms may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate.").[8]

---

[8] Additionally, courts addressing restrictions on the possession of firearms outside the home, such as the Army Corps regulation, have almost uniformly declined to apply a standard above intermediate scrutiny.  *See Drake*, 724 F.3d at 435-36

Consequently, even if the Army Corps regulation did affect conduct

protected by the Second Amendment, and the Court applies a constitutional means-

end analysis, it should apply no more than intermediate scrutiny.

### B.     The Regulation Here Satisfies the Appropriate Level of Review.

"In the Second Amendment context, 'under intermediate scrutiny the

government must assert a significant, substantial, or important interest; there must

also be a reasonable fit between that asserted interest and the challenged law, such

that the law does not burden more conduct than is reasonably necessary.'"

*GeorgiaCarry II*, 38 F. Supp. 3d at 1377 (quoting *Drake*, 724 F.3d at 436).

Additionally, "the fact that the government is acting in a proprietary capacity,

analogous to that of a person managing a private business, is often relevant to

constitutional analysis" because "[t]he government often has more flexibility to

regulate when it is acting as a proprietor . . . than when it is acting as a sovereign

. . ." *Bonidy*, 790 F.3d at 1126.

---

(applying intermediate scrutiny to law requiring showing of justifiable need to
carry handguns in public); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93-94
(2d Cir. 2012) (applying intermediate scrutiny to law requiring showing of proper
cause to carry concealed handgun in public); *Woollard v. Gallagher*, 712 F.3d 865,
874-83 (4th Cir. 2013) (applying intermediate scrutiny to state requirement that
permit to carry, wear, or transport a handgun in public must be conditioned on
showing of "good and substantial reason").

Here, the Army Corps similarly has an important – indeed, compelling – interest in promoting order and public safety on the land it manages, protecting its water resource development projects, and protecting visitors from the risk of firearms violence.  As the Supreme Court has repeatedly emphasized, "[t]he government's interest in preventing crime . . . is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987); *see also Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (internal punctuation omitted); *Skoien*, 614 F.3d at 642 ("[N]o one doubts that the goal of . . . preventing armed mayhem, is an important governmental objective.").

And there is a reasonable fit between the safety and security issues faced by the Army Corps and its chosen regulation.  As an initial matter, Defendants have now submitted administrative records addressing the questions raised in the Eleventh Circuit's affirmance of this Court's denial of Plaintiffs' motion for a preliminary injunction.  *See GeorgiaCarry III*, 788 F.3d at 1328-29.

The administrative records support the conclusion that the Firearms Regulation satisfies intermediate scrutiny.  First, the regulation helps to ensure the safety of visitors to Army Corps recreational facilities.  These facilities "have a high density of use because [they] are close to major population centers."  SAS AR

at 5.  The Army Corps' Lake Allatoona property is one of the most frequently visited Army Corps lakes in the United States, *see* SAM AR 184, 317, with over 6 million visitors during fiscal years 2011 and 2012.  SAM AR 12, 54.  Similarly, approximately 5 million people visited the Lake Thurmond property every year between 2008 and 2012.  SAS AR 46.

The Army Corps must "consider potential sources of conflict between visitors" to their facilities "and manage these recreation areas to mitigate these sources of conflict."  SAS AR at 5.  For example, "visitors staying at campgrounds sleep, cook meals, socialize with their companions, and enjoy nature in a variety of ways all within a limited space."  SAS AR at 5.  Potential sources of conflict among these visitors include, among other things, "preferences for varying tastes of music at different audible levels, loud socializing at times inconvenient to other visitors, consumption of alcohol," and encroachments on other visitors' space.  SAS AR at 5; *see also* HQ AR 819-822, 914, 916.  The Army Corps has concluded that "the presence of firearms could change the nature of common petty disputes between visitors."  SAS AR at 5.

The Army Corps' conclusion is supported by evidence in the record that such disputes occur frequently, that visitors are sometimes verbally abused or threated, and that drugs or alcohol are often involved in these incidents.  In a 2010

21

survey of Army Corps Park Rangers, 74% of respondents reported being aware of a visitor to their project being physically or verbally abused or threatened in the prior 12 months, and that 58% of such incidents involved drugs or alcohol.  SAM AR at 106.  Additionally, in a 1996 survey, 53% of Army Corps Park Rangers reported that they had witnessed between one and ten incidents during the prior three years in which one or more visitors to Army Corps-managed lands had verbally or physically threatened another visitor or visitors.  HQ AR at 821.

Second, the Firearms Regulation is reasonably suited to protecting infrastructure projects that lie at the heart of the Army Corps' recreational facilities.  The U.S. Department of Homeland Security's Office of Inspector General has characterized "[d]ams and related structures," including those operated and managed by the Army Corps, as "critical infrastructure," given that "one catastrophic failure at some locations could affect populations exceeding 100,000 and have economic consequences surpassing $10 billion." SAM AR at 64.  The Army Corps and the U.S. Department of Homeland Security regard some Army Corps infrastructure as critical to homeland security and the economy; these structures include multi-purpose dams and major navigation locks. SAM AR 20.  According to the Congressional Research Service, many of these Army Corps-managed facilities require additional protection measures in times of heightened

22

homeland security concerns.  SAM AR 20.  The McKaskey Creek Campground,

where Plaintiff James allegedly recreates several times per year, is located

approximately 12 miles from the Allatoona Dam.  *See* SAM AR 1312, 1313.  And

Mistletoe State Park, which Plaintiff Barrs alleges he visits frequently during the

summer months, is located approximately 10 miles from Thurmond Dam.  *See*

SAS AR 1609.  The Army Corps is justified in limiting the carrying of loaded

firearms on recreational facilities located near such sensitive areas.

Third, the limitations on the Army Corps' ability to police its own property

make the Firearms Regulation crucial to achieving its goal of maintaining safety on

its premises.  Army Corps Park Rangers are neither equipped nor trained to

function as law enforcement officers because Congress has not directly authorized

Army Corps employees to carry firearms, to execute search warrants, or to enforce

any federal laws except for issuing citations for violations of regulations governing

Army Corps-managed lands.  HQ AR at 607, 1273; SAM AR at 20; SAS AR at 5.

One of the ways the Army Corps maintains public safety and infrastructure

security at its projects – despite this limited law enforcement authority – is to

restrict visitors' authority to carry loaded firearms.  The Firearms Regulation

curtails the possibility that visitors to Army Corps facilities would possess a loaded

firearm when encountering or interacting with Park Rangers.  SAS AR at 5.

Indeed, with the Firearms Regulation in place, Park Rangers at the Army Corps properties at issue here do not presently have any serious problem with unauthorized firearms possession.  Between January 1, 2013 and December 31, 2014, the Army Corps issued only two citations at its Lake Allatoona property for violations of its weapons and explosives regulation, *see* SAM AR 1350-1351, and between 2000 and 2014, the Army Corps issued zero citations and four warnings at its Thurmond Lake project for similar violations.  SAS AR 7.  Without the Firearms Regulation in place, the potential of having armed visitors could have a chilling effect on the overall enforcement of Army Corps regulations at its facilities because Park Rangers themselves are not armed.  SAS AR at 5.

This conclusion is supported by evidence in the record.  In a 2010 survey, 79% of Army Corps Park Rangers reported that they had experienced verbal abuse during the prior 12 months, 25% reported that they had been verbally threatened; 18% reported that a visitor had blocked a Ranger's ability to move or leave the scene; 7% reported that they had been threatened with a visible weapon such as a gun, knife, hatchet, or motor vehicle; 4% reported physical contact or battery; and 3% reported that they had received an injury resulting from physical contact or

batter that required first aid or medical attention.  SAM AR at 85, 104-105.[9]  These

survey results underscore the Army Corps' concerns about Park Ranger safety.

Moreover, the Firearms Regulation is similar to other federal statutes and

regulations that restrict the carrying of firearms on government property.  Under 18

U.S.C. §§ 930(a) and (d)(3), most persons are barred from possessing a "firearm or

other dangerous weapon in a Federal facility," except for "lawful carrying of

firearms or other dangerous weapons . . . incident to hunting or other lawful

purposes."  Similar to 18 U.S.C. § 930, the Firearms Regulation permits the

carrying of firearms incident to hunting or fishing (including permitting the

carrying of unloaded firearms when being transported to, from, or between hunting

and fishing sites).  36 C.F.R. § 327.13(a)(2).  Section 930 allows for the

---

[9] These responses are consistent with those reported in prior surveys.  In a 1996
survey, 62% of Army Corps Park Rangers reported incidents of verbal abuse from
one or more visitors to Army Corps-managed lands during the prior three years,
and 46% reported that they had been physically threatened by one or more visitors
during the prior three years.  HQ AR at 818.  Furthermore, in a 1995 survey, Army
Corps Park Rangers reported that during the prior three years, on average each day,
one Ranger was physically threatened by one or more visitors to Army Corps-
managed lands, and nearly four Rangers were verbally abused or verbally assaulted
by one or more visitors.  HQ AR at 938-939.  In the same survey, Army Corps Park
Rangers reported that during the prior three years, on average, an Army Corps Park
Ranger was assaulted by one or more visitors to Army Corps-managed lands once
every six days.  HQ AR at 938-939.  The number of reported incidents of threats made
by visitors to Army Corps-managed lands against Army Corps Park Rangers
during the prior three years measured by this survey greatly exceeded the number
of reported incidents of threats against U.S. National Park Service officers.  HQ
AR at 938-939; *see also* HQ AR at 1354 (reporting results of 1994 survey).

prohibition of firearms in any "Federal facility," as well as on the grounds "appurtenant to such building."  *See* 18 U.S.C. § 930(f) ("Nothing in this section limits the power of a court of the United States to punish for contempt or to promulgate rules or orders regulating, restricting, or prohibiting the possession of weapons within any building housing such court or any of its proceedings, or *upon any grounds appurtenant to such building*.") (emphasis added).[10]

The Army Corps regulation is thus nothing like the broad prohibition found objectionable in *Heller*.  *Heller* "went to great lengths to emphasize the special place that the home – an individual's private property – occupies in our society." *GeorgiaCarry I*, 687 F.3d at 1259 (citing 554 U.S. at 628-29).  Nothing in *Heller* suggests that the Supreme Court equated an individual's home with a temporary lodging on land neither owned nor managed by that individual.

For these reasons, the Firearms Regulation relates substantially to the Army Corps' important – indeed, compelling – objectives of protecting public safety and

---

[10] *See also, e.g.*, 31 C.F.R. § 407.13 (Department of Treasury) ("No person while on the property shall carry firearms, or other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 38 C.F.R. § 1.218(a)(13) (Department of Veterans Affairs) ("No person while on property shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 36 C.F.R. § 504.14 (Smithsonian Institution Building and Grounds) ("No person while on the premises shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes.").

preventing violent crime on recreational lands it owns and manages.  Accordingly, if the Court deems it necessary to apply a constitutional means-end analysis, it should uphold the Firearms Regulation under intermediate scrutiny.[11]

## CONCLUSION

The Army Corps' Firearms Regulation is a "presumptively lawful" prohibition on "the carrying of firearms in sensitive places," as described in *Heller*, 554 U.S. at 626.  The Regulation thus does not burden conduct that is protected by the Second Amendment and would pass muster under any level of constitutional scrutiny in any event.  Defendants thus respectfully request that the Court enter summary judgment in their favor.

Dated:  December 23, 2015

Of Counsel

JOHN A. HORN
United States Attorney

LORI BERANEK
Assistant United States Attorney
600 Richard B. Russell Federal Building
75 Spring Street, S.W.
Atlanta, Georgia 30303
Lori.Beranek@usdoj.gov

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney
General

   /s/ Daniel Riess
JOHN R. TYLER
Assistant Branch Director
DANIEL RIESS
Trial Attorney
U.S. Department of Justice
Civil Division, Rm. 6122
20 Massachusetts Avenue, NW
Washington, D.C. 20530

---

[11] For the same reasons, the Firearms Regulation would also satisfy strict scrutiny, were such scrutiny appropriate.

Telephone: (202) 353-3098
Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*