**EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| GEORGIACARRY.ORG, INC., et al., | |
| Plaintiffs, | CIVIL ACTION FILE NO. |
| v. | 4:14-CV-139-HLM (consolidated with 4:15-CV-009-HLM) |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |
| Defendants. | |

## [PROPOSED] BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, proposed *amicus curiae* certifies as follows: Everytown for Gun Safety has no parent corporations. It has no stock, and hence, no publicly held company owns 10% or more of its stock.

December 30, 2015

Respectfully submitted,

*/s/ Mary Helen Wimberly*

Mary Helen Wimberly
(GA Bar No. 945127)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
maryhelen.wimberly@hoganlovells.com

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................iv

INTEREST OF *AMICUS CURIAE* ...........................................................1

INTRODUCTION ...........................................................................2

HISTORICAL BACKGROUND....................................................................6

    I.    ENGLISH HISTORY ...................................................................6

        A.    By 1328, England Broadly Restricted Carrying Weapons In Public Areas...........................................................6

        B.    In The 17th And 18th Centuries, English Authorities Interpreted The Statute Of Northampton To Prohibit Carrying Weapons In Public.........................................................8

        C.    The Statute Of Northampton's Narrow Exceptions Confirm Its Broad Prohibition Of Carrying Weapons In Public........................................................10

        D.    The Statute Of Northampton's Restriction On Possessing Weapons In Public Areas Remained Fully In Effect After The English Bill Of Rights Of 1689 ...........................................11

    II.    FOUNDING-ERA AMERICAN HISTORY.......................................12

        A.    The Colonies Began Importing England's Tradition Of Regulating Firearm Possession In Public .................................12

        B.    After Ratification Of The Constitution, Many States Enacted Laws Mirroring The Statute Of Northampton ...........13

    III.    19TH-CENTURY AMERICAN HISTORY.......................................14

    IV.    REGULATIONS ON CARRYING FIREARMS IN PARKS AND RECREATION AREAS..........................................................17

A.   The Federal Government, Including The Military, Began Imposing Regulations On Carrying Firearms When It First Designated Lands For Public Recreational Use ..............17

B.   The Army Corps Of Engineers Immediately Imposed Firearms Regulations Upon Creating Recreational Areas........19

C.   States And Localities Have Similariy Imposed Regulations On Firearms In Public Parks And Other Recreation Areas ..................................................................21

ARGUMENT ...............................................................................................23

I.   THE CORPS' REGULATION IS CONSTITUTIONAL BECAUSE IT CONTINUES A LONGSTANDING ANGLO-AMERICAN PRACTICE OF REGULATING THE CARRYING OF WEAPONS IN PUBLIC PLACES ........................23

A.   Under *Heller*, Longstanding Limitations On The Right To Carry Firearms Are Constitutional Because They Are Consistent With Our Historical Tradition................................23

B.   The Regulation At Issue Reflects A Longstanding Practice Within The Meaning Of *Heller*..................................26

CONCLUSION .....................................................................................32

# TABLE OF AUTHORITIES

CASES                                                              PAGES

*Chune v. Piott,*
   80 Eng.Rep. 1161 (K.B. 1615) ............................................................9

*Colorado Outfitters v. Hickenlooper,*
   No. 14-1290 (10th Cir.) ....................................................................1

*Commonwealth v. Ware,*
   137 Pa. 465 (1890) ...........................................................................31

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)....................................................................passim

*GeorgiaCarry.Org v. Georgia,*
   687 F.3d 1244 (11th Cir. 2012) ......................................................30

*GeorgiaCarry.Org, Inc.  v. U.S. Army Corps of Eng'rs,*
   38 F. Supp. 3d 1365 (N.D. Ga. 2014)...............................................3

*GeorgiaCarry.Org  v. U.S. Army Corps of Eng'rs,*
   788 F.3d 1318 (11th Cir. 2015) ...................................................passim

*Heller v. Dist. of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011)................................................24, 25

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010).........................................................................15

*NRA v. BATF,*
   700 F.3d 185 (5th Cir. 2012) ...........................................................25

*Payton v. New York,*
   445 U.S. 573 (1980)...........................................................................8

*People v. Robinson,*
   152 Mich. 41 (1908) ........................................................................31

iv

*Perkins v. State*,
    78 Wis. 551 (1890) ....................................................................................31

*Peruta v. Cty. of San Diego*,
    742 F.3d 1144 (9th Cir. 2014) ..................................................................1

*Semayne's Case*,
    77 Eng. Rep. 194 (K.B. 1603) .................................................................30

*Silvester v. Harris*,
    No. 14-16840 (9th Cir.) ............................................................................1

*Sir John Knight's Case,* 87 Eng. Rep. 75 (K.B. 1686) ...........................................10

*State v. Cain*,
    2 W. Va. 679 (1882) .................................................................................31

*State v. Cox*,
    128 Me. 151 (1948) ..................................................................................31

*State v. Rheams*,
    34 Minn. 18 (1885) ..................................................................................31

*State v. Sorenson*,
    32 Minn. 118 (1884) ................................................................................31

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ..............................................................27, 28

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) ..............................................................25, 26

*Vaiden v. Commonwealth*,
    53 Va. 717 (1855) .....................................................................................31

*Wrenn v. District of Columbia*,
    No. 15-7057, 2015 WL 8746334 (D.C. Cir. Dec. 15, 2015)................................2

## CONSTITUTIONS

Md. Const. of 1776, art. III, § 1 .............................................................13

v

REGULATIONS

36 C.F.R. § 2.9 (1938) ...............................................................................19

36 C.F.R. § 301 .........................................................................................20

36 C.F.R. § 311 .........................................................................................20

36 C.F.R. § 313.12 (1966) .........................................................................21

36 C.F.R. § 327.13 (1976) ...................................................................2, 4, 21

36 C.F.R. § 327.15 (1986) .........................................................................21

1 Fed. Reg. 672 (June 27, 1936) ...............................................................18

11 Fed. Reg. 9278 (Aug. 24, 1946) (to be codified at 36 C.F.R. § 301.8). .............20

11 Fed. Reg. 11,595 (Oct. 8, 1946)............................................................20

12 Fed. Reg. 3940 (June 17, 1947) ...........................................................20

15 Fed. Reg. 912(Feb. 20, 1950) ...............................................................20

Flood Control Act of 1944, ch. 665, 58 Stat. 887 (1944) ........................19

STATUTES

1854 Ala. Laws 588, § 3272 .....................................................................15

1852 Del. Laws 330, 333, ch. 97, § 13 .....................................................13

1861 Ga. Laws 859, § 4413 ......................................................................15

1821 Me. Laws 285, ch. 76, § 1 ................................................................13

1841 Me. Laws 709, ch. 169, § 16 ............................................................15

1895 Mich. Pub. Acts 596.........................................................................21

1851 Minn. Laws 526, 528, ch. 112, § 18 ................................................15

1905 Minn. Laws 620 ...............................................................................22

1921 N.C. Sess. Laws 53 ...........................................................................22

1686 N.J. Laws 289, ch. 9............................................................. 12, 27

1853 Or. Laws 218, 220, ch. 16, § 17 .................................................15

1861 Pa. Laws 248, 250, § 6 .................................................................15

## OTHER AUTHORITIES

1 William Blackstone, *Commentaries on the Laws of England* (1769) .................11

4 William Blackstone, *Commentaries on the Laws of England* (1769) ........8, 11, 30

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1721) ....................10, 12

1 Francis Wharton, *A Treatise on the Criminal Law of the United States* (1st ed. 1846) ...................................................................................14, 30

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1 (2012) ................................................................6

Patrick J. Charles, *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. 1695 (2012) .......................................8

Clayton Cramer, *Concealed Weapon Laws of the Early Republic* (1999) ..............15

Edward Coke, *The Third Part of the Institutes of the Laws of England* (1817) ........................................................................................8, 10

James Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* (James Oram 1805) ...........................................................................14

Robert Gardiner, *The Compleat Constable* (1692) .................................11

Oscar F.A. Greene, Revised Ordinances of the City of Boulder (Boulder, 1899) ...................................................................................21

H. Duane Hampton, *How the U.S. Calvary Saved Our National Parks* (Indiana Univ. Press 1971), http://www.nps.gov/parkhistory/online_books/hampton/index. ......................17

John Haywood, *A Manual of the Laws of North-Carolina* (1814).........................13

John Haywood, *The Duty & Authority of Justices of the Peace, in the State of Tennessee* (Nasheville, G. Bradford 1810)......................................................14

John Haywood, *The Duty and Office of Justices of the Peace, and of Sheriffs, Coronoers, Constables* (William Boylan 1800)..................................14

Joseph Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* (1683) ....................................................................9

Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. 121 (2015) ................................................................................................................16

St. George Tucker, *Blackstone's Commentaries with Notes of Reference* (1803)................................................................................................................9

## INTEREST OF *AMICUS CURIAE*

Everytown for Gun Safety ("Everytown") respectfully submits this brief as *amicus curiae* in support of Defendants to provide the Court with an in-depth analysis of the historical support for the regulation at issue in this case.

Everytown is the largest gun-violence-prevention organization in the country, with more than three million supporters nationwide, including more than 120,000 Georgia residents and the mayors of 12 Georgia cities. Everytown is dedicated to reducing gun violence and building safer communities. As part of this effort, Everytown has devoted substantial resources to researching the history of firearms regulation, and seeks to assist courts faced with Second Amendment issues by presenting relevant, sometimes overlooked historical materials. Everytown has filed amicus briefs outlining this history in four recent Second Amendment cases in the Courts of Appeals.[1] In light of the Eleventh Circuit's suggestion that a historical analysis of the Second Amendment issue in this case be developed on remand, *see GeorgiaCarry.Org v. U.S. Army Corps of Eng'rs*, 788

---

[1] *See Wrenn v. District of Columbia*, No. 15-7057, 2015 WL 8746334 (D.C. Cir. Dec. 15, 2015), ECF No. 1572443; *Peruta v. Cty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), ECF No. 257, *rehearing en banc granted*, 781 F.3d 1106 (9th Cir. 2015); *Silvester v. Harris*, No. 14-16840 (9th Cir.) (pending), ECF No. 34; *Colorado Outfitters v. Hickenlooper*, No. 14-1290 (10th Cir.) (pending), ECF No. 10268357.

F.3d 1318, 1327 (11th Cir. 2015) [hereinafter "*GeorgiaCarry III*"], Everytown's expertise in the history of firearms regulation and its commitment to ensuring that Second Amendment issues are considered in their proper historical context gives it a strong interest in this case.[2]

## INTRODUCTION

This case involves a Second Amendment challenge to a federal regulation governing the possession of firearms in two recreation areas controlled by the U.S. Army Corps of Engineers (the "Corps"): one at Lake Allatoona in Northwest Georgia, and one at J. Strom Thurmond Lake near the border of Georgia and South Carolina (Allatoona and Thurmond; together, the "Corps Recreation Areas"). This case is therefore governed by *District of Columbia v. Heller*, 554 U.S. 570 (2008) [hereinafter "*Heller*"], which held that "the Second Amendment codified a pre-existing individual right to keep and bear arms for the core lawful purpose of self-defense, at least in the home." *GeorgiaCarry III*, 788 F.3d at 1323 (citations and quotation marks omitted).[3]

---

[2] No counsel for any party authored this brief in whole or part. Apart from *amicus curiae* and its counsel, no person contributed money intended to fund the brief's preparation and submission.

[3] Plaintiffs' challenge is an as-applied challenge to 36 C.F.R. § 327.13 based on the denial of Plaintiff James' and Plaintiff Barrs' requests to carry firearms in the Corps Recreation Areas. *See GeorgiaCarry III*, 788 F.3d at 1322 n.3;

However, the Supreme Court was "careful to note that the Second Amendment right was 'not unlimited.'"   *Id.* (quoting *Heller*, 554 U.S. at 626). *Heller* itself warned that its decision "should not be taken to cast doubt" on "longstanding" firearms regulations that are "fairly supported" by "historical tradition."   554 U.S. at 627.   The Court identified several examples of "presumptively lawful regulatory measures," explicitly stating that the list was not exhaustive.   *Id.* at 626-67 & n.26.

Accordingly, when assessing challenges under the Second Amendment, the Eleventh Circuit has "followed *Heller*'s command to consider the historical background of the Second Amendment."   *GeorgiaCarry III*, 788 F.3d at 1324 (quotation marks omitted).   Indeed, in this case, the Eleventh Circuit expressly suggested that the parties provide such a historical analysis on remand.   *See id.* at 1327 (noting, in affirming this Court's denial of a preliminary injunction, that "although our caselaw instructs that we must look to history in evaluating a Second Amendment claim, none of the parties before this Court have provided any historical evidence to inform our analysis").

---

*GeorgiaCarry.Org v. U.S. Army Corps of Engineers*, 38 F. Supp. 3d 1365, 1371 n.3 (N.D. Ga. 2014) [hereinafter "*GeorgiaCarry II*"]; James Compl. ¶¶ 17, 22, 30-32, 35; Barrs Compl. ¶¶ 6, 24-25.

3

This brief therefore sets out in detail the historical background of the Corps' regulation of firearms at issue in this case.  As explained below, when considered in context, the Corps' firearms regulation fits squarely within a longstanding pattern of regulation, and thus is consistent with the Second Amendment as interpreted in *Heller*.  544 U.S. at 627.

The challenged provision, 36 C.F.R. § 327.13 (the "Regulation"), regulates firearms and ammunition in areas controlled by the Corps.  The Regulation allows possession at hunting sites, fishing sites and shooting ranges, or anywhere with permission of the District Commander, but otherwise prohibits the possession of firearms or ammunition in areas where the public comes together to enjoy the Corps' recreational facilities.

The Regulation continues a longstanding government practice of regulating the possession of weapons in public areas, including areas of recreation, out of concern for public safety and ensuring the peace.  For centuries, English law broadly prohibited anyone from carrying a dangerous weapon in public, beginning no later than the historic Statute of Northampton in 1328, and continuing after the English Bill of Rights of 1689.  This tradition continued in America in the 17th and 18th Centuries, when several colonies enacted similar regulations.   And it continued into the 19th Century, when many States prohibited citizens from

4

carrying firearms in public and other states allowed citizens to carry firearms in public only if they could demonstrate a specific need (or "reasonable cause") for doing so for self-defense.

Consistent with this practice, once the federal government began designating public lands for recreational use in the late 19th Century, it promptly began promulgating rules restricting the carrying of firearms in those areas, including in our National Parks. And the moment the Corps was granted authority to designate lands for public recreational use in 1944, it immediately adopted firearm regulations that are the direct predecessors of the Regulation challenged here.

In light of this robust historical pedigree, there is no merit to Plaintiffs' Second Amendment claim. Whatever the Second Amendment's precise contours, a rule that has its roots in 14th-Century England, is limited to a geographic area designated by the Corps for public recreation, and contains a mechanism by which an individual can seek an exception, is "longstanding," consistent with our "historical tradition," *Heller*, 554 U.S. at 627, and thus constitutionally authorized.

# HISTORICAL BACKGROUND

## I.     ENGLISH HISTORY

### A.     By 1328, England Broadly Restricted Carrying Weapons In Public Areas.

The Anglo-American tradition of broadly restricting the possession of weapons in public areas stretches back to at least the year 1328, when England enacted the Statute of Northampton, which provided that "no Man great nor small" shall "go nor ride armed by night nor by day, in *Fairs*, *Markets*, nor in the presence of the Justices or other Ministers, *nor in no part elsewhere*."  2 Edw. 3, 258, ch. 3 (1328) (emphasis added); App. 3.[4]

Over the remainder of the 14th Century, England repeatedly reenacted the Statute of Northampton's restrictions on carrying weapons in public places.  *See, e.g.*, 7 Ric. 2, 35, ch. 13 (1383); App. 4; 20 Ric. 2, 93, ch. 1 (1396); App. 5.  By the 16th Century, firearms had become increasingly accessible in England, and the possibility that they would be carried in public in areas where people "live, reside and travel" had become an increasing threat to public safety.  Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 22

---

[4] For the convenience of the Court, Everytown is also submitting an Appendix containing copies of historical English, Colonial, State, and municipal laws cited in this brief that are not easily obtainable via widely-used electronic sources. Citations to "App." refer to the pages of that Appendix.

(2012) [hereinafter "*Faces*"] (brackets omitted).  To guard against this threat, Queen Elizabeth I in 1579 called for robust enforcement of the Statute of Northampton's prohibition on carrying "Daggers, Pistols, and such like, *not only* in Cities and Towns, but in *all* parts of the Realm in common highways, whereby her Majesty's good quiet people, desirous to live in peaceable manner, are in fear and danger of their lives."  *Id.* at 21 (emphasis added, brackets omitted, and spelling modernized).  The Queen's decree explained that the carrying of "such offensive weapons" (expressly including "Handguns"), and "the frequent shooting [of] them in and near Cities, Towns corporate, [and] the Suburbs thereof where [the] great multitude of people do live, reside, and trav[el]," had caused "great danger" and "many harms [to] ensue."  *Id.* at 22 (spelling modernized).  Fifteen years later, the Queen reaffirmed that publicly carrying pistols and daggers—whether "secretly" or in the "open"—was "to the terrour of all people professing to travel and live peaceably."  *Id.*[5]

---

[5] Like these statutes, early common law authorities, including the 1419 White Book of the City of London, provided that carrying arms "without government authorization" was unlawful in public, "including the less populated suburbs." *Faces*, *supra*, at 18-19.

**B.   In The 17th And 18th Centuries, English Authorities Interpreted The Statute Of Northampton To Prohibit Carrying Weapons In Public.**

This understanding of the law—as broadly barring people from carrying guns in public places—continued into the 17th and 18th Centuries. *See generally* Patrick J. Charles, *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. 1695 (2012). In 1644, for example, Sir Edward Coke—who was "widely recognized by the American colonists as the greatest authority of his time on the laws of England," *Payton v. New York*, 445 U.S. 573, 594 (1980) (quotation marks omitted)—described the Statute of Northampton as forbidding people "to goe nor ride armed. . . in any place whatsoever." Edward Coke, *The Third Part of the Institutes of the Laws of England* 160 (1817 ).

A century later, Blackstone—"the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593-94—described the Statute similarly: "The offence of riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1769).[6] In other

---

[6] The same description appears in "the most important early American edition of Blackstone's Commentaries (by the law professor and former Antifederalist St.

words, because carrying a dangerous weapon (such as a firearm) in public places naturally terrified the people, it was a crime against the peace—even if unaccompanied by a threat or violence.  *See Chune v. Piott*, 80 Eng. Rep. 1161, 1162 (K.B. 1615) ("Without all question, the sheriffe hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry weapons in the high-way, in terrorem populi Regis; he ought to take him, and arrest him, notwithstanding he doth not break the peace in his presence.").

The reach of the Statute of Northampton was unmistakably broad, and it applied to various areas where people would congregate: "[I]f any person whatsoever . . . shall be so bold as to go or ride Armed . . . in *Fairs*, *Markets*, *or any other places* . . . then any Constable . . . may take such Armor from him for the Kings use, and may also commit him to the Gaol."  Joseph Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* 224 (1683) (emphasis added).

---

George Tucker)."  *Heller*, 554 U.S. at 594; *see* St. George Tucker, *Blackstone's Commentaries* 149 (1803).

**C.      The Statute Of Northampton's Narrow Exceptions Confirm Its Broad Prohibition Of Carrying Weapons In Public.**

The Statute of Northampton contained a limited self-defense exception that applied only in a person's home.  As Sir Edward Coke explained, possessing weapons at home "is by construction excepted out of this act[,] . . . for a man's house is his castle."  Coke, *supra*, at 162.  "But [a man] cannot assemble force," including by carrying firearms, even "though he [may] be extremely threatened, to go with him to Church, or market, or any other place, but that is prohibited by this act."  *Id.*   William Hawkins likewise explained that "a man cannot excuse the wearing [of] such armour in public, by alleging that such a one threatened him, and he wears it for [his] safety," but, in contrast, he may do so "in his own House, against those who threaten to do him any Violence therein, because a Man's House is as his Castle." 1 Hawkins, *A Treatise of the Pleas of the Crown* 489, 516 (1721) (1824 reprint).  Indeed, a rule permitting carrying arms for self-defense in public would have suggested that "the King were not able or willing to protect his subjects."  *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686).[7]

---

[7] There were two other exceptions to the Statute of Northampton's prohibition on carrying weapons in public: a narrow (unwritten) exception permitting high-ranking nobles to wear fashionable swords and walk in public with armed servants, and a narrow (written) exception for the King's officers.  *See* 1 Hawkins, *A Treatise of the Pleas of the Crown* at 798.

10

### D.   The Statute Of Northampton's Restriction On Possessing Weapons In Public Areas Remained Fully In Effect After The English Bill Of Rights Of 1689.

In 1688, Parliament included the right to have arms in the Declaration of Rights which served as conditions for William and Mary to ascend to the English throne, and the right was later codified in the English Bill of Rights in 1689. This right—which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593—ensured that subjects "may have arms for their defence suitable to their conditions, and as allowed by law." 1 W. & M. ch. 2. § 7. As Blackstone later wrote, this right was considered "a public allowance, *under due restrictions*[,] of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." 1 William Blackstone, *Commentaries* 144 (emphasis added). One such "due restriction" was the Statute of Northampton, which remained fully in effect after the right to bear arms was codified in 1689. *See* 4 Blackstone, *Commentaries* 148-49; Robert Gardiner, *The Compleat Constable* 18 (1692).

11

## II.   FOUNDING-ERA AMERICAN HISTORY

### A.   The Colonies Began Importing England's Tradition Of Regulating Firearm Possession In Public.

Around the time that the English Bill of Rights was adopted, the American colonies began prohibiting citizens from carrying weapons in public.  The first such action was a 1686 New Jersey law that sought to prevent the "great fear and quarrels" induced by "several persons wearing swords, daggers, pistols," and "other unusual or unlawful weapons."  1686 N.J. Laws 289, 289-90, ch. 9; App. 30-31.  To combat this "great abuse," the law provided that no person "shall presume privately to wear any pocket pistol" or "other unusual or unlawful weapons," and "no planter shall ride or go armed with sword, pistol, or dagger," except for "strangers[] travelling" through.  *Id.*

Eight years after New Jersey's act, Massachusetts enacted its own version of the Statute of Northampton, authorizing justices of the peace to arrest anyone who "shall ride or go armed *Offensively* before any of Their Majesties Justices, or other . . . Officers or Ministers doing their Office, or elsewhere."  1694 Mass. Laws 12, no. 6 (emphasis added); App. 7.  By using the word "offensively," Massachusetts ensured that this prohibition applied to "offensive weapons," including firearms, as the Statute of Northampton had in England.  *See Faces*, *supra*, at 34 & n.178;

12

Hawkins, *A Treatise of the Pleas of the Crown* at 665 (explaining that "guns, pistols, daggers, and instruments of war" were considered "offensive weapons").

### B. After Ratification Of The Constitution, Many States Enacted Laws Mirroring The Statute Of Northampton.

One century later, after adoption of the Second Amendment, Massachusetts reenacted its law, this time as a State. 1795 Mass. Laws 436, ch. 2; App. 14. Several additional States followed Massachusetts' lead and passed laws prohibiting citizens from carrying weapons in public, including founding-era statutes in Virginia and North Carolina, and later enactments in States from Maine to Tennessee. *See, e.g.*, 1786 Va. Laws 33, ch. 21; App. 9; 1792 N.C. Laws 60, 61, ch. 3; App. 10; 1801 Tenn. Laws 710, § 6; App. 15; 1821 Me. Laws 285, ch. 76, § 1; App. 16-21; 1852 Del. Laws 330, 333, ch. 97, § 13; App. 22-29. Still other States, including Maryland, incorporated the Statute of Northampton's prohibition of carrying weapons in public through their common law. *See* Md. Const. of 1776, art. III, § 1 (adopting "the Common Law of England" and "the English statutes, as existed at the time of their first emigration"); *see Faces*, *supra*, at 31-32.

To ensure that the prohibitions on carrying firearms in public were enforced, the constables, magistrates, and justices of the peace in these jurisdictions were required to "arrest all such persons as in your sight shall ride or go armed." John Haywood, *A Manual of the Laws of North-Carolina*, pt. 2 at 40 (1814) (N.C.

13

constable oath).  That was because, as constables were informed, "riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is prohibited by statute."   John Haywood, *The Duty and Office of Justices of the Peace, and of Sheriffs, Coronoers, Constables* 10 (William Boylan 1800); *accord* John Haywood, *The Duty & Authority of Justices of the Peace, in the State of Tennessee* 176 (Nashville, G. Bradford 1810).

As with the Statute of Northampton, prosecution under these laws did not require the defendant to have "threaten[ed] any person in particular, or committed any particular act of violence."  James Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* 546 (James Oram 1805).  Significantly, these laws contained no self-defense exception outside the home:  No one could "excuse the wearing [of] such armor in public, by alleging that such a one threatened him."  1 Francis Wharton, *A Treatise on the Criminal Law of the United States* 527-28 (1846).

## III.   19TH-CENTURY AMERICAN HISTORY

In 1836, Massachusetts enacted a new, narrow exception to its firearm restrictions, allowing citizens to carry a firearm in public if they had "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property."  1836 Mass. Laws 748, 750, ch. 134, § 16; App. 32-35.  But absent such

14

"reasonable cause," the general prohibition on carrying weapons in public remained in effect:  No person could "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon."  *Id.*

Within a few decades, many States adopted nearly identical laws.  *See, e.g.*, 1838 Wisc. Laws 381, § 16; App. 36; 1841 Me. Laws 709, ch. 169, § 16; App. 37; 1846 Mich. Laws 690, 692, ch. 162, § 16; App. 38-40; 1847 Va. Laws 127, 129, ch. 14, § 16; App. 41-43; 1851 Minn. Laws 526, 528, ch. 112, § 18; App. 44-47; 1853 Or. Laws 218, 220, ch. 16, § 17; App. 48-50; 1861 Pa. Laws 248, 250, § 6; App. 51-69. While some variation among the States emerged in the mid-19th Century—particularly between free States and slave-holding States, some of which allowed white citizens to carry unconcealed weapons in public because of fear of slave uprisings[8]—many States, including States in the South, continued to enact laws broadly restricting the right to carry firearms in public.  Regardless of their differences, these laws were understood to have the same purpose and effect: broadly restricting the possession of firearms outside the home, while establishing

---

[8] *See, e.g.*, 1854 Ala. Laws 588, § 3272; 1861 Ga. Laws 859, § 4413; *see also McDonald v. City of Chicago*, 561 U.S. 742, 844 (2010 (Thomas, J., concurring) ("[I]t is difficult to overstate the extent to which fear of a slave uprising gripped slaveholders and dictated the acts of Southern legislatures.").  *See generally* Cramer, *Concealed Weapon Laws of the Early Republic* (1999).

a limited exception for those with a particular and demonstrable need to carry a weapon in public for self-defense.[9]

After the Civil War, more States enacted similar prohibitions. For example, West Virginia and Texas enacted laws that broadly prohibited public carry without good cause, *i.e.*, without specific evidence of a concrete serious threat. *See* 1870 W. Va. Laws 702, 703, ch. 153, § 8 ("If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance"); App. 70-72; 1871 Tex. Laws 1322, art. 6512 (barring anyone not acting in "lawful defense of the state" (*e.g.*, "as a militiaman" or "policeman") from "carrying on or about his person . . . any pistol" without "reasonable grounds for fearing an unlawful attack on his person" that was "immediate and pressing"); App.73-75.[10]

---

[9] *See, e.g.*, Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 126 Yale L.J. 121 (2015), at 13 n.59, available at http://bit.ly/1U4WwLc (citing prosecution of a Massachusetts man for publicly carrying a gun without reasonable cause to fear injury); *Daily State Journal* (Alexandria), Sept. 16, 1872 (noting that Virginia justices of the peace "may issue a warrant for the arrest of any party going armed with a deadly or dangerous weapon"); *The Daily Dispatch* (Richmond), June 1, 1861 (account of Virginia man "held to bail" for "habitually going armed").

[10] Notably, the "reasonable cause" exceptions written into state laws prohibiting the possession of firearms in public did not expand the limited right to self-defense. Numerous state high court decisions from the 19th and early 20th Centuries demonstrated that, at the time, nearly every state law that prohibited the

## IV.   REGULATIONS ON CARRYING FIREARMS IN PARKS AND RECREATION AREAS

The Anglo-American tradition of prohibiting citizens from carrying weapons in public places has long applied to parks and other areas of public recreation.

### A.   The Federal Government, Including The Military, Began Imposing Regulations On Carrying Firearms When It First Designated Lands For Public Recreational Use.

The federal government began designating land for recreational use by the public in 1872, when Congress established the first national park, Yellowstone National Park.  *See* H. Duane Hampton, *How the U.S. Cavalry Saved Our National Parks*, ch. 2 (Indiana Univ. Press 1971), http://www.nps.gov/parkhistory/online_books/hampton/index.htm.  Although the Department of the Interior was initially in charge of Yellowstone, the War Department assumed control of the Park in 1886 because of issues involving poaching and vandalism.  *Id.* ch. 5.  The War Department immediately imposed a series of new regulations, including that: "Hunting or trapping and the discharge of firearms within the limits of the Park is prohibited."  *Id.*[11]  Similar regulations were imposed in the first National Parks in California, Yosemite and Sequoia, which

---

carrying of firearms in public without good cause also encompassed a duty to retreat in public.  *See infra*, at pp. 3031 & n.17.

[11] The War Department's regulations are reproduced in *Senate Exec. Doc.* 40, 49th Cong., 2d Sess. (SN 2448), Appendix A, p. 7.

were also controlled by the military in the late 19th Century.  In 1895, troops began to require persons entering the parks to turn over their firearms, and would return them when they left.  *Id.* ch. 8.

As the number of National Parks grew, regulations on carrying firearms in the parks continued.  The first-ever Federal Register, published in 1936, included such a prohibition.   It provided that "in all the National Parks, National Monuments, National Military Parks, National Historical Parks, Battlefield Sites, and miscellaneous memorials" under the jurisdiction of the National Park Service or the Department of the Interior, "[f]irearms, explosives, traps, seines, and nets are prohibited  .  .  .  , except upon written permission of the superintendent or custodian."  1 Fed. Reg. 672, 674 (June 27, 1936).  Thus, "[v]isitors entering or traveling through the parks and monuments to places beyond" were required to "surrender all such objects in their possession to the first park or monument officer, and, in proper cases," could "obtain his written permission to carry them through the park or monument sealed."  *Id.*  The first-ever Code of Federal Regulations, published in 1938, contained the same prohibitions.  *See* 36 C.F.R. § 2.9 (1938).[12]

---

[12] Congress recently enacted legislation that permits citizens to carry firearms in the National Parks to the extent allowed under the law of the state where the park is located.  *See GeorgiaCarry III*, 788 F.3d at 1326 n.6 (citing Credit Card

### B.     The Army Corps Of Engineers Immediately Imposed Firearms Regulations Upon Creating Recreational Areas.

As was true in the National Parks, the Army Corps of Engineers imposed regulations governing the carrying of firearms in recreational areas under its control virtually from the moment the Corps obtained authority to designate land for recreational use.  In 1944, Congress enacted a statute that authorized the Chief of the Corps of Engineers to "construct, maintain, and operate public park and recreation facilities . . . when the Secretary of War determines such action to be in the public interest."  These recreation facilities were made available for public use "under such rules and regulations as the Secretary of War may deem necessary."  Flood Control Act of 1944, ch. 665, 58 Stat. 887, 890 (1944).  Pursuant to that authority, in August 1946, the Corps of Engineers designated certain facilities in Oklahoma, Missouri, and Arkansas to be open for public recreation.  The Corps simultaneously adopted rules that generally prohibited "[l]oaded rifles, loaded pistols, and explosives" from Corps-supervised lands, while allowing hunting ("with shotgun only") where authorized.  *See* 11 Fed. Reg. 9278, 9279 (Aug. 24, 1946) (initially codified at 36 C.F.R. § 301.8).

Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111–24, § 512(b), 123 Stat. 1734, 1765 (2009)).  This recent legislation, however, has no bearing on the historical practice outlined above, and is irrelevant to constitutional analysis of the scope of the Second Amendment right.  Congress has not passed similar legislation applicable to recreation areas under the Corps' administration.

Two months later, in October 1946, the Corps of Engineers rescinded 36 C.F.R. § 301 and readopted the same rules as 36 C.F.R. § 311. The Corps included (at Section 311.11) a broad prohibition on firearms. *See* 11 Fed. Reg. 11,595, 11,596 (Oct. 8, 1946). In 1947, the Corps of Engineers amended Section 311.11 slightly to prohibit "loaded rifles, loaded shotguns, loaded pistols and explosives," except when firearms were possessed by law enforcement, when shotguns or rifles were being used for authorized hunting purposes, or when possession was "specifically authorized by the District Engineer." *See* 12 Fed. Reg. 3940, 3940 (June 17, 1947).

In 1950, the Corps of Engineers first opened the Allatoona Recreation Area to the public, and immediately subjected it to the rules in 36 C.F.R. § 311, including the firearm prohibition in Section 311.11. *See* 15 Fed. Reg. 912, 912 (Feb. 20, 1950). Since then, the Corps of Engineers has repeatedly readopted rules prohibiting loaded firearms and explosives in recreational facilities, with exceptions for authorized hunting or target-shooting activities or when the District Commander authorized possession. *See, e.g.*, 36 C.F.R. § 313.12 (1966) (same); 36 C.F.R. § 327.13 (1976) (same); 36 C.F.R. § 327.15 (1986) (including shooting ranges).

20

**C.    States And Localities Have Similarly Imposed Regulations On Firearms In Public Parks And Other Recreation Areas.**

By the turn of the 20th Century, at the same time States were enacting general prohibitions on carrying firearms in public, States and localities were also enacting more specific prohibitions on carrying firearms in parks and similar public spaces.[13]  Michigan, for instance, supplemented the Charter of the City of Detroit in 1895 with an Act providing that:  "No Person shall . . . carry firearms" within a "park or boulevard . . . without the permission of" city commissioners.  1895 Mich. Pub. Acts 596.  Similarly, the City of Boulder, Colorado passed an ordinance prohibiting "[a]ny person other than police officers of the city" from "tak[ing] or carry[ing] . . . into any of the parks belonging to the City of Boulder, any gun, pistol, revolver, or other firearm."    Oscar F.A. Greene, *Revised Ordinances of the City of Boulder* (Boulder, 1899), *available at The Making of Modern Law: Primary Sources*, Page 157, Image 168; App. 95.

Minnesota passed a prohibition that applied to all State parks.  It provided that "[n]o person shall have in his possession within any [State] park or within one-half mile of the outer limits thereof, any gun, revolver, or other firearm unless the same is unloaded, and except after the same has been sealed by the park

---

[13] Of course, park-specific regulations were unnecessary in the many States that already had generally-applicable laws prohibiting the carrying weapons in public. *See supra*, at pp. 13-17.

21

commissioner or a deputy appointed by him, and except such gun or other firearm at all times during which it may be lawfully had in such park remains so sealed and unloaded."  1905 Minn. Laws 620; App.87-88; *see also* 1921 N.C. Sess. Laws 53 ("[A]ny person who shall carry a pistol, revolver, or gun in any park or reservation . . . without having first obtained the written permission of the owner or manager of said park or reservation, shall be guilty of a misdemeanor, or shall be fined or imprisoned . . .); App. 92-94; 1917 Wisc. Sess. Laws 1243 ("[N]o . . . person . . . shall hunt or trap within the boundaries of any wild life refuge, state park, or state fish hatchery lands; nor have in his possession or under his control therein any gun or rifle, unless the same is unloaded and knocked down or enclosed within its carrying case . . . ."); App. 89-91.

## ARGUMENT

## I.   THE CORPS' REGULATION IS CONSTITUTIONAL BECAUSE IT CONTINUES A LONGSTANDING ANGLO-AMERICAN PRACTICE OF REGULATING THE CARRYING OF WEAPONS IN PUBLIC PLACES.

In addressing whether the Corps' prohibition on carrying firearms in the Corps Recreation Areas violates the Second Amendment, this Court must "engage in [a] two-step analysis," asking first, whether "the restricted activity [is] protected by the Second Amendment in the first place," and second, "[i]f so, does it pass muster under the appropriate level of scrutiny?" *GeorgiaCarry III*, 788 F.3d at 1324.   As to the second step, the Regulation would pass muster under the appropriate level of scrutiny if the Court determines that it needs to reach that issue.   But, for the reasons also set forth by Defendants (as well as in this Court's Order denying a preliminary injunction), the Court's analysis does not need to go past step one:  The Regulation here does not restrict activity that is protected by the Second Amendment, in light of the longstanding historical tradition of prohibiting firearm possession and use in areas where the public congregates.

### A.   Under *Heller*, Longstanding Limitations On The Right To Carry Firearms Are Constitutional Because They Are Consistent With Our Historical Tradition.

As the Supreme Court explained in *Heller*, one way to determine whether a law restricts activity protected by the Second Amendment is to assess the

23

"historical understanding of the scope of the right," and consider whether the law is one of the kinds of "longstanding prohibitions" upon which the Second Amendment did not "cast doubt." *Heller*, 554 U.S. at 625, 626. The Court in *Heller* identified several examples of such regulations, including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," which are "presum[ed]" not to violate the Second Amendment because they have been historically accepted as being consistent with the Amendment's protections. *Id.* at 626-27 & n.26. Such longstanding laws, the Court explained, are tradition-based exceptions by virtue of their lengthy historical pedigrees. *Id.* at 635. Longstanding laws "are presumed not to burden conduct within the scope of the Second Amendment," because they have "long been accepted by the public" as consistent with its protections. *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) [hereinafter "*Heller II*"].

As courts have recognized, in determining whether a firearms regulation is "longstanding" or "fairly supported" by "historical tradition" and thus exempted from Second Amendment scrutiny under *Heller*, a practice need not have been uniform across jurisdictions. Indeed, in *Heller*, the Supreme Court concluded that prohibitions on carrying concealed weapons were so supported because "the *majority* of the 19th-century courts to consider the question" held that such

prohibitions were lawful under the Second Amendment or state analogues. 554 U.S. at 626 (emphasis added). Thus, a widespread, though not unanimous, acceptance of a restriction on carrying firearms constitutes a sufficient "historical justification" under *Heller*, and demonstrates that it has been traditionally accepted as a "permissible" limitation on the Second Amendment right. *Id.* at 635.

The courts have also repeatedly recognized that a law does not need to "mirror limits that were on the books in 1791" in order to be considered a longstanding and accepted prohibition under *Heller. United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (*en banc*). To the contrary, laws may qualify as longstanding practices not barred by the Second Amendment even if they "cannot boast a precise founding-era analogue." *NRA v. BATF*, 700 F.3d 185, 196 (5th Cir. 2012). Indeed, as the D.C. Circuit in *Heller II* explained, the Supreme Court "considered 'prohibitions on the possession of firearms by felons' to be 'longstanding' although states did not start to enact them until the early 20th century." *Heller II*, 670 F.3d at 1253 (quoting *Heller*, 554 U.S. at 626).[14]

Application of these principles can be seen in several recent cases in the Courts of Appeals. The court in *Heller II* upheld firearm registration requirements

---

[14] And of course a law could not possibly have a perfect "founding-era analogue" if the law, like the Regulation, regulates something that did not exist in the founding era (*i.e.*, an area designated by the Corps for recreational use).

as "longstanding in American law" because they had been "accepted for a century in diverse states and cities" and are "now applicable to more than one fourth of the Nation by population." *Id.* at 1254.  The Seventh Circuit, sitting en banc, applied similar logic in upholding federal laws criminalizing firearm possession by felons, even though "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938." *Skoien*, 614 F.3d at 640.  Relying on *Heller*, the court reasoned that "the legislative role did not end in 1791 . . . leaving to the people's elected representatives the filling in of details." *Id.*

### B.    The Regulation At Issue Reflects A Longstanding Practice Within The Meaning Of *Heller*.

The regulation of firearms at the Corps Recreation Areas enjoys the kind of widespread historical acceptance required by *Heller*.  The Regulation is "narrowly cabined to a specific area" that is "specifically designed for recreation." *GeorgiaCarry III*, 788 F.3d at 1326.  Many of the millions of visitors to the Allatoona and Thurmond properties visit on weekends and at peak times of year, and some may consume alcohol during their visit.  Thus, the Corps Recreation Areas present the same public safety and public peace concerns that other areas where people congregate do—that armed persons and potential conflicts between armed persons might threaten other citizens.  These concerns led the Corps to

26

adopt the Regulation immediately after the Corps was authorized to designate land for public recreational use in 1946.

The Regulation's restrictions on carrying firearms in the Corps Recreation Areas are consistent with centuries-old English law, Colonial law, and early American law. The concern that citizens would feel threatened by persons carrying weapons, or that dangerous conflicts could arise between armed persons, has long motivated restrictions on the possession of weapons outside the home, tracing back to New Jersey's 1686 efforts to prevent the "great fear and quarrels" induced by "persons wearing swords, daggers, pistols," and "other . . . unlawful weapons," 1686 N.J. Laws 289, 289-90, ch. 9; App. 30-31, and to medieval England before that. The same principles underlie the Regulation at issue here. As the Fourth Circuit explained, "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).

Such regulations on carrying guns have long applied to a variety of areas where people interact in public and travel. The Statute of Northampton itself stated that citizens may not carry weapons "in *Fairs*, *Markets*, . . . *nor in no part elsewhere*." 2 Edw. 3, 258, ch. 3 (emphasis added); App. 3. It applied "*not only* in

Cities and Towns, [but] in *all* parts of the Realm in common high[ways]," "including the less populated suburbs." *Faces*, *supra*, at 18-19, 21 (emphasis added, spelling modernized).

The Founding-era adoption of the Statute of Northampton by States continued such broad restrictions on the possession of weapons in public, especially in areas where people congregate. *See supra*, at pp. 11-14. And the earliest regulations in National Parks and "similar federally managed recreational sites" such as the Corps Recreation Areas, *GeorgiaCarry III*, 788 F.3d at 1327, imposed similar restrictions. Those regulations further the government's "substantial interest in providing for the safety of individuals who visit and make use of the national parks." *Masciandaro*, 638 F.3d at 473. "The government, after all, is invested with 'plenary power' to protect the public from danger on federal lands under the Property Clause." *Id.*

The purpose of the Regulation—to protect public safety and the public peace—is firmly rooted in history, and the longstanding practice of restricting firearm possession in public areas, including parks, provides the historical justification to conclude that the Regulation does not restrict activity protected by

the Second Amendment.  *See Heller*, 554 U.S. at 625, 626; *GeorgiaCarry III*, 788 F.3d at 1326.[15]

The Regulation's specific exceptions are also consistent with historical firearms regulations.   While the Regulation generally prohibits visitors from possessing firearms or ammunition in the Corps Recreation Areas, it contains exceptions for hunting and target shooting in appropriate areas.   And the Regulation provides a mechanism by which visitors to the Allatoona and Thurmond areas who have a particular and demonstrable need to carry a firearm can obtain authorization to carry firearms from a government official (the District Commander), just as citizens could under many 19th Century American laws or under the earliest federal regulation of the National Parks.  *See supra*, at pp. 14-16, 18.

The absence of a general "self-defense" exception in the Regulation (without permission of the District Commander) is also consistent with the historical tradition and, contrary to Plaintiffs' arguments, does not offend the Second

---

[15] That some states, including Georgia, have enacted laws permitting properly licensed citizens to carry weapons in public places does not undermine this constitutional analysis.  Georgia is certainly entitled to make that policy choice, but it does not erase the Corps' interest in protecting public safety in areas under its control or undermine the longstanding historical acceptance of provisions like the Regulation in many other states.

Amendment.   The history outlined here, beginning with the Statute of Northampton and continuing with its progeny, demonstrates that the Second Amendment has never been understood to confer an unfettered right to carry guns for self-defense in public areas; indeed, the common law before and after the Founding imposed a *duty to retreat* in public, not a right to arm up.  *See generally* 4 Blackstone, *Commentaries* 185; 1 Wharton, *A Treatise on the Criminal Law of the United States* 527-28 (1846).[16]  The "castle doctrine," coined in *Semayne's Case* in 1603, applied only at home.  *See Semayne's Case*, 77 Eng. Rep. 194, 195 (K.B. 1603) ("[T]he house of every one is to him as his castle.  . . .  Although a man kills another in his defense, or kills one per infortune, without any intent, yet it is felony, and in such case he shall forfeit his goods and chattels, for the great regard which the law has a man's life; but if thieves come to a man's house to rob him, or murder and the owner or his servants kill any of the thieves in defense of himself and his house, it is not felony, and he shall lose nothing.").  And numerous state high court decisions from the 19th and early 20th Centuries reflect a duty to retreat in public, even in states where a person was permitted to carry firearms in

---

[16] The Eleventh Circuit has assigned great weight to common law principles when assessing challenges under the Second Amendment.  *See GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012) [hereinafter "*GeorgiaCarry I*"].

public based on a showing of reasonable cause to do so.[17]  Thus, the regulations applicable in the Corps Recreation Areas cannot be said to violate any widely accepted historical right to armed self-defense in public, especially as Plaintiffs can "freely exercise their right to bear arms for self-defense elsewhere." *GeorgiaCarry III*, 788 F.3d at 1326.

* * *

The Corps' firearms regulations respect, and are entirely consistent with, historical traditions and widely accepted regulations on carrying weapons dating back to the 14th Century.  The Corps promulgated them at the very moment it began designating areas for recreation, and has maintained them essentially unchanged ever since.  The regulations do not restrict activity protected by the Second Amendment, and are constitutionally permissible under *Heller* at "step one" of the appropriate constitutional analysis.

---

[17] *See, e.g.*, *Perkins v. State*, 78 Wis. 551 (1890); *State v. Cox*, 128 Me. 151 (1948); *People v. Robinson*, 152 Mich. 41 (1908); *Vaiden v. Commonwealth*, 53 Va. 717 (1855); *Goodall v. State*, 1 Ore. 333 (1861); *State v. Cain*, 2 W. Va. 679 (1882); *Commonwealth v. Ware*, 137 Pa. 465 (1890); *State v. Rheams*, 34 Minn. 18 (1885); *State v. Sorenson*, 32 Minn. 118 (1884).

31

## CONCLUSION

For all the foregoing reasons, the Court should grant the Government's motion for summary judgment.

December 30, 2015                    Respectfully submitted,

*/s/ Mary Helen Wimberly*

Mary Helen Wimberly
(GA Bar No. 945127)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
maryhelen.wimberly@hoganlovells.com

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

Of Counsel:

Ira M. Feinberg
David Dunn
Suzanne Novak
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
(212) 918-3000

Alexander Bowerman*
HOGAN LOVELLS US LLP
1835 Market St., 29th Floor
Philadelphia, PA 19103
(267) 675-4600
* *Admitted only in California.*

J. Adam Skaggs
Mark Anthony Frassetto
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 5.1 of the U.S. District Court for the Northern District of Georgia, I hereby certify that the foregoing brief has been composed using Times New Roman 14-point font, double-spaced, with a top margin of 1.5 inches and remaining margins of 1 inch.

December 30, 2015                    Respectfully submitted,

                                     */s/ Mary Helen Wimberly*

                                     Mary Helen Wimberly
                                     (GA Bar No. 945127)
                                     HOGAN LOVELLS US LLP
                                     555 Thirteenth Street, NW
                                     Washington, DC 20004
                                     (202) 637-5600
                                     maryhelen.wimberly@hoganlovells.com

                                     *Counsel for Amicus Curiae*
                                     *Everytown for Gun Safety*