**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

GEORGIACARRY.ORG, INC.　　et.al., )
　　　　　　　　　　　　　　　　　 )
　　　Plaintiffs　　　　　　　　 )　　CIVIL ACTION FILE NO.
　　　　　　　　　　　　　　　　　 )
v.　　　　　　　　　　　　　　　 )　　4:14-CV-139-HLM
　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　 )
THE U.S. ARMY CORPS OF　　　 )
ENGINEERS, et.al.,　　　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　Defendants.　　　　　　　　 )

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

　　　Plaintiffs commenced this action to challenge the constitutionality, as

applied to them, of 36 C.F.R. § 327.13 (the "Regulation").  Defendants have filed a

Motion for Summary Judgment [Doc. 45], on the grounds that the Regulation

comports with the Constitution.  For the reasons discussed below, Plaintiffs oppose

the Motion.

**Argument**

　　　The Regulation provides:

　　　(a) The possession of loaded firearms, ammunition, loaded projectile

firing devices, bows and arrows, crossbows, or other weapons is
prohibited unless:
>  (1) In the possession of a Federal, state or local law
>  enforcement officer;
>  (2) Being used for hunting or fishing as permitted under §
>  327.8, with devices being unloaded when transported to, from
>  or between hunting and fishing sites;
>  (3) Being used at authorized shooting ranges; or
>  (4) Written permission has been received from the District
>  Commander.

(b) Possession of explosives or explosive devices of any kind,
including fireworks or other pyrotechnics, is prohibited unless written
permission has been received from the District Commander.

The individual Plaintiffs each sought and were denied permission from the

District Commander to carry a loaded firearm pursuant to § (a)(4).  The record

does not reveal any reasons for the denial of permission to either Plaintiff.  The

record also does not contain any information indicating anything other than that

each Plaintiff is a responsible, law-abiding citizen.

## I.   As-Applied Second Amendment Challenges

Plaintiffs first bring as-applied Second Amendment challenges to their

respective denials of permission to carry loaded firearms at Corps property.  The

Second Amend provides, "A well regulated militia being necessary to the security

of a free state, the right of the people to keep and bear arms shall not be infringed."

The Supreme Court ruled in *District of Columbia v. Heller,* 554 U.S. 570 (2008)

–2–

that the right described in the Second Amendment is an individual, fundamental

right to keep and carry arms in case of confrontation.

In the case of Plaintiffs, Defendants have refused to give them permission to

possess **loaded** firearms, or ammunition, on Corps property unless they are hunting

or shooting at designated ranges.  To complicate matters, though, Plaintiffs are

permitted to carry **unloaded** firearms anywhere on Corps property, ammunition

separate from a gun when they are on Corps property to hunt or sport shoot, and

**loaded** firearms when they are actually engaged in hunting or sport shooting.

Thus, a person on a week-long hunting trip on Corps property, who camps on

Corps property at night, may possess firearms and ammunition on Corps property,

and a person who is only camping may possess firearms but not ammunition on

Corps property.

There is no indication in the record that Defendants performed any kind of

background check on Plaintiffs before denying Plaintiffs permission to have

ammunition and thus loaded firearms on Corps property.  Defendants' nonsensical

and arbitrary rules, coupled with their failure to make any kind of individualized

determination, are fatal to their defense.

I.A. Second Amendment Analysis

In determining whether a regulation violates the Second Amendment, the 11th Circuit has established a two-prong test used by many Courts of Appeals around the country.[1]  The first prong examines whether the regulation burdens the Second Amendment right.  If it does not, the inquiry ends there.  If it does, then the court applies an appropriate means-end scrutiny test to determine if the regulation passes constitutional muster.

The Corps does not really examine the as-applied aspects of this case in any meaningful way.  The Corps argues the Regulation does not burden the Second Amendment right on its face, an argument that will be discussed below, but it does not argue one way or the other whether Defendants' refusal to grant permission to Plaintiffs burdens Plaintiffs' Second Amendment rights.

Plaintiff James asked to be able to carry a firearm in the camping and boat ramp areas of Lake Allatoona for purpose of self defense of himself and his family.  Doc. 39-3, p. 4.  Plaintiff Barrs asked to be able to carry a concealed firearm at

_____

[1] This test was not used by the Supreme Court in any case where it gave any kind of Second Amendment Analysis (*Heller, McDonald v. City of Chicago,* and *U.S. v. Miller*).

lake Thurmond for self defense of himself and family while camping and engaging in other outdoor activities.  Doc. 40-3, p. 4.  Both requests were denied without reference to either Plaintiff's background or status as responsible, law-abiding citizens.

It takes little effort to conclude that being prohibited from carrying loaded firearms for self-defense on millions of acres of wilderness constitutes *some* burden on the Second Amendment right.  Both Plaintiffs mentioned the desire to carry for self-defense, the central purpose of the Second Amendment.  Both Plaintiffs said they wanted to do so while camping.  When a person is engaged in camping, he at least temporarily has set up his home in his tent or trailer.  He engages in all the activities normally associated with home life – preparing and eating meals, sleeping, bathing, changing clothes, communing with family, etc.  The Supreme Court has said the Second Amendment right is most acute in the home.

The only explanation the Corps suggests that its refusal to grant permission does not burden the Second Amendment right is that Corps property is "sensitive."  The Supreme Court in *Heller* said in *dicta* that restrictions on carrying firearms in "sensitive" places such as schools and government buildings are presumptively

lawful.  The problem with the Corps' reasoning is that campgrounds and boat ramps bear no similarity to schools and government buildings.  Even if they did, however, the Eleventh Circuit has not ruled that a presumptively lawful regulation does not burden the Second Amendment.  Indeed, the more logical reading would be that even if the regulation burdens the Second Amendment, it passes an appropriate means-end scrutiny.

The Corps provides no support for its conclusion that its campgrounds and boat ramps are sensitive.  It does not mention its boat ramps and campgrounds at all in its analysis.  Instead, the Corps devotes pages and pages of its Brief trying to prove that its property is "sensitive" by explaining why its regulation is lawful.  In other words, because the Corps cannot show that its boat ramps and campgrounds are sensitive, it merely declares that they are and then obfuscates the fact that it has no evidence that they are.

The logical extension of the Corps' argument is its own undoing.  If a public boat ramp is a "sensitive place," then is it really any more sensitive than a public sidewalk, a public street, a public landfill, or any other public facility?  It is not immediately obvious what similarity exists between schools and government buildings, but one thing (perhaps the only thing) they have in common is they are

both buildings.  Boat ramps and camp grounds are not buildings.  There simply is no similarity between boat ramps and camp grounds on one hand and schools and government buildings on the other.  Because the Corps makes no effort at all to explain how the camp grounds and boat ramps are "sensitive," this Court cannot make that giant leap.

Defendants' own facts also severely undercut any argument that the areas where Plaintiffs requested permission to carry loaded firearms are sensitive.  The campground where James camps is 12 miles to the Allatoona Dam.  Doc. 45-2, ¶ 52.  Access to the Dam is restricted.  *Id.,* ¶ 54.  The state park where Barrs camps is 10 miles from Thurmond Dam.  *Id.,* ¶ 73.  Thurmond Dam is fenced off and access to it is restricted.  *Id., ¶* 75.  Thus, the only facility at either property that Defendants claim is "sensitive" is 10 or more miles away and physically restricted for public access.  Defendants fail to explain why it would jeopardize the security of the dams, which are access-restricted to begin with, if law-abiding citizens carries loaded firearms 10 miles away.  Defendants also fail to explain how it is not a security issue for hunters and sport shooters to carry loaded firearms on Corps property similar distances away.

Defendants have explicitly denied Plaintiffs permission to carry loaded firearms in case of confrontation, and even while camping.  There is no way to conclude this denial does not burden the Second Amendment in any way.

I.B.  The Second Prong

Having concluded that the Defendants' denial of permission to Plaintiffs burdens Plaintiffs' Second Amendment rights, the second prong is to apply an appropriate means-end scrutiny to the denial.  Importantly, the Corps bears the burden of justifying its denial under the appropriate level of scrutiny.  *Ezell v. City of Chicago,* 651 F.3d 684, 706 (7th Cir. 2011).

The 7th Circuit in *Ezell* analogized Second Amendment cases to First Amendment cases in determining the appropriate level of scrutiny to apply.  65a F.3d at 707 ("[T]he applicable standard of judicial review depends on the nature and degree of the government burden on the … right….").  Thus, content-based regulations are presumptively invalid and thus get strict scrutiny, which means the law must be narrowly tailored to serve a compelling governmental interest.  Less severe burdens must be justified by the government with a strong showing of a substantial relation between the denial and an important governmental goal.  *Id.* The Corps failed to make a showing that would survive ***any*** level of scrutiny.

−8−

Given the nature of the denial, strict scrutiny should apply.  Defendants readily allow anyone engaged in hunting or sport shooting to carry loaded firearms.  Those same people may still possess both firearms and ammunition on Corps property even when they are not engage in those activities.  Defendants denied Plaintiffs the right to carry loaded firearms, or even possess ammunition, when Plaintiffs were at boat ramps or camp sites.  To complete the analogy to First Amendment jurisprudence, Defendants have engaged in "content-based" regulation.  Instead of attempting some kind of "time, place, and manner" restriction (such as, for example, saying loaded firearms are prohibited near the dams but permitted at the boat ramps, or prohibited to be carried openly but permitted to be carried concealed), Defendants have granted permission to carry loaded firearms based on the activities that are being engaged in (i.e., the "content" of the exercise of the right).

Defendants' denial is therefore presumptively invalid, and subject to strict scrutiny.  Defendants bear the heavy burden of proving that their denial of permission to Plaintiffs must be narrowly tailored to serve a compelling governmental interest.

Defendants make no effort to justify their denial under strict scrutiny.  For this reason alone, their Motion must be denied, because they have failed to carry their burden.  Just to be clear, however, there is nothing narrow about the tailoring of their denial.  To both Plaintiffs, Defendants just said "no," without explanation. Even assuming a compelling governmental interest in safety of the public, Defendants made no effort to explain how these Plaintiffs pose a greater threat to public safety than the untold numbers of people Defendants permit to carry loaded firearms for hunting and sport shooting.  Defendants also made no effort to explain how the safety of the public is advanced by allowing everyone to carry unloaded firearms, some people to carry unloaded firearms and ammunition, and some people to carry loaded firearms, without any inquiry into the backgrounds of the different classes of people.  Defendants drew no conclusions at all about the particular Plaintiffs in this case.  Defendants fell far short of carrying their burden.

Even if this Court determines that only intermediate scrutiny applies, Defendants did not carry the burden for that, either.  They concentrated their arguments here (rejecting both strict scrutiny and rational basis out of hand), but they still fell short.  Under intermediate scrutiny, Defendants would have the burden of proving that allowing the particular Plaintiffs in this case to carry loaded

firearms "creates such genuine and serious risks to public safety that prohibiting [them from carrying loaded firearms at camp sites and boat ramps] is justified." *Id.,* 651 F.3d at 709.

Defendants made no showing at all pertaining to either Plaintiff.  The record does not even show that Defendants performed any kind of background check on either Plaintiff or even take into account that Plaintiff Barrs has a Georgia weapons carry license (meaning he has undergone fingerprint-based state and federal criminal background checks – O.C.G.A. § 16-11-129).  There is nothing in the record indicating anything other than that both Plaintiffs are responsible, law-abiding citizens.  There therefore is not any evidence that allowing Plaintiffs to carry loaded firearms at camp sites and boat ramps would pose a serious threat to public safety – more serious, that is, to allowing Plaintiffs to carry unloaded firearms, and allowing others to carry ammunition or even loaded firearms.

Consider, for example, a duck hunter at the same boat ramp as a Plaintiff, launching his boat to begin his hunt.  Defendants permit him to carry ammunition at the boat ramp, and even loaded firearms in the vicinity of the boat ramp. Defendants failed to make a showing that the duck hunter, who may not have undergone any kind of background check, is less of a threat to public safety than is

Barrs, who has undergone both a state and federal fingerprint-based criminal background check.

Defendants focus instead on generic arguments, indicating they are not considering the as-applied challenges at all in their Motion.  Their generic arguments will be discussed more fully below, but even those arguments are ineffective.  Defendants fail, for example, to explain why their rangers cannot cope with campers with loaded firearms, but they are fully capable of dealing with campers with unloaded firearms, and hunters and sport shooters with loaded firearms.  Defendants also fail to explain how their rangers would have any way of knowing if a camper's firearm were loaded.  The *Ezell* court observed that undeveloped or illogical arguments suggest the argument is just a pretext.  651 F.3d at 710.

The Supreme Court in *Heller* took rational basis off the table.  Just to round out the discussion, though, Defendants' denial would not even survive that.  As already noted, it is irrational and arbitrary to allow everyone to carry unloaded firearms, some people to carry unloaded firearms and ammunition, and some people to carry loaded firearms, all in the same place and based only on the activities they are engaged in.

Defendants cannot seriously question the utility of Plaintiffs being allowed to carry loaded firearms for self defense.  As an initial matter, Defendants concede that their rangers are not armed and not really performing the role of law enforcement officers.  Only 15 rangers are assigned to Lake Allatoona.  Doc. 45-2, ¶ 41.  The property is nearly 40,000 acres [*Id.,* ¶ 33] and one of the most heavily visited Corps properties in the country.  *Id.,* ¶ 34.  It receives approximately 6 million visitors per year.  *Id.,* ¶¶ 35-36.  In recent years, the area around the campground has been the site of nearly 1,000 violent crimes, including several murders, dozens of forcible rapes, and hundreds of aggravated assaults.  *Id.,* ¶¶55-58.

Thus, a lot of people visit a large area with sparse, unarmed law enforcement yet known to be the site of murders, rapes, and aggravated assaults.  They spend the night in temporary shelters (tents or trailers) not known for their resistance to burglars, and they are forbidden from bearing what the Supreme Court in *Heller* termed the quintessential arm for self defense in America:  the handgun.

Defendants' after-the-fact reason for denying Plaintiffs' requests is that Defendants' rangers are not equipped to deal with armed visitors.  Defendants fail to explain, however, how rangers deal presently with hunters and sport shooters,

not to mention all the people who carry unloaded firearms in hopes of bluffing their way out of being raped, assaulted, or murdered.

## II.  Facial Challenge

Plaintiff GeorgiaCarry.Org, Inc. ("GCO") raises a facial challenge against the Regulation.  The Administrative Record in this case does not indicate that the Corps ever grants permission to anyone to carry a loaded firearm.  Instead, the Corps treats the Regulation as a categorical ban on loaded firearms for self defense, even though loaded firearms are allowed for sport shooting and hunting.

A categorical ban on carrying firearms for self-defense is a complete destruction of the Second Amendment right.  Like the bans in *Heller* and *McDonald v. City of Chicago,* 561 U.S. 742 (2010)  categorical bans are unconstitutional and cannot withstand any measure of scrutiny.

The Corps defends the ban on grounds that the Corps property is the Corps' to do with whatever it chooses.  The Corps cites this Court's earlier speculation that early Army regulations must surely have precluded the public from carrying firearms on Army property.  Doc. 19, p. 25.  This is, as is by now evident, just speculation.  It has been a year and a half since this Court made that statement. Although Defendants now repeat it in their Brief, they cite no independent

authority for that proposition, a proposition which if true would be readily supportable with reference to historic Army documents. With its own army (of lawyers) available to it, surely the Department of Justice could find such authority in a year and a half if it really exists. The fact that the Corps has not been able to produce it severely undermines any further claims to its existence. Moreover, even in a facial Second Amendment challenge, the burden is on the government to justify its regulation. If the government cannot find the authority for a ban on civilian firearms on Army property from the time of the Founding, the logical conclusion is that there was no such ban and the common understanding of the people at that time is that civilian possession of firearms was permitted.

Aside from any historic Army regulations, however, the ban cannot pass constitutional muster. The Corps argues that the ban only applies on Corps property, and the public is free to exercise its Second Amendment rights elsewhere. The "do it somewhere else" approach to constitutional rights has long been dismissed. Even in *Ezell,* the City of Chicago's ban on gun ranges could not survive based on an argument that gun ranges outside the city were available. Likewise, in *Heller* and *McDonald,* the opportunity to possess guns outside D.C. and Chicago, respectively, did not save the laws at issue in those cases.

The Corps claims to control 12 million acres (roughly 19,000 square miles) of land in 42 states, a statistic GCO does not dispute.  By contrast, the District of Columbia comprises 68 square miles[2] and the City of Chicago 234 square miles.[3] We know from *Heller* and *McDonald* that both DC and Chicago are absolutely prohibited from banning even guns in their jurisdictions.  The Corps fails to explain how it is that it can ban guns in their jurisdiction, which is tens of times larger.  The simple answer is the Corps has no such authority.

The Corps argues that it is not governing, but acting as a proprietor of its own land.  The Regulation belies this theory.  A private property owner is of course free to exclude people from her property for any reason, including that the people are carrying firearms.  A visitor that violates such a rule may be ejected by the property owner, under pain of prosecution for trespassing for refusing to leave.

The Corps enjoys some rights as a private property owner (though not the full panoply of rights – the Corps cannot, for example, exclude on the basis of race the way a private landowner can).  It is plain, however, that the Corps is not acting as a property owner.  The Ban is more than a mere rule, to be enforced by the Corps the

---

[2] https://en.wikipedia.org/wiki/Washington,_D.C. (checked March 9, 2016)
[3] https://en.wikipedia.org/wiki/Chicago (checked March 9, 2016)

way a property owner enforces any other rule.  Not content to rely on property rights, the Corps added to its Ban something only the sovereign can do – attach criminal penalties.

A person who violates the Ban is not merely subject to ejection from Corps property.  The violator is subject to a fine of up to $5,000 or imprisonment for up to 6 months, or both, and may be cited and required to appear before a federal magistrate to answer to the charge.  36 CFR § 327.25.  Private property owners have no such enforcement powers.  Clearly, the Corps is flexing its governmental muscles and not its property owner rights.  If the Corps truly were acting in a propriety capacity, it would settle for enforcing its "rules" as a property owner the way private property owners due, by exercising the right of ejectment.

Moreover, the Government's power to restrict access to its property does not translate into power to trample citizens' fundamental constitutional rights when the people are not restricted from access.  *United States v. Kokinda,* 497 U.S. 720, 725 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business….")  This is especially true where "There is no separation, no fence, and no indication whatever to persons [entering the grounds]…that they have entered

–17–

some special type of enclave." *United States v. Grace,* 461 U.S. 171, 180 (1983).
The issue in *Grace* was whether the Government could ban protests on the sidewalk
in front of the Supreme Court building.  The Court ruled that it could not, because
the sidewalk in front of the Court was indistinguishable from the surrounding streets
and sidewalks of the District of Columbia.  Even though the sidewalk was
Government property (and not a city sidewalk) and had not been dedicated to public
free speech use, the public had a First Amendment right to speak freely on the
sidewalk.  Likewise, the Corps lands at issue do not constitute some special sort of
enclave, and it is entirely possible to pass in and out of Corps property without
notice.

## Conclusion

For the foregoing reasons, this Court should deny the Corps' Motion for
Summary Judgment.


JOHN R. MONROE,


\_\_\_\_/s/ John R. Monroe_____
John R. Monroe

−18−

Attorney at Law
9640 Coleman Road
Roswell, GA 30075
Telephone: (678) 362-7650
Facsimile: (770) 552-9318
jrm@johnmonroelaw.com
Georgia Bar No. 516193
ATTORNEY FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 9, 2016, I served a copy of the foregoing via ECF upon:

Daniel Riess
Daniel.riess@usdoj.gov


_____/s/ John R. Monroe
John R. Monroe

## **RULE 7.1D CERTIFICATION**

I certify that this brief was prepared in accordance with the page, font, size, margin and other requirements of Rules 7.1D and 5.1C.


_____/s/ John R. Monroe_____
John R. Monroe