**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

GEORGIACARRY.ORG, INC.,    )
<u>et</u> <u>al</u>.,    )
    )
    Plaintiffs,    )    CIVIL ACTION FILE NO.
    )
    v.    )    4:14-CV-139-HLM (consolidated
    )    with 4:15-CV-0009-HLM)
U.S. ARMY CORPS OF    )
ENGINEERS <u>et</u> <u>al</u>.,    )
    )
    Defendants.    )

<u>**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS**</u>

Plaintiffs submit the following responses to Defendants' Statement of

Undisputed Material Facts.  As a general matter, Plaintiffs observe that Defendants

seem to equate any scrap of paper appearing in the "record" as being supportive of

a fact.  While the Court has ruled that the case will be decided based solely on the

administrative record in this case, the Court has not declared that any documents

Defendants see fit to include in that record are admissible, relevant and factual.

There are many instances, therefore, where Plaintiffs deny a proposed 'fact on

grounds of admissibility.

**General Information**

1.      The U.S. Army Corps of Engineers ("Army Corps") manages 422 projects (mostly lakes) in 42 states and is the steward of 12 million acres of land and water used for recreation, with 54,879 miles of shoreline.  HQ AR 991,

*Admitted*

2.      Most Army Corps projects are located near population centers, as the projects are often designed with the explicit purpose of protecting population centers from flooding, providing hydroelectric power, improving navigation, and providing nearby developed as well as dispersed recreation and quality natural resources for that local populace.   SAM AR 121.

*Denied.  The citation is to an unidentified document that is not under oath.  It is not admissible on the grounds that it is hearsay.  It also is irrelevant to the present case in that it appears to be a generic statement of all Corps land without reference to the two Corps properties at issue in this case.*

3.      Roughly 80% of Army Corps recreation areas are located within 50 miles of an urban area.  HQ AR 3990; SAM AR 18.

*Denied.  This is irrelevant as not stating any relationship to the two Corps properties that are the subject of this case.*

4.      Army Corps projects include some of the most densely used federal recreation areas.   SAS AR 20.

***Denied.  This is irrelevant as not stating any relationship to the two Corps***

***properties that are the subject of this case.***

5.      Army Corps-managed projects receive more than 370 million visits per

year, making its projects the most visited of any single federal agency's sites.  HQ

AR 1273; SAM AR 125, 133.

***Denied.  This is irrelevant as not stating any relationship to the two Corps***

***properties that are the subject of this case.***

6.      By all measures, the Army Corps hosts the most visits per acre of any

federal resource management agency.   SAM AR 125.

***Denied.  This is irrelevant as not stating any relationship to the two Corps***

***properties that are the subject of this case.***

7.      By contrast with lands managed by the Army Corps, much of the land

managed by the National Park Service and U.S Forest Service is remote and often

minimally developed.   SAM AR 121.

***Denied.  This is irrelevant as not stating any relationship to the two Corps***

***properties that are the subject of this case.  No NPS or USFS lands are at issue***

***in this case.***

8.      The U.S. Department of Homeland Security's Office of Inspector

General has characterized "[d]ams and related structures," including those operated

and managed by the Army Corps, as "critical infrastructure," given that "one

catastrophic failure at some locations could affect populations exceeding 100,000

and have economic consequences surpassing $10 billion."  SAM AR 64.

***Denied.  This is irrelevant as not stating any relationship to the two Corps***

***properties that are the subject of this case.***

9.    The Army Corps and the U.S. Department of Homeland Security

regard some Army Corps infrastructure as critical to homeland security and the

economy; these structures include multi-purpose dams and major navigation locks.

SAM AR 20.

***Denied.  This is irrelevant as not stating any relationship to the two Corps***

***properties that are the subject of this case.***

10.    According to the Congressional Research Service, many of these Army

Corps-managed facilities require additional protection measures in times of

heightened homeland security concerns.  SAM AR 20.

***Denied.  This is irrelevant as not stating any relationship to the two Corps***

***properties that are the subject of this case.***

11.    Public safety on Army Corps-managed lands is of paramount

importance to the Army Corps, and is the basis for policies, rules, and regulations

regarding visitor behavior at Army Corps projects.  HQ AR 877.

***Denied.  The cited source is an unsigned, self-serving opinion apparently***

***generated by the Corps.  It is inadmissible as hearsay, and is no more probative***

*of the truth than if Plaintiffs had submitted documents into the "record" stating*

*that the Corps routinely violates the Second Amendment rights of citizens.*

12.    The primary focus of the Army Corps' recreation mission is to provide

safe and healthy outdoor experiences at Army Corps projects.   SAS AR 461.

*Admitted for the case involving Lake Thurmond, as that is the AR source for this*

*fact.  Denied for the case involving Lake Allatoona, as it is not in the record for*

*that case.*

13.    Some sources of conflict among visitors to Army Corps-managed lands

include alcohol consumption, overcrowded facilities, visitors' preference for

different types of music played at different sound levels, and the relative loudness of

visitors' conversations.  *See* HQ AR 819-822, 914, 916.

*Admitted.*

14.    In a 2010 survey, Army Corps Park Rangers were asked to rank from a closed-ended list the three crimes or violations (1) that most frequently endangered visitors, (2) that most frequently endangered Rangers, (3) as to which they received the most visitor complaints and (4) that most frequently required them to call in law enforcement assistance.   SAM AR 85, 102.

*Denied.  Hearsay.*

15.    In the above-mentioned 2010 survey, Army Corps Park Rangers reported that persons under the influence of alcohol or drugs, fights and disorderly conduct, and vandalism were major challenges or threats in all four areas.   SAM AR 85, 102, 114-115.

*Denied.  Hearsay, not under oath.*

16.    In the above-mentioned 2010 survey, Army Corps Park Rangers ranked theft in the top five responses as to three of the four areas, and ranked domestic violence in the top five responses as to two of the four areas.   SAM AR 85, 102, 114-115.

*Denied.  Hearsay, not under oath.*

17.     In a 2010 survey, 79% of Army Corps Park Rangers reported that they had experienced verbal abuse during the prior 12 months, 25% reported that they had been verbally threatened; 18% reported that a visitor had blocked a Ranger's ability to move or leave the scene; 7% reported that they had been threatened with a visible weapon such as a gun, knife, hatchet, or motor vehicle; 4% reported physical contact or battery; and 3% reported that they had received an injury resulting from physical contact or batter that required first aid or medical attention.   SAM AR 85, 104-105.

**Denied.  Hearsay, not under oath, only applicable to Lake Allatoona as not contained in AR associated with Lake Thurmond.**

18.     In a 2010 survey of Army Corps Park Rangers, 74% of respondents reported being aware of a visitor to their project being physically or verbally abused or threatened in the prior 12 months, and that 58% of such incidents involved drugs or alcohol.   SAM AR 106.

**Denied.  Hearsay, not under oath.**

19.     In a 1996 survey, 62% of Army Corps Park Rangers reported incidents of verbal abuse from one or more visitors to Army Corps-managed lands during the prior three years, and 46% reported that they had been physically threatened by one or more visitors during the prior three years.  HQ AR 818.

**Denied.  Hearsay, not under oath.**

20.     In a 1996 survey, 53% of Army Corps Park Rangers reported that they had witnessed between one and ten incidents during the prior three years in which one or more visitors to Army Corps-managed lands had verbally or physically threatened another visitor or visitors.  HQ AR 821.

**Denied.  Hearsay, not under oath.**

21.     In a 1995 survey, Army Corps Park Rangers reported that during the prior three years, on average each day, one Ranger was physically threatened by one or more visitors to Army Corps-managed lands, and nearly four Rangers were verbally abused or verbally assaulted by one or more visitors.  HQ AR 938-939

*Denied.  Hearsay, not under oath.*

22.     In a 1995 survey, Army Corps Park Rangers reported that during the prior three years, on average, an Army Corps Park Ranger was assaulted by one or more visitors to Army Corps-managed lands once every six days.  HQ AR 938-939.

**Denied.  Hearsay, not under oath.**

23.     In a 1995 survey, the number of reported incidents of threats made by visitors to Army Corps-managed lands against Army Corps Park Rangers during the prior three years greatly exceeded the number of reported incidents of threats against U.S. National Park Service officers.  HQ AR 938-939.

**Denied.  Hearsay, not under oath.  Irrelevant as NPS lands are not at issue in this case.**

10

24.     A 1994 study reported that Army Corps Park Rangers sometimes found themselves in potentially unsafe and dangerous situations, and that typically, such unsafe situations include those involving alcohol and drug use on project lands, the use of weapons by the visiting public, domestic violence, and patrols in remote areas with little or no back-up from other law enforcement agencies.   HQ AR 1354.

**Denied.  Hearsay, not under oath.**

25.     Army Corps Park Rangers are neither equipped nor trained to function as law enforcement officers because Congress has not directly authorized Army Corps employees to carry firearms, to execute search warrants, or to enforce any federal laws except for issuing citations for violations of regulations governing Army Corps-managed lands.  HQ AR 607, 1273; SAM AR 20.

**Denied.  Hearsay, not under oath; internally inconsistent, as issuing citations is a law enforcement function.**

26.     In Georgia, private property owners or persons in legal control of private property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such private property have the right to exclude or eject a person who is in possession of a weapon or long gun on their private property.   Ga. Code Ann. § 16-11-127(c).

**Denied.   This is a conclusion of law and not of fact.   Also inadmissible as irrelevant because Corps lands are not private property.   Moreover, public**

10

*property owners are prohibited under Georgia law from regulating carrying*

*firearms on their property.  O.C.G.A. § 16-11-173.*

27.    The Army Corps' law enforcement agreements with local law

enforcement can be used to obtain increased law enforcement services to meet needs

during a peak visitation period, which is defined as any period during the year when

visitation is sufficiently high to cause significant increase in risk to visitor welfare as

determined by applicable district and or project office.   SAS AR 125; *see, e.g.*, SAS

AR 141-142, 164-165, 174-175 (calling for increased law enforcement services for

Lake Thurmond property during periods of high visitation).

**Admitted.**

28.    Restrictions on firearms use in Army Corps reservoir areas date to at

least 1946.  SAM AR 1149.

**Denied.  Irrelevant, because neither of the two properties at issue in this case**

**was developed prior to 1946.**

**Lake Allatoona Property**

29.    Construction of Allatoona Lake was approved by the United States

Congress in the Flood Control Acts of 1941 and 1946, for the purposes of flood

control and power generation.   Construction of the dam at Allatoona Lake was

completed in 1950.   Later legislation authorized fish and wildlife management,

streamflow regulation, water supply, and recreation as project purposes.   SAM AR

317.

*Admitted.*

30.    The Lake Allatoona property serves seven authorized purposes: flood control, hydroelectric power generation, water supply, recreation, fish and wildlife management, water quality, and navigation.   SAM AR 199, 201, 677.

*Admitted.*

31.    The Lake Allatoona property lies mostly in southwestern Cherokee County, Georgia, but a significant part is located in southeastern Bartow County, and a small part in Cobb County.   *See* SAM AR 347, 390.

*Admitted.*

32.    The Lake Allatoona property is located approximately 30 miles from Atlanta, Georgia.   SAM AR 204.

*Admitted.*

33.    The Lake Allatoona property comprises approximately 25,747 land acres, 12,010 water acres, and 270 miles of shoreline.   SAM AR 13, 54, 185, 1310.

*Admitted.*

34.    The Lake Allatoona property is one of the most frequently visited Army Corps lakes in the United States.   SAM AR 184, 317.

*Admitted.*

35.     During Fiscal Year 2012, 6,175,062 people visited the Army Corps'

Lake Allatoona property.   SAM AR 12.

*Admitted.*

36.     During Fiscal Year 2011, 6,004,769 people visited the Army Corps'

Lake Allatoona property.   SAM AR 54.

*Admitted.*

37.     In 2006, the Lake Allatoona property reported more than 92 million

visitor hours.   SAM AR 199.

*Admitted.*

38.     In 1998, the Lake Allatoona property reported 86,813,126 visitor

hours, which represented more visitor hours than any of the other 450 Army Corps

projects in the United States.   SAM AR 199.

*Admitted.*

39.     The major activities engaged in by people visiting the Army Corps'

Lake Allatoona property during Fiscal Year 2012 included: swimming (2,667,530);

boating (1,881,516); fishing (883,474); picnicking (764,509); sightseeing (161,307);

water skiing (137,937); camping (110,789); hunting (33,968); and other activities

(972,721).   SAM AR 280; *see also* SAM AR 187-198.

*Admitted.*

40.     The major activities engaged in by people visiting the Army Corps'

Lake Allatoona property in 2006 included: swimming (2,858,907); boating

10

(2,042,427); fishing (1,049,410); picnicking (783,380); sightseeing (164,890); water skiing (125,660); camping (104,725); hunting (79,687); and other activities (1,051,862).   SAM AR 280.

**Admitted.**

41.     During Fiscal Year 2011, the Lake Allatoona property was staffed by 15 Army Corps Park Rangers.   SAM AR 54.

**Admitted.**

42.     As of 1998, 45% of the shoreline in the Allatoona Lake property, consisting of 122 miles of shoreline, was allocated to public recreation areas.   SAM AR 319.

**Admitted.**

43.     Campgrounds on the Allatoona Lake property are subject to a number of rules and restrictions.   *See* SAM AR 1372.

**Admitted.**

44.     The McKaskey Creek Campground, where Plaintiff David James alleges that he camps in a tent several weeks per year, is roughly 12 square miles in area, and is located in Bartow County, Georgia.   *See* SAM AR 1312.

**Admitted.**

45.     The operating season for McKaskey Creek Campground generally runs from the end of March to the beginning of September.   *See* SAM AR 188;

http://www.sam.usace.army.mil/Missions/CivilWorks/Recreation/AllatoonaLake/C

amping/McKaskeyCreekCampground.aspx

*Admitted*

46.     Fifty-one campsites are located on the McKaskey Creek Campground. SAM AR 188.

***Admitted.***

47.     The McKaskey Creek Campground is one of nine managed campgrounds within the Lake Allatoona property.   SAM AR 1310.

***Admitted.***

48.     Between March 22 and September 3, 2013, 8,220 people made reservations to use the campsites in the McKaskey Creek Campground, and stayed an average of 2.56 days.   SAM AR 1318.

***Admitted.***

49.     Between March 21 and September 2, 2014, 8,736 people made reservations to use the campsites in the McKaskey Creek Campground, and stayed an average of 2.75 days.   SAM AR 1319.

***Admitted.***

50.     Between March 20 and September 8, 2015, 5,224 people made reservations to use the campsites in the McKaskey Creek Campground, and stayed

an average of 2.61 days.   SAM AR 1320.

*Admitted.*

51.    Between January 1, 2013 and December 31, 2014, Army Corps Park Rangers in the Allatoona Lake property reported the issuance of two citations for violations of the Army Corps regulation restricting the use of firearms and explosives.   Neither of the two citations was issued in the McKaskey Creek Campground.   SAM AR 1350-1351.

*Admitted.*

52.    The Allatoona Dam is located roughly 12 miles south of the McKaskey Creek Campground, in Bartow County, Georgia.   *See* SAM AR 1312, 1313.

*Admitted.*

53.    The Allatoona Dam is 1250 feet long at the roadway level, and its elevation above the roadway is 880 feet.   *See* SAM AR 391, 673.

*Admitted.*

54.    Public access to the area near the Allatoona Dam is restricted due to security concerns.   SAM AR 1363.

*Admitted.*

55.    In 2012, the sheriff's office or county police department of Bartow County reported the following offenses that occurred in their jurisdiction to the FBI:

329 violent crimes; 13 incidents of forcible rape; 24 robberies; 292 aggravated assaults; 2,726 property crimes; 821 burglaries; 1,703 incidents of larceny-theft; and 202 motor vehicle thefts.   SAM AR 33.

***Admitted.***

56.    In 2011, the sheriff's office or county police department of Bartow County reported the following offenses that occurred in their jurisdiction to the FBI: 241 violent crimes; 2 murders or non-negligent manslaughters; 7 incidents of forcible rape; 37 robberies; 195 aggravated assaults; 2,841 property crimes; 805 burglaries; 1,845 incidents of larceny-theft; and 191 motor vehicle thefts.   SAM AR 55.

***Admitted.***

57.    In 2010, the sheriff's office or county police department of Bartow County reported the following offenses that occurred in their jurisdiction to the FBI: 224 violent crimes; 1 murder or non-negligent manslaughter; 23 incidents of forcible rape; 34 robberies; 166 aggravated assaults; 2,470 property crimes; 740 burglaries; 1,515 incidents of larceny-theft; and 215 motor vehicle thefts.   SAM AR 157.

***Admitted.***

58.    In 2009, the sheriff's office or county police department of Bartow County reported the following offenses that occurred in their jurisdiction to the FBI:

14

190 violent crimes; 4 murders or non-negligent manslaughters; 19 incidents of forcible rape; 29 robberies; 138 aggravated assaults; 2,430 property crimes; 691 burglaries; 1,520 incidents of larceny-theft; and 219 motor vehicle thefts.   SAM AR 223.

*Admitted.*

59.    Other than pedestrian access or general public recreation activities, any activity on the Lake Allatoona property not authorized by a permit or license is considered a trespass or degradation of public property, and constitutes a violation of the Army Corps' rules and regulations contained in Title 36, Code of Federal Regulations, Part 327.   SAM AR 337.

*Denied.  This is not a statement of fact, but a conclusion of law.*

60.    Restrictions on firearms use at the Allatoona Property date back to 1950.   SAM AR at 1118, 1123.

*Admitted.*

**Thurmond Lake Property**

61.    Construction of the Army Corps' Lake Thurmond project was approved by Congress in the Flood Control Act of 1944.   Construction of the Thurmond Dam was completed in 1954.   SAS AR 1377.

*Admitted.*

62.     The Lake Thurmond property is located primarily in Columbia,

Lincoln, and McDuffie Counties, Georgia, and McCormick County, South Carolina;

smaller portions of the property extend into Warren, Wilkes, and Elbert Counties,

Georgia, and Abbeville County, South Carolina.   SAS AR 1073, 1379, 1382-1383.

*Admitted.*

63.     Authorized purposes for the Lake Thurmond property include flood

control, downstream navigation, hydroelectric power production, recreation, water

quality/supply, and fish and wildlife management.   SAS AR at 1053.

*Admitted.*

64.     Approximately 5 million people visited the Lake Thurmond property

each year between 2008 and 2012.   SAS AR 46.

*Admitted.*

65.     As of 1995, the Lake Thurmond property has a water surface area of

approximately 71,100 acres and a land base of 75,237 acres.   SAS AR 1383,

1387-1389.

*Admitted.*

66.     As of 2001, 15% of the shoreline in the Lake Thurmond property is

allocated to public recreation areas.   SAS AR 1055.

*Admitted.*

67.     As of 1995, 18.3% of the total land area in the Lake Thurmond property

is classified as recreational.   SAS AR 1380.

14

*Admitted.*

68.     Mistletoe State Park, which Plaintiff Brian Barrs alleges he visits frequently during the summer months, is a 1,920 acre park operated by the State of Georgia on the Army Corps' Lake Thurmond property.   SAS AR 1505.

*Admitted*

69.     The Army Corps leases the 1,920 acres comprising Mistletoe State Park to the State of Georgia.   SAS AR 1383.

*Admitted.*

70.     Mistletoe State Park is located in Columbia County, Georgia.   *See* SAS AR 1505-1507, 1576-1577.

*Admitted.*

71.     As of 1995, Mistletoe State Park contained 20 rental cottages, 107 campsites with electricity, 35 primitive campsites, 272 picnic sites, 8 picnic shelters and 1 reserved group picnic shelters; in addition, the park contained boat launching ramps, a beach and bathhouse, playgrounds, nature trail, observation tower, telephone, and a small concession area.   SAS AR 1505; *see also* SAS AR 1506-1507 (maps of Mistletoe State Park).

*Admitted.*

72.     The Columbia County, Georgia sheriff's department conducts regular patrols of the Army Corps' Lake Thurmond property in Columbia County.   *See*

14

SAS AR at 50-123, 285-412, 488-634.

*Admitted.*

73.     The J. Strom Thurmond Dam (also known as the Clarks Hill Dam)

is located in McCormick County, Georgia, roughly 10 miles west of Mistletoe

State Park.   *See* SAS AR 1609.

*Admitted.*

74.     The Thurmond Dam has a maximum height of 200 feet in height, and
is

5,680 feet in length.   SAS AR at 1385.

*Admitted.*

75.     The area surrounding the Thurmond Dam is a restricted area

enclosed by a fenced area, to which public access is generally restricted.   *See* SAS

AR at 848.

*Admitted.*

76.     In 2013, the sheriff's office or county police department of Columbia

County reported the following offenses that occurred in their jurisdiction to the
FBI:

58 violent crimes; 1 murder or non-negligent manslaughter; 11 incidents of rape;

17 robberies; 29 aggravated assaults; 2,054 property crimes; 287 burglaries;

18

1,695 incidents of larceny-theft; 72 motor vehicle thefts; and 6 arson incidents.

SAS AR

13.

***Admitted.***

     77.    In 2012, the sheriff's office or county police department of Columbia County reported the following offenses that occurred in their jurisdiction to the FBI:

68 violent crimes; 1 murder or non-negligent manslaughter; 10 incidents of forcible rape; 20 robberies; 37 aggravated assaults; 2, 297 property crimes; 396 burglaries;

1,804 incidents of larceny-theft; 97 motor vehicle thefts; and 11 arson incidents. SAS AR 40.

***Admitted.***

     78.    In 2011, the sheriff's office or county police department of Columbia County reported the following offenses that occurred in their jurisdiction to the FBI:

94 violent crimes; 4 murders or non-negligent manslaughters; 19 incidents of forcible rape; 20 robberies; 51 aggravated assaults; 2,438 property crimes; 452 burglaries; 1,900 incidents of larceny-theft; 86 motor vehicle thefts; and 10 arson incidents.   SAS AR 210.

*Admitted*

79.    In 2010, the sheriff's office or county police department of Columbia

County reported the following offenses that occurred in their jurisdiction to the

FBI:

72 violent crimes; 1 murder or non-negligent manslaughter; 10 incidents of

forcible rape; 15 robberies; 46 aggravated assaults; 2,323 property crimes; 376

burglaries;

1,860 incidents of larceny-theft; 87 motor vehicle thefts; and 9 arson

incidents. SAS AR 479.

*Admitted.*

80.    In 2009, the sheriff's office or county police department of Columbia

County reported the following offenses that occurred in their jurisdiction to the

FBI:

119 violent crimes; 4 murders or non-negligent manslaughters; 14 incidents of

forcible rape; 42 robberies; 59 aggravated assaults; 2,269 property crimes; 353

burglaries; 1,795 incidents of larceny-theft; 121 motor vehicle thefts; and 6

arson incidents.   SAS AR 692.

*Admitted.*

81.    Between 2000 and 2014, the Army Corps issued zero citations and 4 warnings in its Thurmond Lake project for violations of its weapons and explosives regulation.   SAS AR 7.

*Admitted.*

82.    Between 2000 and 2014, the Army Corps issued 31 citations and 224 warnings in its Thurmond Lake project for violations of its project restrictions. SAS AR 8.

*Admitted.*

83.    Between 2000 and 2014, the Army Corps issued zero citations and zero warnings in its Thurmond Lake project for interference with Army Corps Park Rangers.   SAS AR 9.

*Admitted.*

84.    Restrictions on firearms use at the Thurmond Lake project date back to 1951.   SAS AR 1717.

*Admitted.*

_____ /s/ John R. Monroe _____
John R. Monroe
John Monroe Law, P.C.
Attorney for Plaintiffs
9640 Coleman Road
Roswell, GA  30075
678 362 7650
770 552 9318 (fax)
GA bar # 516193

jrm@johnmonroelaw.com

18

## CERTIFICATE OF SERVICE
**I certify that on March 9, 2016, I served a copy of the foregoing via ECF upon:**

**Daniel Riess**
**Daniel.riess@usdoj.gov**

**_____/s/ John R. Monroe____**
**John R. Monroe**