IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| GEORGIACARRY.ORG, INC.   et.al., ) | | |
| | ) | |
| Plaintiffs | ) | CIVIL ACTION FILE NO. |
| | ) | |
| v. | ) | 4:14-CV-139-HLM |
| | ) | |
| | ) | |
| THE U.S. ARMY CORPS OF | ) | |
| ENGINEERS, et.al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' BRIEF IN RESPONSE TO BRIEF *AMICUS CURIAE* OF EVERYTOWN FOR GUN SAFETY**

Everytown for Gun Safety ("Everytown") has filed a Brief *amicus curiae* [Doc. 51] in support of Defendants' Motion for Summary Judgment [Doc. 45]. Everytown's Brief purports to be a historical analysis of some 800 years' worth of gun regulation based on Everytown's "expertise." Because the analysis is particularly unhelpful, and at times just plain incorrect, Plaintiffs submit this Brief in Response.

As an initial matter, Plaintiffs note that Everytown does not understand the basic provisions of the Ban at issue in this case. Everytown mistakenly believes

–1–

that the Ban restricts possession of firearms throughout Corps property except at "hunting sites, fishing sites and shooting ranges." Everytown Brief, p. 4. As discussed in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, the Ban is not nearly so consistent. First, the Ban does not restrict possession of firearms alone (i.e., unloaded firearms) anywhere on Corps property. Only ammunition, either by itself or with a firearm, is restricted, and only then the Ban applies based on the activities in which the possessor is engaged (not, as Everytown suggests, by the location of the possessor).

There are not really "hunting sites," as Everytown would have the Court believe, as much as there are parts of Corps property where hunting is not permitted. That is, hunting generally is permitted, with some locations where it is not. Furthermore, nothing in the Ban suggests that the Ban does not apply at "fishing sites." That appears to be Everytown's own creation. Lastly, the Ban does not appear to have its own definition of firearm or ammunition, so presumably one is left with the general definitions of those devices in the Code, such as the Gun Control Act. ("GCA").

Under the GCA, muzzle loading guns and guns manufactured prior to 1896 are not firearms. This even applies to modern muzzle loaders. Presumably, these

items are not covered by the Ban and can be readily possessed on Corps property (even by convicted felons, because the federal felon in possession statute does not cover these non-firearms).

Everytown relies quite heavily on the Statute of Northampton, passed during the reign of Edward III, in 1328. Everytown misunderstands the meaning of the Statute at the time it was passed, and by the magic of *ipse dixit* declares that (incorrect) meaning to be present in modern American legal codes. Plaintiffs will demonstrate the errors in Everytown's Brief.

Beginning with its first citation to the Statute, Everytown misses the mark. Everytown cites that no man "shall go nor ride armed by night nor by day." Doc. 51-2, p. 15. This phrase is the basis for nearly all the rest of Everytown's Brief. Everytown fails to analyze, however, what was meant by "going armed" in 1328. If Everytown had just read the rest of the Statute, it would have seen that the penalty for violations is that violators "forfeit their armour to the king and their bodies to prison." One might wonder why a person who illegally "goes armed" forfeits his "armour." Does he keep his gun but forfeit his breast plate, or could there be more to the meaning of "going armed" in 1328 than bearing weapons?

Fortunately, the academic research on that issue has been done.[1]  "At most the original intent appears to have been to prohibit the wearing of armor by knights and nobles other than royal officials out of concern that wearing armor would terrify common people, by suggesting that combat was imminent."  Cramer, p. 3. Blackstone likened the Statute to the laws of Solon, where "every Athenian was finable who walked about the city in armour."  Cramer, p. 2, *citing* William Blackstone, 2 Commentaries on the Laws of England 110 (1838).  An 1808 treatise including a discussion of the Statute said, "A man cannot excuse the wearing of such armour in public."  Cramer, p. 2.  It also said, "And persons armed with privy coats of mail [i.e., chain mail worn under the outer garments], to the intent to defend themselves, against their adversaries, are not within the meaning of this statute, because they do nothing to the terror of the people."  Cramer, p. 3, *citing* Leonard McNally, 1 The Justice of the Peace for Ireland: Containing the Authorities of that Officer 32 (1808).  Furthermore, the Encyclopedia Londinesis explained, "Under [the Statute] none may wear (unusual) armor publicly…."  Cramer, p. 3, *citing* 2 Encyclopedia Londinesis 201 (1810).  ,

---

[1] Cramer, Clayton E., The Statute of Northampton (1328) and Prohibitions on the Carrying of Arms (September 19, 2015).  Available at SSRN: http://ssrn.com/abstract-2662910 or http://dx.doi.org/10.2139/ssrn.266910.  A copy of this treatise is appended for the Court's convenience.

Everytown fails to cite a single instance of anyone being successfully prosecuted under the Statute for bearing arms. Lest the reader think such things occurred but the records do not survive, there are multiple instances in which there were incidents involving subjects bearing arms during disturbances, riots, etc. Cramer, p. 4. It was generally agreed that confiscation of weapons from those (protestant) subjects would be illegal. *Id.*

It is therefore clear that, at the time it was passed, the Statute was referring to the wearing of armor, nor the bearing of arms. Even if that were not the case, the Ban does not apply to the types of arms in common usage at the time the Statute was passed (muzzle loading guns and all manner of bladed weapons). Thus, even under Everytown's misinterpretation of the Statute, everything that the Statute *might* have banned is not banned by the Corps.

Other legal activity in England contemporaneous with the American Founding suggest that the Statute did not apply to weapons, but to armor. A series of court decisions found that there was an individual right to bear arms for self-defense and that "every housekeeper was a militia-man, and had a right to bear arms." Cramer, p. 5.

In 1819, Parliament passed the Seizure of Arms Act, empowering constables to search for and seize arms that were being kept for a purpose dangerous to the public peace. *Id.* Curiously, the Act applied to pikes and spears but not to dirks, daggers, pistols, guns or other weapons kept for self-defense. *Id.* If, as Everytown asserts, the Statute was alive and well and applicable to arms in 1819, the Act conflicted with the Statute.

In colonial America, Cramer reports that the bearing of firearms by citizens was commonplace and not considered criminal. Cramer, pp. 7-8. There even were instances of people acquitted of murder by reason of self-defense, with no hint that the carrying of a weapon was illegal. *Id.* In 1820s Georgia:

> No adult male ever went abroad unarmed. Whether it was to attend church, a social affair, or a political meeting, the Georgians carried loaded pistols, bowie knives, and sword canes. The pistols rested in the breast pockets of the coat and could be drawn quickly by both hands.

Cramer, p. 11.

Georgia passed a law in the early 19th Century banning carrying firearms, but the Supreme Court of Georgia ruled the ban only could apply to concealed carry, open carry being protected by the Second Amendment. Cramer, p. 13; *Nunn v. State,* 1 Ga. 243 (1846).

Regardless of what the Statute meant when it was passed, by the time of the English Bill of Rights (confirming the rights of Protestants to bear arms) and of the American Bill of Rights (the Second Amendment confirming the right of the people to keep and bear arms), the Statute of Northampton had no effect of prohibiting the bearing of arms.

Everytown essentially ignores the Supreme Court's decisions in *Heller* and *McDonald*. To be clear, Everytown pays lip service to those precedents, but relegates them to protecting nothing more than a right to keep arms in the home. Everytown reads "bear" right out of the Second Amendment. As the Supreme Court ruled, "bear arms" means to "wear, bear, or carry upon the person or in the clothing or in a pocket for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person. 554 U.S. at 584.

> [A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower. A woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public than the resident of a fancy apartment building (complete with doorman) has a claim to sleep with a loaded gun under her mattress. But Illinois wants to deny the former claim, while compelled by *McDonald* to honor the latter. That creates an arbitrary difference. To confine the right to be armed to the home is to divorce the Second

> Amendment from the right of self-defense described in *Heller* and *McDonald*. It is not a property right – a right to kill a houseguest who in a fit of aesthetic fury tries to slash your copy of Roman Rockwell's paint *Santa with Elves*. That is not self-defense….

*Moore v. Madigan,* 702 F.3d 933, 937 (7th Cir. 2012).

Just last month, the Supreme Court vacated an opinion of the Supreme Judicial Court of Massachusetts that affirmed the conviction of a homeless person for possession of a stun gun. *Caetano v. Massachusetts,* 194 L.Ed. 2d 99, 2016 U.S. LEXIS 1862 (March 21, 2016). The focus of that case was whether stun guns are protected by the Second Amendment, but surely the Supreme Court would not have granted certiorari in a Second Amendment case involving bearing a weapon outside the home if the Court did not believe the Second Amendment applies outside the home.

Everytown's position is further undermined by the fact that the Ban does not prohibit carrying firearms at all – it only prohibits carrying **loaded** firearms or ammunition. It does not even prohibit those items for people engaged in hunting or sport shooting on Corps property. That is, the bearing of unloaded firearms is perfectly legal on Corps property. If, as Everytown suggests, the bearing of arms is prohibited because it can terrify the public, then the Ban fails to accomplish its

–8–

mission.  If the mere openly bearing of firearms, loaded or not, terrifies the public, then the Ban fails to have the necessary relationship between the government interest and means sought to protect that interest.

Everytown cites Sir Edward Coke for the proposition that in 1817 the Statute of Northampton prohibited a person from carrying firearms to church.  Whether Coke was correct as to the application of the Statute in England is open to debate, but it is clear that in America the Statute had no such application.  Colonial Georgia had a statute ***requiring*** every man who attends church to carry pistols.  In fact, several colonies had similar requirements.  Clayton Cramer, *Colonial Firearm Regulation* (a copy of *Colonial Firearm Regulation* is attached for the Court's convenience).[2]

## **Conclusion**

Everytown's Brief does nothing to support the Government's defense.  The Statute of Northampton does not ban the general carrying of firearms, but even if it did, it was not recognized as valid in the American colonies, or even in England for decades or even centuries before the Founding.  The Second Amendment would

---

[2] http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961

have repealed the Statute even if it had been in effect at the Founding, and the Supreme Court of Georgia ruled as much in *Nunn*.

JOHN R. MONROE,

___/s/ John R. Monroe_____
John R. Monroe
John Monroe Law, P.C.
9640 Coleman Road
Roswell, GA 30075
Telephone: (678) 362-7650
Facsimile: (770) 552-9318
jrm@johnmonroelaw.com
Georgia Bar No. 516193
ATTORNEY FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

I certify that on April 8, 2016, I served a copy of the foregoing via ECF upon:

Daniel Riess
Daniel.riess@usdoj.gov

                                                  /s/ John R. Monroe
                                                  John R. Monroe

## **RULE 7.1D CERTIFICATION**

I certify that this brief was prepared in accordance with the page, font, size, margin and other requirements of Rules 7.1D and 5.1C.


     /s/ John R. Monroe
John R. Monroe