# The Statute of Northampton (1328) and Prohibitions on the Carrying of Arms

Clayton E. Cramer[1]

*Abstract: The Statute of Northampton (1328) has been claimed as an ancient prohibition on civilians carrying deadly weapons in public.  Analysis of its history and subsequent interpretation reveals otherwise.*

It is commonly believed that the Statute of Northampton (1328) prohibited the carrying of arms by anyone but royal officials, and this understanding should inform judicial interpretation of the arms provisions of the English Bill of Rights (1689) and the U.S. Bill of Rights (1791).  There are many defects to this view:

1. The actual intent of the Statute of Northampton;

2. The manner in which the later arms guarantees were understood by both contemporaries and later generations;

3. The manner in which the later arms guarantees were regarded as replacing existing statutory and common laws.

[1] Adjunct History Faculty, College of Western Idaho. Mr. Cramer is the author of CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999) (cited by Justice Breyer in McDonald v. City of Chicago, 130 S. Ct. 3020, 3132 (2010) (Breyer, J., dissenting)), and ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE (2006), and co-author of, among other articles, Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 GEO. J.L. & PUB. POL'Y 511 (2008) (cited by Justice Scalia in District of Columbia v. Heller, 554 U.S. 570, 588 (2008)), and Clayton E. Cramer, Nicholas J. Johnson & George A. Mocsary, *"This Right is Not Allowed by Governments that Are Afraid of the People": The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO.MASON L. REV. 823 (2010) (cited by Justice Alito in *McDonald*, 130 S. Ct. at 3039 n.21, 3041 n.25, 3043). Mr. Cramer's website is CLAYTON CRAMER'S WEB PAGE, http://www.claytoncramer.com (last visited Aug. 20, 2013).

Funding for this research was provided by Firearms Policy Coalition and The Calguns Foundation

## What did the Statute of Northampton (1328) Prohibit?

The Statute of Northampton (1328) explains its purpose in the first paragraph: "whereas offenders have been greatly encouraged, because [the] charters of pardon have been so easily granted in times past, of manslaughters, robberies, felonies, and other trespasses against the peace…"[2] The language prohibits coming before "the King's justices, or other of the King's ministers doing their office, with force and arms" or bringing "force in affray of the peace"[3].  An exception exists for those assisting the King's servants "upon a cry made for arms to keep the peace" suggesting that those keeping the peace had a right to be armed.

"Armed" seems to have meant something different in 1328 than it does today.  Blackstone's discussion of the Statute of Northampton compares it to "by the laws of Solon, every Athenian was finable who walked about the city in armour."[4] This reference to "armed" as referring to wearing armor persists into the seventeenth century.  In at least one source, "armed" means "with armor," because the soldiers are described as "some ten only (who had pieces would could reach [the Indians]) shot" and yet later, "they shot only one of ours, and he was armed, all the rest being without arms."[5]  This definition continues to appear in dictionaries into the eighteenth century.[6]  Even in the nineteenth century, a manual for justices of the peace in Ireland discussing the Statute explains that "A man cannot excuse the wearing of such armour in public."[7]  Significantly the Statute punishes violators "upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure"[8] with no mention of forfeiting arms. Even as to wearing arms in the modern sense, this volume is clear that "no wearing of arms is within the meaning of

---

[2] 2 Edw. III, Stat. Northampt. sec. 2.

[3] 2 Edw. III, Stat. Northampt., sec 3.

[4] William Blackstone ,2  COMMENTARIES ON THE LAWS OF ENGLAND 110 (1838).

[5] John Winthrop, 1 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND" 1630-1649 191 (J. K. Hosmer, ed., 1908).

[6] Thomas Sheridan, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1789), s.v. "to arm" (To furnish with armour of defence, or weapons of offence").

[7] Leonard MacNally, 1 THE JUSTICE OF THE PEACE FOR IRELAND: CONTAINING THE AUTHORITIES AND DUTIES OF THAT OFFICER (1808), 32.

[8] 2 Edw. III, Stat. Northampt., sec 3.

this statute, unless it be accompanied with such circumstances as are apt to terrify the people…"[9] Concerning those wearing armor under their clothes: "And persons armed with privy coats of mail, to the intent to defend themselves, against their adversaries, are not within the meaning of this statute, because they do nothing in terror of the people."[10]  At most, the original intent appears to have been to prohibit the wearing of armor by knights and nobles other than royal officials out of concern that wearing armor would terrify common people, by suggesting that combat was imminent.

Other ancient sources confirm that "arms" had a different meaning than current.  The Encyclopaedia Londinesis (1810) explains that "Arms, in the understanding of the law, are extended to any thing that a man wears for his defence, or takes into his handsb or useth in anger to strike or cast at another."[11]  Further, the same section explains that the Statute of Northampton and later versions, "Under these statutes none may wear (unusual) armor publicly…"[12]

## How Was The Statute Understood?

As the above examples show, there was an understanding that "arms" meant "armor."  Other evidence shows that the Statute was *not* understood to refer to a general prohibition on carrying arms.  Sir John Knight was charged under the Statute of Northampton with carrying arms, but the charges were dismissed. One summary of the case includes the following notes: it did not apply of course to royal officials or "persons executing his precepts, or themselves endeavouring to keep the peace" (thus excluding otherwise law-abiding persons intent on self-defense or the defense of other innocent parties) and the punishment includes "forfeiting their armour"[13] (again evidence the Statute was aimed at wearing armor in a manner likely to engender fear).

---

[9] MacNally, op cit., note 7.
[10] *Id.*
[11] **2** Encyclopaedia Londinesis 201 (1810).
[12] *Id.*
[13] Humphry William Woolrych, A PRACTICAL TREATISE ON MISDEMEANOR 221-2 (1842).

The Gordon Riots in 1780 London was one of those times when anarchy broke out,[14] and if the Statute of Northampton prohibited private citizens from bearing arms in public, one would expect some use of it or at least mention of it in Parliamentary debate.  In the aftermath of those riots, Members of Parliament faulted the government for actions it took and actions it did not take.[15]  In particular, the Duke of Richmond objected to

> the conduct of the Commander in Chief of the army, for the letters he sent to Colonel Twisleton, who commanded the military force in the City, ordering him to disarm the citizens, who had taken up arms, and formed themselves into associations, for the defence of their lives and properties.  These letters he considered as a violation of the constitutional right of Protestant subjects to *keep and bear arms* for their own defence.[16]

Lord Amherst agreed that the disarming order was intended only for the rioters, "but no passage in his letter could be construed to mean, that the arms should be taken away from the associated citizens, who had very properly armed themselves for the defence of their lives and property."[17]

> The duality of the contemporary usage was shown by a contemporaneous pronouncement by the Recorder of London—the city's chief legal officer—when asked if the right to *have arms* in the English Declaration of Rights protected armed defensive groups as well as armed individuals.
>
> The right of his majesty's Protestant subjects, to *have* arms for their own defence, and to *use* them for lawful purposes, is most clear and undeniable. It seems, indeed, to be considered, by the ancient laws of this kingdom, not only as a *right*, but as a *duty*; for all the subjects of the realm, who are able to *bear arms*, are bound to be ready, at all times, to assist the sheriff, and other civil magistrates, in the execution of the laws and the preservation of the public peace. And *that right, which every Protestant most unquestionably possesses, individually, may, and in many cases must, be exercised collectively, is likewise a point which I conceive to be most clearly established* by the

---

[14] *Malcolm, infra note 14,*  at 130.

[15] Id.

[16] *Debates in the House of Lords*, 49 London Mag. 467, 467 (1780) (emphasis added).  See 49 London Mag. 290 (1780) for Lord Amherst's letter ordering disarming of citizens and the response of the Lord Mayor of London *Id.,* at 290, 291 explaining that this disarming should only apply to those suspected of rioting ("for when he speaks of the arms in the hands of the city militia, or other persons authorized by the king to be armed, he certainly includes the arms in the hands of the citizens ansd housekeepers… and Colonel Twisleton has put the proper construct on those letters, by only taking arms from suspected persons, or those who could not give a good account of themselves.")

[17] *Id.* at 467-68.

authority of judicial decisions and ancient acts of parliament, as well as by reason and common sense.[18]

The agricultural slump after the Napoleonic Wars led to widespread unrest, riots, and assemblies calling for Parliamentary reform.[19]  After the so-called Peterloo massacre, the conflict between the right to bear arms and fear of working class unrest led the English courts to distinguish between the differing reasons for bearing arms.[20]  The courts concluded that there was an individual right to bear arms for self-defense, but there was no right to carry arms to a public meeting if the number of arms "so carried are calculated to produce terror and alarm."[21]

The Seizure of Arms Act, one of the "Six Acts" passed in 1819 by Parliament in response to the unrest, provided for constables to search for and seize arms on the testimony of a single person that they were being kept for a purpose "dangerous to the public peace."[22]  The Seizure of Arms Act was limited to the industrial areas where riots took place, and with a two-year expiration period.[23]  The Seizure of Arms Act made distinctions based on the function of different classes of arms that were to be seized.  "Any pike, pike head or spear in the possession of any person or in any house or place" was subject to confiscation, but "any dirk, dagger, pistol or gun or other weapon" was to be seized only if they were possessed for "any

---

[18]  Malcolm, infra note 14,, at 134 (emphasis added) (quoting William Blizard, DESULTORY REFLECTIONS ON POLICE: WITH AN ESSAY ON THE MEANS OF PREVENTING CRIME AND AMENDING CRIMINALS 59-60 (1785)).  Also, see 49 LONDON MAG. 290 (1780) for the opinion of the "recorder and counsel… that every housekeeper was a militia-man, and had a right to bear arms…"

[19]  Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994), at 166 (emphasis added) (quoting William Blizard, DESULTORY REFLECTIONS ON POLICE: WITH AN ESSAY ON THE MEANS OF PREVENTING CRIME AND AMENDING CRIMINALS 59-60 (1785)).

[20]  Id. at 166-68.

[21]  Id. at 168. Sixty-seven years later, motivated by similar working class efforts to correct social ills, the United States Supreme Court would make approximately the same distinction. See Clayton E. Cramer, FOR THE DEFENSE OF THEMSELVES AND THE STATE: THE ORIGINAL INTENT AND JUDICIAL INTEPRETATION OF THE RIGHT TO KEEP AND BEAR ARMS (1994), at 128-34 (discussing Presser v. Illinois, 116 U.S. 252 (1886), and similar prohibitions on labor union militias).

[22]  Malcolm, supra note 14, at 168.

[23]  Id.

purpose dangerous to the public peace."[24]  This distinguished between weapons perceived as offensive and defensive, for even the supporters of the Seizure of Arms Act generally accepted the right to possess arms for self-defense.[25]  If the Statute of Northampton was still considered a barrier to private citizens carrying arms for self-defense, it is curious that it left no trace in these debates.

There seems to have been a scarcity of the use of deadly force in Colonial America, but mostly because of the cultural traditions of Englishmen, not that the laws prohibited the carrying of arms.  Misson de Valbourg in 1695 described the love of fighting in England.  After observing that even among adults, minor disputes would turn into fights with large crowds gathered to egg on the participants: "They use neither sword nor stick against a man that is unarmed; and if any unfortunate stranger (for an Englishman would never take it into his head) should draw his sword upon one that had none, he'd have a hundred people upon him in a moment."[26]  There was a notion of fair or proportionate use of weapons.

In America, the right of private citizens to carry deadly weapons was well established, as evidenced by the widespread reporting of such actions with no evidence that it was considered criminal.  Nathanael Byfield's account of the overthrow of Governor Andros's authority in Boston in 1689 described how "the Town was generally in Arms, and so many of the Countrey came in, that there was twenty Companies in Boston, besides a great many that appeared at Charles Town that could not get over (some say fifteen hundred)."[27]  Governors Andros's report described how "the greatest part of the people… appeared in arms at Boston… to the number of about two thousand horse and foote…."[28]  Samuel Prince's description of the insurrection tells us:

> I knew not anything of what was intended, till it was begun; yet being at the north end of the town,

---

[24] Colin Greenwood, FIREARMS CONTROL: A STUDY OF ARMED CRIME AND FIREARMS CONTROL IN ENGLAND AND WALES (1972), at 14. Greenwood was Chief Inspector of the West Yorkshire Constabulary at the time he wrote his ground-breaking work on British gun control law.

[25] Hansard, 41 PARLIAMENTARY DEBATES 695.

[26] John Carey, ed., EYEWITNESS TO HISTORY 192-3 (1988),.

[27] Nathanael Byfield, AN ACCOUNT OF THE LATE REVOLUTION IN NEW-ENGLAND…. (1689), in Charles M. Andrews, ed. NARRATIVES OF THE INSURRECTIONS: 1675-1690. 170-3 (1915; reprinted 1959).

[28] "Andros's Report of his Administration, 1690," in Andrews, supra note 22 at  232.

where I saw boys run along the street with clubs in their hands, encouraging one another to fight, I began to mistrust what was intended; and, hasting towards the town-dock, I soon saw men running for their arms: but, ere I got to the Red Lion, I was told that Captain George and the master of the frigate was seized, and secured in Mr. Colman's house at the North End….

None of these accounts is explicit that the "arms" included guns, however.  That these men soon took control of a British Navy frigate from its crew strongly suggests that they were armed with guns, not swords or pikes.[29]

Other accounts of the day are more explicit.  A British major, when told to turn over his regiment's "Colours and Drums" reprimanded the insurrectionists; "they threatened to shoot him down…."  After taking custody of a number of officials, including the sheriff, this unsympathetic account described a "guard of Musqueteers to prevent all escapes" from the jail.  After ordering the governor "and other Gentlemen to withdraw to Mr. Usher's….  Thither they come, guarded with a full company of Musqueteers…."[30]

When Leisler's forces rebelled against the royal governor in 1689 New York, they were armed with swords and clubs, based on one incident in which they drove four customs commissioners out of the customs collector's office with swords.[31]  Another account for this incident described how Leisler's men fired into the city, "whereby several of his Majesties Subjects were killed and wounded as they passed in the street…."[32]  Other accounts in that same source, seeking to justify Leisler's actions, reduced the number killed by gunfire from Leisler's men, but do not dispute that it happened.[33]

Yet another account in that same source, and one that portrayed Leisler very darkly, described how men under Leisler's command went to him "and threatened to shoot him if he did not head them."  (Leisler was believed to have contrived this threat by his men to justify his actions.)  Another section described how Leisler "sends severall Armed men, with no other warrant their Swords and Guns" to arrest a prominent

---

[29] Andrews, supra note 22 at 186-90.

[30] Andrews, supra note 22 at 200, 202.

[31] Michael Belesiles, ARMED AMERIC, 89 (2001).

[32] A LETTER FROM A GENTLEMAN OF THE CITY OF NEW-YORK TO ANOTHER…. (1698), in Andrews, supra note 22, at 369.

[33] LOYALTY VINDICATED FROM THE REFLECTIONS OF A VIRULENT PAMPHLET… (1698), in Andrews, supra note 22, at 391.

merchant.[34]  There is no mention that this violated any existing English laws about carrying arms in public, as might be expected from sources hostile to Leisler.

In 1760s North Carolina, a series of conflicts between the Regulators of the back country and the formal government of the tidewater government lead to a number of instances where the Regulators appeared in public places armed with deadly weapons with no sign that officials attempted to arrest them or even considered these actions unlawful. Colonel Spencer's letter to Governor Tryon of April 28, 1768 describes how the Regulators "came up to the Court House to the number of about forty armed with Clubs and some Fire Arms…."[35]  Nor was there any surprise when pistols appear in the hands of the law-abiding, such as a description of Rev. Whitfield preaching in Massachusetts, "he was attended by many Friends with Muskets and Pistols on Account of the Indians. . . . ."[36]

Pistols appear repeatedly in travel accounts of this period and newspaper stories.  They are *never* identified as surprising, startling, or unusual in the American context.  In a few cases, they are explicitly declared to be common.  They are often described as being carried by private citizens.

Accounts from the early American Republic show that the carrying of deadly weapons was common in nearly all regions, suggesting that the Statute of Northampton was irrelevant to American law. Dr. James Reynolds was tried for attempted murder in 1799 Philadelphia.  The jury found him innocent by reason of self-defense.  He was not charged with carrying a pistol, with which he shot James Gallagher, Jr.[37]

Robert Carleton's account of frontier Indiana Hall discussed the problem of stagecoach robberies and reported that a fellow traveler on the road to Indiana described an earlier journey: "I need hardly say I then traveled with weapons, and as we entered the mountainous country, a brace of pistols was kept loaded

---

[34] [Nicholas Bayard], A MODEST AND IMPARTIAL NARRATIVE OF SEVERAL GRIEVANCES AND GREAT OPPRESSIONS… (London: n.p., 1690), in Andrews, supra note 22, at 333.

[35] *7 The Colonial Records of North Carolina.* 722 (William L. Saunders ed. 1890; reprinted 1968).

[36] PENN. GAZETTE, Aug. 15, 1745.

[37] *See* THE TRIAL OF WILLIAM DUANE, JAMES REYNOLDS, ROBERT MOORE, AND SAMUEL CUMING FOR RIOT, PHILADELPHIA, PENNSYLVANIA (1799), *reprinted in* 7 AMERICAN STATE TRIALS 676, 680 (John D. Lawson ed., 1917) [hereinafter TRIAL OF WILLIAM DUANE].

usually in a pocket of the carriage."  The traveler's earlier journey had been interrupted by highwaymen armed with hammers, axes, and bludgeons, and his threat to use a pistol had driven the robbers away.[38]

Another traveler in the carriage told Hall of a similar conflict at an inn in the South.  "Of course, I barricaded the door as well as possible, and, without noise, examined my pistols—and got out my dirk…."[39] A third traveler described a journey from Charleston to Georgetown by stagecoach with slave-dealers: "Their diversion often was, to entice dogs near the stage and then to fire pistol-balls at them…."[40]

Hall later described problems with armed robbers, and explained, "We are not advocates for Lynching, but we do know that where laws cannot and do not protect backwoodsmen, they fall back on reserved rights and protect themselves.  Nay, such, instead of laying aside defensive weapons… we know that such woodsmen will go better armed, to slay and and not unrighteously on the spot every unholy apostate that *maliciously* and *wilfully* strikes down and stamps on God's image!" [emphasis in original]  In Hall's grandiloquent language, describing the conflict with legislators who sought imprisonment for robbers, and the backwoodsmen, partial to firearm solutions, "Many neighbours out there will always physic [treat] such with lead pills—at lest till Reformers have prisons prepared fit to hold their pets longer than a few hours!"[41]

Pim Fordham, while staying at Princeton, Indiana, in 1817-18, reported that, "Yesterday 8 men on foot armed with pistols and rifles came into the town from Harmony.  They had been in pursuit of an absconded debtor from Vincennes."[42]  There was no problem persuading eight men armed with pistols and rifles to pursue a mere debtor, and Fordham found nothing surprising about them being so armed.

Fordham also described a party in the Illinois Territory that had excluded some "vulgar" party-crashers. Some of Fordham's party "armed themselves with Dirks (poignards [daggers] worn under the clothes)" to

---

[38] Robert Carleton [Baynard Rush Hall], 1 THE NEW PURCHASE, OR SEVEN AND A HALF YEARS IN THE FAR WEST 23, 29-30 (1843).
[39] [Hall], supra note 32, at 1:32-33.
[40] [Hall], supra note 32, at 1:33.
[41] [Hall],  supra note 32, at 1:231-5.
[42] Elias Pim Fordham, PERSONAL NARRATIVE OF TRAVELS IN VIRGINIA, MARYLAND, PENNSYLVANIA, OHIO, INDIANA, KENTUCKY; AND OF A RESIDENCE IN THE ILLINOIS TERRITORY: 1817-1818 (Frederic Austin Ogg, ed., 1906; reprinted 1970), 137.

resist another such attempt, but later, "In going away some of the gentlemen were insulted by the rabble, but the rumour that they were armed with dirks and pistols prevented serious mischief."[43]  While the antecedent of "they were armed" is unclear, that it prevented serious mischief by "the rabble" suggests that members of Fordham's party were the ones armed.  Pistols were weapons commonly enough carried to be a realistic deterrent to "the rabble."

Fordham described the flatboat men who worked the Mississippi River as a wild and dangerous population.  Fordham warned, "But I would advise all travellers going alone down the river, to get one man at least that they can depend upon, and to wear a dagger or *a brace of pistols*; for there are no desperadoes more savage in their anger than these men." [emphasis added][44]

The Methodist preacher Peter Cartwright described a journey through the Allegheny Mountains to Baltimore in April, 1820 which shows that pistols were not startling discoveries, even when found lying in the road:

> In passing on our journey going down the mountains, on Monday, we met several wagons and carriages moving west.  Shortly after we had passed them, I saw lying in the road a very neat pocket-pistol.  I picked it up, and found it heavily loaded and freshly primed.  Supposing it to have been dropped by some of these movers, I said to brother Walker, "This looks providential;" for the road across these mountains was, at this time, infested by many robbers, and several daring murders and robberies had lately been committed.[45]

Cartwright then recounted his use of this pistol shortly thereafter to defend himself against a robber.[46]  On his return trip, he described his carrying of a pistol to defend himself from robbery during a dispute at a tollgate.  The owner of the tollgate "called for his pistols," apparently with the aim of shooting at Cartwright.[47]  In other incidents from the 1820s, Cartwright makes references to pistols in a manner that suggests that they were not at all unusual items, even if the *use* of them was dramatic.[48]

---

[43] Fordham, supra note 34, at 219-20.
[44] Fordham, supra note 34, 195-6.
[45] Peter Cartwright, AUTOBIOGRAPHY OF PETER CARTWRIGHT, THE BACKWOODS PREACHER 200 (1856).
[46] Cartwright, supra note 39, at 201.
[47] Cartwright, supra note 39, at 206.
[48] Cartwright, supra note 39, at 223-225.

Cartwright described two young men reduced to deadly enemies as a result of rivalry over a young lady:

> They quarreled, and finally fought; both armed themselves, and each bound himself in a solemn oath to kill the other.  Thus sworn, and armed with pistols and dirks, they attended camp meeting.[49]

Cartwright did not find the carrying of pistols and dirks surprising.

William Oliver Stevens described 1820s Georgia as a place so brutal and lawless that:

> [N]o adult male ever went abroad unarmed.  Whether it was to attend church, a social affair, or a political meeting, the Georgians carried loaded pistols, bowie knives, and sword canes.  The pistols rested in the breast pockets of the coat and could be drawn quickly by both hands.[50]

Charles Haswell described a widely reported 1830 incident in the District of Columbia.  A prominent Washington newspaper editor, Duff Green, drew a concealed handgun to deter attack by a New York City newspaper editor at the U.S. Capitol.  Haswell's account of subsequent events suggests that instead of regarding this as dastardly, criminal, unrespectable, or surprising, Green's acquaintances good-naturedly ribbed him about the incident.[51]  Green appears to have earned no infamy for his actions; two years later he published the 1830 census for the federal government.[52]

There is no shortage of handguns in private hands in this period, and they appear in acts of violence at the highest levels of American society.  The U.S. House of Representatives tried Samuel Houston for "a breach of the privileges of the House of Representatives, by assaulting and beating Mr. Stanbery, a member of that House."  The testimony included that Rep. Stanbery "had a consultation with some of my friends, who agreed with me upon the answer which was sent.  It was the opinion of one of my friends (Mr. Ewing, of Ohio,) that it was proper I should be armed; that, immediately upon the reception of my note, Mr.

---

[49] Cartwright, supra note 39, at 238.
[50]. William Oliver Stevens, PISTOLS AT TEN PACES: THE STORY OF THE CODE OF HONOR IN AMERICA 39-40 (1940).
[51] Charles H. Haswell, REMINISCENCES OF NEW YORK BY AN OCTOGENARIAN 244 (New York: Harper & Bros., 1896).
[52] Enumeration of the Inhabitants of the United States, 1830 (1832).

Houston would probably make an assault upon me.  Mr. Ewing, accordingly, procured for me a pair of pistols, and a dirk; and, on the morning on which the answer was sent, I was prepared to meet Mr. Houston if he should assault me."[53]

An Alabama paper from February 1837 reported a quarrel in Columbus, Georgia, between "Col. Felix Lewis and a Doctor Sullivan, the latter drew a pistol and attempted to shoot the former, when Lewis produced a Bowie knife, and stabbed Sullivan to the heart, who died in two minutes."[54]  An incident from Missouri involved an Alexander H. Dixon, who drew a sword cane on a man named Flasser.  Flasser drew a pistol, and shot Dixon to death.[55]

Near Natchez, Captain Crosly of the steamboat *Galenian* had a difficulty with one of his passengers, during which Crosly "drew a Bowie knife, and made a pass at the throat of the passenger," but without causing any injury.  Crosly ordered the passenger to leave the boat.  As the passenger was leaving, Crosly retrieved a pistol from his cabin, pointed it at the passenger, and accidentally shot him.[56]

Thomas Cather, an Ulster Scot traveler to America in the 1830s, commented on the reluctance of the criminal justice system in the South and West to interfere in violence: "Everyone goes armed with dagger, Boey [Bowie] knife, or pistols, and sometimes with all three, and in a society where the passions are so little under control it is not to be wondered… that murderous affrays should so often take place in the streets."[57]

In 1831, Arkansas Territorial Governor Pope expressed his concern about passions out of control, arguing that the willingness of juries to reduce murder to manslaughter encouraged killing: "Men should be brought to bridle their passions when life is at stake, and no excuse for shedding blood should be received but that of *absolute necessity*.  The distinction between murder and manslaughter should be

---

[53] U.S. Congress, 25  JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, 611.

[54] Fatal Rencontre at Columbus, Geo., (Tuscumbia) NORTH ALABAMIAN, February 17, 1837, 2.

[55] A young man by the name of Alexander H. Dixon…, NASHVILLE DAILY REPUBLICAN BANNER 2, Oct. 13, 1837.

[56] "Horrid Rencontre," …, NASHVILLE DAILY REPUBLICAN BANNER 2, Oct. 7, 1837.

57 Thomas Cather, VOYAGE TO AMERICA: THE JOURNALS OF THOMAS CATHER143-144 (Thomas Yoseloff ed., 1961; reprinted 1973).

abolished in all cases where a dirk, pistol or other deadly weapon is used, except in cases of *self-defense* [emphasis in original]."[58]

Frederick Law Olmsted's description of a not completely concealed Colt revolver on a Kentucky railroad in 1853 strongly suggests that concealed carrying of handguns was at least common, if not widespread:

> In the cars in Kentucky a modest young man was walking through with the hand[le] of a Colt out of his pocket-skirt behind.  It made some laugh & a gentleman with us called out, "You'll lose your Colt, Sir."  The man turned and after a moment joined the laugh and pushed the handle into the pocket.
>
> John said, "There might be danger in laughing at him."  "Oh no," replied our companion, evidently supposing him serious, "he would not mind a laugh."  "It's the best place to carry your pistol, after all," said he.  "It's less in your way than anywhere else.  And as good a place for your knife as anywhere else is down your back, so you can draw over your shoulder."
>
> "Are pistols generally carried here?"
>
> "Yes, very generally."

Allison said *commonly*, but he thought not generally [emphasis in original].[59]  There are travel accounts and newspaper accounts in large numbers that demonstrate that handguns were commonly carried in at least some parts of the United States, and the presence of handguns is *never* presented as a surprise.

Kentucky, Louisiana, Indiana, Alabama, Georgia, Virginia, and Arkansas all passed laws between 1813 and 1840 that prohibited the carrying of concealed pistols (among other deadly weapons).[60]  These laws did not apply to openly carried deadly weapons except in the case of Georgia, leading the Georgia Supreme Court to strike it down for violating the Second Amendment.[61]  If the Statute of Northampton was understood to prohibit private citizens from carrying arms, then these bans on concealed carry were completely superfluous.

---

[58] William F. Pope, EARLY DAYS IN ARKANSAS 103 (1895).

[59] Frederick Law Olmsted, 2 THE PAPERS OF FREDERICK LAW OLMSTED 232-3 (Charles E. Beveridge and Charles Capen McLaughlin, ed.,, 1981).

[60] Generally see Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (Westport, Conn.: Praeger Press, 1999).  Appendix A contains the full text of the statutes.

[61] Nunn v. State, 1 Ga.  243 (1846).

## How the Bill of Rights Made the Statute of Northampton Obsolete

We have seen that whatever the meaning of the Statute of Northampton was in 1328, its relevance to American and English law was apparently zero by the nineteenth century.  At least in part, this was because both the English Bill of Rights (1689) and the U.S. Bill of Rights provided strong guarantees of a right to keep and *bear* arms.  As much of the previous literature on this subject demonstrates, the Second Amendment was overwhelmingly understood to protect an individual right to possess and carry deadly weapons before the Civil War.  While many state supreme courts held that the Second Amendment limited only the federal government's authority, some recognized it as a limitation on state laws as well, and even many of these decisions recognized that the state constitutional arms guarantees were analogous to the Second Amendment.

In some cases, we have explicit rejections of the validity of the Statute of Northampton with respect to American law because of the subsequent constitutional development.   In Simpson v. State (1833), the Tennessee supreme court rejected an indictment for affray on the grounds that both English case law in Serjeant Hawkins case rejected such a wide reading, but that even if not, "our constitution has completely abrogated it."[62]  Similarly, the North Carolina supreme court rejected that the carrying of deadly weapons was a violation of the Statute of Northampton arguing that it "is to be remembered that the carrying of a gun *per se* constitutes no offence.  For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry a gun.  It is the wicked purpose—and  mischievous result—which essentially constitute the crime."[63]

---

[62] Simpson v. State, 13 Tenn. (5 Yerg.) 359, 360 (1833).
[63] State v. Huntley, 25 N.C. (3 Ired.) 418, 422, 423, 40 Am. Dec. 416 (1843).

## Ancient History

The Statute of Northampton is ancient history, a ban on being armored that because of its antique language has been misinterpreted as a ban on private citizens being armed in public.  Even if that had been its original purpose, it is as relevant today as 1328's laws allowing press censorship, trial by combat (not repealed in New York until 1786[64]), establishment of the Church, and the use of torture to obtain confessions.

---

[64] New York sess. Laws (1786), ch. 7.