# Colonial Firearm Regulation

Clayton E. Cramer

*Recently published scholarship concerning the regulation of firearms in Colonial America claims that because Colonial governments distrusted the free population with guns, the laws required guns to be stored centrally, and were not generally allowed in private hands. According to this view, even those guns allowed in private hands were always considered the property of the government. This Article examines the laws of the American colonies and demonstrates that at least for the free population, gun control laws were neither laissez-faire nor restrictive. If Colonial governments evinced any distrust of the free population concerning guns, it was a fear that not enough freemen would own and carry guns. Thus, the governments imposed mandatory gun ownership and carriage laws.*

*Clayton E. Cramer is an independent scholar who took the leading role in exposing the Michael Bellesiles hoax. His website is: www.claytoncramer.com.*

## I. The Legal Significance of Colonial Firearm Regulation Today

In much the same way that an understanding of the limits of free speech in Colonial America may provide insights into the intent of Congress and the states when they adopted the First Amendment, so an understanding of colonial firearms regulation has the potential to illuminate our understanding of the limits of the right protected by the Second Amendment. What types of firearms laws were common, and might therefore have been considered within the legitimate scope of governmental regulation?

In the last several years, widely publicized scholarship by Michael Bellesiles has asserted that the English colonies strictly regulated the individual possession and use of firearms. While acknowledging that the English government ordered the colonists to own firearms for the public defense as a cost-cutting measure, he asserts:

> At the same time, legislators feared that gun-toting freemen might, under special circumstances, pose a threat to the very polity that they were supposed to defend. Colonial legislatures therefore strictly regulated the storage of firearms, with weapons kept in some central place, to be produced only in emergencies or on muster day, or loaned to individuals living in outlying areas. They were to remain the property of the government. The Duke of York's first laws for New York required that each town have a storehouse for arms and ammunition. Such legislation was on the books of colonies from New Hampshire to South Carolina.[i]

This assertion—that the Colonial governments distrusted their free people with firearms, and closely controlled their possession in governmental hands—has began to appear in court decisions concerning the meaning of the right to keep and bear arms provisions contained in the U.S. Constitution and 46 of the state constitutions.[ii]

Then as now, laws were not always obeyed, and were sometimes indifferently or unequally enforced. The evidence from contemporary accounts, from probate records, or even from archaeological digs (which could suggest something about gun ownership levels by recovered artifacts), might provide us with evidence for evaluating how often those laws were followed. Under the best of conditions, however, analysis of this type is complex, and differing interpretative models may come to differing conclusions as to whether those laws were generally obeyed, generally ignored, or perhaps were somewhere in between. By comparison, evaluating the claim that Colonial governments passed laws that restricted firearms ownership and use (regardless of how they were actually enforced) is fairly easy.

An examination of the Colonial statutes reveals that, contrary to Bellesiles's claim of distrusted and disarmed freemen, almost all colonies *required* white adult men to possess firearms and ammunition. Some of these statutes were explicit that militiamen were to keep their guns at home; others imply the requirement, by specifying fines for failing to bring guns to musters or church. Colonies that did not explicitly require firearms

ownership passed laws requiring the carrying of guns under circumstances that implied nearly universal ownership.

None of the Colonial militia statutes even *suggest* a requirement for central storage of all guns. None of the Colonial laws in any way limited the possession of firearms by the white non-Catholic population; quite the opposite. Most colonies did, however, pass laws restricting possession of firearms by blacks and Indians. In a few cases, in a few colonies, whites suspected of disloyalty (including Catholics) were also disarmed.

As the statutes demonstrate, colonial governments did not hold that firearms in private hands, "were to remain the property of the government."[iii] Indeed, the evidence is largely in the other direction—that colonial governments were often reluctant to seize weapons for public use. When driven by necessity to do so, they compensated owners of those guns.

Colonial regulations that limited the use of firearms were usually for reasons of public safety. These regulations were similar in nature, though generally less restrictive in details, than similar laws today.

## II. FIREARMS AND CIVIC DUTY

The laws regulating firearms ownership adopted by the American colonies bear a strong resemblance to each other. This is not surprising, since by 1740, every colony bore allegiance to the English crown, and the laws reflected the shared heritage. The similarity in laws is especially noticeable with respect to the English duty of nearly all adult men to serve in the militia, and to bear arms in defense of the realm.

### A. Connecticut

Among the Colonial militia statutes, Connecticut's 1650 code contains one of the clearest expressions of the duty to own a gun: "That all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare arms...; and every male person with this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band...."[iv] A less elaborate form of the law appeared in 1636, with reiterations in 1637, 1665, 1673, 1696, and 1741.[v] Fines varied between two and ten shillings for lacking firearms or for failure to appear with firearms "compleat and well fixt upon the days of training...."[vi]

### B. Virginia

Virginia provides another example of a militia statute obligating all free men to own a gun. A 1684 statute required free Virginians to "provide and furnish themselves with a sword, musquet and other furniture fitt for a soldier... two pounds of powder, and eight pounds of shott...."[vii] A similar 1705 statute required every foot soldier to arm himself "with a firelock, muskett, or fusee well fixed" and gave him eighteen months to comply with the law before he would subject to fine.[viii] There are minor modifications to the statute in 1738 that still required all members of the militia to appear at musters with the same list of gun choices, but reduced the ammunition requirement to one pound of powder and four pounds of lead balls.[ix] A 1748 revision is also clear that militiamen were obligated to provide themselves with "arms and ammunition."[x] The 1748 statute, however, did acknowledge that all freemen might not be wealthy enough to arm themselves, and provided for issuance of arms "out of his majesty's magazine."[xi] By 1755, all cavalry officers were obligated to provide themselves with "holsters and pistols well fixed...."[xii]

### C. New York

Another typical colonial militia statute is the Duke of York's law for New York (adopted shortly after the colony's transfer from the Dutch), that provided, "Besides the Generall stock of each Town[,] Every Male within this government from Sixteen to Sixty years of age, or not freed by public Allowance, shall[,] if freeholders[,] at their own, if sons or Servants[,] at their Parents and Masters Charge and Cost, be furnished from time to time and so Continue well furnished with Arms and other Suitable Provition hereafter mentioned: under the penalty of five Shillings for the least default therein[:] Namely a good Serviceable Gun, allowed Sufficient by his Military Officer to be kept in Constant fitness for present Service" along with all the other equipment required in the field.[xiii]

D. Maryland

Similar to statutes appearing in other colonies, Maryland's "An Act for Military Discipline" enacted in February or March of 1638/9 (O.S.) required "that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes[,] one Serviceable fixed gunne of bastard muskett boare…" along with a pound of gunpowder, four pounds of pistol or musket shot, "match for matchlocks and of flints for firelocks…."[xiv] A different form of this law, ordering every member of the militia to "appear and bring with him one good servicelable Gun, fixed, with Six Charges of Powder," appears in a 1715 Maryland statute book as well.[xv] Cavalrymen were obligated to "find themselves with Swords, Carbines, Pistols, Holsters and Ammunition" with a fine for failure to appear armed at militia muster.[xvi]

Of course, laws were sometimes passed but not enforced in colonial times, just as happens now. But the provisions for enforcement in Maryland would seem likely to encourage enforcement for purely selfish reasons. The officers of the militia were required to verify compliance with the law by "a Sight or view of the said armes and ammunition" every month. People who failed to possess arms and ammunition were to be fined thirty pounds of tobacco, payable to the militia officer responsible for the inspection. Anyone who lacked arms and ammunition was to be armed by their militia commander, who could force payment at "any price… not extending to above double the value of the said armes and ammunition according to the rate then usual in the Country."[xvii]

To make sure that householders moving to the new land were adequately armed, it appears that one of the conditions of receiving title to land in Maryland beginning in 1641 was bringing "Armes and Ammunition as are intended & required by the Conditions abovesaid to be provided & carried into the said Province of Maryland for every man betweene the ages of sixteene & fifty years w[hi]ch shalbe transported thether." The arms required included "one musket or bastard musket with a snaphance lock," ten pounds of gunpowder, forty pounds of bullets, pistol, and goose shot.[xviii]

The Maryland militia law of 1638/9 was revised in 1642 requiring, "That all housekeepers provide fixed gunn and Sufficient powder and Shott for each person able to bear arms."[xix] A 1658 revision of the law required "every householder provide himselfe speedily with Armes & Ammunition according to a former Act of Assembly viz 2 [pounds] of powder and 5 [pounds] of shott & one good Gun well fixed for every man able to bear Armes in his house." A householder was subject to fines of 100, 200, or 300 pounds of tobacco, for the first, second, and third failures to keep every man in the house armed.[xx]

In 1756, Maryland again made it explicit that " all and every Person and Persons of the Militia of this Province are as aforesaid, not only liable to the Duties and Services required by this Act, but also if able to find, at their own proper Cost and Charge, Suitable Arms…." At the same time, concerned that those exempted from militia duty who were wealthy were getting an unfair advantage, it ordered that exempts were obligated to "each of them find one good and Sufficient Firelock, with a Bayonet, and deliver the Same to the Colonel or Commanding Officer of the County wherein he shall reside, or pay to the Said Colonel or Commanding Officer the Sum of Three Pounds Current Money in lieu thereof…."[xxi]

At the start of the Revolution, Maryland still assumed that the freemen of the colony were armed as required by law. The Maryland Convention in 1775 threatened that: "if any Minute or Militia-man shall not appear at the time and place of Muster with his Firelock and other accoutrements in good order, … he shall forfeit and pay a sum not exceeding five shillings Common money…."[xxii]

E. Massachusetts

Massachusetts adopted a measure March 22, 1630/1 that required all adult men to be armed.[xxiii] Although this measure is not explicit that the arms were *firearms*, it is apparent that guns were not in short supply in Massachusetts, because within 15 years, the Colonial government had made the requirement for guns explicit, and had even become quite demanding as to what type of guns were acceptable for militia duty. An order of October 1, 1645 directed that in the future, the only arms that would be allowed "serviceable, in our trained bands… are ether full musket boare, or basterd musket at the least, & that none should be under three foote 9 inches…."[xxiv] Even those exempt from militia duty were not exempt from the requirement to have a gun in their home. A June 18, 1645 order required "all inhabitants" including those exempt from militia duty, "to have armes in their howses fitt for service, with pouder, bullets, match, as other souldiers…."[xxv]

Massachusetts Bay Colony, like many modern governments, expressed its concern about the nexus of guns and children. A May 14, 1645 order directed that "all youth within this jurisdiction, from ten yeares ould to the age of sixteen yeares, shalbe instructed, by some one of the officers of the band, or some other experienced souldier… upon the usuall training dayes, in the exercise of armes, as small guns, halfe pikes, bowes & arrows…..."[xxvi] The duty to be armed meant that even children were required to learn to use a gun.

F. New Haven and Plymouth

Other colonies also required their free adult males to own guns. New Haven Colony passed such laws in 1639, 1643, 1644, and 1646.[xxvii] Plymouth Colony did the same in 1632, 1636, and 1671 (although the last statute is less clear than the earlier two as to requiring private ownership).[xxviii]

G. New Hampshire

A statute in New Hampshire's 1716 compilation ordered "That all Male Persons from Sixteen Years of Age to Sixty, (other than such as are herein after excepted) shall bear Arms … allowing Three Months time to every Son after his coming to Sixteen Years of Age, and every Servant so long, after his time is out, to provide themselves with Arms and Ammunition…. That every Listed Souldier and Housholder, (except Troopers) shall be always provided with a well fix'd, Firelock Musket, of Musket or Bastard-Musket bore,… or other good Fire-Arms, to the satisfaction of the Commission Officers of the Company… on penalty of *Six Shillings* for want of Such Arms, as is hereby required…." [emphasis in original] Similar requirements were imposed on cavalrymen.[xxix]

H. New Jersey

New Jersey's 1703 militia statute was similar, requiring all men "between the Age of Sixteen and Fifty years" with the exception of ministers, physicians, school masters, "Civil Officers of the Government," members of the legislature, and slaves, to be members of the militia. "Every one of which is listed shall be sufficiently armed with one good sufficient Musquet or Fusee well fixed, a Sword or [Bayonet], a Cartouch box or Powder-horn, a pound of Powder, and twelve sizeable Bullets, who shall appear in the Field, so armed, twice every year…."[xxx]

I. Delaware

In 1742, Delaware required, "That every Freeholder and taxable Person residing in this Government (except such as are hereafter excepted) shall, on or before the First Day of March next, provide himself with the following Arms and Ammunition, viz. One well fixed Musket or Firelock, one Cartouch-Box, with Twelve Charges of Gun-Powder and Ball therein, and Three good Flints, to be approved of by the Commanding Officer of the respective Company to which he belongs, and shall be obliged to keep such Arms and Ammunition by him, during the Continuance of this Act...." There was a fine of forty shillings for those who failed to do so.

While "every Freeholder and taxable Person" in Delaware was obligated to provide himself with a gun, not all were required to enlist in the militia, only "all Male Persons, above Seventeen and under Fifty Years of Age" with a few exceptions.

The exemptions from militia duty are quite interesting. Quakers were exempted from the requirement to provide themselves with guns, from militia duty, and from nightly watch duty, in exchange for paying two shillings six pence for every day that "others are obliged to attend the said Muster, Exercise, or Watch...."

Others were exempted from militia musters, but not from the requirement to fight, or the requirement to own a gun. "[A]ll Justices of the Peace, Physicians, Lawyers, and Millers, and Persons incapable through Infirmities of Sickness or Lameness, shall be exempted and excused from appearing to muster, except in Case of an Alarm: They being nevertheless obliged, by this Act, to provide and keep by them Arms and Ammunition as aforesaid, as well as others. And if an Alarm happen, then all those, who by this Act are obliged to keep Arms as aforesaid... shall join the General Militia...." Ministers appear to have been exempted from all of these requirements.[xxxi]

J. Rhode Island

There seems to be no explicit Rhode Island law that required every man to own a gun. There is, however, a 1639 statute that ordered "noe man shall goe two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."[xxxii] While not an explicit order that every man was required to own a gun, widespread gun ownership was clearly assumed. The Rhode Island city of Portsmouth did impose a requirement to own a gun in 1643, and directed militia officers to personally inspect every inhabitant of the town to verify that they had both bullets and powder.[xxxiii]

### K. South Carolina

Much like Rhode Island, South Carolina's obligation to own a gun is not explicit, but did require "all, and every person and persons now in this Colony" to "appeare in armes ready fitted in their severall Companies…."[xxxiv] "Armes," of course, might include a sword or other non-firearm weapon, but South Carolina's 1743 requirement to bring guns to church (to be discussed later), suggests that "armes" meant guns.

### L. North Carolina

North Carolina passed militia laws in or before 1715 and in 1746 that were similar in form. The earlier statute required every member of the militia (every freeman between 16 and 60) to show up for muster "with a good Gun well-fixed Sword & at least Six Charges of Powder & Ball" or pay a fine.[xxxv] The 1746 statute obligated "all the Freemen and Servants… between the Age of Sixteen Years, and Sixty" to enlist in the militia, and further, required all such persons "be well provided with a Gun, fit for Service,… and at least Twelve Charges of Powder and Ball, or Swan Shot, and Six spare Flints….." Failure to have those when called to militia muster would subject one to a fine of two shillings, eight pence, "for Want of any of the Arms, Accoutrements, or Ammunition…." Interestingly enough, unlike other colonies, the definition of militia member under both statutes did not exclude free blacks.[xxxvi] According to John Hope Franklin, "free Negroes served in the militia of North Carolina with no apparent discrimination against them."[xxxvii]

### M. Georgia

Georgia's long and poorly written militia law of 1773 at first appears to provide for the government to arm the militia, since it declares that the governor or military commander may "assemble and call together all male Persons in this Province from the Age of Sixteen Years to Sixty Years… at such times, and arm and array them in such manner as is hereafter expressed…."[xxxviii] But later the statute directs that, "every Person liable to appear and bear arms at any Exercise Muster or Training… Shall constantly keep and bring with them… one Gun or Musket fit for Service[,] one Catridge [*sic*] Box with at least Nine Catridges filled with Good Gun Powder and Ball that shall fit his Piece[,] a horn or Flask containing at least a Quarter of a Pound of Gun Powder[,] a shot Pouch with half a pound of Bulletts…." This is followed by a *very* complete list of tools required to use a gun in the field.[xxxix]

A member of the militia who was an indentured servant, or otherwise subject to "Government or Command" of another, was not obligated to arm himself, but like New York and other colonies, his master was. He "Shall constantly keep such arms amunition [*sic*] and Furniture for every such Indented Servant…."[xl] The militia statute also provided for enlisting male slaves from 16 to 60 "as [their masters] can Recommend as Capable and faithful Slaves." Masters were also supposed to arm such slaves when in actual militia service "with one Sufficient Gun… powder Horn and shot pouch…."[xli]

Failure to appear "completely armed and furnished as aforesaid at any General Muster" could result in a fine of twenty shillings. Militia officers were allowed to appear at the residence of any person obligated to militia duty up to six times a year, "and to Demand a Sight of their arms amunition [*sic*] and accoutrements aforesaid…." Failure to possess the arms and ammunition could result in a five shilling fine.[xlii] Similar provisions applied to those who were cavalry militiamen.[xliii]

### N. Pennsylvania

Pennsylvania is the only colony that does not appear to have imposed an obligation to own guns on its citizens.[xliv] It appears that Pennsylvania's exception was because of its Quaker origins and Quaker pacifism.

O. Indentured Servants

As part of requiring the arming of all freemen, several colonies imposed requirements that masters give guns to indentured servants who had completed their term of service. A 1699 Maryland statute (reiterated in 1715) directed what goods the master was to provide a servant completing his term. Along with clothes and a variety of tools, the master was also directed to give a newly freed male servant, "One Gun of Twenty Shillings Price, not above Four Foot by the barrel, nor less than Three and a Half; which said Gun shall, by the Master or Mistress, in the Presence of the next Justice of the Peace, be delivered to such Free-man, under the Penalty of Five Hundred Pounds of Tobacco on such Master or Mistress omitting so to do…." To encourage the newly freed servant to keep his gun, "And the like Penalty on the said Free-man selling or disposing thereof within the Space of Twelve Months…." Starting in 1705, Virginia imposed a similar requirement that freedom dues include a musket worth at least twenty shillings.[xlv] A 1715 North Carolina statute gave masters the choice of fulfilling freedom dues with either a suit or "a good well-fixed Gun…."[xlvi]

P. Gunpowder

Gunpowder import records also provide some clues about firearms ownership and use. The British Board of Trade recorded quantities of gunpowder imported through American ports for a brief period just before the Revolution. We have surviving records for the years 1769, 1770, and 1771 that show the American colonies imported a total of 1,030,694 pounds.[xlvii] Of course, this shows only gunpowder imported with knowledge of the Crown; Americans smuggled goods quite regularly during those years, and there was some domestic production of gunpowder as well.[xlviii]

Gunpowder was used not only for civilian small arms, but also for cannon, blasting, and (in extremely small quantities), for tattooing. It seems likely that at least some of this million pounds of gunpowder was sold to the British military, colonial governments, or the Indians. Nonetheless, the quantity is enormous. Even if only one-quarter of the million pounds of gunpowder was used in civilian small arms, that is enough for eleven to seventeen million shots over those three years—in a nation where, according to some, few Americans owned guns, most guns were stored in central storehouses because of mistrust of the population, and few Americans hunted with guns.[xlix]

Q. Summary

Common to nearly every colony was the requirement that members of the militia (nearly all free white men) possess muskets and ammunition; the rest, such as Rhode Island and South Carolina, clearly assume it. Some of these statutes are explicit that militiamen are to keep their guns at home; others imply it, by specifying fines for failure to appear with guns at church or militia musters. If the militiaman's gun was stored in an armory, and was issued "only in emergencies or on muster day," it is strange that the governments fined militiaman for failing to appear with gun and ammunition. None of the Colonial militia statutes even *suggest* a requirement for central storage of all guns. None of these laws in any way regulated the possession of firearms by the white population, except for requiring nearly all white men to own guns.

III. THE OBLIGATION TO CARRY FIREARMS

Another part of the civic duty to be armed included the duty to bring guns to church and other public meetings, or while traveling.

A. Guns in Church

The statute that most clearly states the intent of "bring your guns to church" laws is a 1643 Connecticut order, "To prevent or withstand such sudden assaults as may be made by Indeans upon the Sabboth or lecture dayes, It is Ordered, that one person in every several howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, with powder and shott to e[a]ch meeting…." Connecticut found within a month that, "Whereas it is obsearved that the late Order for on[e] in a Family to bring his Arms to the meeting house every Sabboth and lecture day, hath not bine attended by divers persons" there was now a fine for failing to do so.[l]

Massachusetts Bay Colony also imposed a requirement to come to church armed, though it was repealed

and reinstated several times as fear of Indian attack rose and fell. A March 9, 1636/7 ordinance required individuals to be armed. (Britain and its colonies changed from Julian to Gregorian calendar in 1752; as part of that change, the beginning of the new year changed from March 25 to January 1.  What had been January 3, 1751 on the Julian calendar would be January 3, 1752 on the Gregorian calendar.  Dates from before March 25, 1752 are typically recorded in a form that shows what year appears in the records—but also what year our calendar would consider that date to have been.)

Because of the danger of Indian attack, and because much of the population neglected to carry their guns, every person above eighteen years of age (except magistrates and elders of the churches) was ordered to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12*d.* for every default…."[li]

The requirement to bring guns to church was repealed November 20, 1637[lii] (perhaps because of the Antinomian crisis to be discussed below). A May 10, 1643 order that directed the military officer in each town to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting" suggests that this requirement was again back in force. The motivation for the 1643 law appears to have been preventing theft of arms while the inhabitants were attending church.[liii]

Rhode Island's 1639 law ordered that, "none shall come to any public Meeting without his weapon." There was a fine of five shillings for failing to be armed at public meetings.[liv] Maryland did likewise in 1642: "Noe man able to bear arms to goe to church or Chappell… without fixed gunn and 1 Charge at least of powder and Shott."[lv] The Rhode Island town of Portsmouth passed a similar requirement in 1643,[lvi] as did New Haven Colony in 1644.[lvii]

Plymouth's 1641 law is oddly worded, and might at first be read as referring to a communal obligation of the township: "It is enacted That every Towneshipe within this Government do carry a competent number of pieeces fixd and complete with powder shott and swords every Lord's day to the meetings…." The rest of the sentence clarifies that at least one member of each household was obligated to bring weapons to church during that part of the year when Indian attack was most feared: "one of a house from the first of September to the middle of November, except their be some just & lawfull impedyment."[lviii] By 1658, Plymouth had reduced the requirement so that only one fourth of the militia was obligated to come to church armed on any particular Sunday.[lix] In 1675, apparently in response to a current military crisis, all were again required to come to church armed "with at least six charges of powder and shott" during "the time of publicke danger…."[lx]

The earliest mandatory gun carrying law is a 1619 Virginia statute that required everyone to attend church on the Sabbath, "and all suche as beare armes shall bring their pieces, swords, pouder and shotte." Those failing to bring their guns were subject to a three shilling fine.[lxi] This law was restated in 1632 as: "All men that are fittinge to beare arms, shall bring their pieces to the church…."[lxii]

While the original motivation in colonies both North and South for bringing guns to church was fear of Indian attack, by the eighteenth century, the Southern colonies' concerns appear to have shifted to fear of slave rebellion. Virginia's 1619 and 1632 statutes were somewhat vague as whether all white men were required to come armed to church or not, because of the qualification "fittinge to beare arms." The requirement was more clearly restated in a November 1738 statute that required all militiamen to come to church armed, if requested by the county's militia commander. Other language in the statute suggests that protection of the white inhabitants from possible slave uprising was now the principal concern.[lxiii]

South Carolina's 1743 confusingly worded statute required "every white male inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who [are] liable to bear arms in the militia of this Province… shall, on any Sunday or Christmas day in the year, go and resort to any church or any other public place of divine worship within this Province, and shall not carry with him a gun or a pair of horse-pistols… with at least six charges of gun-powder and ball, and shall not carry the same into the church or other place of divine worship as aforesaid" would be fined twenty shillings. Other provisions required church-wardens, deacons, or elders to check each man coming in, to make sure that he was armed. The purpose was "for the better security of this Province against the insurrections and other wicked attempts of Negroes and other Slaves…."[lxiv] A very similar statute appears in Georgia in 1770.[lxv]

B. Guns for Travelers

Along with the duty to be armed at church, several colonies required travelers to be armed. A 1623

Virginia law (reissued in similar form in 1632) required, "That no man go or send abroad without a sufficient parte will armed…. That go not to worke in the ground without their arms (and a centinell upon them.)… That the commander of every plantation take care that there be sufficient of powder and am[m]unition within the plantation under his command and their pieces fixt and their arms compleate…."[lxvi]

Massachusetts imposed a similar requirement in 1631, ordering that no person was to travel singly between Massachusetts Bay and Plymouth, "nor without some armes, though 2 or 3 togeathr." While the law does not specify that "armes" meant firearms, it would seem likely, considering Massachusetts's other laws requiring all militiamen to own a gun.[lxvii] The measure was strengthened in 1636: "And no person shall travel above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12*d.* for every default…."[lxviii]

Rhode Island imposed a similar requirement in 1639: "It is ordered, that noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword…." There was a fine of five shillings for failing to be armed.[lxix] Maryland's 1642 law requiring everyone to come to church armed also dictated, "Noe man able to bear arms to goe… any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott."[lxx]

While the requirements varied from colony to colony, and the motivations changed in the South from fear of Indians to fear of slaves, common to many of the colonies was the duty to come to church armed. Somewhat less commonly there was an obligation to be armed (sometimes explicitly with a gun) while traveling away from settled areas.

## IV. RACE, SLAVERY, & REGULATION

Colonial governments imposed a duty to own guns, but otherwise seem to have imposed few restrictions on gun possession—for whites. For Indians and blacks (either free or slave), colonial laws were much more restrictive.

### A. Indians

Colonial concern about Indians acquiring guns is not surprising. Firearms provided a significant advantage to whites because of their novelty, because gunfire created fear and confusion, and because a gun could do damage where an arrow could not.

William Bradford's account of the Pilgrims' first battle with Indians shows the advantage that guns provided the Europeans. A band of Pilgrims who were exploring the new land in December of 1620 found themselves under attack by Indians armed with bow and arrow. When the Pilgrims began firing muskets, most of the attacking Indians retreated. One brave member of the band, perhaps their leader, stood behind a tree, "within half a musket shot of us," and fired arrows repeatedly at the Pilgrims. He was far enough way, and making sufficiently good use of cover, that Myles Standish, the only professional soldier among the Pilgrim settlers, had little opportunity of hitting him. Finally, Standish, after taking "full aim at him… made the bark or splinters of the tree fly about his ears, after which he gave an extraordinary shriek, and away they went, all of them."[lxxi]

When the Pilgrims arrived in 1620, the Indians of Massachusetts had no guns. Only three years later, John Pory's account reported that those Indians unfriendly to the Pilgrims had been "furnished (in exchange of skins) by some unworthy people of our nation with bow and arrow, shot, [and] powder…."[lxxii] By 1627, the Indians of Massachusetts Bay were believed to have at least sixty guns, largely supplied by Thomas Morton, an Englishman whose trading post, Merrymount, was filled with the sort of hedonists whom the Pilgrims had hoped to leave behind in England. Morton bartered guns for furs with the Indians, violating a royal proclamation against supplying firearms, powder, or shot to the Indians.[lxxiii]

Even after Morton's banishment to England, there were problems with other Europeans selling guns to the Indians. Governor Bradford's history of Plymouth details the arrest of an Englishman named Ashley for illegal sales in 1631, and complaines about French traders selling guns and ammunition to the Indians.[lxxiv]

Attempts to regulate gun sales to the Indians appear in many colonies, and the severity of the punishments suggests that not all colonists shared their government's concerns. Much like the modern effort

to disarm people who are not trusted, the colonial gun control efforts were a series of very strict bans that could not be enforced, and were sometimes replaced with more realistic laws that sought to control rather than prohibit sales.

The prohibitions vary in the severity of punishments and vigorous of enforcement. In 1640, Springfield, Massachusetts tried a woman accused of selling her late husband's gun to an Indian. Her defense was that she did not sell it, but lent it to the Indian, "for it lay [spoiling] in her [cellar]," and she expected to reclaim it shortly. The judge warned her that she should get it home again speedily, "for no commonwealth would allow of such a misdemeanor."[lxxv] At the other extreme, a 1642 Maryland law prohibited providing gunpowder or shot to the Indians, and made execution one of the possible punishments.[lxxvi]

Massachusetts Bay Colony, to supplement the royal proclamation against providing guns or ammunition to the Indians, passed its own ordinance on May 17, 1637 prohibiting sale of guns, gunpowder, shot, lead, or shot molds to the Indians, or repair of their guns.[lxxvii] In 1642, Massachusetts Bay complained that "some of the English in the eastern parts" who were under no government at all, were supplying gunpowder and ammunition to the Indians. Unsurprisingly, Massachusetts Bay passed laws punishing those sales.[lxxviii]

Other evidence of a mistrust based on race can be seen in a pair of orders concerning militia duty. The first, on May 27, 1652, required all "Scotsmen, Negers, & Indians inhabiting with or servants to the English" between 16 and 60 to train with the militia.[lxxix] In May, 1656, perhaps after the military crisis of the moment had passed, "no Negroes or Indians… shalbe armed or permitted to trayne…."[lxxx]

Connecticut struggled with unlawful sales of guns to Indians. The very first entry in *Public Records of the Colony of Connecticut* concerns a 1636 complaint that "Henry Stiles or some of the ser[vants] had traded a piece with the Indians for corn."[lxxxi] In 1640, Connecticut ordered George Abbott to pay a £5 fine for "selling a pistol & powder to the Indians…."[lxxxii] A few years later, Robert Slye, George Hubberd, John West, and Peter Blatchford were each fined £10 for "exchanging a gun with an Indian…."[lxxxiii]

Connecticut found enforcement of its gun control law prohibiting sales to the Indians[lxxxiv] frustrated by other colonies. Because merchants in the Dutch and French colonies were selling guns to the Indians, Connecticut next prohibited sale of guns outside the colony. Finally, Connecticut prohibited foreigners from doing business with Indians in Connecticut; the ban was retaliation for continued sales of guns to the Indians by Dutch and French traders elsewhere.[lxxxv] Connecticut also repeatedly fined colonists for selling ammunition to the Indians.[lxxxvi]

By the middle of the seventeenth century, either the original fear of the Indians having guns was receding throughout the New England colonies, or the futility of trying to keep them disarmed was becoming apparent. The laws appear to have changed by the 1660s to less restrictive forms. In 1662, a Springfield, Massachusetts court fined two Indians for drunkenness. Not having the money for the fine, one of them, "Left a gun with the County Treasurer till they make payment."[lxxxvii] On April 29, 1668, the Massachusetts General Court decided to license the sale of "powder, shot, lead, guns, i.e., hand guns [small arms]" to Indians "not in hostility with us or any of the English in New England…."[lxxxviii] In 1668-69, an Indian sued Francis West in Plymouth for the theft of a hog and a gun. The court ordered West to pay for the stolen hog and return the gun to the Indian.[lxxxix]

A similar progression is visible in Connecticut in this same period. In 1660, Connecticut ordered that "if any Indians shall bring in guns into any of the towns" that the colonists were to seize them. The Indians could redeem their seized guns for 10*s.* each, with half paid to the Treasury, and the other half paid to the Englishman who seized the gun. Because the Indians could redeem their guns, it seems that the objection was not to the Indians having guns, but bringing them to town.

By the following year, this ban on Indians bringing guns to town was repealed for the Tunxis Indians that lived nearby, who "have free liberty to carry their guns, through the English towns, provided they are not above 10 men in company."[xc] The Tunxis Indians were apparently trusted enough to come to town (in small numbers) armed.

Virginia provides perhaps the best example of the shifting views of the colonists about the effectiveness of such laws. A March 1658 Virginia statute provided that "what person or persons so ever shall barter or sell with any Indian or Indians for piece, powder or shot, and being lawfully convicted, shall forfeit his whole estate…." Any Virginian who found an Indian with gun, powder, or shot, was legally entitled to confiscate it.[xci]

By the following year, "it is manifest that the neighboring plantations both of English and [foreigners] do plentifully furnish the Indians with guns, powder & shot, and do thereby draw from us the trade of beaver to our great loss and their profit, and besides the Indians being furnished with as much of both guns and ammunition as they are able to purchase, *It is enacted,* That every man may freely trade for guns, powder and shot: It derogating nothing from our safety and adding much to our advantage…."[xcii] [emphasis in original]

In October 1665, Virginia again prohibited the sale of guns and ammunition to the Indians. The statute admitted that New Amsterdam's sales of guns to the Indians had made the March 1658 law unenforceable. The seizure of New Amsterdam by the Duke of York in 1664 had changed the situation. "[T]hose envious neighbors are now by his majesty's justice and providence removed from us," thus the ban was again in force.[xciii]

The ban on gun sales was not obeyed, however. In March 1676, as tensions between whites and Indians escalated into Bacon's Rebellion, Virginia enacted a new statute, complaining "the traders with Indians by their [avarice] have so armed the Indians with powder, shot and guns, that they have been thereby emboldened…." The new statute made it a capital offense to sell guns or ammunition to the Indians, and also declared that any colonist found "within any Indian town or three miles without the English plantations" with more than one gun and "ten charges of powder and shot for his necessary use" would be considered guilty of selling to the Indians, and punished accordingly.[xciv]

In times of tension, of course, colonies might again pass restrictions on sale of guns or ammunition to Indians, but Maryland seems to have followed the model of Virginia—severe restrictions followed by more realistic regulations. A 1638/9 Maryland law made it a felony "to sell give or deliver to any Indian or to any other declared or professed enemie of the Province any gunne pistol powder or shott without the knowledge or lycence of the Leiutenant Generall…."[xcv] A 1649 statute provided that "noe Inhabitant of this Province shall deliver any Gunne or Gunnes or Ammunicon or other kind of martiall Armes, to any Indian borne of Indian Parentage…."[xcvi] A 1763 Maryland law prohibited "any Person or Persons within this Province to Sell or give to any Indian Woman or Child any Gun Powder Shot or lead Whatsoever[,] nor to any Indian Man within this Province more than the Quantitys of one Pound of Gun Powder and six Pounds of Shot or lead at any one Time[,] and not those or lesser Quantitys of Powder or Lead oftener than once in Six Months…."[xcvii]

## B. Blacks

Laws disarming blacks were more common in the southern colonies. A 1680 Virginia statute prohibited "any negroe or other slave to carry or arme himselfe with any club, staffe, gunn, sword or any other weapon of defence or offence…"[xcviii]

By May, 1723, however, there seem to have been enough free blacks and Indians in the militia that the law was changed: "That every free negro, mulatto, or indian, being a house-keeper, or listed in the militia, may be permitted to keep one gun, powder, and shot…." Those blacks and Indians who were "not house-keepers, nor listed in the militia" were required to dispose of their weapons by the end of October, 1723. Blacks and Indians living on frontier plantations were required to obtain a license "to keep and use guns, powder, and shot…."[xcix] Even the small number of blacks and Indians who were members of the militia were apparently no longer trusted with guns in public by 1738. They were still required to muster, but "shall appear without arms…."[c]

Other southern colonies showed similar mistrust of blacks with guns. A Maryland statute passed in or before 1715 directed, "That no Negro or other slave, within this Province, shall be permitted to carry any Gun or any other offensive Weapon, from off their Master's Land, without Licence from their said Master...."[ci] While less clear, Delaware's 1742 militia statute prohibited all indentured servants and slaves from bearing arms, or mustering in any company of the militia. It is unclear from the statute if this ban applied to free blacks as well.[cii]

A Georgia statute of 1768 "for the Establishing and Regulating Patrols" prohibited slaves possessing or carrying "Fire Arms or any Offensive Weapon whatsoever, unless such Slave shall have a Ticket or License in Writing from his Master Mistress or Overseer to Hunt and Kill Game Cattle or Mischievous Birds or Birds of Prey…." Other provisions allowed a slave to possess a gun while in the company of a white person 16 years or older, or while actually protecting crops from birds. Under no conditions was a slave allowed to carry "any

Gun Cutlass Pistol or other Offensive Weapon" from Saturday sunset until sunrise Monday morning. The "Patrols" alluded to in the law's title were for the purpose of "Searching and examining any Negroe house for Offensive Weapons Fire Arms and Ammunition."[ciii]

Unlike the white population, blacks and Indians were not generally trusted with guns, and the laws reflected this. While individual whites might be disarmed as punishment for a crime or suspected disloyalty (as will be discussed next), gun ownership was generally unrestricted, except for blacks or Indians.

## V. DISARMING THE DISLOYAL

Individual whites were sometimes disarmed if they were perceived as disloyal to the polity.

### A. Antinomians

In 1637 Massachusetts, Anne Hutchinson's Antinomian heresy threatened the social order. Hutchinson's beliefs had spread rapidly through Puritan society, and "some persons being so hot headed for maintaining of these sinfull opinions, that they feared breach of peace, even among the Members of the superiour Court… those in place of government caused certain persons to be disarmed in the severall Townes, as in the Towne of Boston, to the number of 58, in the Towne of Salem 6, in the Towne of Newbery 3, in the Towne of Roxbury 5, in the Towne of Ipswitch 2, and Charles Towne 2."[civ]

Today we can look with disfavor on this disarming order for a variety of violations of the Constitution: as a bill of attainder; as a deprivation of due process; for granting favor to one religious point of view. These concerns, of course, are ahistorical. What the disarming order tells us about Colonial Massachusetts strongly indicates that gun regulation was generally *not* restrictive.

While consistent with the claim that Colonial governments disarmed persons who were not trusted, that there was a need to cause "certain persons to be disarmed" suggests that firearms were *not* stored in central storehouses and were not usually under governmental control. Most freemen were armed, as the laws of all the colonies except Pennsylvania required. Only as punishment for a specific crime—heresy—did Massachusetts disarm Hutchinson's partisans. The number disarmed—77 out of a population then in the thousands—is far less than the percentage legally disarmed in America today.

Virginia's statutes provide a positive variant of this notion. A 1676/7 statute directed: "It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony…."[cv] Any loyal subject of the crown was permitted to purchase and own guns.

### B. Catholics

Maryland provides a somewhat different example. Catholics were exempted from militia duty because, like Hutchinson's Antinomians, and blacks almost everywhere in the colonies, they were not completely trusted. In light of the role that Catholics played in the recurring attempts to restore the Stuarts to the throne of England, the distrust is unsurprising.

In exchange for exemption from militia duty, Catholics were doubly taxed on their lands.[cvi] As part of the same statute, members of the militia were required to swear an oath of allegiance to King George II. Catholics who refused the oath—thus refusing their legal obligation as British subjects to defend the realm—were not allowed to possess arms or ammunition.[cvii]

The law of Britain concerning Catholics and arms after the accession of William I to the throne is at first glance quite confusing. A 1689 law prohibited Catholics from possessing "any arms, Weapons, Gunpowder, or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace, at their general Quarter sessions, for the Defence of his House or Person)."[cviii]  The law both prohibited Catholics from possessing arms, and yet allowed them, under some restrictions, to have at least defensive arms. Joyce Malcolm argues that, "This exception is especially significant, as it demonstrates that even when there were fears of religious war, Catholic Englishmen were permitted the means to defend themselves and their households; they were merely forbidden to stockpile arms."[cix]

At least in times of crisis, the English law would appear to have been the justification for disarming Catholics both in Britain and America. In Britain, for example, the death of the queen in 1714 caused orders that, "The Lords Leiutents of the severall Countrys were directed to draw out the Militia to take from Papists

& other suspected Persons their Arms & Horses & to be watchfull of the Publick Tranquillity."[cx]

Yet there seem to be relatively few incidents that appear in the *Archives of Maryland* that actually involve taking away arms from Catholics, and even these bear careful scrutiny. In 1744, "No Roman Catholick be for the future enrolled or mustered among the Militia of the said County and that if any of the *Publick Arms* be in the Possession of any Roman Catholick, the Colonel of the said County is hereby desired to oblige the Person in whose Custody such Arms are, to deliver the same to him." [emphasis added][cxi] The law apparently did not order confiscation of privately owned arms owned by Catholics.

By contrast, in 1756, "all Arms Gunpowder and Ammunition of what kind soever any Papist or reputed Papist within this Province hath or shall have in his House or Houses" were ordered seized.[cxii] That the order was adopted when it was, however, suggests that while the 1689 law *allowed* complete prohibition of Catholic gun ownership at the discretion of the government, in Maryland they were not *usually* prohibited from possession.

Catholics settled mainly in Maryland. In other colonies, there is no evidence that Catholics in general were disarmed.

Georgia provides an example of selective Catholic disarmament. At the start of the French & Indian War, British forces demanded that the French population of Nova Scotia swear an oath of allegiance to the crown. Persons who refused were forcibly removed to other British colonies. Some of these Acadians (the ancestors of the Cajuns) were bound as indentured servants in Georgia. A 1756 law prohibited indentured Acadians "to have or use any fire Arms or other Offensive Weapons otherwise than in his Masters Plantation or immediately under his Inspection…."[cxiii] There seems to be no general prohibition on Catholic ownership of firearms in Georgia; the Acadians were disarmed because they had refused to be loyal subjects of the British government, and the suspicion of disloyalty followed them to Georgia.

## VI. PRIVATE VS. GOVERNMENT OWNERSHIP

Regarding Bellesiles's claim that guns "were to remain the property of the government,"[cxiv] the evidence suggests quite the opposite.

### A. Guns for the Poor

On any number of occasions, the Colonial governments supplied guns to subjects too poor to purchase them. The laws usually specified that the recipient was to pay for the gun.

For example, a March 22, 1630/1 Massachusetts statute required the entire adult male population to be armed. Every person, including servants, was to own "good & sufficient armes" of a type "allowable by the captain or other officers, those that want & are of abilitie to buy them themselves, others that are unable to have them provided by the town…." Those who were armed by the town under the March 22 statute were to reimburse the town "when they shalbe able."[cxv] On March 6, 1632/3, the law was amended to require that any single person who had not provided himself with acceptable arms would be compelled to work for a master. The work earned him the cost of the arms provided to him by the government.[cxvi]

Connecticut's Code of 1650 provided that a person who was required to arm themselves, or arm a dependent, but "cannot purchase them by such means as he hath, hee shall bring to the clark so much corne or other merchantable goods" as was necessary to pay for them. The value of the arms was to be appraised by the clerk "and two others of the company, (whereof one to bee chosen by the party, and the other by the clarke,) as shall be judged of a greater value by a fifth parte, then such armes or ammunition is of…."

Thus, the man who would not purchase a gun and ammunition would have one provided by the government, but at a price as much as twenty percent above the market price. The high price created an incentive to purchase a gun privately.

Another part of the law provided for hiring out any unarmed single men to earn the price of a gun and ammunition.[cxvii] Very similar laws appeared in New York[cxviii] and New Hampshire.[cxix]

A 1673 Virginia law, while less explicit about the process for determining the value of the arms, directed militia officers to purchase guns on the public account for distribution to those who could not afford them, "for them to dispose of the same as there shalbe occasion; and that those to whome distribution shalbe made doe pay for the same at a reasonable rate…."[cxx] The law does not directly disprove that guns were "to remain

the property of the government." It does, however, seem a bit strange for the government to provide guns to individual militiamen, and then require them to pay for those guns, if the guns were to remain governmental property.

## B. Public Arms

Not every Virginia militiaman apparently succeeded in arming himself; a 1748 statute provided "it may be necessary in time of danger, to arm part of the militia, not otherwise sufficiently provided, out of his majesty's magazine and other stores within this colony…." Contrary to the claim that all guns were considered the property of the government, the same statute criminalized embezzlement of "arms or ammunition" that were issued to those who were too poor to arm themselves, and thus drew a distinction between public arms issued from "his majesty's magazine" and other, presumably privately owned firearms.[cxxi]

Similarly, a Maryland statute of 1733 passed "to prevent the Embezzlement of the Public Arms" directed "That all the Public Arms shall be Marked with such Marks… to denote such Arms to belong to the Public; after which Marks so made, no Person or Persons whatsoever, shall presume to Sell or Purchase such Arms so Marked…."[cxxii] If all guns automatically belonged to the government, it seems a bit odd that there was a need to mark them as "Public Arms."

In 1756, Maryland's militia officers were ordered to make a diligent search for arms and ammunition, demanding that everyone show what guns they had. The reason would appear to be, "Whereas on many Occasions Arms Ammunition and military Accoutrements of different Kinds have been delivered out of the public Magazines of this Province and are now dispersed among the Inhabitants and have been Sold or Sent from one to another and it is represented that the Locks have been taken of from many of the Said Arms and put to private Use…."[cxxiii] If all guns were "automatically government property," the careful search for publicly owned arms, distinguishing them from private property, would make no sense.

Massachusetts at one point directed that, "The surveyar genrall of the armes of the country shall have power to sell any of the country armes for an equall price, either in corne or other country pay, & to p[ro]vide armes againe therew[i]th so soone as may bee, so hee sell them not out of this jurisdiction."[cxxiv] Publicly owned arms were to be sold (not issued or loaned), as long as they were sold in Massachusetts.

A 1765 Virginia statute is also strong evidence that guns were not regarded as automatically government property. It provided for militia commanders in "each of the counties from which the militia has been sent into service in the pay of this colony shall, within the space of three months after the passing this act, sell, for the best price that be had for the same, all arms, ammunition, provisions, and necessaries purchased at the publick expense in the said counties…."[cxxv] Surplus government guns were clearly sold, not loaned out to militiamen.

## C. Private Arms

Other evidence establishes that Colonial governments at least sometimes recognized that guns could be private property, and were *not* regarded as automatically the property of the government. Connecticut's records provide such evidence. In 1639, after the Pequot War, "a musket with 2 letters I W" was found, "conceaved to be Jno. Woods who was killed att the Rivers mouth. It was ordered for the present [that] the musket should be delivered to Jno. Woods friends until other appeare."[cxxvi] If the Connecticut government regarded a dead man's musket as "government property," it is odd that they delivered it to his friends.

We also have examples of colonists fined for selling guns to the Indians—and with no suggestion that these were publicly owned arms. A 1636 complaint in the Connecticut records shows that "Henry Stiles or some of the ser[vants] had traded a peece with the Indians for Corne."[cxxvii] In 1640, George Abbott is ordered to pay a £5 fine for "selling a pystoll & powder to the Indeans…."[cxxviii] Fines are also repeatedly assessed for selling guns to the Indians, with no hint or suggestion that these were government property.[cxxix]

Were guns privately owned or government property? We have evidence such as a Connecticut lawsuit in 1639 by a "Jno. Moody contra Blachford, for a fowling peece he bought and should have payd for it 40*s*."[cxxx] In 1640, also in Connecticut, a William Hill was fined £4 "for buying a stolen peece of Mr. Plums man."[cxxxi] There is nothing in the reports of these cases that suggests that these guns were considered government property.

Similarly, in New Haven Colony, a civil suit of 1645 concerns a gun purchased by Stephen Medcalfe from

a Francis Linley. The gun was defective, and when it exploded, Medcalfe lost an eye. There is nothing in the description of the suit that suggests that the gun was "property of the government" and it was no surprise that one person sold a gun to another.[cxxxii]

Bellesiles claims that "the government reserved to itself the right to impress arms on any occasion, either as a defensive measure against possible insurrection or for use by the state. No gun ever belonged unqualifiedly to an individual."[cxxxiii]

Yet there are a number of examples that directly contradict this claim. An October 13, 1675 statute of Massachusetts Bay provided for assessments on persons exempt from militia training of "so many fire armes, muskets, or carbines, with a proportionable stocke of [powder] & am[m]unition, as the said committees respectively shall appoint…." It appears that this was an assessment in kind, not of money. Another part of the statute specified "all such persons as shall be assessed, and shall accordingly provide three fire armes, shall be freed from being sent abroad to the warrs, except in extreame & utmost necessity."[cxxxiv]

Thus, the government believed that there were enough people who owned at least three guns that the government was prepared to exempt them from the onerous duty to fight overseas if they offered those guns to the government. As much as the government needed the guns, it did not believe that it had the authority to confiscate them. Instead, it needed to make a deal with the owners. Apparently the government did not believe that all guns were its property.

More evidence that militiamen possessed their *own* arms, and that the arms were not always issued from government magazines for militia service, is Massachusetts Governor William Shirley's 1755 order to the militia to appear for service. "To such of them as shall be provided with sufficient Arms at their first Muster, they shall be allowed a *Dollar* over and above their Wages, and full Recompence for such of their Arms as shall be inevitably lost or spoiled."[cxxxv]

Clearly, Governor Shirley believed that there were some members of the militia who, contrary to law, did not have firearms appropriate to military service. Just as clearly, Governor Shirley believed that some members would show up appropriately armed, and he was prepared to pay them extra to do so. Most importantly from the standpoint of private vs. public ownership, "full Recompence" shows that militiamen would be compensated for the loss of their privately owned guns; the guns were not "property of the government."

Maryland's Governor Sharpe similarly directed calling up of the militia, offering to provide government arms in 1759, but also "That for Every One of such Arms as any of Your men shall bring with them, and that may be Spoiled or Lost in actual Service, I will pay at the rate of Twenty five Shillings a Firelock."[cxxxvi]

At the start of the Revolution, a number of colonies made arrangements for additional pay for those soldiers who showed up with their own guns. Connecticut, for example, provided "that each inlisted inhabitant that shall provide arms for himself, well fixed with a good bayonet and cartouch box, shall be paid a premium of ten shillings…."[cxxxvii] Later measures also suggest that militia men showing up with their own guns, and being paid extra, were the rule, not the exception.[cxxxviii] Like Governor Shirley's "full Recompense," the Connecticut laws provided for compensation for those whose guns were lost in the war. While Connecticut impressed guns from the population for militiamen who did not have their own, the owners were to be paid four shillings for the use of impressed guns, and "the just value of the such gun" if lost.[cxxxix]

At the start of the Revolution, the Provincial Congress of Massachusetts purchased firearms from private parties,[cxl] and requested private citizens to sell their guns to the government: "[I]t is strongly recommended to such inhabitants…, that they supply the colony with same."[cxli] A request of June 15, 1775 for individuals to sell their arms is also phrased in terms that seem quite voluntary. "*Resolved*, that any person or persons, who may have such to sell, shall receive so much for them, as the selectmen of the town or district in which or they may dwell, shall appraise such arms at…."[cxlii]

Other colonies also purchased guns from private parties—a strange behavior if guns remained "the property of the government." [cxliii] Similarly, in November of 1775, with the war well under way, the Pennsylvania government issued a very odd statement, if guns were automatically "property of the government":

> The Committee of Safety are of opinion, that it is not improper for Mr. James Innes to purchase any second hand Arms which he may find in the hands of Individuals of this Province,

and therefore have no objection to his buying them; But as they have employed, and are endeavouring to employ, all the Artificers that can be procured in making new arms for the public, they apprehend any application by Mr. Innes to such Artificers, will be attended with bad consequences to the general Cause by enhancing the Price of arms….[cxliv]

At the start of the Revolution, the Maryland government confiscated guns from Tories and others suspected of disloyalty to the Patriot cause. Yet even then, the owners received compensation for the value of their guns.[cxlv] Even disloyalty was not just cause for confiscation without compensation.

Another piece of evidence that guns were not "property of the government" is a 1776 order of the Continental Congress:

> Whereas in the execution of the resolve of Congress of the 14th of March, respecting the disarming disaffected persons, many fire arms may be taken, which may not be fit for use to arm any of the troops mentioned therein: Therefore, Resolved, That all the fire arms so taken, being appraised according to said resolve, none of them shall be paid for, but those that are fit for the use of such troops, or that may conveniently be so made, and *the remainder shall be safely kept by the said assemblies, conventions, councils or committees of safety, for the owners, to be delivered to them when the Congress shall direct.*[cxlvi] [emphasis added]

The owners were to be paid for guns taken for military use. Government ownership of guns was not assumed. Quite the opposite, private ownership was assumed and respected, even for Tories.

In the days after Lexington and Concord, General Gage was understandably nervous about being attacked from the rear by armed rebels. General Gage consequently ordered the people of Boston to turn in their arms. Many Bostonians were also deeply interested in leaving town, both because of the increasing poverty caused by the Boston Port Act of 1774, and the likelihood that the revolutionary army would attack Boston.

As an incentive, General Gage offered passes to leave Boston to all who turned in their weapons. No weapons or ammunition were allowed to leave Boston. The arms were to be "marked with the names of the respective owners…that the arms aforesaid, at a suitable time, would be returned to the owners." The marking of the arms demonstrates that at least some of these were personally owned, not public arms. On April 27th, "the people delivered to the selectman 1778 fire-arms, 634 pistols, 973 bayonets, and 38 blunderbusses…."[cxlvii]

## VII. RESTRICTIONS ON PRIVATE USE

There are restrictions on the use of firearms in the Colonial law, and most of these are unsurprising. They are safety and hunting regulations of the same general form, though less restrictive, than current laws.

### A. Restrictions on Discharge

The need for such laws strongly suggests that the claim that guns were kept centrally stored is incorrect. A March 1655/6 Virginia statute, for example, prohibited shooting "any guns at drinkeing (marriages and funerals only excepted)" because gunshots were the common alarm of Indian attack, "of which no certainty can be had in respect of the frequent shooting of gunns in drinking…."[cxlviii] Similarly, a 1642 Maryland statute also ordered that, "No man to discharge 3 guns within the space of ¼ hour… except to give or answer alarm."[cxlix]

There are some regulations that appear to have been temporary measures designed to deal with a particular crisis, and we may only speculate as to the motivations. An example is a 1675 Plymouth statute that prohibited shooting except at an Indian or a wolf. Since this measure immediately followed one requiring everyone to come to church armed "during the time of publicke danger,"[cl] it seems likely that the law was an attempt to prevent unnecessary alarm, for the same reasons as the Virginia and Maryland laws.

Shooting was apparently a common enough pastime in 1638 Massachusetts that when an Emanuell Downing had "brought over, at his great charges, all things fitting for takeing wild foule by way of [decoy],"

the General Court felt it necessary to order "that it shall not bee lawfull for any person to shoote in any gun within halfe a mile of the pond where such [decoy] shalbee placed…."[cli] The need for such a law suggests that guns were not kept locked in a central storehouse.

The laws were passed not only for the economic benefit of the community as a whole, but also because negligent misuse of firearms was not unknown. An incident from a history of Plymouth Colony described how:

> On 1 July 1684 Robert Trayes of Scituate, described as a 'negro,' was indicted for firing a gun at the door of Richard Standlake, thereby wounding and shattering the leg of Daniel Standlake, which occasioned his death. The jury found the death of Daniel Standlake by 'misadventure,' and the defendant, now called 'negro, John Trayes,' was cleared with admonition and fine of £5.[clii]

A statute adopted at the Massachusetts 1713-14 legislative session complained, "Whereas by the indiscreet firing of guns laden with shot and ball within the town and harbour of Boston, the lives and limbs of many persons have been lost, and others have been in great danger, as well as other damage has been sustained…" the legislature prohibited firing of any "gun or pistol" in Boston ("the islands thereto belonging excepted").[cliii]

Perhaps for a similar reason—or just to allow the inhabitants to get some sleep—in 1759, Georgia made it unlawful to fire "any great gun or [small] arm in the town or harbour of Savannah after Sun Set without leave or permission from the Governor…."[cliv]

### B. Restrictions on Hunting

Hunting with firearms was also sufficiently common for Colonial governments to adopt restrictions. A 1632 Virginia statute licensed hunting wild pigs, but "any man be permitted to kill deare or other wild beasts or fowle in the common woods, forests, or rivers…. That thereby the inhabitants may be trained in the use of theire armes, the Indians kept from our plantations, and the wolves and other vermine destroyed."[clv] A March 1661/2 statute prohibited "hunting and shooting of diverse men" on land without the owner's permission "whereby many injuryes doe dayly happen to the owners of the said land…." The statute also provided that it was lawful to pursue game shot elsewhere onto private land without permission.[clvi] A 1699 statute, "prohibiting the unseasonable killing of Deer," complained about how the deer population "is very much destroyed and diminished" by killing "Does bigg with young…."[clvii]

Laws regulating hunting appear in at least two colonies by mid-eighteenth century, and the language in both statutes suggests that hunting was common. A 1722 New Jersey "Act to prevent the Killing of Deer out of Season" prohibited deer hunting from January through June. That same law included a provision prohibiting "Persons carrying of Guns, and presuming to Hunt on other Peoples Land" explaining that it was required because "divers Abuses have been committed, and great Damages and Inconveniencies arisen…." The same act prohibited a slave from hunting or carrying a gun without permission of his master.[clviii]

A 1738 North Carolina "Act, to Prevent killing Deer, at Unseasonable Times" made it unlawful "to kill or destroy any Deer… by Gun, or other Ways and Means whatsoever" from February 15 to July 15."[clix]

Virginia temporarily banned deer hunting in 1772, complaining that "many idle people making a practice, in severe frozen weather, and deep snows, to destroy deer, in great numbers, with dogs, so that the whole breed is likely to be destroyed, in the inhabited parts of the colony…." The government's concern was that, "numbers of disorderly persons… almost destroyed the breed, by which the inhabitants will… be deprived of that wholesome and agreeable food…." Therefore, deer hunting was completely prohibited until August 1, 1776.[clx] It is not made explicit that the hunting was with guns, however.

Maryland had a few hunting restrictions as well. A 1648 law complained that because licenses previously issued for "killing of Wild Hoggs [e]mploying Indians to kill deere with Gunnes" both to residents and non-residents of Maryland "hath occasioned some inconvenience & hath given great offence to divers of the Inhabitants of this Province," all existing licenses were repealed. Unfortunately, the statute failed to explain in what manner this hunting had inconvenienced or offended the "Inhabitants."[clxi]

Two years later, another law prohibited foreigners "either English or Indian" from hunting "in any part of this Province or kill any Venison or other Game" without a license from the governor,[clxii] again with no

explanation of the problem this law was intended to solve.

A 1654 Maryland law sought to prohibit shooting on Sundays: "Noe work shall be done on the Sabboth day but that which is of Necessity and Charity to be done no Inordinate Recreations as fowling, fishing, hunting or other, no shooting of Gunns be used on that day Except in Case of Necessity[.]" Following immediately upon prohibitions on drunkenness, swearing and gossiping, the statute seems intended to improve morals of the population, and was not specifically directed at guns.[clxiii] In 1678, the law was expanded to prohibit a larger list of amusements, and still prohibited fishing and hunting.[clxiv]

### C. Restrictions on Fire-hunting

One particularly destructive practice of Colonial America was "fire-hunting," well described by a 1760 account explaining why white pines in New York, New England, and New Jersey were protected for the use of the Royal Navy:

> This restriction is absolutely necessary, whether considered as securing a provision for the navy, or as a check upon that very destructive practice, taken from the Indians, of fire-hunting. It used to be the custom for large companies to go into the woods in the winter, and to set fire to the brush and underwood in a circle of several miles. This circle gradually contracting itself, the deer, and other wild animals inclosed, naturally retired from the flames, till at length they got herded together in a very small compass.
>
> Then, blinded and suffocated by the smoke, and scorched by the fire, which every moment came nearer to them, they forced their way, under the greatest trepidation and dismay, through the flames. As soon as they got into the open daylight again, they were shot by the hunters, who stood without and were in readiness to fire upon them.[clxv]

Fire-hunting was not confined to the Northeast colonies; there are a number of statutes of Colonial Virginia and Maryland that either directly prohibit fire-hunting with reference to guns,[clxvi] or that license hunting on the frontier in an attempt to control fire-hunting.[clxvii] Doubtless other restrictions on firearms use existed—but if so, those who argue that Colonial governments severely restricted firearms use have yet to produce them.

CONCLUSION: COLONIAL FIREARMS REGULATIONS WERE NEITHER *LAISSEZ-FAIRE* NOR RESTRICTIVE

As should be clear from the preceding walk through these laws, the Colonial statutes were not *laissez-faire*; there were many obligations concerning the ownership and carrying of guns adopted for the public good. Neither were they restrictive, at least for whites (with the exception of Catholics in Maryland). There were, it is true, some severe restrictions on firearms ownership in Colonial America, but they applied only to people who were not trusted to be loyal members of the community, particularly Indians and blacks. For the vast majority of people, who were considered loyal members of the community, gun ownership was not only allowed, it was an obligation.

ENDNOTES

---

[i]. Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A. Knopf, 2000), 73. Similar text, with a subset of the same footnotes, appears at Michael Bellesiles, "Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794," *Law & History Review.* 16:575 (1998).

Bellesiles also asserts government ownership of all guns at *Arming America*, pp. 79-80. Because individuals failed to take adequate care of guns in private hands, "The eventual solution to the lack of care devoted to firearms was to make all guns into the property of the state, subject to storage in central storehouses where they could be cleaned and repaired

by paid government gunsmiths." Similarly, Bellesiles asserts that while "the colonies supported and subsidized the private ownership of firearms, the government reserved to itself the right to impress arms on any occasion, either as a defensive measure against possible insurrection or for use by the state. No gun ever belonged unqualifiedly to an individual."

ii. *State v. Hirsch*, 177 Or. App. 441, 34 P.3d 1209 (Or. App. 2001).

iii. Bellesiles, *Arming America*, 73.

iv. *Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford, Conn.: Silas Andrus, 1822), 72-73; J. Hammond Trumbull (vol. 1-3), Charles J. Hoadly (vol. 4-15), *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony* (Hartford, Conn.: Brown & Parsons, 1850) (hereinafter *Public Records of Connecticut*), 1:542-543.

v. *Public Records of Connecticut*, 1:3-4, 15-16, 2:19-20, 217-18, 4:177, 8:379-80.

vi. *Id.*, 2:217-18, 4:177, 8:379-80.

vii. William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (New York: R. & W. & G. Bartow, 1823), 3:13.

viii. *Id.*, 3:338.

ix. *Id.*, 5:17, 21.

x. *Id.*, 6:116.

xi. *Id.*, 6:118.

xii. *Id.*, 6:537.

xiii. *The Colonial Laws of New York from the Year 1664 to the Revolution…* (Albany, New York: James B. Lyon, 1894), 1:49-50.

xiv. William Hand Browne, ed., *Archives of Maryland* (Baltimore: Maryland Historical Society, 1885) (hereinafter *Archives of Maryland*), 1:77.

xv. *Id.*, 75:258.

xvi. *Id.*, 75:259.

xvii. *Id.*, 1:77.

xviii. *Id.*, 3:100-1.

xix. *Id.*, 3:103.

xx. *Id.*, 3:345.

xxi. *Id.*, 52:469.

xxii. *Id.*, 11:21. But see *id.*, 11:90 for a complaint that many had failed to conform to the law, though the complaint alleges that that the problem was "would not," not "could not."

xxiii. Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston: William White, 1853), 1:84.

xxiv. *Id.*, 2:134. This requirement is reiterated on November 11, 1647. *Id.*,2:222.

xxv. *Id.*, 3:84.

xxvi. *Id.*, 2:99.

xxvii. Charles J. Hoadly, ed., *Records Of The Colony And Plantation Of New Haven, From 1638 To 1649* (Hartford, Conn.: Case, Tiffany, 1857), 25-26, 96-97, 131, 202. Hoadly, 122-3, lists a number of men fined for failure to obey.

xxviii. William Brigham, ed., *The Compact with the Charter and Laws of the Colony of New Plymouth…* (Boston: Dutton and Wentworth, 1836), 31, 44-45, 285-6.

xxix. *Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England…* (1716), 91-92, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1985.

xxx. *The Laws and Acts of the General Assembly of Her Majesties Province of Nova Caesarea or New-Jersey* (W. Bradford, 1709), 12-13, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1412.

xxxi. *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Franklin, 1741), 171-7. While the title page is clearly 1741, this must have been only for the first of annual series, since the law was passed in 1742. See also a 1740 statute, *Id.*, 151, imposing similar requirements on the town of Lewes, which was apparently considered especially exposed to naval attack.

xxxii. John Russell Bartlett, ed., *Records of the Colony of Rhode Island and Providence Plantations, in New England* (Providence, R.I.: A. Crawford Greene and Brother, 1856), 1:94.

xxxiii. *Id.*, 1:79-80.

xxxiv. Alexander S. Salley, *Journal of the Grand Council of South Carolina* (Columbia, S.C.: Historical Commission of South Carolina, 1907), 1:10-11.

xxxv. *Laws of North Carolina–1715*, ch. 25, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 2:29-31.

xxxvi. *A Collection of all the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use...* (Newbern, N.C.: James Davis, 1751), 215-16.

xxxvii. John Hope Franklin, *The Free Negro in North Carolina, 1790-1860* (Chapel Hill, N.C.: University of North Carolina Press, 1995), 101-102.

xxxviii. Allen D. Candler, comp., *The Colonial Records of the State of Georgia* (Atlanta, Ga.: Chas. P. Byrd, 1911), 19(part 1):291. Nearly identical language appears in the 1755 militia statute. *Id.*, 18:7, 11-12.

xxxix. *Id.*, 19(part 1):296.

xl. *Id.*, 19(part 1):303. There are many pages of highly detailed fines and provisions to handle any imaginable contingency in this statute.

xli. *Id.*, 19(part 1):324-25.

xlii. *Id.*, 19(part 1):297-8.

xliii. *Id.*, 19(part 1):299. See the similar obligation imposed in 1757 on members of the militia to keep and carry "one good Gun or Pistol in Order… and a Cartridge Box with at least Six Cartridges" when on patrol duty. *Id.*, 18:231.

xliv. A few scattered scraps that give some idea of the conflict between governor and legislature on passage of a mandatory militia law can be found at *Pennsylvania Archives*, 4th series, 1:706-8, 2:441, 548, 555.

xlv. *Archives of Maryland*, 75:264; Abbot Emerson Smith, *Colonists in Bondage: White Servitude and Convict Labor in America, 1607-1776* (Gloucester, Mass.: Peter Smith, 1965), 239.

xlvi. *Laws of North Carolina—1715*, ch. 46, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 63; Farley Grubb, "The Statutory Regulation of Colonial Servitude: An Incomplete-Contract Approach," *Explorations in Economic History* 37 (January, 2000):69.

xlvii. Public Records Office, Customs 16:85, 109, 171. In 1769: 229,545 pounds; 1770: 410,591; 1771: 390,558 pounds.

xlviii. William J. Novak, "*Salus Populi*: The Roots of Regulation in America, 1787-1873" (Ph.D. diss., Brandeis University, 1992), 188.

xlix. This calculation is necessarily imprecise, but is based on statutes of the time that assumed four pounds of lead for every pound of gunpowder, and a 0.75 caliber Brown Bess: *Archives of Maryland*, 1:77; Matthew Page Andrews, *Tercentenary History of Maryland* (Chicago and Baltimore: S.J. Clarke Publishing Co., 1925), 1:150; Hening, 5:17, 21. Many firearms in Colonial America were smaller caliber, and consequently used less powder, increasing the number of shots that could have been fired. Concerning the claim of gun ownership, storage requirements, and hunting, see generally Bellesiles, *Arming America*.

l. *Public Records of Connecticut*, 1:95, 96.

li. Shurtleff, 1:190.

lii. *Id.*, 1:210.

liii. *Id.*, 2:38.

liv. Bartlett, 1:94.

lv. *Archives of Maryland*, 3:103.

lvi. Bartlett, 1:79.

lvii. Hoadly, 131-32. See *id.*, 122-23, for men fined for failure to bring their guns to church, and Hoadly, 500, for William Paine's request that he be exempted from this requirement, "he lives [far off] and hath three small children, and his wife is lame and cannot help to bring the children."

lviii. Brigham, 70.

lix. *Id.*, 115.

lx. *Id.*, 176.

lxi. August 2, 1619, "Proceedings of the Virginia Assembly, 1619," in Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606-1625* (New York: Charles Scribner's Sons, 1907; reprinted New York: Barnes & Noble, 1959), 273.

lxii. Hening, 1:198.

lxiii. *Id.*, 5:19.

lxiv. David J. McCord, *Statutes at Large of South Carolina* (Columbia, S.C.: A. S. Johnson, 1840), 7:417-19.

lxv. Candler, *The Colonial Records of the State of Georgia*, 19(part 1):137-40.

lxvi. Hening, 1:127, 198.

lxvii. Shurtleff, 1:85.

lxviii. *Id.*, 1:190.

lxix. Bartlett, 1:94.

lxx. *Archives of Maryland*, 3:103.

lxxi. William Bradford, Samuel Eliot Morison, ed., *Of Plymouth Plantation, 1620-1647* (New York: Alfred A. Knopf, 2001), 70.

lxxii. Sydney V. James, Jr., *Three Visitors to Early Plymouth* (Bedford, Mass.: Applewood Books, 1997), 16.

lxxiii. Francis Adams, Jr., ed., *New English Canaan of Thomas Morton* (Boston: The Prince Society, 1883; reprinted New York: Burt Franklin, 1967), 21-28.

lxxiv. Bradford, 204, 206-8, 232-3.

lxxv. Joseph H. Smith, ed., *Colonial Justice in Western Massachusetts (1639-1702): The Pynchon Court Record, An Original Judges' Diary of the Administration of Justice in the Springfield Courts in the Massachusetts Bay Colony* (Cambridge: Harvard University Press, 1961), 208.

lxxvi. *Archives of Maryland*, 3:103.

lxxvii. Shurtleff, 1:196.

lxxviii. *Id.*, 2:24.

lxxix. *Id.*, 3:268.

lxxx. *Id.*, 3:397.

lxxxi. *Public Records of Connecticut*, 1:1, 2.

lxxxii. *Id.*, 1:49.

lxxxiii. *Id.*, 1:182.

lxxxiv. *Id.*, 1:79-80.

lxxxv. *Id.*, 1:113-14, 138, 145-6, 197-8.

lxxxvi. *Id.*, 1:146-7, Richard Lord fined £7 and Thomas Stanton, £5. *Id.*, 1:167, Thomas Lord ordered to appear. *Id.*, 1:242, Captain Sebadoe fined £10.

[lxxxvii]. Smith, 263.

[lxxxviii]. Shurtleff, 4 (part 2):365.

[lxxxix] John E. Soule, Milton E. Terry, and Robert S. Wakefield, comp., *George Soule of the Mayflower and His Descendants for Four Generations*, 3rd ed. (Plymouth, Mass.: General Society of Mayflower Descendants, 1999), 6.

[xc]. *Public Records of Connecticut,* 1:351, 375.

[xci]. Hening, 1:441.

[xcii]. *Id.,* 1:525.

[xciii] *Id.,* 2:215.

[xciv]. *Id.,* 2:336-7.

[xcv]. *Archives of Maryland,* 1:71.

[xcvi]. *Id.,* 1:250.

[xcvii]. *Id.,* 58:420.

[xcviii]. Hening, 2:481.

[xcix]. *Id.,* 4:131.

[c]. *Id.,* 5:17. Indians and blacks to appear unarmed for muster reiterated in 1757. *Id.,* 7:95.

[ci]. *Archives of Maryland,* 75:268.

[cii]. *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Frankllin, 1741), 178.

[ciii]. Candler, *The Colonial Records of the State of Georgia,* 19(part 1):76-78. Essentially identical language appears in the 1755 slave law, *Ibid.,* 18-117-18.

[civ]. J. Franklin Jameson, ed., *Johnson's Wonder-Working Providence: 1628-1651* (New York: Barnes & Noble, Inc., 1959), 175. Shurtleff, 1:211-12, gives the disarming orders.

[cv]. Hening, 2:403.

[cvi]. *Archives of Maryland,* 52:450-1 contains a 1756 militia law that exempts "Papists, the Persons commonly called Neutralls, Servants, and Slaves." See instructions at 52:598 ordering that no soldier be enlisted "Roman Catholic or Deserter, knowing them to be such…." Also discussed at 6:419-20, 9:315-6; 28:315

[cvii]. *Id.,* 52:451-2.

[cviii]. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (Cambridge, Mass.: Harvard University Press, 1994), 123. Britain and Ireland had different laws concerning the disarming of Catholics, with the Irish law somewhat more restrictive on the possession of arms for self-defense. Compare 1 W. & M., ch. 15 (1689) with the Irish law 7 Will, III ch.5 (1695).

[cix]. Joyce Lee Malcolm, "The Right of the People to Keep and Bear Arms: The Common Law Tradition," *Hastings Constitutional. Law Quarterly* 10:310 (1983).

[cx]. *Archives of Maryland,* 25:288-9.

[cxi]. *Id.,* 28:315.

[cxii]. *Id.,* 52:454.

[cxiii]. Candler, *The Colonial Records of the State of Georgia,* 18:190-1.

[cxiv]. Bellesiles, *Arming America,* 73.

[cxv]. Shurtleff, 1:84.

[cxvi]. *Id.,* 1:93.

[cxvii]. *Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford, Conn.: Silas Andrus, 1822), 72-73.

[cxviii]. *Colonial Laws of New York,* 1:52.

[cxix]. *Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England…* (1716), 91-92, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1985, 94.

[cxx]. Hening, 2:304.

[cxxi]. *Id.*, 6:118.

[cxxii]. *Archives of Maryland*, 75:425.

[cxxiii]. *Id.*, 52:452.

[cxxiv]. Shurtleff, 2:31. Shurtleff, 3:187, includes a May 23, 1650 order that the public arms to be sold not include cannon. An October 14, 1651 order at Shurtleff, 3:248, provides for the gift of five publicly owned muskets to inhabitants of Salem and "our present honored Governor."

[cxxv]. Hening, 8:125-6.

[cxxvi]. *Public Records of Connecticut,* 1:29.

[cxxvii]. *Id.*, 1:1, 2.

[cxxviii]. *Id.*, 1:49.

[cxxix]. *Id.*, 1:182, Robert Slye fined £10 for "exchanging a gunn with an Indian," George Hubberd, John West, and Peter Blatchford "for the same" all fined the same amount.

[cxxx]. *Id.*, 1:33.

[cxxxi]. *Id.*, 1:50.

[cxxxii]. Hoadly, *Records Of The Colony And Plantation Of New Haven,* 176-77.

[cxxxiii]. Bellesiles, *Arming America*, 79.

[cxxxiv]. Shurtleff, 5:48-49.

[cxxxv]. Library of Congress, Printed Ephemera Collection; Portfolio 35, Folder 15b.

[cxxxvi]. *Archives of Maryland*, 9:565. Similar offers appear at 31:404, in 1760, and at 56:404 in 1761.

[cxxxvii]. *Public Records of Connecticut,* 14:417-18. See *id.*, 15:188, for a similar measure in December 1775.

[cxxxviii]. *Id.*, 15:97.

[cxxxix]. *Id.*, 14:418-19.

[cxl]. Massachusetts Provincial Congress, *The Journals of Each Provincial Congress of Massachusetts in 1774 and 1775* (Boston: Dutton and Wentworth, 1838), 536-37, 584-93. *Id.*, 584 (107 "small arms"); 585 (13 "guns"); 591 (28 "guns, for the use of the colony, collected by order of Congress").

[cxli]. *Id.*, 210.

[cxlii]. *Id.*, 336-37.

[cxliii]. February 7, 1776, *Colonial Records of Pennsylvania* (Chicago: Library Resources, 1970), 10:478;   February 9, 1776, 10:481; April 9, 1776. 10:537; April 10, 1776, 10:537; July 30, 1776, 10:471; July 24, 1776, 10:653; August 23, 1776, 10:698; November 29, 1775, *Minutes of the Supreme Executive Council of Pennsylvania* (Harrisburg, Penn.: Theo. Fenn & Co., 1852), 10:416-67, 10:550-51, 686-67, 700.

[cxliv]. November 30, 1775, *Min.Sup.Penn.*, 418.

[cxlv]. See March 8, 1776, *American Archives* 4th series, 5:1509 for Baltimore, Maryland's confiscation and compensation of guns.

[cxlvi]. Worthington C. Ford, *et al,*. ed., *Journals of the Continental Congress, 1774-1789* (Washington, D.C., 1904-37), 4:220-21.

[cxlvii]. Richard Frothingham, *History of the Siege of Boston, and of the Battles of Lexington, Concord, and Bunker Hill,* 6th ed. (Boston: 1903), 94-95.

[cxlviii]. Hening, 1:401-2.

[cxlix]. *Archives of Maryland,* 3:103.

[cl]. Brigham, 176.

[cli]. September 6, 1638, Shurtleff, 1:236.

[clii]. Eugene Aubrey Stratton, *Plymouth Colony: Its History & People, 1620-1691* (Salt Lake City: Ancestry Publishing, 1986), 188.

[cliii]. *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay…* (Boston: Albert J. Wright, 1878), 3:305-6.

[cliv]. Candler, *The State Records of the Colony of Georgia,* 18:294-5.

[clv]. Hening, 1:199.

[clvi]. *Id.,* 2:96-97. *Id.,* 3:328, contains a minor revision of this law in 1705.

[clvii]. *Id.,* 3:180.

[clviii]. *Laws and Acts of the General Assembly Of His Majesties Province of Nova Caesarea or New-Jersey…* (William Bradford, 1722), 143-45.

[clix]. *Laws of North Carolina—1738,* ch. 10, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 2:128.

[clx]. Hening, 8:592-3.

[clxi]. *Archives of Maryland,* 3:255.

[clxii]. *Id.,* 1:295-96. Also reiterated in 1654 at 1:351.

[clxiii]. *Id.,* 1:343-44.

[clxiv]. *Id.,* 7:51-52.

[clxv]. Andrew Burnaby, "In the Woods" in Albert Bushnell Hart and Mabel Hill, *Camps and Firesides of the Revolution* (New York: Macmillan Co., 1937), 51. See also J. Franklin Jameson, ed., *Johnson's Wonder-Working Providence: 1628-1651* (New York: Barnes & Noble, Inc., 1959), 85, for what *may* be a description of Indian fire-hunting of deer in seventeenth century New England.

[clxvi]. Hening, 5:62 is a 1738 statute prohibiting fire-hunting by both colonists and Indians. "And if any Indian be found fire-hunting… it shall and may be lawful, for the owner of such land… to take away the gun of such Indian, and the same to keep to his own use." *Id.,* 5:431 again punishes fire-hunting.

*Archives of Maryland,* 28:348-9 is a 1745 statute that prohibits fire-hunting, although it is not explicit that the "hunters" were using guns. *Id.,* 44:21, 36, 39, 173, 180-1, trace the legislative history from the request earlier that year from the backwoods farmers to prohibit fire-hunting and hunting by non-residents to final passage. For reasons not explained, a similar law is debated in 1753 at 50:211 and 251, where it was "referred to the Consideration of next Assembly."

Connecticut's 1733 statute regulating "Firing the Woods" at *Public Records of Connecticut,* 7:456-7, is not explicitly about hunting, nor does it ever mention firearms, but may have been motivated by the same concerns.

[clxvii]. Hening, 3:69.