# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ROME DIVISION

GEORGIACARRY.ORG, INC.,
and DAVID JAMES,

      Plaintiffs,

v.

U.S. ARMY CORPS OF
ENGINEERS and JON
J. CHYTKA, in his official
capacity as Commander,
Mobile District, U.S. Army
Corps of Engineers,

      Defendants.

CIVIL ACTION FILE NO.:
4:14-CV-0139-HLM

---

GEORGIACARRY.ORG, INC., and
BRIAN BARRS,

      Plaintiffs,

v.

CIVIL ACTION FILE NO.
4:15-CV-009-HLM

AO 72A

(Rev. 8/8

(CONSOLIDATED WITH
4:14-CV-0139-HLM)

THE U.S. ARMY CORPS OF
ENGINEERS, and
THOMAS J. TICKNER, in his
official capacity as Commander,
Savannah District of the U.S. Army
Corps of Engineers,

     Defendants.

## ORDER

This case is before the Court on Defendants' Motion for

Summary Judgment [45] and on Plaintiffs' Motion to Strike

[54].[1]

---

[1]In ruling on the instant Motions, the Court has not relied upon the Amicus Curiae Brief and supporting appendix filed by Everytown for Gun Safety (Docket Entry No. 51). Nonetheless, the Court has reviewed Plaintiffs' response to that filing (Docket Entry No. 64).

AO 72A
(Rev.8/8
2)

## I.   Procedural Background

On June 12, 2014, Plaintiffs GeorgiaCarry.org, Inc. ("Plaintiff GCO") and David James ("Plaintiff James") filed this lawsuit, seeking a declaration that 36 C.F.R. § 327.13 (the "Firearms Regulation"), which restricts gun use on Defendant Army Corps of Engineers' ("Defendant Army Corps") property, violates the Second Amendment of the United States Constitution. (Docket Entry No. 1.) Plaintiffs later filed a Motion for Preliminary Injunction, seeking an injunction prohibiting enforcement of the Firearms Regulation. (Docket Entry No. 5.) On August 18, 2014, the Court denied that Motion. GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs, 38 F. Supp. 3d 1365 (N.D. Ga. Aug. 18, 2014) ("GeorgiaCarry II"). Plaintiffs promptly appealed

3

(Docket Entry No. 20), and, on June 9, 2015, the United States Court of Appeals for the Eleventh Circuit affirmed the denial of preliminary injunctive relief and remanded the case to this Court for further proceedings. <u>GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs</u>, 788 F.3d 1318 (11th Cir. 2015) ("<u>GeorgiaCarry III</u>").

On September 4, 2014, Plaintiffs GCO and Brian Barrs ("Plaintiff Barrs") filed an action in the United States District Court for the Southern District of Georgia, challenging the Firearms Regulation as violating the Second Amendment. On January 14, 2015, United States District Judge J. Randal Hall entered an Order transferring that action to this Court. The case was transferred to this Court and assigned to the undersigned.

AO 72A
(Rev.8/8

Defendants moved to consolidate the two cases, and, on February 18, 2015, the Court entered an Order consolidating the two actions.  (Order of Feb. 18, 2015 (Docket Entry No. 28).)   On December 23, 2015, Defendants filed their Motion for Summary Judgment. (Docket Entry No. 45.)  On March 9, 2016, Plaintiffs filed their Motion to Strike.  (Docket Entry No. 54.)  The briefing processes for both Motions are complete, and the Court finds that the matters are ripe for resolution.

## II.   Motion to Strike

Plaintiffs have moved to strike the bulk of the administrative records (the "ARs") filed in this case.[2]  (See

_____

[2]Defendants filed three ARs in this case: (1) the HQ AR, which relates to the Firearms Regulation (Docket Entry No. 38); (2) the SAS AR, which relates to Plaintiff Barrs (Docket Entry No. 40); and (3) the SAM AR, which relates to Plaintiff James (Docket Entry No.

AO 72A

(Rev.8/8

generally Br. Supp. Mot. Strike (Docket Entry No. 54-1).)

Plaintiffs argue that most of the documents filed by

Defendants in the three ARs are irrelevant to Plaintiffs'

facial challenge to the Firearms Regulation.  (Id. at 2-3.)

Plaintiffs also challenge the certifications for certain ARs.

(Id. at 3-5.)   Further, Plaintiffs contend that "[i]t is a

fundamental denial of due process for an administrator to

deny a petition based on a record of which the petitioner

was given no notice." (Id. at 5.)

"The complete administrative record consists of all

documents and materials directly or indirectly considered by

the agency." Bar MK Ranches v. Yuetter, 994 F.2d 735,

739 (10th Cir. 1993).  "Documents and materials indirectly

───────────────

39).

6

considered by agency decision-makers are those that may not have literally passed before the eyes of the decision-makers, but were so heavily relied on in the recommendation that the decisionmaker constructively considered them." <u>Georgia River Network v. U.S. Army Corps of Eng'rs</u>, No. 4:10-CV-267, 2012 WL 930325, at *5 (S.D. Ga. Mar. 19, 2012), <u>aff'd</u>, 517 F. App'x 699 (11th Cir. 2013) (internal quotation marks and citations omitted). "[T]he designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity." <u>Yuetter</u>, 994 F.2d at 740; <u>see also</u> <u>Georgia Aquarium, Inc. v. Pritzker</u>, No. 1:13-CV-3241-AT, 2014 WL 10463747, at *2 (N.D. Ga. Dec. 16, 2014) ("[A]bsent clear evidence, an agency is entitled to

7

a strong presumption of regularity, that it properly designated the administrative record." (alteration in original) (internal quotation marks and citation omitted)). "The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary." <u>Yuetter</u>, 994 F.2d at 740; <u>see also Georgia Aquarium, Inc.</u>, 2014 WL 10463747, at *6 ("The burden rests with Georgia Aquarium to establish by clear evidence that NMFS has failed to properly designate the Administrative Record."); <u>Georgia River Network</u>, 2012 WL 930325, at *5 ("The burden rests with Plaintiffs to establish by clear evidence that the Corps has failed to properly designate the record.").

Here, Plaintiffs failed to show by clear evidence that Defendants failed to designate the ARs properly, and they

8

failed to cite any authority supporting their contention that the materials at issue in the Motion to Strike do not belong within the ARs. As such, Plaintiffs are not entitled to an Order striking any portions of the ARs.

Plaintiffs also argue that Defendants' certifications accompanying the ARs are inadequate. As an initial matter, courts "have held that there is no legal authority compelling the defendants to certify an administrative record in the first instance." Banner Health v. Sebelius, 945 F. Supp. 2d 1, 18 (D.D.C. May 16, 2013), vacated in part on other grounds, No. CV 10-01638 (CKK), 2013 WL 11241368 (D.D.C. July 30, 2013). Plaintiffs here failed to cite "any authority for the proposition that purportedly inadequately worded certification–or even the complete absence of a

9

certification–defeats the presumption of regularity to which the administrative record is entitled, and this Court has found none." Id.  In any event, "[a]n agency's designation and certification of the administrative record is treated like other established administrative procedures, and thus entitled to a presumption of administrative regularity." McCrary v. Gutierrez, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. July 13, 2007).  "Accordingly, [i]n the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties.'" Id. (alterations in original) (internal quotation marks and citation omitted).  Plaintiffs provided no clear evidence to support their contention that the officers who certified the

10

ARs did so improperly, and they have not overcome the presumption of administrative regularity.

To the extent that Plaintiffs claim that they suffered due process violations because they had no notice of portions of the ARs on which Defendants relied, Plaintiffs provided no legal or factual support for this contention.[3]   The Court therefore does not address it.  See Yuetter, 994 F.2d at 739 n.3 ("Plaintiffs state that their due process rights were violated because they were denied the opportunity to address some of the evidence on which the Forest Service

_____

[3]In their brief, Plaintiffs state: "The due process aspect will be discussed in further detail in Plaintiffs' brief in opposition to the Government's motion for summary judgment."  (Br. Supp. Mot. Strike at 5.)  Plaintiffs' brief in opposition to the Motion for Summary Judgment, however, does not address the purported due process issues.  (See generally Br. Opp. Mot. Summ. J. (Docket Entry No. 55).)

11

relied.  We do not address this claim, however, because Plaintiffs provide no legal or factual support for this assertion.").

Finally, to the extent that Plaintiffs claim that the length of the ARs was burdensome, the proper remedy for that issue was to request an extension of time to respond to the Motion for Summary Judgment.  Plaintiffs made no such request here, and, given that Plaintiffs had nearly four months in which to review the ARs before filing their response to the Motion for Summary Judgment, this argument does not entitle Plaintiffs to an Order striking the ARs.

12

AO 72A
(Rev.8/8
2)

In sum, the Court finds that Plaintiffs are not entitled to an Order striking any portion of the ARs.   The Court therefore denies the Motion to Strike.

## III.   Motion for Summary Judgment

### A.   Background

Keeping in mind that, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts.   <u>Strickland v. Norfolk S. Ry. Co.</u>, 692 F.3d 1151, 1154 (11th Cir. 2012).   This statement does not represent actual findings of fact.   <u>Rich v. Sec'y, Fla. Dep't of Corr.</u>, 716 F.3d 525, 530 (11th Cir. 2013).   Instead, the Court has provided the statement simply to place the

13

Court's legal analysis in the context of this particular case or controversy.

As required by the Local Rules, Defendants filed a Statement of Undisputed Material Facts ("DSMF"). (Docket Entry No. 45-2.)   As also required by the Local Rules, Plaintiffs filed a response to DSMF ("PRDSMF").   (Docket Entry No. 55-1.) The Court addresses DSMF and PRDSMF infra.

## 1.   General Information

Defendant Army Corps manages 422 projects, mostly lakes, in forty-two states and is the steward of twelve million acres of land and water used for recreation, with 54,879 miles of shoreline.   (DSMF ¶ 1; PRDSMF ¶ 1.)   Most of Defendant Army Corps' projects are located near population

14

AO 72A
(Rev.8/8

centers, and the projects often are designed with the express purposes of protecting population centers from flooding, providing hydroelectric power, improving navigation, and providing nearby developed, as well as dispersed, recreation and quality natural resources for the local populations. (SAM AR 121.) Roughly eighty percent of Defendant Army Corps' recreation areas are located within fifty miles of an urban area. (HQ AR 3990; SAM AR 18.) Defendant Army Corps' projects include some of the most densely-used federal recreation areas, and receive more than 370 million visits per year, making the projects the most-visited of any single federal agency's sites. (SAS AR 20; HQ AR 1273; SAM AR 125, 133.) Indeed,

15

Defendant Army Corps hosts the most visits per acre of any federal resource management agency.  (SAM AR 125.)[4]

The U.S. Department of Homeland Security's Office of Inspector General characterized "[d]ams and related structures," including those operated and managed by Defendant Army Corps, as "critical infrastructure," noting that "one catastrophic failure at some locations could affect populations exceeding 100,000 and have economic consequences surpassing $10 billion."  (SAM AR 64.) Defendant Army Corps and the U.S. Department of Homeland Security regard some Defendant Army Corps' infrastructure, including multi-purpose dams and major

---

[4]In contrast, much of the land managed by the National Park Service and the U.S. Forest Services is remote and often minimally developed.  (SAM AR 121.)

16

navigation locks, as critical to homeland security and the economy.  (SAM AR 20.)  The Congressional Research Service has noted that many of those Defendant Army Corps-managed facilities require additional protective measures in times of heightened homeland security concerns.  (SAM AR 20.)

According to Defendant Army Corps, public safety on Defendant Army Corps-managed lands is of paramount importance to Defendant Army Corps, and provides the basis for policies, rules, and regulations concerning visitor behavior at Defendant Army Corps projects.  (HQ AR 877.) The primary focus of Defendant Army Corps' recreation mission is to provide safe and healthy outdoor experiences at Defendant Army Corps' projects.  (SAS AR 461.)

17

Some sources of conflict among visitors to lands managed by Defendant Army Corps include alcohol consumption, overcrowded facilities, visitors' preferences for different types of music played at different sound levels, and the relative loudness of visitors' conversations. (DSMF ¶ 13; PRDSMF ¶ 13.) Defendants point to a number of surveys in which Defendant Army Corps' Park Rangers reported that: (1) individuals under the influence of alcohol or drugs, fights and disorderly conduct, and vandalism were major challenges or threats, and that theft and domestic violence also were concerns (SAM AR 85, 102, 114-115); (2) Park Rangers had experienced verbal abuse and threats, with a relatively small percentage being threatened with a visible weapon, and a small percentage suffering

18

physical contact or battery (SAM AR 85, 104-05); and (3) a majority of the Park Rangers were aware of a visitor being physically or verbally abused or threatened in the prior twelve months, and the majority of those incidents involved drugs and alcohol (SAM AR 106). Defendant Army Corps Park Rangers are not authorized to carry firearms, to execute search warrants, or to enforce any federal laws with the exception of issuing citations for violations of regulations governing Defendant Army Corps-managed lands. (HQ AR 607, 1273; SAM AR 20.)

Defendant Army Corps' law enforcement agreements with local law enforcement can be used to obtain increased law enforcement services to meet needs during a peak visitation period, which is defined as any period during the

19

year when visitation is sufficiently high to cause significant

increase in risk to visitor welfare, as determined by the

applicable district or project office. (DSMF ¶ 27; PRDSMF

¶ 27.)

Restrictions on firearms use in Defendant Army Corps'

reservoir areas date to at least 1946. (SAM AR 1149.)

## 2.    The Allatoona Lake Property

The construction of Allatoona Lake was approved by

the United States Congress in the Flood Control Acts of

1941 and 1946, for the purposes of flood control and power

generation. (DSMF ¶ 29; PRDSMF ¶ 29.) Construction of

the dam at Allatoona Lake was completed in 1950. (DSMF

¶ 29; PRDSMF ¶ 29.) Later legislation authorized fish and

wildlife management, streamflow regulation, water supply,

20

AO 72A

(Rev.8/8

and recreation as project purposes. (DSMF ¶ 29; PRDSMF ¶ 29.)   The Allatoona Lake property serves seven authorized purposes: flood control; hydroelectric power generation; water supply; recreation; fish and wildlife management; water quality; and navigation. (DSMF ¶ 30; PRDSMF ¶ 30.)

The Allatoona Lake property lies mostly in southwestern Cherokee County, Georgia, with a significant portion of the property located in southeastern Bartow County, while a small portion of the property is located in Cobb County. (DSMF ¶ 31; PRDSMF ¶ 31.) The Allatoona Lake property is located approximately thirty miles from Atlanta, Georgia.   (DSMF ¶ 32; PRDSMF ¶ 32.)   The Allatoona Lake property consists of approximately 25,747

21

land acres, 12,010 water acres, and 270 miles of shoreline. (DSMF ¶ 33; PRDSMF ¶ 33.)

The Allatoona Lake property is one of the most frequently visited Defendant Army Corps' lakes in the United States.  (DSMF ¶ 34; PRDSMF ¶ 34.)  During fiscal year 2012, 6,175,062 people visited the Allatoona Lake property. (DSMF ¶ 35; PRDSMF ¶ 35.)  During fiscal year 2011, 6,004,769 people visited the Allatoona Lake property. (DSMF ¶ 36; PRDSMF ¶ 36.)

In 1998, the Allatoona Lake property reported 86,813,126 visitor hours, representing more visitor hours than any of the 450 other Defendant Army Corps projects in the United States.  (DSMF ¶ 38; PRDSMF ¶ 38.)  In 2006,

22

the Allatoona Lake property reported more than ninety-two million visitor hours.  (DSMF ¶ 37; PRDSMF ¶ 37.)

As of 1998, forty-five percent of the shoreline in the Allatoona Lake property, consisting of 122 miles of shoreline, was allocated to public recreation areas.  (DSMF ¶ 42; PRDSMF ¶ 42.)  During fiscal year 2012, the major activities that people visiting the Allatoona Lake property engaged in included: (1) swimming (2,667,530 visitors); (2) boating (1,881,516 visitors); (3) fishing (883,474 visitors); (4) picnicking (764,509 visitors); (5) sightseeing (161,307 visitors); (6) water skiing (137,937 visitors); (7) camping (110,789 visitors); (8) hunting (33,968 visitors); and (9) other activities (972,721 visitors).  (DSMF ¶ 39; PRDSMF ¶ 39.)

23

AO 72A
(Rev.8/8

Campgrounds on the Allatoona Lake property are subject to a number of rules and restrictions. (DSMF ¶ 43; PRDSMF ¶ 43.) The McKaskey Creek Campground, where Plaintiff James alleges that he camps in a tent several weeks per year, is roughly twelve square miles in area and is located in Bartow County. (DSMF ¶ 44; PRDSMF ¶ 44.) The operating season for the McKaskey Creek Campground generally runs from the end of March to the beginning of September. (DSMF ¶ 45; PRDSMF ¶ 45.) The McKaskey Creek Campground has fifty-one campsites. (DSMF ¶ 46; PRDSMF ¶ 46.) The McKaskey Creek Campground is one of nine managed campgrounds within the Allatoona Lake property. (DSMF ¶ 47; PRDSMF ¶ 47.)

24

Between March 22 and September 3, 2013, 8,220 people made reservations to use the campsites in the McKaskey Creek Campground, staying an average of 2.56 days.  (DSMF ¶ 48; PRDSMF ¶ 48.)  Between March 21 and September 2, 2014, 8,736 people made reservations to use the campsites in the McKaskey Creek Campground, staying an average of 2.75 days.  (DSMF ¶ 49; PRDSMF ¶ 49.)  Between March 20 and September 8, 2015, 5,224 people made reservations to use the campsites in the McKaskey Creek Campground, staying an average of 2.61 days.  (DSMF ¶ 50; PRDSMF ¶ 50.)

During fiscal year 2011, the Allatoona Lake property was staffed by fifteen Defendant Army Corps Park Rangers.  (DSMF ¶ 41; PRDSMF ¶ 41.)  Between January 1, 2013

AO 72A

(Rev.8/8

and December 31, 2014, Defendant Army Corps Park Rangers at the Allatoona Lake property reported issuing two citations for violations of the Firearms Regulation. (DSMF ¶ 51; PRDSMF ¶ 51.) Neither of those two citations were issued in the McKaskey Creek Campground. (DSMF ¶ 51; PRDSMF ¶ 51.)

The Allatoona Dam is located roughly twelve miles south of the McKaskey Creek Campground, and is in Bartow County. (DSMF ¶ 52; PRDSMF ¶ 52.) The Allatoona Dam is 1250 feet long at the roadway level, and has an elevation above the roadway of 880 feet. (DSMF ¶ 53; PRDSMF ¶ 53.) Public access to the area near the Allatoona Dam is restricted due to security concerns. (DSMF ¶ 54; PRDSMF ¶ 54.)

26

AO 72A
(Rev.8/8

In 2012, the sheriff's office or county police department of Bartow County reported to the Federal Bureau of Investigation (the "FBI") the following offenses that occurred in their jurisdiction: (1) 329 violent crimes; (2) thirteen incidents of forcible rape; (3) twenty-four robberies; (4) 292 aggravated assaults; (5) 2,726 property crimes; (6) 821 burglaries; (7) 1,703 incidents of larceny or theft; and (8) 202 motor vehicle thefts.  (DSMF ¶ 55; PRDSMF ¶ 55.)  In 2011, the Bartow County sheriff's office or county police department reported to the FBI the following offenses that occurred in their jurisdiction: (1) 241 violent crimes; (2) two murders or non-negligent manslaughters; (3) seven incidents of forcible rape; (4) thirty-seven robberies; (5) 195 aggravated assaults; (6) 2,841 property crimes; (7) 805

27

burglaries; (8) 1,845 incidents of larceny or theft; and (9) 191 motor vehicle thefts. (DSMF ¶ 56; PRDSMF ¶ 56.)

In 2010, the Bartow County sheriff's office or county police department reported to the FBI the following offenses that occurred in their jurisdiction: (1) 224 violent crimes; (2) one murder or non-negligent manslaughter; (3) twenty-three incidents of forcible rape; (4) thirty-four robberies; (5) 166 aggravated assaults; (6) 2,470 property crimes; (7) 740 burglaries; (8) 1,515 incidents of larceny or theft; and (9) 215 motor vehicle thefts. (DSMF ¶ 57; PRDSMF ¶ 57.) In 2009, the Bartow County sheriff's office or county police department reported to the FBI the following offenses that occurred in their jurisdiction: (1) 190 violent crimes; (2) four murders or non-negligent manslaughters; (3) nineteen

AO 72A
(Rev.8/8

incidents of forcible rape; (4) twenty-nine robberies; (5) 138 aggravated assaults; (6) 2,430 property crimes; (7) 691 burglaries; (8) 1,520 incidents of larceny or theft; and (9) 219 motor vehicle thefts.  (DSMF ¶ 58; PRDSMF ¶ 58.)

Restrictions on firearms use at the Allatoona Lake property date back to 1950.  (DSMF ¶ 60; PRDSMF ¶ 60.)

### 3.   Lake Thurmond Property

Construction of Defendant Army Corps' Lake Thurmond project was approved by Congress in the Flood Control Act of 1944.   (DSMF ¶ 61; PRDSMF ¶ 61.) Construction of the Thurmond Dam was completed in 1954. (DSMF ¶ 61; PRDSMF ¶ 61.)  The Lake Thurmond property is located primarily in Columbia, Lincoln, and McDuffie Counties in Georgia, and in McCormick County, South

29

Carolina.  (DSMF ¶ 62; PRDSMF ¶ 62.)  Smaller portions of the property extend into Warren, Wilkes, and Elbert Counties in Georgia, as well as into Abbeville County in South Carolina.  (DSMF ¶ 62; PRDSMF ¶ 62.)  Authorized purposes for the Lake Thurmond property include flood control, downstream navigation, hydroelectric power production, recreation, water quality and supply, and fish and wildlife management.  (DSMF ¶ 63; PRDSMF ¶ 63.)

As of 1995, the Lake Thurmond property had a water surface area of approximately 71,100 acres and a land base of 75,237 acres.  (DSMF ¶ 65; PRDSMF ¶ 65.)  As of 2001, fifteen percent of the shoreline in the Lake Thurmond property was allocated to public recreation areas.  (DSMF ¶ 66; PRDSMF ¶ 66.)  As of 1995, 18.3 percent of the total

30

land area in the Lake Thurmond property is classified as recreational.  (DSMF ¶ 67; PRDSMF ¶ 67.)

Mistletoe State Park, which Plaintiff Barrs alleges he visits frequently during the summer months, is a 1,920 acre park operated by the State of Georgia on the Lake Thurmond property.    (DSMF ¶ 68; PRDSMF ¶ 68.) Defendant Army Corps leases the 1,920 acres that make up Mistletoe State Park to the State of Georgia.  (DSMF ¶ 69; PRDSMF ¶ 69.) Mistletoe State Park is located in Columbia County, Georgia.  (DSMF ¶ 70; PRDSMF ¶ 70.)  As of 1995, Mistletoe State Park contained twenty rental cottages, 107 campsites with electricity, thirty-five primitive campsites, 272 picnic sites, eight picnic shelters, and one reserved group picnic shelter.    (DSMF ¶ 71; PRDSMF ¶ 71.)

AO 72A
(Rev.8/8

Mistletoe State Park also contained boat launching ramps, a beach and bathhouse, playgrounds, a nature trail, an observation tower, a telephone, and a small concession area.  (DSMF ¶ 71; PRDSMF ¶ 71.)

The J. Strom Thurmond Dam, also known as the Clarks Hill Dam (the "Thurmond Dam"), is located in McCormick County, Georgia, and is roughly ten miles west of Mistletoe State Park.  (DSMF ¶ 73; PRDSMF ¶ 73.)  The Thurmond Dam has a maximum height of 200 feet, and it is 5,680 feet long.  (DSMF ¶ 74; PRDSMF ¶ 74.)  The area surrounding the Thurmond Dam is a restricted area enclosed by a fenced area, to which public access is generally restricted. (DSMF ¶ 75; PRDSMF ¶ 75.)

32

AO 72A
(Rev.8/8

The Columbia County sheriff's department conducts regular patrols of the Lake Thurmond property located in Columbia County. (DSMF ¶ 72; PRDSMF ¶ 72.) In 2013, the Columbia County sheriff's office or county police department reported to the FBI the following offenses that occurred in their jurisdiction: (1) fifty-eight violent crimes; (2) one murder or non-negligent manslaughter; (3) eleven incidents of rape; (4) seventeen robberies; (5) twenty-nine aggravated assaults; (6) 2,054 property crimes; (7) 287 burglaries; (8) 1,695 incidents of larceny or theft; (9) seventy-two motor vehicle thefts; and (10) six arson incidents. (DSMF ¶ 76; PRDSMF ¶ 76.) In 2012, the Columbia County sheriff's office or county police department reported to the FBI the following offenses that occurred in

33

their jurisdiction: (1) sixty-eight violent crimes; (2) one murder or non-negligent manslaughter; (3) ten incidents of forcible rape; (4) twenty robberies; (5) thirty-seven aggravated assaults; (6) 2,297 property crimes; (7) 396 burglaries; (8) 1,804 incidents of larceny or theft; (9) ninety-seven motor vehicle thefts; and (10) eleven arson incidents. (DSMF ¶ 77; PRDSMF ¶ 77.)  In 2011, the Columbia County sheriff's office or county police department reported to the FBI the following offenses that occurred in their jurisdiction: (1) ninety-four violent crimes; (2) four murders or non-negligent manslaughters; (3) nineteen incidents of forcible rape; (4) twenty robberies; (5) fifty-one aggravated assaults; (6) 2,438 property crimes; (7) 452 burglaries; (8) 1,900 incidents of larceny or theft; (9) eighty-six motor

34

vehicle thefts; and (10) ten arson incidents.  (DSMF ¶ 78; PRDSMF ¶ 78.)   In 2010, the Columbia County sheriff's office or county police department reported to the FBI the following offenses that occurred in their jurisdiction: (1) seventy-two violent crimes; (2) one murder or non-negligent manslaughter; (3) ten incidents of forcible rape; (4) fifteen robberies;  (5)  forty-six  aggravated  assaults;  (6)  2,323 property crimes; (7) 376 burglaries; (8) 1,860 incidents of larceny or theft; (9) eighty-seven motor vehicle thefts; and (10) nine arson incidents.  (DSMF ¶ 79; PRDSMF ¶ 79.)  In 2009, the Columbia County sheriff's office or county police department reported to the FBI the following offenses that occurred in their jurisdiction: (1) 119 violent crimes; (2) four murders  or  non-negligent  manslaughters;  (3)  fourteen

35

incidents of forcible rape; (4) forty-two robberies; (5) fifty-nine aggravated assaults; (6) 2,269 property crimes; (7) 353 burglaries; (8) 1,795 incidents of larceny or theft; (9) 121 motor vehicle thefts; and (10) six arson incidents.  (DSMF ¶ 80; PRDSMF ¶ 80.)

Between 2000 and 2014, Defendant Army Corps issued no citations and four warnings at the Thurmond Lake property for violations of the Firearms Regulation.  (DSMF ¶ 81; PRDSMF ¶ 81.)  Between 2000 and 2014, Defendant Army Corps issued thirty-one citations and 224 warnings at the Thurmond Lake property for violations of its project restrictions.  (DSMF ¶ 82; PRDSMF ¶ 82.)  Between 2000 and 2014, Defendant Army Corps issued no citations or warnings at the Thurmond Lake property for interference

36

with Defendant Army Corps Park Rangers.  (DSMF ¶ 83; PRDSMF ¶ 83.)

Restrictions on firearms use at the Thurmond Lake project date back to 1951.  (DSMF ¶ 84; PRDSMF ¶ 84.)

Approximately five million people visited the Lake Thurmond property each year between 2008 and 2012. (DSMF ¶ 64; PRDSMF ¶ 64.)

## B.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) allows a court to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of showing the Court that summary judgment is appropriate

AO 72A
(Rev.8/8
2)

and may satisfy this burden by pointing to materials in the record. <u>Jones v. UPS Ground Freight</u>, 683 F.3d 1283, 1292 (11th Cir. 2012).  Once the moving party has supported its motion adequately, the burden shifts to the non-movant to rebut that showing by coming forward with specific evidence that demonstrates the existence of a genuine issue for trial. <u>Id.</u>

When evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion.  <u>Morton v. Kirkwood</u>, 707 F.3d 1276, 1280 (11th Cir. 2013); <u>Strickland</u>, 692 F.3d at 1154.  The Court also must "'resolve all reasonable doubts about the facts in favor of the non-movant.'" <u>Morton</u>, 707 F.3d at 1280

AO 72A
(Rev.8/8
2)

(internal quotation marks and citations omitted).  Further,

the Court may not make credibility determinations, weigh

conflicting evidence to resolve disputed factual issues, or

assess the quality of the evidence presented.  Strickland,

692 F.3d at 1154.  Finally, the Court does not make factual

determinations. Rich, 716 F.3d at 530.

## C.   Discussion

### 1.   As-Applied Challenge[5]

The  Supreme  Court's  2008  decision  in  District  of

Columbia v. Heller made clear that the Second Amendment

_____

[5]Though not raised by the Parties, as a threshold issue, the
Court notes that all Plaintiffs have standing to challenge the
Firearms Regulation because "Plaintiffs are seriously interested in
engaging in conduct that is arguably prohibited by the [Firearms
Regulation] and that could give rise to prosecution by [federal]
authorities." See GeorgiaCarry.Org v. Georgia, 687 F.3d
1244,1252-53 (11th Cir. 2012) ("GeorgiaCarry I").

AO 72A
(Rev.8/8

encompasses an individual right to keep and bear arms.[6]

See District of Columbia v. Heller, 554 U.S. 570, 635 (2008)

("[The Second Amendment] elevates above all other

interests the right of law-abiding, responsible citizens to use

arms in defense of hearth and home."). Further, Heller left

little doubt that laws banning "handgun possession in the

home" are in violation of the Second Amendment. (Id.)

---

[6]In McDonald v. City of Chicago, Ill., the Supreme Court ruled that the Fourteenth Amendment made the Second Amendment applicable to the states. See McDonald v. City of Chicago, Ill., 561 U.S. 742, 791 (2010) ("[T]he Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller."). No state laws, however, are at issue in this case. Further, McDonald did not actually invalidate any law. Id. at 791. Instead, McDonald remanded the case for further proceedings after incorporating the Second Amendment right recognized in Heller to the States. Id.

Most recently, in Caetano v. Massachusetts, No. 14-10078, 577 U.S. ---, 2016 WL 1078932 (U.S. Mar. 21, 2016), the Supreme Court concluded that a state law banning possession of a stun gun violated the Second Amendment. This case, however, does not involve a stun gun.

40

However, the extent to which the Second Amendment protects individuals seeking to carry firearms outside the home, and the framework by which courts are to evaluate laws regulating firearm possession, remains unclear. See id. at 718 (Breyer, J., dissenting) ("The [majority] decision will encourage legal challenges to gun regulation throughout the Nation. Because it says little about the standards used to evaluate regulatory decisions, it will leave the Nation without clear standards for resolving those challenges.").

Despite this lack of guidance from the Supreme Court, the Eleventh Circuit, along with most other circuits to address the issue, has adopted a two step approach to evaluating Second Amendment challenges. See GeorgiaCarry III, 788 F.3d at 1324 ("In evaluating a Second

41

Amendment claim like the one before us, we would typically engage in the two-step analysis adopted in [GeorgiaCarry I]: (1) Is the restricted activity protected by the Second Amendment in the first place? (2) If so, does it pass muster under the appropriate level of scrutiny?"); GeorgiaCarry I, 687 F.3d at 1261 n.34 ("Like our sister circuits, we believe a two-step inquiry is appropriate: first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny."); see also Ezell v. City of Chicago, 651 F.3d 684, 700-704 (7th Cir. 2011) (applying two step framework); Jackson v. City & Cnty. of San Francisco, 746 F.3d 953, 960 (9th Cir. 2014) ("Like the majority of our sister circuits, we have discerned from

42

<u>Heller</u>'s approach a two-step Second Amendment inquiry.").

"First, the threshold inquiry in some Second Amendment

cases will be a 'scope' question: Is the restricted activity

protected by the Second Amendment in the first place?"

<u>Ezell</u> 651 F.3d at 701. Second, if the regulated activity is not

categorically unprotected, "there must be a second inquiry

into the strength of the government's justification for

restricting or regulating the exercise of Second Amendment

rights." <u>Id.</u> at 703. The scrutiny applied "will depend on how

close the law comes to the core of the Second Amendment

right and the severity of the law's burden on the right." <u>Id.</u>

The Court applies this framework below.[7]

---

[7]The Complaint filed by Plaintiffs GCO and James requests a declaration that the Firearms Regulation is "unconstitutional on its face and as applied." (Compl. (Docket Entry No. 1) ¶ 36.)  On appeal from the denial of Plaintiffs GCO and James' Motion for

43

### a.   The Firearms Regulation Does Not Burden a Pre-existing Right

To determine whether the Firearms Regulation burdens

a pre-existing right, courts are instructed to make "a textual

and historical inquiry into original meaning." Ezell 651 F.3d

at 701. In other words, the framework adopted by the

_____

Preliminary Injunction, the Eleventh Circuit noted:

> The plaintiffs characterize their challenge as both facial
> and as-applied, but we agree with the district court that
> it must be considered as-applied.  The plaintiffs never
> explain why the regulation would be unconstitutional
> even if the district commander had granted permission
> to carry a weapon pursuant to 36 C.F.R. § 327.13(a)(4).
> Thus, as the district court explained, the "[p]laintiffs do
> not attempt to establish that no set of circumstances
> exists under which the [regulation] would be valid," as
> required for a facial challenge.

GeorgiaCarry III, 788 F.3d at 1323 n.3 (alterations in original)
(citations omitted).  The individual Plaintiffs' facial challenge to the
Firearms Regulation fares no better at the summary judgment
stage, and the Court treats their challenge solely as an "as-applied"
challenge.  The Court addresses Plaintiff GCO's facial challenge
infra.

44

country's appellate courts requires this Court to determine whether, in 1791, there was a widely accepted right to carry firearms on Defendant Army Corps' property.[8] See Heller, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" (emphasis omitted).) For the following

---

[8]The Court finds that the pre-existing right encompassed by the Second Amendment was not free from locational restrictions. See Heller, 554 U.S. at 626 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). The Court addresses such limitations in the context of Defendant Army Corps' property below.

45

reasons, the Court once again finds it highly unlikely that any such right existed.

"When Congress organized the Continental Army on June 16, 1775, it provided for a Chief Engineer and two assistants with the Grand Army and a Chief Engineer and two assistants in a separate department, should one be established." U.S. ARMY CORPS OF ENGINEERS OFFICE OF HISTORY, THE U.S. ARMY CORPS OF ENGINEERS: A HISTORY 1 (2008) (hereinafter, "Army Corps History"). During the revolutionary war, "Engineer officers reconnoitered enemy positions and probable battlefields, wrote useful reports based on their observations, oversaw the construction of fortifications, and drew detailed maps for commanders." Id. at 2. In the years following the Revolutionary War, there was

46

much debate in the country about the necessity of a large standing army, and the use of engineering corps was limited to temporary assignments to upgrade old coastal fortifications and occasionally to build new ones. Id. at 7. However, "[o]n March 16, 1802, Congress permanently established a separate U.S. Army Corps of Engineers and the U.S. Military Academy at West Point as the Nation's first engineering school." Id. at 8.

During the War of 1812, "the engineers performed many of the same tasks they had in the Revolution, including constructing fortifications, reconnoitering and mapping, and assisting the movement of armies." Army Corps History at 12. However, "fortifications were the

47

AO 72A
(Rev.8/8

primary concern of the engineers during the War of 1812, as they had been earlier." Id.

Though primarily concerned with defense related projects, Defendant Army Corps' role began to encompass civil works at an early stage in its history. For example, in 1800, "Secretary of War James McHenry . . . suggested that engineer officers possess talents that serve the country not only in war, but also in peacetime 'works of a civil nature.'" Army Corps History at 241. However, it was still clear that Defendant Army Corps was, first and foremost, a branch of the United States military. For example, "[m]ail intended for the Chief Engineer was sent under cover to the Secretary of War with the words 'Engineer Department' written on the lower left-hand corner of the envelope." Id. Oversight of

48

Defendant Army Corps was also entrusted to the cabinet official overseeing the United States Army. Id. Finally, many congressional acts mandating that Defendant Army Corps carry out civil works activities "explicitly mandated that the Secretary of War supervise the expenditure of appropriated funds." Id. at 243.

Much like the firearms that were initially protected by the Second Amendment have evolved over the years, the role of Defendant Army Corps has changed to suit the country's needs. For example, it may have been hard for the framers to comprehend a wilderness "recreational facility" at all, much less one owned and operated by the federal government. Nonetheless, the Flood Control Act of 1944 authorized Defendant Army Corps to "construct,

49

maintain, and operate public park and recreational facilities

at water resource development projects under the control of

the Department of the Army." 16 U.S.C. § 460d.

However, despite this evolution, Defendant Army Corps

is still an integral part of the United States Armed Forces.

See 10 U.S.C. § 3063(a)(4) ("The Secretary of the Army

may assign members of the Army to its basic branches. The

basic branches [include] . . . [the] Corps of Engineers.").

Though much of Defendant Army Corps' modern day work

is on civil projects, those projects, including the flood control

project that led to the creation of Allatoona Lake, are

regularly overseen by the Secretary of the Army. See 33

U.S.C. § 701b ("Federal investigations and improvements

of rivers and other waterways for flood control and allied

AO 72A
(Rev.8/8

purposes shall be under the jurisdiction of and shall be prosecuted by the Department of the Army under the direction of the Secretary of the Army and supervision of the Chief of Engineers.").

Moreover, it cannot be overlooked that the existence of Defendant Army Corps' "recreational facilities" is merely a byproduct of the sensitive dam construction projects nearby. Indeed, those projects often are designed with the express purposes of protecting population centers from flooding, providing hydroelectric power, improving navigation, and providing nearby developed, as well as dispersed, recreation and quality natural resources for the local populations. (SAM AR 121.) These dams and other infrastructure works, just like the fortifications built by

51

Defendant Army Corps during the founding era of our
country, are vitally important to our national security and
well being. (See id. at 64 (consisting of a document in which
the U.S. Department of Homeland Security's Office of
Inspector General characterized "[d]ams and related
structures," including those operated and managed by
Defendant Army Corps, as "critical infrastructure," noting
that "one catastrophic failure at some locations could affect
populations exceeding 100,000 and have economic
consequences surpassing $10 billion"); see also id. at 20
(reflecting that Defendant Army Corps and the U.S.
Department of Homeland Security regard some Defendant
Army Corps' infrastructure, including multi-purpose dams
and major navigation locks, as critical to homeland security

52

and the economy, and noting that many of those Defendant Army Corps-managed facilities require additional protection measures in times of heightened homeland security concerns).) Simply put, the Court cannot fathom that the framers of the Constitution would have recognized a civilian's right to carry firearms on property owned and operated by the United States Military, especially when such property contained infrastructure products central to our national security and well being.

The Allatoona Lake and Thurmond Lake projects are no exception. As the Court previously noted, Allatoona Lake was approved for the purposes of flood control and power generation. (DSMF ¶ 29; PRDSMF ¶ 29.) Later legislation authorized fish and wildlife management,

AO 72A

(Rev. 8/8

streamflow regulation, water supply, and recreation as project purposes. (DSMF ¶ 29; PRDSMF ¶ 29.) The Allatoona Lake property serves seven authorized purposes: flood control; hydroelectric power generation; water supply; recreation; fish and wildlife management; water quality; and navigation. (DSMF ¶ 30; PRDSMF ¶ 30.) The Allatoona Lake property is located approximately thirty miles from Atlanta, Georgia, a major population center, and consists of approximately 25,747 land acres, 12,010 water acres, and 270 miles of shoreline. (DSMF ¶¶ 32-33; PRDSMF ¶¶ 32-33.) The Allatoona Dam is located roughly twelve miles south of the McKaskey Creek Campground, is 1250 feet long at the roadway level, and has an elevation above the roadway of 880 feet. (DSMF ¶¶ 52-53; PRDSMF ¶¶ 52-53.)

54

Public access to the area near the Allatoona Dam is restricted due to security concerns.  (DSMF ¶ 54; PRDSMF ¶ 54.)  Moreover, firearms restrictions on the Allatoona Lake property date to 1950.  (DSMF ¶ 60; PRDSMF ¶ 60.)

Authorized purposes for the Lake Thurmond property include flood control, downstream navigation, hydroelectric power production, recreation, water quality and supply, and fish and wildlife management.  (DSMF ¶ 63; PRDSMF ¶ 63.)  As of 1995, the Lake Thurmond property had a water surface area of approximately 71,100 acres and a land base of 75,237 acres, with fifteen percent of the property's shoreline allocated to public recreation areas as of 2011, and with 18.3 percent of the total property allocated to recreation purposes. (DSMF ¶¶ 65-67; PRDSMF ¶¶ 65-67.)

55

AO 72A
(Rev.8/8
2)

Mistletoe State Park is a 1,920 acre park operated by the State of Georgia on the Lake Thurmond property. (DSMF ¶ 68; PRDSMF ¶ 68.) The Thurmond Dam is roughly ten miles west of Mistletoe State Park, has a maximum height of 200 feet, and is 5,680 feet long. (DSMF ¶¶ 73-74; PRDSMF ¶¶ 73-74.) The area surrounding the Thurmond Dam is a restricted area enclosed by a fenced area, to which public access is generally restricted. (DSMF ¶ 75; PRDSMF ¶ 75.)

Turning to the relatively small amount of Second Amendment case law that has wound its way through the country's courts following Heller, the Court can find no decisions suggestive of a right to carry firearms on Defendant Army Corps' property. As discussed above, the

56

Heller court declined to address what degree of constitutional protection firearm possession outside the home is afforded. However, the Heller court acknowledged that the restriction of firearm possession in certain locations did not burden any pre-existing rights. The court wrote that "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Heller, 554 U.S. at 626. Though Defendant Army Corps' property is more expansive than just a "building," there is no reason to doubt that the Firearms Regulation, which restricts the use of firearms on military property nearby sensitive

AO 72A
(Rev.8/8

infrastructure projects, falls squarely into the existing "laws forbidding the carrying of firearms in sensitive places" referenced in Heller. Id.

Further, the Eleventh Circuit's GeorgiaCarry I opinion is not contrary to, and in certain respects supports, the Court's finding today. In GeorgiaCarry I, Plaintiff GCO sued the State of Georgia and several Georgia state government officials challenging a law that prevented licensed gun holders from carrying firearms in "places of worship" unless they received permission from security or management personnel of the church. GeorgiaCarry I, 687 F.3d at 1248-49. The court found that no pre-existing right to carry firearms on the property of others existed, so the law did not

58

infringe upon Second Amendment rights and no constitutional scrutiny need be applied. Id. at 1266.

The GeorgiaCarry I holding is of course not a perfect comparison to the instant situation. It concerned the rights of private property owners, namely places of worship, to keep firearms off of their privately owned property. See GeorgiaCarry I 687 F.3d at 1264 ("Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed."). However, while Defendant Army Corps is not a private property owner, in contrast to many examples of publicly held lands, there is little doubt that Defendant Army Corps could exclude civilians from its property altogether. See United

59

AO 72A
(Rev.8/8
2)

States v. Jelinski, 411 F.2d 476, 478 (5th Cir. 1969)[9] ("We do not doubt the Commander's historically recognized authority to summarily bar civilians from a military establishment in the exercise of his discretion in managing the internal operations of the military facility."); see also 16 U.S.C. § 460d (stating that Defendant Army Corps is "authorized" to maintain recreational facilities, but including no requirement that it do so). Under those circumstances, the Eleventh Circuit's proclamation in GeorgiaCarry I that private property owners may exclude guns from their property is relevant to the case at hand. It would be an awkward holding to find that, though Defendant Army Corps

---

[9]Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/8
2)

may exclude civilians from its property altogether, if it

chooses to allow them access, it must also allow them to

carry firearms.[10] Indeed, it is not hard to see how the end

result of an order from this Court requiring Defendant Army

Corps to allow the use of firearms for self defense on its

property could result in the limitation of access to Defendant

Army Corps property for all citizens, whether or not the

citizens are attempting to carry firearms.

-----

[10]The same can be said of the position taken by the United States District Court for the District of Idaho in Morris v. U.S. Army Corps. of Eng'rs, 990 F. Supp. 2d 1082 (D. Idaho Jan. 10, 2014), that placing a tent on Defendant Army Corps property makes such property more like a "home" and brings the regulation within the scope of Heller. 990 F. Supp. 2d at 1085-86. Unlike private property or national park property, Plaintiffs have no constitutional or statutory right to pitch a tent on Defendant Army Corps' property in the first place. To hold that Defendant Army Corps' decision to allow civilians to erect tents on its property means that Defendant Army Corps must also allow firearms in those tents would be irrational.

61

The Court is aware that the right to carry firearms for self defense purposes is central to the Second Amendment. See McDonald, 561 U.S. at 744 ("[S]elf-defense is 'the central component' of the Second Amendment right." (emphasis omitted) (quoting Heller, 554 U.S. at 599)). However, the Court cannot find that the Firearms Regulation infringes on Plaintiffs' constitutionally enshrined right to defend themselves. The only contours that the Supreme Court gave to this right to self defense is that citizens have a right to bear arms for self defense within the home. See id. at 780 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."). The Firearms Regulation does not infringe on that right.

AO 72A

(Rev.8/8

2)

Further, while some lower courts have expanded on

that limited right, such cases are inapplicable here. In <u>Ezell</u>,

a Chicago law banned residents from possessing firearms,

even in the home, without first completing at least "one hour

of [firing] range training." <u>Ezell</u>, 651 F.3d at 691. However,

that same law "banned [firing ranges] throughout the city."

<u>Id.</u> Consequently, though the <u>Ezell</u> Plaintiffs were technically

challenging Chicago's ban on firing ranges, that ban also

burdened Chicago residents' ability to possess firearms in

their homes. No such burden is at issue with the instant

Firearms Regulation. <u>See, e.g.,</u> <u>Young v. Hawaii</u>, 911 F.

Supp. 2d 972, 990 (D. Haw. Nov. 29, 2012) ("Unlike the law

held unconstitutional in <u>McDonald</u>, which operated as a

complete ban, or <u>Ezell</u>, which burdened gun ownership for

63

self-defense in the home, Hawaii's Firearm Carrying Laws allow firearms to be carried in public between specified locations or with a showing of special need. Plaintiff does not allege a constitutional violation because the right to bear arms does not include the right to carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (internal quotation marks and citations omitted)).

In Moore, the Seventh Circuit evaluated an Illinois law that essentially banned the possession of loaded firearms outside the home altogether. See Moore, 702 F.3d at 934. The Court found that right to self defense espoused in Heller and McDonald necessarily included some right to bear arms outside one's home. See id. at 937 ("To confine the right to be armed to the home is to divorce the Second

64

Amendment from the right of self-defense described in Heller and McDonald."). In the words of Judge Posner, limiting the right to bear arms to one's home would do little to protect the right to self defense, as "a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower." Id.

Certainly, Judge Posner's statement is true, and the Court does not address whether carrying firearms outside the home is protected under certain circumstances. Nonetheless, Judge Posner's proclamation bears little bearing on the instant facts. Unlike city streets, or even public schools, post offices, and other government properties, Defendant Army Corps has the right to exclude

65

Plaintiffs from its property altogether, and Plaintiffs can ensure no harm befalls them on Defendant Army Corps property by simply choosing to recreate elsewhere.[11] Indeed, courts have found carry restrictions on properties far more integral to citizens' everyday lives to fall outside the scope of the Second Amendment. See, e.g., Young, 911 F. Supp. 2d at 989-90 (finding that Hawaii laws banning firearm possession outside the home without application for a permit based on an exceptional showing of fear or injury

---

[11]In the Fourth Amendment context, the Supreme Court has held that what may ordinarily be a constitutional incursion falls outside an individual's constitutional rights when such incursion is the result of an individual's voluntary actions. See, e.g., Wyman v. James, 400 U.S. 309, 317-18 (1971) (finding that requiring welfare recipients to allow social workers into their homes in order to receive aid did not violate fourth amendment rights because "the visitation in itself is not forced or compelled, and [] the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be . . . .").)

66

"to the applicant's person or property" do not violate Second Amendment rights); <u>Kachalsky v. Cacace</u>, 817 F. Supp. 2d 235, 240, 264 (S.D.N.Y. Sept. 2, 2011) (finding that a New York law banning handgun possession outside of the home without a showing of "a special need for self-protection distinguishable from that of the general community" fell outside the scope of the Second Amendment (internal quotation marks omitted), <u>aff'd</u>, 701 F.3d 81 (2d Cir. 2012); <u>Digiacinto v. Rector & Visitors of George Mason Univ.</u>, 704 S.E.2d 365, 370, 281 Va. 127, 137 (2011) (finding that an almost total ban of firearm possession on a university campus did not violate the Second Amendment); <u>United States v. Dorsan</u>, 350 Fed. App'x 874, 875-76 (5th Cir. 2009) (per curiam) (finding that a firearms ban in post office

67

parking lots fell outside the scope of the Second

Amendment).[12] Consequently, the Firearms Regulation

---

[12]In a recent case, the United States Court of Appeals for the Tenth CIrcuit found that a firearms ban in post office parking lots and buildings did not implicate the Second Amendment right to bear arms. Bonidy v. United States Postal Serv., 790 F.3d 1121 (10th Cir. 2015). The plaintiff in that case challenged a United States Postal Service ("USPS") regulation prohibiting storing and carrying firearms on USPS property. Id. at 1122-23. The plaintiff claimed "the regulation [was] unconstitutional as applied to him because it violate[d] his Second Amendment right to (1) bring his gun into the United States Post Office building in Avon, Colorado . . . , and (2) store the gun in the post office parking lot while he pick[ed] up his mail." Id. at 1123.

The district court concluded "that the regulation is constitutional insofar as it prohibits guns in the building, but unconstitutional insofar as it prohibits guns in the parking lot." Bonidy, 790 F.3d at 1123. The Tenth Circuit found "that the regulation is constitutional as to all USPS property at issue in this case, including the . . . parking lot, because the Second Amendment right to bear arms has not been extended to 'government buildings.'" Id. The Tenth Circuit reasoned that "[g]overnment buildings, in this context, includes the government owned parking lot connected to the U.S. Post Office." Id. Alternatively, the Tenth Circuit noted that it "would uphold this regulation as constitutional as applied to the parking lot under independent intermediate scrutiny." Id.

Notably, the post office at issue in Bonidy was located in a rural area where the USPS did not provide home delivery. 790

68

does not burden Plaintiffs' right to carry a firearm in self

defense.[13]

---

F.3d at 1123. Instead, the USPS provided mailboxes located in the lobby of the post office building, and residents traveled to the post office to collect their mail. Id.

The Tenth Circuit concluded "that the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices." Bonidy, 790 F.3d at 1125. With respect to the parking lot prohibition, the Tenth Circuit noted:

> We conclude, on the facts of this case, that the parking lot should be considered as a single unit with the postal building itself to which it is attached and which it exclusively serves. There is, in fact, a drop-off box for the post office in the parking lot, meaning that postal transactions take place in the parking lot as well as in the building.

Id. The Tenth Circuit therefore concluded that the Second Amendment right to carry arms did not extend to the USPS parking lot. Id.

Here, as in Bonidy, Defendant Army Corps' property is government property. Admittedly, not all of Defendant Army Corps' property consists of government buildings. The property, however, resembles government buildings in important ways--access is restricted and regulated, and Defendant Army Corps does not have to allow access to the property at all.

[13]In Kolbe v. Hogan, No. 14-1945, 2016 WL 425829 (4th Cir.

69

The Court also rejects Plaintiffs' contention that the

Allatoona Lake and Thurmond Lake properties are not

---

Feb. 4, 2016), the United States Court of Appeals for the Fourth Circuit found that a Maryland law banning assault weapons and large capacity magazines "implicates the core protection of the Second Amendment," and that controlling precedent required the court "to conclude that the burden is substantial and strict scrutiny is the applicable standard of review for Plaintiffs' Second Amendment claim." Id. at *1. The law at issue in Kolbe "made it a crime after October 1, 2013, to possess, sell, offer to sell, transfer, purchase, or receive or to transport into Maryland any firearm designed as an assault weapon." Id. (internal quotation marks and citation omitted). The law also made "it illegal to manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." Id. at *2 (internal quotation marks and citation omitted). Certain exceptions applied, including a grandfather clause and exceptions for "active law enforcement officers and licensed firearms dealers under certain circumstances," and for "retired state or local law enforcement agents" under certain circumstances. Id. The Fourth Circuit reasoned that "the conduct being regulated by the [Maryland law] includes an individual's possession of a firearm in the home for self-defense." Id. at *4; see also id. at *11 ("We therefore struggle to see how Maryland's law would not substantially burden the core Second Amendment right to defend oneself and one's family in the home with a firearm that is commonly possessed by law-abiding citizens for . . . lawful purposes."). This case does not involve the same concern.

AO 72A

(Rev.8/8

sensitive places under <u>Heller</u> because the properties are not schools or government buildings. (Pls.' Resp. Mot. Summ. J. at 5-7.) <u>Heller</u>, however, clearly did not limit "sensitive places" to schools and government buildings or to other indoor spaces. <u>Heller</u>, 554 U.S. at 626. Indeed, other courts have upheld restrictions on firearms in sensitive places that included outdoor areas. <u>See</u> <u>Bonidy</u>, 790 F.3d at 1125-26 (finding that a postal service regulation barring possession of firearms in postal service parking lots was not unconstitutional); <u>Dorosan</u>, 350 F. App'x at 875 (upholding a regulation prohibiting firearms possession in postal service parking lots).

The fact that Defendant Army Corps allows firearms in designated hunting and sport shooting areas of the

71

Allatoona Lake and Thurmond Lake properties does not undermine the Court's conclusion that the properties are sensitive places.  Designated hunting and sport shooting areas are distinct from the recreational facilities of the properties, and the presence of those areas on the properties does not compromise Defendant Army Corps' concerns about armed visitors on the recreational facilities portions of the properties.[14]

Likewise, the fact that the recreational facilities at issue in this case are located some distance away from the dams and infrastructure projects on the Allatoona Lake and

---

[14]Defendants correctly note that "[t]he individual [P]laintiffs do not seek to carry firearms in designated hunting or sport shooting areas, which are distinct from recreational areas, but rather challenge [Defendant] Army Corps' ability to regulate firearms on other portions of its property." (Defs.' Reply Supp. Mot. Summ. J. (Docket Entry No. 63) at 4.)

Thurmond Lake properties does not diminish the status of those facilities as sensitive places.  As the ARs make clear, Defendant Army Corps is significantly concerned with public safety in all areas of its projects, including the recreation areas.  The mere fact that those recreation areas may be located some distances from the dams and infrastructure projects on the properties does not compel a conclusion that the recreation areas are not sensitive places.[15]

For all the above reasons, the Court finds that the conduct regulated by the Firearms Regulation falls outside the scope of the Second Amendment. Consequently, no

---

[15]Given the significant public safety and national security concerns associated with the dams and infrastructure projects, it is not surprising that the portions of the projects devoted to recreation are located some distance from the dams and infrastructure projects.

73

further evaluation of the Firearms Regulation need occur.

Nonetheless, the Court proceeds to consider the regulation's ability to withstand constitutional scrutiny.

### b.  The Firearms Regulation Withstands Appropriate Constitutional Scrutiny

As discussed above, the Court finds that the Firearms Regulation does not burden rights protected by Second Amendment, and therefore falls outside its scope. Nonetheless, the Court is mindful that, though the Second Amendment was drafted almost two and a quarter centuries ago, litigation over its meaning, and the resulting case law is still in its infancy. Indeed, another district court faced with the same question found that the Firearms Regulation "goes beyond merely burdening Second Amendment rights, but destroys those rights for law-abiding citizens carrying

74

operable firearms for the lawful purpose of self-defense."

<u>Morris v. U.S. Army Corps. of Eng'rs</u>, 60 F. Supp. 3d 1120,

1123 (D. Idaho Oct. 13, 2014) (internal quotation marks and

citation omitted). Consequently the Court proceeds to

determine the appropriate level of scrutiny and to apply it to

this case under the assumption that the Firearms

Regulation treads upon Second Amendment protections.

### i.   Intermediate Scrutiny Applies

Although the <u>Heller</u> court declined to determine the

appropriate level of scrutiny to apply to Second Amendment

based challenges, it did take rational-basis scrutiny off the

table. <u>See Heller</u>, 554 U.S. at 628 n.27 ("[Rational-basis

scrutiny] could not be used to evaluate the extent to which

a legislature may regulate a specific, enumerated right, be

75

AO 72A

(Rev.8/8

it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms."). The Court therefore must choose between strict scrutiny, which requires that a law be narrowly tailored to serve a compelling government interest, see Abrams v. Johnson, 521 U.S. 74, 91 (1997), and intermediate scrutiny, which requires a law to be substantially related to an important governmental interest, see Clark v. Jeter, 486 U.S. 456, 461 (1988).[16] For the following reasons, the Court finds that the intermediate scrutiny standard applies here.

---

[16]The Supreme Court has also used an "undue burden" test in the context of laws limiting access to abortions. See, e.g., Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 877 (1992). However, the Court finds that such a standard, which provides that a law is permissible as long as it does not have the "purpose or effect of placing a substantial obstacle in the path" of the individual seeking to engage in constitutionally protected conduct, is best left to the abortion cases from which it stemmed. Id.

76

First, the Court finds that the lowest possible level of scrutiny applies because Defendant Army Corps' issuance of the Firearms Regulation was not an act of governance--it was a managerial action affecting only government owned lands. The Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as a lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'" Engquist v.Oregon Dept. of Agric., 553 U.S. 591, 598 (2008) (quoting Cafeteria & Rest. Workers v. McElroy, 367 U.S. 886, 896 (1961)) (alteration in original). Indeed, the Ninth Circuit used this government property rationale to uphold a law stating that "[e]very person who brings onto or

77

AO 72A
(Rev.8/8

possesses on County property a firearm, loaded or

unloaded, or ammunition for a firearm is guilty of a

misdemeanor." Nordyke v. King, 681 F.3d 1041, 1044 (9th

Cir. 2012); see also United States v. Masciandaro, 638 F.3d

458, 473 (4th Cir. 2011) (upholding restrictions on firearms

in national parks based, in part, the rule that "[t]he

government . . . is invested with 'plenary power' to protect

the public from danger on federal lands under the Property

Clause"). The respect courts must pay to government

decisions concerning the management of its own lands only

increases when the land in question is military property. See

Jelinski, 411 F.2d at 478 (finding that military base

commander "was not required to afford notice and a hearing

to appellant prior to barring him from the base").    It is

78

AO 72A

(Rev.8/8

abundantly clear from the ARs that the properties, although open in some limited respects to the public, remain under the control and regulation of Defendant Army Corps, which remains a part of the U.S. military.

Second, the Court again concludes that the voluntary nature of Plaintiffs' presence on Defendant Army Corps property limits the extent to which Plaintiffs' Second Amendment rights are burdened by the Firearms Regulation. As the Moore Court wrote: "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need." Moore, 702 F.3d at 940; see also Jackson v. City & Cnty. of San

79

Francisco, 746 F.3d 953, 961 (9th Cir. 2014) (applying to a

Second Amendment case the First Amendment principle

that "laws that place reasonable restrictions on the time,

place, or manner of protected speech and that leave open

alternative channels for communication of information, pose

less of a [constitutional] burden . . . and are reviewed under

intermediate scrutiny" (internal quotation marks and citation

omitted)).  Stated differently, unlike most laws that have

been struck down on Second Amendment grounds, the

Firearms Regulation only burdens Plaintiffs' right to defend

themselves on a finite amount of property. Further, the

property in question is not a road, a school, or a post office

that Plaintiffs arguably need to use on a regular basis. The

portions of the properties at issue are merely a collection of

80

recreational campsites. The Court cannot find that any limitation of Plaintiffs' ability to bear arms on those campsites constitutes a serious burden on Plaintiffs' Second Amendment rights.

The Court also rejects Plaintiffs' contention that strict scrutiny should apply because the Firearms Regulation is a "content-based" regulation. (Pls.' Br. Resp. Mot. Summ. J. at 8-9.) The Court notes that Ezell, which Plaintiffs cite in support of this contention, did not expressly import the First Amendment's "content-based" strict scrutiny analysis to the Second Amendment context. Ezell, 651 F.3d at 708. Rather, Ezell simply chose to "distill . . . First Amendment doctrine and extrapolate a few general principles to the Second Amendment context." Id. Nothing in Ezell

AO 72A
(Rev.8/8
2)

purported to apply strict scrutiny to a Second Amendment challenge simply because the regulation at issue was "content-based." Id.  Other federal appellate courts have expressed reluctance to "import substantive First Amendment principles wholesale into Second Amendment jurisprudence." Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 91 (2d Cir. 2012) (emphasis in original); see also Hightower v. City of Boston, 693 F.3d 61, 80 (1st Cir. 2012) ("Hightower argues that her facial challenge should succeed under particular doctrines that were developed under the First Amendment: the prior restraint and overbreadth doctrines.  We disagree and find these First Amendment doctrines a poor analogy for purposes of facial challenges under the Second Amendment."); United States v.

82

<u>Marzzarella</u>, 614 F.3d 85, 96 n.15 (3d Cir. 2010) ("While we recognize the First Amendment is a useful tool in interpreting the Second Amendment, we are also cognizant that the precise standards of scrutiny and how they apply may differ under the Second Amendment.").  Indeed, the United States Court of Appeals for the Second Circuit has observed:

> [I]t would be as imprudent to assume that the principles and doctrines developed in connection with the First Amendment apply equally to the Second, as to assume that rules developed in the Second Amendment context could be transferred without modification to the First. Endorsing that approach would be an incautious equation of the two amendments and could well result in the erosion of hard-won First Amendment rights.  As discussed throughout, there are salient differences between the state's ability to regulate each of these rights.

83

Kacahlsky, 701 F.3d at 92 (citation omitted).  The Court

agrees, and declines to adopt the view urged by Plaintiffs.[17]

For the reasons discussed above, the Court applies

intermediate scrutiny to the Firearms Regulation.  The Court

conducts that analysis infra.

---

[17]Even if the Court found Plaintiffs' analogy persuasive, intermediate scrutiny still would apply.  The Firearms Regulation simply is a "place" restriction on firearms possession.

Likewise, Plaintiffs' reliance on United States v. Grace, 461 U.S. 171 (1983) is misplaced.  That case's holding turns on the application of the First Amendment's "public forum" doctrine. Grace, 461 U.S. at 177-180 (holding that 40 U.S.C. § 13k, which prohibited displaying certain flags, banners, and devices in the United States Supreme Court building and on its grounds, could not be applied to the public sidewalks on the grounds, which were a public forum).  The Court is aware of no authority incorporating the First Amendment's "public forum" doctrine into Second Amendment jurisprudence, and declines to be the first court to make that leap.

AO 72A
(Rev.8/8

### ii. The Firearms Regulation Withstands Intermediate Scrutiny

In the Second Amendment context, "under intermediate scrutiny the government must assert a significant, substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary." Drake v. Filko, 724 F.3d 426, 436 (3d Cir. 2013); see also Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1244 (11th Cir. 2003) ("Under [intermediate scrutiny], a preference may be upheld so long as it is substantially related to an important governmental objective." (internal quotation marks and citation omitted)). "When reviewing the constitutionality of statutes, courts 'accord substantial deference to the

85

[legislature's] predictive judgments.'" <u>Drake</u>, 724 F.3d at 436-37 (quoting <u>Turner Broad. Sys., Inc. v. FCC</u>, 520 U.S. 180, 195 (1997)) (alteration in original)).

Here, Defendant Army Corps undoubtedly has a substantial interest in "providing the public with safe and healthful recreational opportunities while protecting and enhancing [its] resources." 36 C.F.R. § 327.1. The only question is whether there is a reasonable fit between that interest and the Firearms Regulation. The Court finds that there is.

First, the Firearms Regulation contributes to ensuring that visitors to Defendant Army Corps' property are safe. Roughly eighty percent of Defendant Army Corps' recreation areas are located within fifty miles of an urban

86

area.  (HQ AR 3990; SAM AR 18.)  Defendant Army Corps'

projects include some of the most densely-used federal

recreation areas, and receive more than 370 million visits

per year, making the projects the most-visited of any single

federal agency's sites.  (SAS AR 20; HR AR 1273; SAM AR

125, 133.)  Indeed, Defendant Army Corps hosts the most

visits per acre of any federal resource management agency.

(SAM AR 125.) Public safety on Defendant Army Corps-

managed lands, including providing safe and healthy

outdoor experiences on those lands, is highly important to

Defendant Army Corps, and this concern underlies the

policies, rules, and regulations concerning visitor behavior

at Defendant Army Corps projects.  (HQ AR 877; SAS AR

461.)     Some sources of conflict among visitors to lands

AO 72A
(Rev.8/8

managed by Defendant Army Corps include alcohol consumption, overcrowded facilities, visitors' preferences for different types of music played at different sound levels, and the relative loudness of visitors' conversations. (DSMF ¶ 13; PRDSMF ¶ 13.)

Allatoona Lake and Thurmond Lake are no exception to the general rule. Allatoona Lake is one of the most frequently visited Defendant Army Corps' lakes in the United States, and attracted over six million visitors in each of 2011 and 2012. (DSMF ¶¶ 34-36; PRDSMF ¶¶ 34-36.) In 1998, the Allatoona Lake property reported 86,813,126 visitor hours, which represented more visitor hours than any of the 450 other Defendant Army Corps projects in the United States. (DSMF ¶ 38; PRDSMF ¶ 38.) In 2006, the

Allatoona Lake property reported more than ninety-two million visitor hours. (DSMF ¶ 37; PRDSMF ¶ 37.) The visitors to the Allatoona Lake property engage in a number of activities, including: (1) swimming (2,667,530 visitors); (2) boating (1,881,516 visitors); (3) fishing (883,474 visitors); (4) picnicking (764,509 visitors); (5) sightseeing (161,307 visitors); (6) water skiing (137,937 visitors); (7) camping (110,789 visitors); (8) hunting (33,968 visitors); and (9) other activities (972,721 visitors). (DSMF ¶ 39; PRDSMF ¶ 39.) It is reasonable to expect that allowing loaded firearms in the recreational areas of Allatoona Lake, which have a high volume of visitors, would present significant safety concerns for the public and Defendant Army Corps' Park Rangers. Indeed, simply patrolling and regulating those

89

AO 72A
(Rev.8/8

areas and the rest of the Allatoona Lake property could prove difficult enough for the relatively small number of Park Rangers assigned to Allatoona Lake without adding visitors with loaded firearms in recreational areas to the mix. (See DSMF ¶ 41 and PRDSMF ¶ 41 (indicating that, during 2011, fifteen Park Rangers were assigned to Allatoona Lake).)

Lake Thurmond also experiences a high volume of visitors. (DSMF ¶ 64; PRDSMF ¶ 64.) Indeed, the record indicates that approximately five million people visited the Lake Thurmond property each year between 2008 and 2012. (DSMF ¶ 64; PRDSMF ¶ 64.) Again, it is reasonable to expect that allowing loaded firearms in the recreational areas of Thurmond Lake, which experience a high volume

90

of visitors, would present significant safety concerns for the public and Defendant Army Corps' Park Rangers.

Given the above circumstances, the Court cannot find unreasonable Defendant Army Corps' conclusion that allowing visitors to the recreational areas to possess loaded firearms could escalate conflicts or pose additional safety and regulatory concerns for the Park Rangers.

Second, the Firearms Regulation is reasonably suited to protecting the infrastructure projects that lie at the heart of Defendant Army Corps' properties. As previously noted, "[d]ams and related structures," including those operated and managed by Defendant Army Corps, are "critical infrastructure," and "one catastrophic failure at some locations could affect populations exceeding 100,000 and

91

have economic consequences surpassing $10 billion."
(SAM AR 64.) Further, Defendant Army Corps and the U.S.
Department of Homeland Security regard some Defendant
Army Corps' infrastructure, including multi-purpose dams
and major navigation locks, as critical to homeland security
and the economy, and many of those Defendant Army
Corps-managed facilities require additional protection
measures in times of heightened homeland security
concerns. (SAM AR 20.) The Court finds it reasonable for
Defendant Army Corps to limit the carrying of loaded
firearms around such sensitive areas.

Finally, and perhaps most importantly, the limitations
on Defendant Army Corps' ability to police its own property
make the Firearms Regulations key to achieving Defendant

92

Army Corps' goal of maintaining safe premises for all visitors. Park Rangers do not carry firearms. Indeed, Park Rangers could not carry firearms even if they chose to, as Congress has not given them any authorization to carry firearms, execute search warrants, or enforce other federal laws, other than by writing citations, on Defendant Army Corps' property. Instead, Park Rangers must call in local law enforcement to handle any serious issues. And, even when local law enforcement is called in, those officers can only enforce state and local laws, and they are still subject to their other state and local law enforcement demands.

Plaintiffs argue that the Firearms Regulation is unconstitutional as applied to them because the Firearms Regulation reflects a uniform policy, instead of one that

93

AO 72A
(Rev.8/8
2)

analyzes Plaintiffs' particularized circumstances as individuals who are licensed to carry concealed weapons in Georgia. (Br. Resp. Mot. Summ. J. at 10-11.) The court in Bonidy rejected a similar argument. 790 F.3d at 1127. The plaintiff in Bonidy argued that the regulation at issue was overinclusive as to its safety objectives, noting that his local post office did not provide residential delivery and required patrons to pick up their mail personally or to have someone else do so on their behalf. Id. According to the plaintiff in Bonidy, "the USPS should have devised site-specific safety policies to compensate for customers' desire to carry firearms in rural areas [like the plaintiff's]." Id. The Tenth Circuit rejected that argument, noting:

> [T]he USPS is not required to tailor its safety regulations to the unique circumstances of each

94

customer, or to craft different rules for each of its more than 31,000 post offices, or to fashion one set of rules for its parking lots and another for its buildings and perhaps another for the steps leading up to the building.  Intermediate scrutiny does not require a perfect fit between a rule's objectives and the circumstances of each individual subject to the rule.  To require the USPS to tailor a separate gun policy for each of its properties or indeed for its many diverse customers would present an impossible burden not required by the intermediate scrutiny test.

Bonidy has a licensed concealed-carry permit under Colorado law.   But there is no national registry of firearms carry permits.  Gun carry laws differ in different states and localities, and such laws vary widely in their requirements and level of enforcement.   Consistent with the Supremacy Clause, the USPS and other federal agencies need not stop every customer at the government's property lines to inquire whether each has a valid, active firearms license under state or local law. Local and state laws do not trump federal laws, and those local and state regulations do not give Bonidy a right to openly carry a firearm on sensitive federal property.  Thus, Bonidy's right to

AO 72A

(Rev.8/8

2)

carry in Colorado does not undermine the constitutionality of this USPS regulation.

The USPS, as a federal business, may create and enforce a single, national rule regarding carrying firearms onto postal property. Such regulations will inevitably impact some individuals more than others. However, an alternative system involving piecemeal exceptions and individual waivers would be wasteful and administratively unworkable, and would raise entirely new problems related to fairness, official discretion, and equal administration of the laws. There is no reason to believe that a regulatory regime in which ad hoc exceptions are made for people like Mr. Bonidy would be superior, as a matter of sound policy or constitutional law, to a single bright-line rule such as the regulation challenged here. Under a more nuanced or discretionary regime, problems of perceived unfairness or unreasonableness—and accompanying litigation—would likely multiply, not disappear.

Id. at 1127-28. The Court finds that reasoning persuasive,

and concludes that the Firearms Regulation is not

impermissible because it reflects a uniform Defendant Army

96

Corps' policy. The Firearms Regulation is sufficiently tailored to Defendant Army Corps' important interest in safety under an intermediate scrutiny analysis, and Defendant Army Corps is "not constitutionally required to tailor a separate gun carry policy with respect to each of its properties" or with respect to individual visitors' circumstances. Id. at 1128. Instead, it is sufficient that the Firearms Regulation as a whole is substantially related to Defendant Army Corps' interests in visitor safety and in securing the dams and critical infrastructure present on Defendant Army Corps' properties.

The Court also rejects Plaintiffs' challenge to the Firearms Regulation based on their contention that a "duck hunter" could possess a firearm at the same location where

AO 72A

(Rev.8/8

2)

Plaintiffs wish to possess firearms. (Br. Resp. Mot. Summ. J. at 11-12.) As Defendants point out, "Plaintiffs fail to identify any portion of the recreational facilities of the two Army Corps properties that either Plaintiff James or Barrs wishes to visit on which hunting is permitted." (Reply Supp. Mot. Summ. J. at 13.) Indeed, the ARs indicate that the campgrounds where Plaintiffs wish to carry loaded firearms are separate and distinct from the designated hunting areas within the properties at issue. (SAM AR 1312, 1353-1362; SAS AR 1505.) Further, as Defendants point out, "even a visitor who may possess a loaded firearm for hunting may do so only within a designated hunting area." (Reply Supp. Mot. Summ. J. at 14 (citing 36 C.F.R. § 327.13(a)(2)). Finally, the fact that Defendant Army Corps allows

98

individuals who visit their properties to possess loaded firearms for hunting in areas specifically dedicated to hunting does not undermine Defendant Army Corps' determination that restricting possession of firearms in recreational areas is substantially related to the important interests of protecting public safety and preventing threats to critical infrastructure.

Moreover, the fact that Plaintiffs would prefer that visitors to Defendant Army Corps' recreational facilities be permitted to possess firearms in the event of crime does not warrant a different result.  (Br. Resp. Mot. Summ. J. at 13-14.)   Given the high density of visitors and use at Defendant Army Corps' recreational facilities, the various potential sources of conflict among visitors, and limitations

99

on Defendant Army Corps' ability to police its own properties, restricting visitors' authority to carry loaded firearms helps Defendant Army Corps maintain public safety and the security of infrastructure on those properties. Under those circumstances, Defendant Army Corps was justified in reaching its decision not to permit the possession of firearms in Defendant Army Corps' recreational facilities.

Additionally, the Firearms Regulation is not comparable to the broad prohibition on handgun possession in one's home that the Supreme Court rejected in <u>Heller</u>. (Br. Resp. Mot. Summ. J. at 14-16.) As Defendants point out, the law at issue in <u>Heller</u> was enacted by the District of Columbia in its regulatory capacity. (Reply Supp. Mot. Summ. J. at 15.) Here, the Firearms Regulation was promulgated under

100

AO 72A
(Rev.8/8

Defendant Army Corps' authority as a property owner.  In
Georgia, private property owners may prohibit the
possession of firearms on their real property, and this right
extends to individuals who are in legal control of private
property through a lease or rental agreement.  O.C.G.A. §
16-11-127(c).   Although Defendant Army Corps is not
technically a private property owner, it certainly may control
access to its property, and the Court sees no valid reason
to require that Defendant Army Corps, as the owner and
manager of its various properties, allow guests who are
temporarily staying on Defendant Army Corps' property to
carry firearms.[18]   The fact that the Firearms Regulation may

---

[18]Indeed, GeorgiaCarry III rejected Plaintiffs' contention that
"as in Heller, the regulation in this case is so destructive of the right
to bear arms that no scrutiny analysis is required."  GeorgiaCarry
III, 788 F.3d at 1325.  The court observed that Heller addressed a

101

be enforced through criminal penalties also does not require

"vastly broader firearms regulation[] than the restriction at issue here," as it "totally ban[ned] handgun possession in the home." Id. (second alteration in original) (internal quotation marks and citation omitted).  The court noted:

> The Corps' firearms regulation, in sharp contrast, applies only to Corps property: it is narrowly cabined to a specific area, and in this case that area is specifically designated for recreation.  The plaintiffs can freely exercise their right to bear arms for self-defense elsewhere, whether in the home or on the streets, without running afoul of this regulation. And, as the district court noted, the plaintiffs' presence at Allatoona was voluntary–they did not need to use [the Allatoona campgrounds] on a regular basis. Other areas for camping and recreation are available to the plaintiffs where their Second Amendment rights would be undisturbed by 36 C.F.R. § 327.13, including national parks and Georgia state parks.  The limited scope of the regulation provides a powerful distinction from the cases on which the plaintiffs rely; so narrow a restriction on so limited a geographic expanse cannot fairly be said to destroy the plaintiffs' Second Amendment rights altogether.  The Corps' firearms regulation does not reach nearly as far as the regulation[] at issue in Heller . . . , and the plaintiffs cannot prevail simply by arguing that this case must reach the same result.

Id. at 1326 (emphasis and first alteration in original) (internal quotation marks, citations, and footnotes omitted).

102

a different result.  See <u>United States v. Kokinda</u>, 497 U.S.

720, 725-26 (1990) (concluding that the government acted

in its proprietary capacity when it enforced a U.S. postal

service regulation that also carried with it criminal penalties);

<u>Bonidy</u>, 790 F.3d at 1126 (upholding U.S. postal service

regulation banning firearms on postal service property and

concluding that the postal service was acting as a

proprietor); <u>Dorosan</u>, 350 F. App'x at 875 ("[T]he Postal

Service owned the parking lot where Dorosan's handgun

was found, and its restrictions on guns stemmed from its

constitutional authority as the property owner.  This is not

the unconstitutional exercise of police power that was the

source of the ban addressed in <u>Heller</u>." (citations omitted)).

103

AO 72A
(Rev. 8/8
2)

For the reasons discussed above, even if the Firearms Regulation impacted Plaintiffs' Second Amendment rights, the Firearms Regulation survives intermediate scrutiny. The Court therefore rejects the individual Plaintiffs' as-applied challenges to the Firearms Regulation.

### c.   Summary

In sum, the Court concludes that the Firearms Regulation does not impact Plaintiffs' Second Amendment rights.   Alternatively, even if the Firearms Regulation impacts Plaintiffs' Second Amendment rights, the Firearms Regulation survives intermediate scrutiny.   The Firearms Regulation thus is constitutional as applied to Plaintiffs.

AO 72A
(Rev.8/8
2)

## 2.    Facial Challenge

Plaintiff GCO brings a facial challenge to the Firearms

Regulation.  (Br. Resp. Mot. Summ. J. at 14-18.) "A facial

challenge, as distinguished from an as-applied challenge,

seeks to invalidate a statute or regulation itself." Am. Fed'n

of State, Cnty. & Mun. Emps. Council 79 v. Scott, 717 F.3d

851, 863 (11th Cir. 2013) (internal quotation marks and

citation omitted).    "[W]hen a plaintiff mounts a facial

challenge to a statute or regulation, the plaintiff bears the

burden of proving that the law could never be applied in a

constitutional manner." Id. (alteration in original) (internal

quotation marks and citation omitted).  "Put another way,

the challenger must establish that no set of circumstances

exists under which the Act would be valid." Id. (internal

105

quotation marks and citation omitted).  For the reasons discussed supra Part III.C.1., Plaintiffs' as-applied challenge to the Firearms Regulation fails.  Plaintiff GCO's facial challenge likewise fails, as the Firearms Regulation is valid in its applications as to the individual Plaintiffs.  See GeorgiaCarry I, 687 F.3d at 1266 ("We conclude that the Second Amendment does not give an individual a right to carry a firearm on a place of worship's premises against the owner's wishes because such right did not pre-exist the Amendment's adoption. Enforcing the Carry Law against a license holder who carries a firearm on private property against the owner's instructions would therefore be constitutional.  Plaintiffs' facial challenge fails because the Carry Law is capable of numerous constitutional

106

applications."); see also United States v. Inzunza, 638 F.3d 1006, 1019 (9th Cir. 2009) (rejecting a facial challenge to 18 U.S.C. § 1346, noting that "[b]oth parties acknowledge that this court has upheld the statute against as-applied challenges based on vagueness," and stating that "[b]ecause the statute was valid in those applications, . . . [the defendant's] facial challenge fails").[19]

### 3. Summary

In sum, all of Plaintiffs' challenges to the Firearms Regulation fail.  The Court therefore grants Defendants' Motion for Summary Judgment.

---

[19]For the same reasons, any facial challenge that Plaintiffs James and Barr might have attempted to bring also would fail.

AO 72A
(Rev.8/8
2)

## IV.  Conclusion

ACCORDINGLY, the Court **DENIES** Plaintiffs' Motion to Strike [54], and **GRANTS** Defendants' Motion for Summary Judgment [45].  The Court **DISMISSES** Plaintiffs' claims, and **DIRECTS** the Clerk to **CLOSE** this case and to **PERMANENTLY CLOSE** the consolidated case, Civil Action File No. 4:15-CV-0009-HLM.

IT IS SO ORDERED, this the 25 day of April, 2016.

_____
UNITED STATES DISTRICT JUDGE

108